# EXHIBIT 1



February 9, 2007

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
2001 K Street NW
Washington, D.C. 20006

Re:   Joseph E. Stiglitz v. Rita M. Bank
      Civil Action No. 05-1826 RJL

Dear Mr. Simpson,

As requested, I reviewed the amounts claimed as damages by Dr. Stiglitz as a result of
the alleged professional negligence by Rita M. Bank. In my opinion, the calculation of
monetary damages, if any, should have been determined by an individual recognized as
an expert in calculating such damages. To the best of my knowledge, Dr. Stiglitz has not
been named as an expert in this regard, and the determination of damages, if any, is
beyond the scope of a lay witness. Further, the damages as expressed by Dr. Stiglitz do
not meet the minimum standards for determination of damages. Specifically, little or no
specific documentation has been offered by Dr. Stiglitz to support the amounts, no
calculations have been provided by Dr. Stiglitz which could be checked for accuracy and
reasonableness, and most amounts are, at best, estimates and are for unusually large, even
dollar amounts. In addition, while Dr. Stiglitz claims that much of the damages are due to
the fact that the proceedings were filed in New York City as opposed to Washington,
D.C., in two of his three calculations of damages he fails to reduce his estimates of
damages by reasonable costs that likely would have been incurred had the proceedings
taken place in Washington, D.C., or to consider that additional costs would have been
incurred had a settlement ultimately been reached in Washington, D.C. Finally, many of
his assumptions are based upon conclusions as to what the likely legal outcome would
have been had the trial taken place in Washington, D.C. as compared to the settlement
reached in New York City. Dr. Stiglitz does not provide information or documentation as
to the basis for his conclusions.

Dr. Stiglitz bases two of his alleged damages calculations on a comparison with a May
16, 2002, plaintiff settlement offer and the third is based on a comparison with Dr.
Stiglitz's July 2, 2002, settlement offer, as modified. As will be seen later, the form and
format of the two settlement offers are so significantly different from one another and
from the Stipulation of Settlement that a meaningful comparison is almost impossible
and, if anything, indicates that the ultimate agreement reached in the Stipulation of
Settlement results in a favorable settlement to Dr. Stiglitz as compared to the two

Wells Fargo Centre    1700 Lincoln Street, Suite 1400    Denver, CO 80203-4514    303 861-4545    Fax 303 832-5705

Beyond Your Numbers                                                                                    BKD.com

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 2

settlement proposals. As a result, it is my opinion that Dr. Stiglitz is not qualified to
present expert testimony, there is no basis for any of the amounts claimed by Dr. Stiglitz,
they cannot be recalculated or tested, and they are not supported by appropriate
documentation. Therefore, his testimony and damage claims should be excluded.

The remainder of this report addresses the differences between lay and expert witnesses,
the documentation standards required for determination of damages by an expert, the
sources of the alleged damages asserted by Dr. Stiglitz, and my analysis of each of the
damage scenarios. In addition, I will assess the overall lack of reasonableness of each of
the individual damage claims presented in the three alleged damage scenarios.
Attachment I to this report is a listing of the documents received in this matter.

**Expert Testimony**

Federal Rule of Evidence 701 addresses opinion testimony offered by lay witnesses. Rule
701 states in part that a witness who has not been qualified as an expert may offer only
opinions that are "rationally based on the perception of the witness." The advisory notes
for Rule 701 specify the differences between lay opinion testimony and expert testimony.
Lay testimony "results from a process of reasoning familiar in everyday life," while
expert testimony "results from a process of reasoning which can be mastered only by
specialists in the field." Hence, per the advisory notes, a non-expert expert may offer only
opinions such as "the appearance of persons or things, the identity, the manner of conduct
[or] competency of a person, degrees of light or darkness, sound, size, weight [or]
distance." Hence, a lay witness may not provide expert testimony opinions without those
opinions being subject to scrutiny under the Daubert factors. Accordingly, Rule 702
states that an individual qualified as an expert may give opinions or testimony "if (1) the
testimony is based upon sufficient facts or data, (2) the testimony is a product of reliable
principles and methods, and (3) the witness has applied the principles and methods
reliably to the facts of the case." Non-scientific opinions on financial or accounting issues
clearly fall within the expert testimony outlined above.

While Dr. Stiglitz has not been offered as an expert witness and a report regarding his
damage calculations has not been offered, his testimony regarding damages, as proffered
in his depositions, is clearly beyond the scope of that of a lay witness. Accordingly, if he
is to be allowed to offer opinions as to his economic losses, then those opinions should be
subject to the same standards as an expert witness as defined in Rule 702 and elsewhere. I
will address each of his damage claims with some specificity later in this report.
However, none of his claims are "based upon sufficient facts or data" or are "the product
of reliable principles and methods" which can, in any way, be tested for accuracy and
reliability. Further, Rule 26 requires that an expert provide a signed, written report, which
must include the following:

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 3

1. A complete statement of all opinions to be expressed by the witness and the basis and reasons for the opinions.
2. The data or other information the witness considered in forming his or her opinions.
3. Any exhibits to be used as a summary or in support of the opinions.
4. A list of the qualifications of the witness, including a list of all publications authored within the last ten years.
5. A statement of the compensation to be paid the witness for the study and testimony.
6. A list of any other cases in which the witness has testified as an expert at trial or by deposition within the last four years.

The advisory committee notes referred to above require that expert reports be "detailed and complete." In *Salgado v. General Motors Corp.* 150 F.3d 735, 742 & n.6 (7th Cir. 1998), the court held that reports issued in accordance with Rule 26 should be "complete such that opposing counsel is not forced to depose an expert to avoid ambush at trial." Dr. Stiglitz has not provided such a report, nor has he provided specific documents or calculations supporting his damages claims.

As a certified public accountant, I look to other sources for guidance regarding providing expert services related to damage assessments and reporting requirements. One such resource is Consulting Services Special Report 03-01 prepared by the American Institute of Certified Public Accountants titled "Litigation Services and Applicable Professional Standards." Paragraph 23 addresses sufficient relevant data stating "A practitioner attempts to obtain relevant data that is sufficient to provide a reasonable basis for conclusions or recommendations for any professional services performed. In litigation, data are usually obtained through discovery, including depositions, interrogatories, and document production motions. In addition, the data-gathering process may include a review of relevant documents, research and analysis, and interviews. The nature and extent of the data will vary with each engagement and may include the practitioner's computations and analysis and other information-supporting conclusions."

Practice Aid 06-4 prepared by the Business Valuation and Forensic & Litigation Services Section of the American Institute of Certified Public Accountants titled "Calculating Lost Profits" stresses the need for sufficient relevant data. Appendix B of that publication is a Testimony Pyramid. The base of the pyramid is titled "Source Data, Facts and Assumptions." Only with sufficient source data and facts can an accurate data analysis be performed based upon accepted methodology applied in a reliable manner. All of these factors must be present before admissible opinions can be formed.

The American Institute of Certified Public Accountants Statement of Standards for Consulting Services also addresses sufficient relevant data, stating "Obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 4

to any professional services performed." Finally, the American Institute of Certified
Public Accountants Code of Professional Conduct with regard to sufficient relevant data
states "Obtain sufficient relevant data to afford a reasonable basis for conclusions or
recommendations in relation to any professional services performed."

In my opinion, and as will be seen in greater detail below, Dr. Stiglitz does not meet the
standards necessary to testify as an expert and he has not supported his conclusions with
required documents, calculations or other means.

**Plaintiff's Damages Claims**

As noted above, Dr. Stiglitz has not been named as an expert witness, nor has he
provided an expert report or other documents that outline the damages claimed in this
matter. Rather, the specific components of alleged damages and the respective amounts
are identified in several different sources. In addition, each of the damages analyses is
different and inconsistent with one another, even though they were presented within
approximately three months of one another. Further, in his deposition, Dr. Stiglitz leaves
open the possibility of additional changes to his damages analyses.

The first analysis is reflected on page 4 of Plaintiff's Answers to Defendant's First Set of
Interrogatories signed and dated by Joseph E. Stiglitz on March 30, 2006. The analysis
shows total damages of $3,015,222.99. The response on page 3 states in part, "Plaintiff's
measure of damages is the difference between the settlement offer proposed by
Hannaway on or around May 16, 2002, and the value of monies the Plaintiff was required
to pay Hannaway pursuant to the August 2004 Stipulation. Had the Defendant acted in an
expeditious way to file suit for divorce in the District of Columbia, pursuant to the
Plaintiff's instructions, the following approximate amounts would not have been subject
to division with Hannaway." In his Second Deposition, Dr. Stiglitz states in part, "And
the claim I am making is this offer of May 16, 2002, provides a way of thinking about
where they thought a court would have settled had it gone to court."

The second and third calculations are included in Plaintiff's Revised Supplemental
Response to Defendant's First Set of Interrogatories and Objection to Second Set of
Interrogatories signed and dated July 6, 2005, by David G. Whitworth Jr., Esq. Damages
alleged on pages 2 and 3 are in the range of $2,875,000 to $3,565,000. Damages alleged
on pages 4 and 5 are in the range of $3,460,000 to $3,950,000. Once again, the response
to interrogatory #2 states in part, "Plaintiff's measure of damages is the difference
between the settlement offer proposed by Hannaway in or around May 16, 2002, and the
value of monies the Plaintiff was required to pay Hannaway pursuant to the August 2004
stipulation." These alleged damages on pages 4 and 5 "are based on Stiglitz's July 2
offer, with two modifications: (a) dropping all claims for repayment for expenses in the
repair of the California house; (b) dropping most of the claim on the Nobel Prize."

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 5

Using either settlement proposal as a basis of comparison is, on its face, suspect as
neither resulted in a settlement. At best, they represent a base from which settlement
could be negotiated. This is especially true with regard to <u>his</u> settlement offer of July 2,
2002. There is no basis for believing this was a proper offer, no showing that Ms.
Hannaway would have accepted the offer, and no showing that it would have resulted in a
reasonable resolution to the matter. Also, Dr. Stiglitz was a party to rejecting the May 16,
2002, settlement offer. His e-mail to Ms. Bank dated September 22, 2002, Bates stamped
AA994, wherein he outlines a proposal he sent directly to Ms. Hannaway, further
supports this conclusion. This e-mail is a clear indication that he personally was rejecting
the May 16, 2002, settlement offer.

### Analysis of the Damages Claims

As noted, the first damages claim was included on page 3 of Plaintiff's Answers to
Defendant's First Set of Interrogatories (hereinafter "Initial Damages Calculation" or
"First Damages Calculation"). The other two damage calculations were included on
pages 2 and 3 and 4 and 5, respectively, of the Plaintiff's Revised Supplemental
Response to Defendant's First Set of Interrogatories and Objection to Second Set of
Interrogatories (hereinafter "Second Damages Calculation" and "Third Damages
Calculation," respectively).

### *Initial Damages Calculation*

A copy of the Initial Damages calculation is included as Attachment II to this report.
There are nine damage descriptions totaling $3,015,222.99.

The first item is "Plaintiff's earnings after June of 2001, including Nobel Prize monies
and other monies earned after the Action Commencement Date in New York, including
'adjustments' to those earnings for receivables due for work performed before the Action
Commencement Date." The amount attributed to this item is $220,000. No specific
documentation has been provided by Dr. Stiglitz to support this amount. Without specific
documentation, there is no way to determine how much of the claimed amount is
attributable to the Plaintiff's earnings after June 2001, how much is attributable to the
Nobel Prize monies, how much is attributable to "other monies" earned after the Action
Commencement Date, how much is related to the purported "adjustments" to those
earnings, and the amount and source of the "receivables due for work performed before
the Action Commencement Date." Without the appropriate documentation, there is no
way of knowing, for example, whether or not this represents pre-tax or after-tax amounts,
or why receivables due for work performed <u>before</u> the Action Commencement Date
would be excluded. Without an explanation and documentation by Dr. Stiglitz, work
performed before the Action Commencement Date would normally be considered a
marital asset. In addition, use of an "after June of 2001" cutoff date appears arbitrary and
Dr. Stiglitz has not provided any support for the appropriateness of that date. Further, and

*K:\Clients\3958\2006\Word\report.doc*

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 6

more importantly, he states that these amounts are based upon "the difference between
the settlement offer proposed by Hannaway on or around May 16, 2002, and the value of
monies the Plaintiff was required to pay Hannaway pursuant to the August 2004
Stipulation." Based upon my review of the schedules attached to the May 16, 2002,
settlement offer, most assets were valued as of the end of February 2002 through March
25, 2002. There was no reduction for any earnings, or other assets, acquired subsequent
to June 2001, and the Nobel Prize was specifically included in the proposal. Accordingly,
this item specifically attempts to include amounts as damages that were, in fact, included
in the May 16, 2002, settlement offer.

The next item is "*Royalties on Roaring Nineties, Globalization and Its Discontents, the
3rd Edition of Principles, the 4th Edition of Principles,* New Paradigm." The amount
attributed to this item is $350,000. Once again, Dr. Stiglitz provides no specific
documentation as to how this amount was calculated. In addition, it is unclear as to the
time frame when these royalties were earned. Given the fact that the next line item is
"Future Royalties," it would appear that these royalties represent royalties earned
subsequent to June 2001, through the date of the Stipulation of Settlement. As with the
previous line item, these amounts were included on the assets listed on the schedule
attached to the May 16, 2002, settlement offer. The first full paragraph on page 3 of the
settlement offer addresses the royalties to be received and states in part, "We can resolve
the issue of the book royalties and alimony by taking Joe's income, subtracting Jane's,
and having Joe pay Jane an amount equal to 27½% of the difference." Hence, the
settlement offer included payment of royalties to Ms. Hannaway in addition to the
division of assets listed on the schedules to the May 16, 2002, settlement offer. Therefore,
this item attempts to include amounts as damages that were, in fact, included in the May
16, 2002, settlement offer.

As noted, the next item is "Future Royalties." The amount attributed to this item is
$200,000. As with the previous amounts, Dr. Stiglitz provided no specific documentation
to support this amount. In addition, it is unclear whether future royalties relate to those
subsequent to June 2001, or subsequent to the August 4, 2004, Stipulation of Settlement.
Finally, as with the previous two damages items, payment of royalties was specifically
included in the May 16, 2002, settlement offer.

As noted in the previous two paragraphs, royalties were part of the May 16, 2002,
settlement offer and ultimately part of the Stipulation of Settlement. It would be
impossible to calculate the monetary difference as both approaches would be impacted by
the gradual decline in royalties over time. However, the May 16, 2002, settlement offer
was open ended. That is, it provided that Dr. Stiglitz pay Ms. Hannaway 27½% of the
difference in their incomes without a termination date. It is likely Dr. Stiglitz would have
paid Ms. Hannaway significantly more under the May 16, 2002, settlement offer given
the disparity in their incomes, even without taking the royalties into consideration.

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 7

The next item is "1/2 of Vanguard Accounts and other accounts funded with pre-marital money." The amount attributed to this item is $425,000. Once again, Dr. Stiglitz provided no specific documentation to support this amount. In addition, no specific documents were provided by Dr. Stiglitz indicating how much of the amount is a result of the "Vanguard Accounts" and how much is from "Other Accounts" or what other accounts there are that make up a portion of the balance. It is also not clear why the amounts represent "1/2" of the totals. A pre-marital asset should be a specific amount owned prior to the date of marriage and maintained as separate property throughout the duration of the marriage, not some percentage of an account. Dr. Stiglitz must provide specific documents that show the separate character of the asset at the date of marriage, as well as specific documents supporting the fact that the assets maintained their separate character throughout the marriage. Finally, the Vanguard accounts were included on the schedules to the May 16, 2002, settlement offer. However, the total balances, including retirement accounts, were approximately $691,100 at that point. Fifty percent of that would be $345,550, not the $425,000 claimed. In addition, it is likely that some of those balances represent growth, which would be a marital, not separate, asset.

The next item is "100% of World Bank Pension (1/2 = loss)." The amount attributed to this item is $200,000. Dr. Stiglitz provided no specific documentation to support the amount claimed. In addition, it is unclear as to whether or not the $200,000 represents 100% of the World Bank pension, or one-half of the total value of the pension. Also, while a dollar amount was not attributed, the World Bank pension plan was listed on the schedule to the May 16, 2002, settlement offer with the caption "Unknown" under the fair market value column. Finally, it is my understanding that the benefits of this plan were earned entirely during the marriage and that monthly benefits are being received by Dr. Stiglitz. Accordingly, the "unknown" in the settlement offer allows for the possibility that the monthly benefits could have been divided by way of a Qualified Domestic Relations Order, plan permitting, or the net present value of the future benefits could have been included on the schedule attached to the settlement offer as an asset, taken into consideration with regard to the division of all of the other assets and liabilities. Clearly, however, it was considered as part of the May 16, 2002, settlement offer.

The next item is "Mortgage payments paid during 37 month negotiation." The amount attributed to this item is $222,000. In addition to the fact that no specific documents have been provided by Dr. Stiglitz supporting the calculation of this amount, no specific documents have been provided supporting the assumption that separate funds were used to make the mortgage payments. If the payments were made from marital funds, then this amount should not be included as a damage amount. The schedule to the May 16, 2002, settlement offer includes the marital residence as well as the related mortgage. As a result, the payments made in part reduced the outstanding liability, hence, increasing the net fair market value of the marital residence on that schedule. In addition, if Dr. Stiglitz received a benefit in the way of an income tax deduction for interest and/or real estate taxes paid on the marital residence, then this benefit should likewise reduce the claimed

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 8

damage amount. Given the fact that his income tax return for 2001 reflected real estate taxes of $30,097 and home mortgage interest of $98,456, it is likely that he claimed both the interest and real estate taxes on that return. As noted, the tax savings realized should serve to reduce any damage amounts. Finally, Dr. Stiglitz does not specify which 37 months are encompassed in his calculation.

The next item is "Payments for enhanced earnings and Hannaway's legal bills." The amount attributed to this item is $535,000. Dr. Stiglitz provided no specific documentation supporting this amount. In addition, legal fees are an inherent part of divorce proceedings. Further, payment of legal fees decreases the marital estate, irrespective of whose checking account they are paid from. Finally, while "enhanced earnings" may be a term of art in New York, the earnings capacity of the parties is always a consideration in arriving at an equitable settlement and determining the appropriateness of alimony. Accordingly, Dr. Stiglitz must substantiate why the amounts included for enhanced earnings represent the amounts that exceed what would have been incurred to determine his earnings capacity had the matter been settled based upon the May 16, 2002, settlement offer, or had the matter been adjudicated in Washington, D.C.

The next item is "New York Legal Bills and Expert Reports." The amount is $723,037.27. Dr. Stiglitz provided no specific documentation supporting this amount. Further, no documentation has been provided supporting the allegation that these expenses were above and beyond the expenses that would have been incurred had the matter been settled based upon the May 16, 2002, settlement offer, or based upon adjudication at trial in Washington, D.C. The correspondence indicates the parties were far apart as of May 16, 2002, and yet Dr. Stiglitz does not provide any offset to the amounts claimed for additional expenses that would have been incurred to either complete the negotiations for settlement or to try the case in Washington, D.C.

The final item is "Experts for New York litigation: Kroll, Cambridge & Klein." The respective amounts were $41,747.31, $61,051.91 and $37,188.50. Of these amounts, the Plaintiff's Revised Supplemental Response to Defendant's First Set of Interrogatories and Objection to Second Set of Interrogatories did include a copy of an invoice from Cambridge Financial Partners, LLC in the amount of $61,051.94. However, no supporting documentation has been provided relating to the $41,747.31 or $37,188.50 balances. Dr. Stiglitz does not provide support as to why these amounts represent expert fees that would have been above and beyond the expert fees required to ultimately reach a settlement based upon the May 16, 2002, settlement offer or trial in Washington, D.C.

For the reasons noted, none of these amounts have been substantiated and they should not be included as damages. Also, the total of the individual damages listed is $3,015,024.99, not the $3,015,222.99 reflected as the total on the schedule.

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 9


### Second Damages Calculation

A copy of the Second Damages Calculation is included as Attachment III to this report.
There are nine damage descriptions totaling between $3,405,000 and $4,095,000. In
addition, there are two credits totaling $530,000. Hence, the net damages alleged are
between $2,875,000 and $3,565,000.

The first item is "Cash as of September 17, 2000: Plaintiff's earnings deposited in
separate bank account after April 1, 2002 upon advise [*sic*] of Bank." The amount
attributed to this item is $110,000. Dr. Stiglitz provided no specific documentation to
support this amount. In addition to not knowing the source of the funds, there is no basis
to assume that the funds are non-marital. Further, the stated basis of comparison is the
May 16, 2002, settlement offer which, by definition, would indicate any claim would
have to be limited to the timeframe subsequent to May 16, 2002. Whether Dr. Stiglitz
deposited the funds into a separate bank account or not does not impact the character of
the funds as marital or non-marital.

In his Second Deposition regarding these funds, Dr. Stiglitz states in part, "and of those
amounts, I am claiming that those are amounts that were put into a separate bank account
after April 1. They were all money earned after—most of it was earned after June 15 in
fact, actually, over the summer." In addition, Dr. Stiglitz states, "So that if the settlement
offer had been accepted or if there had been an expeditious going to court, these amounts
would not have been a subject of division." As noted above, Dr. Stiglitz clearly provides
for the possibility that the matter may have gone to court in Washington, D.C. Had that
been the case, earnings up to the date of trial would likely have been included as a marital
asset.

The next item is "Royalties paid to J.H. August, 2004." The amount attributed to this
item is $260,000. The Stipulation of Settlement does provide for payment of $260,802,
listed as "Wife receives from Husband her share of post-commencement payments of
book royalties, after reduction of 44 percent for husband's payment of income taxes." As
noted above, however, royalties were included in the May 16, 2002, settlement offer.
Hence, the settlement offer contemplated payment of royalties to Ms. Hannaway in
addition to the division of assets listed on the schedules to the May 16, 2002, settlement
proposal. Therefore, this item includes as alleged damages amounts that were, in fact,
included in the May 16, 2002, settlement offer. Further, paragraph 8 of Article VI, Book
Royalties, of the Stipulation of Settlement identifies royalties received by Dr. Stiglitz
from January 1, 2003, through August 4, 2004. The total represented by Dr. Stiglitz is
$1,236,970.89. After taxes, the net amount would be $692,703.69. Fifty percent of that
would be $346,351.85, not the $260,802 that was ultimately agreed to in the Stipulation
of Settlement.

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 10

The next item is "Royalties after August 2004 (estimated)[4]." The amount attributed to
this item is between $500,000 and $700,000. Dr. Stiglitz provided no specific
documentation or calculations as to how these amounts were derived. The footnote does
state that royalties vary greatly and "average payment on half-yearly basis to J.H. for the
three periods Feb. 03, Aug. 04, and Feb. 04 (the basis of the August settlement) were
slightly greater than $85,000, i.e., $170,000 a year, on an after-tax basis, or $386,000 on a
pre-tax basis." First, it is unclear why this amount is different from the Future Royalties
of $200,000 in the Initial Damages Calculation. In addition, as noted above, treatment of
royalties as marital property was contemplated in the May 16, 2002, settlement offer.
Therefore, this item again attempts to include amounts as damages that were, in fact,
included in the May 16, 2002, settlement offer. Finally, the footnote implies that the
amounts paid to Ms. Hannaway were after payment of income taxes. That is not the case.
Paragraph 10 of Article VII specifically states, "It is the intention and the agreement of
parties that the Wife shall be solely responsible for the payment of any taxes on payments
assigned or transferred to her pursuant to this Article, and the Wife agrees to reimburse
the Husband and to hold him harmless and indemnified with respect to any payment by
the Husband of taxes that should have been paid by the Wife relating to payments which
are to be assigned and transferred to her pursuant to this Article."

In his Second Deposition, Dr. Stiglitz attempts to explain the two royalty items by stating
in part, "Let me try to explain those next two entries in the context of—in the second
page there is the 27-1/2% of the difference in income. That's the alimony payment
commitment on the next page. In her proposal—remember we're making a comparison
between her proposal and what I had to pay. In her proposal, that particular proposal,
said, 'We don't want any royalties as a separate claim, we will let you treat that as your
own property but we want 27-1/2% of your earned income.'" At that point, Mr.
Whitworth interjected to clarify, "Of the difference." Dr. Stiglitz continued by stating,
"Of the difference of your earned income. And these two items then are the royalties I
paid, and I am expected to pay to Jane under the stipulation. So I have to back those out
because those are monies that I would not have to give in the—[settlement proposal]." He
then states, "Most of that is recaptured in a different form. On the next page. It's just
moving monies around from one category to another, but there is a difference in the way
that they are treated." While this is true, as will be seen below, Dr. Stiglitz takes liberties
as to what is included as his income as compared to the May 16, 2002, settlement offer. A
comparison of the differences is further complicated by the fact that the May 16, 2002,
settlement offer incorporated the royalty payments into a proposed maintenance payment.
The Stipulation of Settlement provided for a specific percentage of royalties on each
publication. It would be virtually impossible to determine with any degree of certainty the
amount of royalties to be received on each of the publications. Accordingly, detail
calculations and analyses are required in order to substantiate these amounts. As noted,
such calculations and analyses have not been provided.

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 11

As to the royalties to be received after August 2004, estimated to be $500,000 to
$700,000, in his Second Deposition, Dr. Stiglitz states in part, "The amount I had turned
over to her was $260,000, but that was equivalent to close to—around $400,000 on a pre-
tax basis. So I guess are just the two numbers that they did. They were fair enough to say
that since I had to pay tax on it, I didn't have to—I didn't have to turn over the pre-tax
basis." He then states, "It is going on to be very difficult. So basically as we said it was
386 over the preceding year and-a-half. I used as my one conservative that basically the
royalty payments would last for another roughly two years and then drop off to zero. So
that's how you get a 500,000. That is very conservative." Accordingly, Dr. Stiglitz is
admitting that these estimates are based on pre-tax royalties to be received by him, even
though it was anticipated that the net amount would be paid to Ms. Hannaway. Further,
the Stipulation of Settlement provides that the payments would be made, when possible,
directly to Ms. Hannaway, therefore, automatically making her responsible for the
income tax consequences.

The next item is "100% of World Bank Pension (1/2=Loss)."[5] The amount attributed to
this item is $200,000 to $400,000. The comments related to this item above under the
Initial Damages Calculation are also appropriate here. In addition, it is unclear as to how
the amounts changed from $200,000 in the Initial Damages Calculation to $200,000 to
$400,000 here. The footnote does state that "Payments are approximately $24,000 a year,
but indexed to inflation. A 25 year life expectancy at a modest 3% inflation would put
total payments at $750,000 so the *loss* should be $375,000. Higher inflation numbers
would, however, increase the number substantially." While it is appropriate to include
cost of living adjustments if provided by the plan, it is also appropriate to discount the
future payments to net present value based upon some reasonable discount rate. Dr.
Stiglitz indicates a 25-year life expectancy, yet he provided no information or
documentation as to the source of that expectation. In addition, this was the only
retirement account where the marital portion was not divided equally by the Stipulation
of Settlement. Dr. Stiglitz, however, fails to consider the fact that no maintenance was
claimed or agreed to in the Stipulation of Settlement. Maintenance was a consideration in
the May 16, 2002, settlement offer. In addition, in his initial deposition, Dr. Stiglitz states
in part "She came back and we offered basically something like $3,500 a month for three
years." He also states that the 27 ½% difference in income between him and Ms.
Hannaway "is more than $50,000." Both of these amounts are significantly greater than
the additional 50% of the monthly benefit assigned to Ms. Hannaway in the Stipulation of
Settlement. Hence, payment of maintenance should have been considered as an offset to
these alleged damages by Dr. Stiglitz.

The next item is "Payments for enhanced earnings and Hannaway's legal bills."[6] The
amount attributed to this item is between $710,000 and $800,000. Dr. Stiglitz provided
no specific documentation to support this amount. In addition, no explanation is provided
as to why the amount claimed in the Initial Damages Calculation was $535,000, and now
it is in the range of $710,000 to $800,000. The footnote to this item states in part, "These

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 12

include $350,000 J.H. paid out of marital assets, half the cost of which therefore was
borne by Stiglitz." It is not clear what this statement means. There is no breakout as to the
amount that represents enhanced earnings and the amount that represents legal bills. In
addition, legal bills related to a divorce represent a marital expense that should be paid
out of marital assets. Finally, Exhibit A – Asset Division to the Stipulation of Settlement
does include a line item referring to enhanced earnings capacity; however, in total it
states, "Wife receives $600,000 from Husband in settlement of various claims including
Husband's payments to/on behalf of Anya Schiffrin, consulting fees earned from
Microsoft Litigation Fund and Sebago, and enhanced earning capacity." While no
amounts were assigned to these items, wife's claimed adjustments related to Ms.
Schiffrin were approximately one-half of this amount. Without a further breakdown,
which was not provided, it is impossible to determine the amount that was attributable to
"enhanced earning capacity."

Regarding the payments on the enhanced earnings and Ms. Hannaway's legal bills, Dr.
Stiglitz states in part, "There are actually three or four items which are listed in that, if
you look on the Stipulation as a reference point. And the easiest and simplest is not in the
stipulation. I had to pay $350,000 up front for her legal bills in New York. So that was
just a simple amount. The second part was that roughly—$350,000 of Ms. Hannaway's
legal bills came out of marital assets after the date of commencement of the actions in
New York, and so it was as if I paid half of that. The third element was in the stipulation
there was $500,000 or in the settlement negotiations under the settlement that was made
that provided the basis of the stipulation. There was $500,000 for enhanced earnings and
her legal bills. That's the direct part of that. And then the fourth part, there was a
$100,000 that was for a category of things that was mixed together of claims that she
made, Hannaway made, that varied from—she was—even though I normally do cash
accounting, she said that there was some elements of accrual income that I would have
earned but didn't earn, that I hadn't yet received as of September 17 and that she was
entitled to those." Clearly, this explanation is insufficient to test the alleged damages
claimed, is inconsistent with the amounts in the Stipulation of Settlement, as noted above,
and Dr. Stiglitz provided no additional specific documentation to substantiate the
amounts claimed.

The next item is "New York Legal bills and expert reports.[7]" The amount attributed to
this item is $980,000. The same experts are listed in footnote 7, Kroll, Cambridge and
Klein, as in the Initial Damages Calculation above. The amounts for Kroll and Klein are
identical to the Initial Damages Calculation, namely, $41,747.31 and $37,188.50,
respectively. The amount attributed to Cambridge increased from $61,051.91 to
$148,743.57, an increase of $87,691.61. Dr. Stiglitz provided no explanation, however, as
to why the total claimed increased from $723,037.27 in the Initial Damages Calculation
to $980,000 in the Second Damages Calculation, an increase of $256,962.73. As with the
Initial Damages Calculation, no additional documents were provided to support these
amounts, nor was an analysis provided supporting the claim that these expenses were

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 13

above and beyond expenses that would have been incurred to negotiate a settlement
based upon the May 16, 2002, settlement offer or those that would have been incurred
had the matter gone to trial in Washington, D.C.

In his Second Deposition, in response to the question "The New York legal bills and
expert report, that is just a straight calculation of a set bills that if you added up they
added up to 980,000?" Dr. Stiglitz's answer was, "That's right." However, as noted, he
did not provide specific documents supporting these amounts.

The next item is "Mortgage Payments.[8]" The amount attributed to this item is $220,000.
This item is also listed under the Initial Damages Calculation above in the amount of
$222,000. The comments related to this item under Initial Damages Calculation above are
also appropriate here. Footnote 8 indicates that the amount is based upon "estimated on
the basis of 36 extra months." There is no indication as to why the number of months
changed from the Initial Damages Calculation and the Second Damages Calculation.

In his Second Deposition, Dr. Stiglitz states, "What I am making a claim, this is not really
covered in the discussion in the settlement. What I am making a claim here is had Rita
Banks [sic] acted expeditiously, it would not have gone on for 49 months. And so what I
am putting here that's an estimate based upon 36 months because of the extension. I
probably should have put in a range to reflect that there is obviously some uncertainty
about how fast it could have been done, even if she had acted expeditiously." While this
explains how the number of months was determined by Dr. Stiglitz, it does not provide
answers to the remaining questions raised and, if anything, adds additional speculation as
to the appropriate amount, if any, attributable to this item.

The next item is "Additional time required by Stiglitz, largely as a result of the change in
venue, largely associated with enhanced earnings claim, 400 hours @ 1000 hour.[9]" The
amount attributed to this item is $400,000 to $600,000. The footnote states in part,
"Conservative estimate of additional time required and cost of foregone opportunities. Hourly
rate in private sector litigation (Microsoft, Visa, Realnetwork) cases for which there was
substantial demand for my services was $1200. Speaking engagements, some of which
were precluded because of my lack of time, pay between $10,000 and $40,000 (for
approximately 6 to 12 hours net time). Alternatively, I could have made substantial
progress in the incremental time writing another book. The advance on my last book was
1 million dollar [sic] in 400 hours of work, I could have completed an estimated 50% of
the book, for a value of $500,000." This is consistent with statements in his Initial
Deposition where he stated in part "I do know I turned down speaking opportunities. I'd
have to look at, you know, which were turned down because of conflicts that were
specifically related, but if I had more, you know, time spent." While Dr. Stiglitz provided
reams of documents relating to his calendar, professional speaking engagements,
contracts, and other related documents, it would be virtually impossible to determine
whether or not any private sector litigation cases were not undertaken as a result of the

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 14

divorce proceedings, whether or not any speaking engagements had been precluded, or
the amount of time that had been spent with counsel preparing for the New York
litigation. Further, with regard to speaking engagements, most of the arrangements are
made months in advance. The documents provided support this. It is highly unlikely,
therefore, that meetings with counsel could be anticipated far enough in advance such
that speaking engagements were turned down so that Dr. Stiglitz could be available for
the meetings. Further, that would have been inconsistent with the way Dr. Stiglitz
operated prior to moving to New York. Essentially, meetings related to the divorce were
scheduled when Dr. Stiglitz was available. The documents provided do show that Dr.
Stiglitz turned down a number of speaking opportunities; however, they were
substantially all for $0 or minimal stipends. Finally, Dr. Stiglitz provides no estimate of
the time that would have otherwise been spent had the settlement proposal been
negotiated or had the matter gone to trial in Washington, D.C.

The next item is "Division of Columbia University Pension." The amount attributed to
this item is $25,000. Dr. Stiglitz provided no specific documentation or calculations
supporting this amount. Further, paragraph 11 of Article V, Retirement Accounts, of the
Stipulation of Settlement states that the total balance in the Columbia account was
$54,225.38, of which 46% is marital. Paragraph 12 states that Ms. Hannaway is to
receive 23% of that total, or $12,427.53, as her property. Dr. Stiglitz, however, fails to
document why this amount should not be included as a marital asset, when the
Stipulation of Settlement specifically refers to it as the "Marital Portion" of the account.

In his Second Deposition, Dr. Stiglitz states, "The reason why this particular is singled
out is that this is all money earned after—earned pre-commencement of the action, but
more than a year after, 14 months after, separation. So had she acted expeditiously, these
are monies that would not have to have been divided." As noted, Dr. Stiglitz provides no
documentation supporting the amount, nor support as to why these amounts would not
have been divided had the matter gone to trial in Washington, D.C.

The next item is "(Credit for Pre-Marital Assets in New York Settlement beyond that in
Hannaway Proposed Settlement).[10]" The amount attributed to this item is $(100,000). Dr.
Stiglitz provided no specific documentation or explanation as to how this amount was
determined. Further, the amount could not be determined after a review of the Stipulation
of Settlement and the schedules attached to the May 16, 2002, settlement offer.

In his Second Deposition, Dr. Stiglitz states in part, "In that first entry, that was in fact in
the stipulation, there is a small credit for my assets I brought to the marriage in 1978." In
fact, Exhibit A – Asset Division has a line item titled "Less Husband's $207,000 separate
property credit" in the amount of $207,000, not $100,000.

The next item is "(27½% of difference in earned taxable income July 1, 2002, to June 30,
2005 (estimated) (after tax value))." The amount attributed to this item is ($430,000).

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 15

Footnote 10 states in part, "2002 earned taxable income estimated at approximately
$900,000, 2003 at $1.6 million, 2004 at $900,000, calculated by subtracting out from
taxable income the income from retirement payments, dividends, interest, capital gains,
and W-2 earnings to Anya. No account is taken of Anya Stiglitz's share of Schedule C
income, which would lower 2004 income substantially." Dr. Stiglitz provided no specific
documentation or calculations in support of this amount. It would appear that the "27.5%
of difference in earned taxable income" is referring to the May 16, 2002, settlement offer,
which states in part, "We can resolve the issue of the book royalties and alimony by
taking Joe's income, subtracting Jane's, and having Joe pay Jane an amount equal to
27½% of the difference." There is no provision in this statement for reducing Dr.
Stiglitz's income for retirement payments, dividends, interest, capital gains, and W-2
earnings to Anya. Accordingly, the Form 1040 for Dr. Stiglitz for 2002 reflects income of
$1,452,618, not $900,000. For 2003, his income was $1,942,935, not $1,600,000, and for
2004, his income was $1,424,339, not $900,000.

For the reasons noted above, none of these amounts have been substantiated and they
should not be included as damages.

### Third Damages Calculation

A copy of the Third Damages Calculation is included as Attachment IV to this report.
There are nine damage descriptions totaling between $3,660,000 and $4,300,000. In
addition, there are two credits totaling between $200,000 and $350,000. Hence the net
damages alleged are between $3,460,000 and $3,950,000. As noted on Attachment IV,
"plaintiff claims that damages may be measured as the difference between what Bank
advised Stiglitz that he would be reasonably expected to receive, were the matter litigated
in D.C. and/or as a result of negotiations in D.C. (assuming that the legal framework
within which those negotiations were conducted was that of D.C.). These damages are
based on Dr. Stiglitz's July 2 offer, with two modifications: (a) dropping all claims for a
repayment for expenses in the repair of the California House; (b) dropping most of the
claim on the Nobel Prize.)"

The first item is "Cash on hand from earnings from June 1 to September 17 divided in
marital settlement plus portion of Nobel Prize.") The amount attributed to this item is
$130,000. Dr. Stiglitz provided no specific documentation to support this amount. In
addition, it is unclear as to why this amount differs from the first item listed in the Second
Damages Calculation, discussed above, of $120,000. The comments related to this item
under the Second Damages Calculation above are also appropriate here.

The next item is "Royalties paid to J. H. August, 2004 less royalties payable under July 2
offer (estimated)." The amount attributed to this item is $220,000. Once again, it is
unclear why this amount differs from the "Royalties paid to J. H. August, 2004" included

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 16

under the Second Damages Calculation above in the amount of $260,000. The comments related to this item under Second Damages Calculation above are also appropriate here.

The next item is "Royalties after August 2004 (estimated)[12,13]." The amount attributable to this item is between $350,000 and $500,000. This item is also listed under the Second Damages Calculation with a range of damages between $500,000 and $700,000. Footnote 13 explains the difference as "differs from previous methodology because there was some book royalties under July 2 offer." As noted above, given the fact that royalties were, in fact, included under the May 16, 2002, offer as well, this item specifically attempts to include amounts as damages that were already included in that settlement offer.

The next item is "100% of World Bank Pension (1/2 = loss)[14]." The amount attributable to this item is between $200,000 and $400,000. This item is identical to the item included in the Second Damages Calculation above, and comments related to this item above are also appropriate here.

The next item is "Payments for enhanced earnings and Hannaway's legal bills[15]." The amount attributed to this item is between $710,000 and $800,000. This item is identical to the item included in the Second Damages Calculation above, and comments related to this item above are also appropriate here.

The next item is "New York Legal bills and expert reports[16]." The amount attributable to this item is $980,000. This item is identical to the item included in the Second Damages Calculation above, and comments related to this item above are also appropriate here.

The next item is "Mortgage payments[17]." The amount attributed to this item is $220,000. This item is identical to the item included in the Second Damages Calculation above, and comments related to this item above are also appropriate here.

The next item is "Additional time required by Dr. Stiglitz, largely as a result of a change in venue, largely associated with enhanced earnings claims, 400 to 600 hours at 1000 hour[18]." The amount attributed to this item is between $400,000 to $600,000. This item is identical to the item included in the Second Damages Calculation above, and comments related to this item above are also appropriate here.

The next item is "Division of Columbia University pension." The amount attributed to this item is $25,000. This item is identical to the item included in the Second Damages Calculation above, and comments related to this item above are also appropriate here.

The next item is "(Credit for pre-marital assets in New York settlement beyond that in July offer.)" The amount attributed to this item is ($100,000). This item is identical to the item included in the Second Damages Calculation above, and comments related to this item above, and are also appropriate here.

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 17

The next item is "Vanguard Account Purchased with Pre-marital funds." The amount attributable to this item is $425,000. The Initial Damages Calculation above includes an amount titled "½ of Vanguard Accounts and other accounts funded with pre-marital money," also the amount of $425,000. The comments related to that item above are also appropriate here. Dr. Stiglitz provided no explanations or documents as to how this amount was determined, nor why the description differs from the similar amount included in the Initial Damages Calculation above.

The next item is "Less litigation/negotiations/mediation cost in D.C." The amount attributed to this item is between ($100,000) and ($250,000). Dr. Stiglitz provided no documentation or explanations supporting these amounts. Also, based upon the documents provided related to the negotiations resulting in the Stipulation of Settlement, there were numerous settlement offers and significant negotiations and correspondence in arriving at the Stipulation of Settlement. Further, the documents indicate significant time and resources were spent negotiating the actual wording of the Stipulation of Settlement. It is likely a similar process would have taken place had settlement negotiations proceeded subsequent to the May 16, 2002, settlement offer. Dr. Stiglitz has not documented how he takes this into consideration when determining this credit.

### Comparison of Stipulation of Settlement with May 16, 2002, and July 2, 2002, Settlement Offers

As noted above, it is difficult to compare the final settlement as documented in Exhibit A – Asset Division to the Stipulation of Settlement with the May 16, 2002, and July 2, 2002, settlement offers due to the significant differences in form and format between the documents. For example, the first page of Exhibit A includes a line item "Total Value of Joint Tangible Assets (Page 2)" in the amount of $1,860,140.12. Page 2 is a listing of the accounts, primarily checking and savings accounts, with the then-current balances. However, certain accounts listed on Exhibit A, such as Union Bank of California, are not included on the May 16, 2002, or July 2, 2002, settlement offers. Likewise, page 2 of Exhibit A includes items such as "Add-back for portion of Vanguard securities sold to pay Kroll," "Add-back for ML Securities sold for 6/04 residence purchase," and "Add-back for Fidelity securities sold for 6/04 residence purchase," none of which were included in the May 16, 2002, or July 2, 2002, settlement offers.

#### Comparison with May 16, 2002 Settlement Offer

Page 2 of Exhibit A lists "Total: Husband's Non-retirement Assets" at $325,380.26. It also lists "Total: Wife's Non-retirement Assets" at $177,372.23. Finally, it lists "Total: Joint Assets" of $1,860,140.12. These amounts total $2,362,892.61. On the first page of Exhibit A, a credit of $207,000 is attributed against these assets as "Less Husband's $207,000 separate property credit," resulting in a net amount of $2,155,892.61. The comparable amounts listed on the schedule to the May 16, 2002, settlement offer, total

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 18

$2,346,796 and include the categories of cash accounts of $1,962,671, life insurance of
$50,792, and Nobel Peace Prize of $333,333. These amounts do not include other items
listed on Exhibit A, including a life insurance policy in the amount of $3,505.43, an
amount for the World Bank pension payments of $19,001.00, Folio*FN* in the amount of
$9,589.79, and a 2000 Saab in the amount of $11,870. When these amounts are added to
the schedule attached to the May 16, 2002, settlement offer, the total becomes
$2,390,762.22, which is $234,869.61 greater than the amounts listed on the Stipulation of
Settlement.

In total, Exhibit A reports the "Subtotal tangible non-retirement assets to be divided
equally" to be $2,155,892.61. One-half of that amount, or $1,077,946.30, was attributed
to each party. One-half of the $2,390,762.22 would be $1,195,381.11. Hence, at this
point, Dr. Stiglitz is ahead $117,434.81. All retirement accounts were essentially divided
equally, with the exception of the World Bank pension plan, both in the Stipulation of
Settlement as well as proposed in the May 16, 2002, settlement offer. However, the
Stipulation of Settlement did provide for payment of $600,000 described as "Wife
receives $600,000 from Husband in settlement of various claims, including Husband's
payments to/on behalf of Anya Schiffrin, consulting fees earned from Microsoft
Litigation Fund and Sebago, and enhanced earning capacity." As mentioned above, no
breakout has been provided as to when these amounts were earned, amounts attributable
to the various categories, nor why they would be considered non-marital assets. Further,
many of these amounts likely would have been included in the earnings of Dr. Stiglitz
subsequent to the May 16, 2002, settlement offer and taken into account when
determining the payments to Ms. Hannaway in accordance with calculation of the 27.5%
difference in Dr. Stiglitz's and Ms. Hannaway's income.

In addition, Exhibit A includes an item titled "Wife receives from Husband her share of
post-commencement payments of book royalties after reduction of 44 percent for
Husband's payment of income taxes," in the amount of $260,802. Again, Ms. Hannaway
would have likely been entitled to a portion of this as having been earned during the
pendency of the marriage and a portion as part of the calculation of the 27.5% of the
difference in Dr. Stiglitz's and Ms. Hannaway's income, in accordance with the May 16,
2002, settlement offer.

In summary, the ultimate settlement as reflected in the Stipulation of Settlement was not
significantly different than the May 16, 2002, settlement offer made by Ms. Hannaway.
As noted above, when compared to the assets listed on the Asset Summary of the May
16, 2002, settlement offer, Dr. Siglitz is ahead approximately $117,500 as compared to
the Stipulation of Settlement. In addition, the remaining $860,800 awarded to Ms.
Hannaway likely would have been received by Ms. Hannaway under the terms of the
May 16, 2002, settlement offer.

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 19

*Comparison with July 2, 2002, Settlement Offer*

As noted above, the July 2, 2002, settlement offer is a settlement offer made by Dr.
Stiglitz to Ms. Hannaway. This offer was rejected by Ms. Hannaway and, as noted above,
there is no basis for believing this was a proper offer, especially considering that Ms.
Hannaway rejected the offer, and there has been no showing that it could possibly have
resulted in a reasonable resolution to the matter. Accordingly, on its face any comparison
to the Stipulation of Settlement should be given little weight.

Comparison with the Stipulation of Settlement is further complicated by the fact that the
July 2, 2002, settlement offer does not provide a schedule of the assets and liabilities or
the proposed division of those assets and liabilities. However, an e-mail from Dr. Stiglitz
to Ms. Bank dated September 22, 2002, Bates stamped AA994, does provide that
breakdown. According to Dr. Stiglitz, the July 2, 2002, settlement offer would provide
Ms. Hannaway with 50% of the California home, valued at $730,000, 50% of the
Kensington home, valued at $200,000, Vanguard accounts, valued at $576,000, 50% of
the Ordway residence, valued at $200,000, 50% of stocks (not including Dr. Stiglitz's
claimed premarital Vanguard 500 account) valued at $576,000, 50% of the cash accounts,
valued at $100,000, 50% of the marital pension plans, valued at $1.5 million, 50% of the
World Bank pension, estimated at $0.3 million, royalties on books, estimated at $0.1
million, and three years of maintenance, valued at $.126 million. According to Dr.
Stiglitz, the total value of this package was approximately $3.93 million.

In order to make a comparison, these amounts must be adjusted for items that were not
included on Exhibit A – Asset Division to the Stipulation of Settlement. Specifically, the
$200,000 for the 50% of Kensington, the $1.5 million for the 50% of the marital pension,
the $.1 million of royalties on books, and the $.126 million of maintenance are not
included on Exhibit A. After reduction for these amounts, Dr. Stiglitz's proposed
settlement with Ms. Hannaway is $2 million.

At the time of the Stipulation of Settlement, the California and Washington, D.C. homes
had been sold; hence, they were included in the cash accounts at that time. The
Stipulation of Settlement also includes some things that were not included in the July 2,
2002, settlement offer. These included the cash surrender value of life insurance policies,
the 2000 Saab, and the add-backs for the post-commencement royalties, after reduction of
44% for Husband's payment of income taxes of $260,802 and the $600,000 in settlement
of various claims. However, even with those items included, Ms. Hannaway received
assets valued at $1,942,161. If rounded to $1,942,000, this means that she received
approximately $58,000 less in the Stipulation of Settlement than Dr. Stiglitz proposed in
his settlement offer of July 2, 2002.

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 20

In summary, the Stipulation of Settlement resulted in assets being distributed to Ms.
Hannaway that were not significantly different in amount with the July 2, 2002,
settlement offer.

## Comparison of May 16, 2002, and July 2, 2002 Settlement Offers

The Asset Summary attached to the May 16, 2002, settlement offer reflected net marital
assets of $5,466,307, with a proposed division of $2,571,819 to Ms. Hannaway. The July
2, 2002, settlement offer purportedly allocated total assets to Ms. Hannaway of $3.93
million. Given the fact that Ms. Hannaway's settlement offer was the May 16, 2002,
offer, it would appear that the settlement offer of Dr. Stiglitz was significantly higher
than that proposed by Ms. Hannaway. However, as with the comparisons above, there
are significant differences in the assets included in the two proposals.

The May 16, 2002, proposal does not include a specific value for the World Bank
pension, which the July 2, 2002, settlement offer values at $300,000. In addition, the
May 16, 2002, settlement offer listed two TIAA-CREF accounts but only one had a value
attributed to it. The value of the second account, which was included in the value of the
marital pension in the July 2, 2002, settlement offer, was $2,062,936. Finally, the May
16, 2002, settlement offer did not include the 50% of California house at $730,000,
royalties on books (est.) at $100,000 and three years maintenance at $126,000, all of
which were included in the July 2, 2002, settlement offer. Offsetting this, the May 16,
2002, settlement offer did include the Nobel Peace Prize valued at $333,333, which was
not included in the July 2, 2002, settlement offer. When the $2,571,800 proposed
division of assets by Ms. Hannaway in the May 16, 2002, settlement offer is adjusted for
50% of the additional TIAA-CREF account and 100% of the other items above, the
adjusted value of the May 16, 2002, settlement offer, is $4,526,000, as compared to the
$3,930,000 proposed by Dr. Stiglitz in the July 2, 2002, settlement offer. Hence, when a
complete comparison is performed, and when all of the assets and income are included,
the July 2, 2002, settlement offer by Dr. Stiglitz was actually for less income and a
smaller share of the marital estate than what was proposed by Ms. Hannaway in the May,
16, 2002, settlement offer.

## Summary of Conclusions

In my opinion, Dr. Stiglitz has not documented his alleged damages calculations such
that they can be tested and verified. In addition, he has failed to prove that the settlement
reached in the Stipulation of Settlement was, in fact, materially different from the
settlement offers proposed on May 16, 2002, and July 2, 2002, and, more importantly,
that it resulted in payments to Ms. Hannaway that were greater than either settlement
offer. As a result, Dr. Stiglitz's testimony and damages claims should be excluded.

*K:\Clients\3958\2006\Word\report.doc*

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 21

Attached is a copy of my curriculum vitae and list of testimony. I am being compensated at the rate of $300 per hour and $325 per hour for deposition and testimony. I have not published in the past ten years.

Sincerely,

Robert F. Aucone, CPA

Attachments

RFA/lam

Documents Received

The following is a list of documents received in this matter.

1. Complaint for Professional Negligence Received by the Civil Clerk's Office, August 17, 2005.

2. Defendant Rita M. Bank's Responses to Plaintiff's Request for Admission of Facts.

3. Defendant Rita M. Bank's Responses to Plaintiff's First Set of Interrogatories.

4. Plaintiff's Answers to Defendant's First Set of Interrogatories.

5. Plaintiff's Revised Supplemental Response to Defendant's First Set of Interrogatories and Objection to Second Set of Interrogatories.

6. Stipulation of Settlement Dated August 4, 2004.

7. Deposition of Rita M. Bank Taken April 20, 2006.

8. Deposition of Rita M. Bank Taken August 17, 2006.

9. Deposition Exhibits of Rita M. Bank.

10. Deposition of Joseph E. Stiglitz Taken April 21, 2006, hereinafter the "Initial Deposition."

11. Deposition of Joseph E. Stiglitz Taken July 21, 2006, hereinafter the "Second Deposition."

12.

13. Deposition Exhibits of Joseph E. Stiglitz.

14. Plaintiff's Expert Witness Designation.

15. An undated memorandum, Bates stamped AA778 through AA779 from Dr. Stiglitz to "Sharon and Rita."

16. An e-mail from Dr. Stiglitz to S. Siegel dated February 25, 2002, and attachment, collectively Bates stamped AA419 through AA421.

17. A letter from Rita M. Bank to Sanford K. Ain, Esq. dated April 16, 2002, Bates stamped AA758 through AA761.

18. A letter, and attachments, from Sanford K. Ain to Rita M. Bank, Esq. dated May 16, 2002, Bates stamped AA721 through AA723 (the three-page attachment is not Bates stamped).

19. A letter from Darrell A. Feldman to Rita M. Bank, Esq., and attachments, dated May 31, 2002. This document was not Bates stamped and consists of a one-page letter and four pages of schedules attached.

20. A letter from Rita M. Bank to Sanford K. Ain, Esq. and attachments dated July 2, 2002, Bates stamped AA624 through AA643.

21. An e-mail from Dr. Stiglitz to Ms. Bank dated September 22, 2002, Bates stamped AA994 through AA995.

22. The personal income tax returns on Form 1040 for Joseph Stiglitz and Jane Hannaway for 1998, 1999, and 2000.

23. The personal income tax return on Form 1040 for Joseph Stiglitz for 2001 and 2003.

24. The personal income tax return for Joseph and Anya Stiglitz on Form 1040 for 2004.

25. A draft report of Michael I. Cragg, Ph.D., dated January 26, 2004.

26. A Reply to the Expert Report of Michael Cragg by John R. Johnson, Managing Partner, and John T. Kuznia, Manager of BST Valuation and Litigation Advisors, LLC dated March 10, 2004.

27. The Expert Rebuttal Report of Michael Cragg titled "Final March 9, 2004."

28. A Career Enhancement, Enhanced Earnings Capacity & Enhanced Earnings Report as of September 16, 2002, by Ronald J. Klein, CPA/ABV of Klein Lipton Liebman Gresen, LLC, to Alton Abramowitz, Esq.

29. A report titled "Valuation of Dr. Joseph Stiglitz' Career/Celebrity Status" dated January 23, 2004, prepared by John R. Johnson, Managing Partner, BST Valuation & Litigation Advisors, LLC to Dr. Jane Hannaway.

30. A series of documents referred to as the "New York Briefing on Enhanced Earnings" Bates stamped AA8427 through AA8514.

31. Numerous documents related to Dr. Stiglitz's calendar, speaking engagements, speaking contracts, and related correspondence and memorandums.

32. Numerous documents and correspondence related to the New York City litigation, including various settlement offers.

## Robert F. Aucone

### PROFESSIONAL BACKGROUND

| | |
|---|---|
| **EMPLOYMENT** | **BKD**, LLP<br>1700 Lincoln Street, Suite 1400<br>Denver, Colorado 80203 |
| **EDUCATION** | University of Colorado,<br>Boulder, Colorado<br>B.S. degree in accounting December 1972 |
| | Mercer County Community College<br>Trenton, New Jersey<br>A.S. degree in data processing, June 1970 |
| | Accredited in Business Valuations, AICPA<br>Certificate of Educational Achievement in Business Valuations, AICPA |
| **EMPLOYMENT<br>HISTORY** | Shareholder/Director<br>Robert F. Aucone & Associates, P.C.<br>Denver, Colorado 1992-2001 |
| | Shareholder<br>Barrett/Gurovich, P.C.<br>1988-1992 |

### PROFESSIONAL ASSOCIATION AFFILIATIONS

American Institute of Certified Public Accountants
Colorado Society of Certified Public Accountants
Management Consulting Services Division of the AICPA
Board of Directors, Colorado Collaborative Law Professionals

**FIRM PROFILE**          BKD, LLP is among the nation's 10 largest public accounting and
advisory firms.  BKD's nearly 1,600 personnel, including 220
partners and principals, serve clients in many industries.  BKD
primarily provides services to middle-market companies, but
clients also include small, closely-held businesses; large, publicly
traded entities; governmental entities; not-for-profits; and a large
number of individuals.  Along with our 27 offices, we also have
wholly owned subsidiaries – BKD Wealth Advisors, LLC, BKD
Insurance, LLC, BKD Corporate Finance, LLC and BKD
Foundation.

**EXPERT WITNESS TESTIMONY**

Robert F. Aucone has served as an expert witness in numerous
federal and state courts.