# EXHIBIT 4



THE GEORGE
WASHINGTON
UNIVERSITY
LAW SCHOOL
WASHINGTON DC

CATHERINE J. ROSS
*Professor of Law*

(202) 994-9456
(202) 994-5614 (FAX)
cross@law.gwu.edu

February 9, 2007

Richard A. Simpson, Esq.
Ross, Dixon & Bell, LLP
2001 K Street, N.W.
Washington D.C. 20006

## Re: Joseph E. Stiglitz v. Rita M. Bank, Civ. No. 05-1826- RJL

Dear Mr. Simpson,

You have retained me on behalf of the defendant in the above-referenced matter. As I understand it, the divorce action between Joseph F. Stiglitz ("Stiglitz"), the plaintiff in this matter and his former wife, Jane Hannaway ("Hannaway"), was resolved pursuant to a settlement agreement after Hannaway filed for divorce in New York. You have asked me to advise you concerning the distinctions between law in the District of Columbia (the "District") and in the State of New York during the relevant time period as those distinctions would bear on the resolution of the Stiglitz/Hannaway divorce, with particular reference to how each jurisdiction would have been likely to treat Stiglitz's Nobel Prize and any accompanying material advantages related to it. As I understand it, Stiglitz now claims that his position in negotiations was undermined or diminished by his asserted "celebrity status" under New York law.

In preparing this opinion, I have examined the following materials which you transmitted to me under cover of a letter dated February 1, 2007:

(1) the Statement of Facts which your firm prepared for my review (the "Statement of Facts");

(2) the Curriculum Vitae of Joseph E. Stiglitz; and

(3) reports from experts forwarded to you under cover of a letter from David G. Whitworth, Jr. dated February 1, 2006 including a review of Stiglitz's Career Enhancement, Enhanced Earning Capacity and Enhanced Earnings as of September 16, 2002 prepared by Ron J. Klein, C.P.A., a Valuation of Dr. Joseph Stiglitz's Career/ Celebrity Status transmitted to Hannaway c/o her attorney Eleanor Alter by John R. Johnson on January 23, 2004, the report of Michael Cragg dated January 26, 2004, and a Reply to the Expert Report of Michael Cragg transmitted to Hannaway and her attorney on March 10, 2004 by John R. Johnson and John T. Kuznia.

After I had already formulated my general views of this matter, I asked you to provide me with the terms of the settlement agreement. In response, on February 5 your associate emailed me the settlement agreement between Stiglitz and Hannaway dated August 4, 2004 (the "Settlement Agreement"). I have reviewed that document as well.

In preparing this opinion letter I have relied on the facts as set forth in the Statement of Facts, which I do not replicate here. I have also noted unresolved issues of fact as set forth in the various expert reports, to which I refer as needed.

## SUMMARY OF CONCLUSIONS

As explained below, the reasoning by which courts in New York or the District of Columbia might have reached (or explained) their decisions, given the opportunity, would plausibly have rested on distinguishable grounds. Nonetheless courts in both jurisdictions could have distributed the intangible benefits of a Nobel Prize received during the course of a long marriage in similar dollar amounts, or, equally plausible, could have declined to do so. Put more simply, the fact that Hannaway filed for divorce in the State of New York did not disadvantage Stiglitz, nor would it have advantaged him if he had chosen the jurisdiction by filing first in the District of Columbia. To the extent that the bargaining over the terms of the settlement occurred in the shadow of New York law, rather than the law of the District of Columbia, it is my opinion that the choice of jurisdiction did not make a significant difference to the outcome.

### Introduction

Both New York and the District of Columbia are equitable distribution regimes. N.Y. Dom. Rel. L. § 236, D.C. Code § 16-910. In both, trial courts have enormous discretion in crafting equitable distribution of the parties marital assets. *Holterman* v. *Holtermann* 3 N.Y.3d 1, 814 N.E.2d 765 (2004), *citing Arvantides* v. *Arvantides*, 64 N.Y. 2d 1033, 478 N.E. 2d 199 (1985); *Young-Jones* v. *Bell*, 905 A.2d 275 (D.C. Ct. App. 2006), *citing Barnes v. Sherman*, 758 A.2d 936 (D.C. 2000). The breadth of that discretion makes it difficult to predict accurately how courts in either jurisdiction would apply the law to the instant facts, which involve issues of first impression in both states. Since we do not have the benefit of a court opinion in the divorce litigation, we are dealing with each party's speculations about what a court in each jurisdiction might have done had the divorce case gone to trial, and with each party's presumptions during settlement negotiations about how they expected a New York court to treat their respective claims.

In the analysis that follows, I examine the range of plausibly predictable court decisions based on these facts in both jurisdictions. This exploration may involve seemingly contradictory interpretations of fact. The proper interpretation of the facts, insofar as they have been contested in the documents I have reviewed, is not, however,

2

my assignment. Indeed, my review of the expert opinions prepared in the New York litigation has led me to conclude that a court would have likely engaged in extensive fact-finding regarding a number of disputed claims bearing on Stiglitz's reputation before and during the marriage, as well as on Hannaway's contributions to the marital estate through the support she offered at home and in child rearing, as well as her willingness to relocate to advance Stiglitz's career and the extent to which such support allowed Stiglitz to continue his prodigious productivity. In the discussion that follows, I apply the law to interpretations or applications of the facts that might have resulted from a full exploration in an adversarial hearing.

At the outset, it is important to consider the only reported case in any jurisdiction involving the proceeds of a Nobel Prize in the context of a divorce. *Ketterle* v. *Ketterle*, 61 Mass. Ct. App. 758, 814 N.E.2d 385 (Mass. App. Ct. 2004). *Ketterle* was decided in Massachusetts which, like both New York and the District of Columbia, is an equitable distribution jurisdiction, in which the trial court has discretion in pursuing "'an equitable, rather than an equal, division of property [which is] the ultimate goal'" of the equitable distribution statute. *Id.* at 389, *quoting Williams* v. *Massa*, 431 Mass. 619, 626, 728 N.E.2d 932 (2000). On appeal, the court held that the district court did not abuse its discretion in finding that the "Nobel Prize identified the husband as a superstar in the scientific and academic universe" resulting in "his having substantial ability to acquire future income and assets," and accordingly did not err in awarding the physicist's wife more than half of the marital assets. *Id.* at 387.

It is possible to distinguish the facts in *Ketterle* from those in the instant case. For example, it is undisputed that the husband in *Ketterle* performed all of the work that led to his receipt of the Nobel Prize during the course of the marriage while the question of whether Stiglitz would have won the prize if he had stopped working in his field before his marriage to Hannaway appears to be hotly contested, and the wife in *Ketterle* could barely support herself while Hannaway earns a respectable salary, though far less than Stiglitz earns. Nonetheless, for the reasons explained below, it is my opinion that if the distribution of the assets in the marriage of Hannaway and Stiglitz had been decided by a court rather than through a negotiated settlement, the choice of jurisdiction would not have made a significant difference to the outcome insofar as it involved the treatment of Stiglitz's Nobel Prize and the continued development of his professional reputation during the course of the marriage.

## Treatment of "celebrity status" and related issues in New York

Only New York and New Jersey recognize "celebrity goodwill" as a marital asset subject to division upon divorce. Laurence J. Cutler and Robin C. Bogan, *Celebrity Goodwill*, 25-WTR Fam. Advoc. 20, 21 (2003). It is far from clear, however, that Hannaway could have convinced a New York court that Stiglitz qualified as a celebrity to whom the court should apply this rarely-used doctrine. The argument would have raised a question of first impression, and would arguably have required the trial court to expand the doctrine of celebrity good will considerably. Even in New York, courts have only

found divisible celebrity good will in two cases, both of which are distinguishable from the case at hand.

*Elkus* v. *Elkus*, 169 A.D.2d 134, 572 N.Y.S.2d 901 (N.Y. A.D. 1'st Dep't 1991), concerned the value of the career of opera star Frederica von Stade Elkus, who, like Stiglitz, was well-established in her field before her marriage to Peter Elkus. Von Stade was already performing with the Metropolitan Opera in New York, albeit in minor roles, and earned very little money when she married Elkus, who served as her voice coach and teacher both before and during the marriage. By the time the marriage dissolved, von Stade was one of the leading opera stars in the world. Based on New York cases that, under certain conditions, assigned to spouses a portion of the value of professional training and licenses (discussed below), the intermediate appellate court recognized that the enhanced value of "a career as a performing artist, and its accompanying celebrity status, constitute marital property subject to distribution" where the non-celebrity spouse served as a voice coach, teacher and critic during the marriage. Similarly, in *Golub* v. *Golub*, 527 N.Y.S.2d 946 (Sup. Ct. N.Y. Co., 1988), the trial court held that the increase in value of actress Marissa Berenson's career during her marriage to a high profile attorney who helped to promote her career and provided her with legal and financial advice constituted divisible marital property. No New York court has found an increase in celebrity status meriting division in the more than 15 years since *Elkus* was decided.

Commentators have observed that *Elkus* and *Golub* raise many questions, including whether "they apply to spouses who work in all fields, or are they limited to people who work in the entertainment field?" J. Thomas Oldham, Divorce, Separation and the Distribution of Property § 10.03[5] 10-57 (2005). Since no court in any jurisdiction has applied the doctrine since *Elkus* was decided over fifteen years ago, I doubt that a New York trial court would be inclined to expand the doctrine to encompass prize-winning economists such as Stiglitz. Even assuming for the sake of argument that Hannaway might have convinced an activist judge that Stiglitz is a "celebrity" with a proven track record (*see Sterling* v. *Sterling*, 2001 WL 968262 (N.Y. Sup.Ct. N.Y. Co. 2001) (unpublished opinon) (summarizing the requirements for celebrity status and declining to apply the doctrine), or that any increase in his earning capacity could be accurately valued, it is almost inconceivable that she could meet the "direct contribution" requirement established in the two celebrity status cases. The *Elkus* court emphasized that its holding would not extend where the spouse seeking a share of the celebrity spouse's enhanced career had made only indirect contributions of the sort all spouses make to the joint enterprise of marriage by sharing responsibilities (including contributions as homemakers). Instead, the court expressly noted, "it cannot be overlooked that the defendant's [Elkus's] contributions to plaintiff [von Stade's] career were direct and concrete, going far beyond child care and the like, which he also provided. . . . to the extent that the appreciation in the plaintiff's career was due to the defendant's efforts and contributions, this appreciation constitutes marital property." *Id.* at 139-140. Thus, even if a trial court were inclined to extend the *Elkus* approach to reach Stiglitz, Hannaway would have a heavy burden to show her "direct and concrete" contribution to Stiglitz's rising professional status during the marriage. *See Sterling* v. *Sterling*, *supra*, * 7 (in the three reported celebrity cases, *Elkus*, *Golub* and *Piscopo* v. *Piscopo*, 557 A.2d 1040 (N.J.

4

Super. Ct. App. Div. 1989) "the courts stressed the fact that the noncelebrity spouse had contributed meaningfully to the other spouse's success and was, indeed, an integral part of that success.").

As noted above, the New York celebrity goodwill cases build on a line of cases limited to claims arising from higher education and professional licenses. New York adopts a unique position by expressly awarding spouses an equitable share of enhanced earning capacity resulting from degrees or professional licenses earned in whole or in part during the marriage with the direct or indirect support of a spouse. *O'Brien* v. *O'Brien*, 66 N.Y.2d 576, 489 N.E.2d 712 (N.Y. 1985), *Holterman* v. *Holterman*, 3 N.Y.3d 1, 814 N.E.2d 765 (N.Y. 2004). However, *O'Brien*, *Holterman* and their prodigy are inapposite to the Hannaway/Stiglitz facts because it is undisputed that Stiglitz earned his professional credentials and had embarked on his career before meeting Hannaway, and certainly before marrying her. *See, e.g.*, *O'Brien* (medical degree earned entirely during a short marriage in which nonprofessional spouse provided support and did not reap the benefits of the degree); *Holterman*, (wife who earned income while husband completed his medical degree and residency entitled to 35% of the remaining economic value of the medical license after 19 years of marriage); *Duspiva* v. *Duspiva*, , 181 A.D. 2d 810 (2d Dep't 1992) (certified public accountant license acquired during marriage); *Holihan* v. *Holihan*, 159 A.D. 2d 823 (2d Dep't 1989) (law degree earned during marriage); *Anderson* v. *Anderson*, 153 A.D. 2d 823 (2d Dep't 1989) (teaching degree); *Farrell* v. *Cleary-Farrell*, 306 A.D. 597 (3rd Dep't 2003) (husband entitled to distributive award of a small portions of wife's enhanced earnings as a dental hygienist where he supported the family while wife was earning her license). *See also* Sandra Mulay Casey et al., *Domestic Relations XXIV*, N.Y. Jur. 2d Domestic Relations § 2503 (collecting recent cases to the same effect).

In short, "[t]here is great doubt as to whether any award can be made for the value of a professional license or degree which was earned in its entirety prior to the marriage. A professional license or degree earned prior to marriage constitutes separate property. While the appreciation in separate property can be considered marital property, there are substantial difficulties in establishing appreciation in the value of a professional license or degree. Post-marriage earnings of the licensed or degreed spouse would appear to be the natural outgrowth of the enhanced earning potential created by the separate property." Alan Sheinkman, *Equitable Distribution of Property*, 11 N.Y. Prac, New York Law of Domestic Relations § 14:28 (Oct. 2006)) (collecting recent cases).

Moreover, any trial court judge confronted with an invitation to expand the scope of the celebrity status or professional degree cases to reach these facts would be well aware of the extensive criticism to which *Golub*, *Elkins* and even *O'Brien* and its prodigy have been subjected. No high court outside New York has accepted the claim that a professional license is marital property, much less that enhanced celebrity status is. Indeed, the New York Court of Appeals has never considered the latter issue. In 1996 the House of Delegates of the New York State Bar Association expressly called upon the New York legislature to overrule *O'Brien*. New York State Bar Association, *Report of the Task Force on Family Law* 15 (August 19, 1996), *cited in* American Law Institute,

*Principles of the Law of Family Dissolution*, § 4.07 cmt. a at 706 (2003). More recently, although after the execution of the settlement at issue here, the Report of the New York State Matrimonial Commission to the Chief Judge, recognizing the significant "expressions of concern" over the problems arising with the treatment of a spouses enhanced earnings capacity, recommended legislation that would eliminate "a party's 'enhanced earning capacity' as a marital asset" and specifically references "celebrity goodwill" and "career enhancement" as assets that shall not be considered marital property subject to division. ( Report of the New York State Matrimonial Commission to the Chief Judge (2006), p. 65 and Appendix L, *quoted in F.M.C.* v. *F.A.C.*, 2006 WL 1642671 *10 (N.Y. Sup. Ct. Nassau Co. 2006) (slip op.). However, the proposed legislation would provide that "in arriving at an equitable division of marital property, the court shall consider the direct or indirect contributions to the development during the marriage of the enhanced earning capacity of the other spouse." *Id.* This approach would bring New York into line with many other jurisdictions, including the District of Columbia, as examined below, and expressly contemplates the use of compensatory maintenance as a means of achieving equity.

It is my understanding that Hannaway planned to argue in New York that the enhanced earning capacity created by Stiglitz's Nobel Prize and public service during the marriage constituted divisible marital property because they were the fruits of work performed during the marriage, and that Stiglitz claimed in contrast that he earned the Nobel Prize and other recognition based on work completed before the marriage. In my view, this debate constitutes a red herring insofar as the uniqueness of New York law is concerned. *O'Brien, Holterman* and their prodigy are inapposite, as demonstrated in the preceding paragraph. Properly conceptualized, the issue is that all of the money Stiglitz earned during the marriage constituted marital earnings. These earnings contributed to the family's affluent life style as well as to the accumulation of marital assets. Thus, the compensation Stiglitz earned for work performed during the marriage is already reflected in the tangible assets available for distribution in either New York or the District of Columbia. To the extent that a court would consider Stiglitz's ability to earn at similar levels after the divorce in crafting an equitable remedy, the analysis I posit below under the laws of the District of Columbia could also have come into play in a New York court applying the statutory factors set forth in the Domestic Relations Law § 236.

### Applying the District of Columbia's Equitable Distribution Regime to a Nobel Prize and Its Accompanying Benefits

My conclusion that Hannaway did not obtain a significant advantage by proceding in New York is not intended to suggest that she would not have been able to persuade a court to structure an order that would recognize the economic benefits of Stiglitz's Nobel Prize and other accomplishments during the marriage, and that would accord her a share of those benefits. In this section, I consider how a District of Columbia court, applying the statutory factors set forth in D.C. Code § 16-910, might have treated Stiglitz's prodigious earning capacity.

It has long been clear in the District of Columbia that "the trial court has considerable discretion and broad authority in distributing marital property as part of a judgment of divorce." *Barnes* v. *Sherman*, 758 A.2d 936, 939 (D.C. 2000) (*quoting Dews* v. *Dews*, 632 A. 2d 1160, 1164 (D.C. 1993). The trial court is charged by statute with distributing marital property 'in a manner that is equitable, just and reasonable, after considering all relevant [statutory] factors,' and 'so long as the trial court considers all relevant factors, its conclusions will not be disturbed on appeal.'" *Id.* Indeed the District's Court of Appeals concedes that different judges, applying the same factors, might well reach a "different result in terms of the division of marital property" but that both results would be virtually immune from reversal. *Young-Jones* v. *Bell*, 905 A.2d 275, 278 (D.C. 2006).

The 2001 edition of the D.C. Code, § 16-910 was entitled, "Dissolution of property rights; jurisdiction of court." It provided, in pertinent part, that the court shall award each party his or her separate property and shall:

> Distribute all other property accumulated during the marriage, regardless of whether title is held individually or by the parties in a form of joint tenancy or tenancy by the entireties, in a manner that is equitable, just and reasonable, after considering all relevant factors, including, but not limited to: the duration of the marriage, any prior marriage of either party, the age, health, occupation, amount and sources of income, vocational skills, employability, assets, debts, and needs of each of the parties, provision for minor children, whether the distribution is in lieu of or in addition to maintenance, and the opportunity of each for future acquisition of assets and income.

The statute also instructed the court to consider each party's contributions to assets and to the "family unit."

On October 19, 2002 § 16-910 was amended and retitled "Assignment and equitable distribution of property." The new section is, in most important respects, not notably different from the statute that was in effect from June 2000 when Stiglitz and Hannaway separated and September 16, 2002 when Hannaway filed for divorce. I continue my analysis based on the language that became effective in October 2002 and remains in effect today, but do not believe the results would differ under the former version of § 16-910.

D.C. Code § 16-910 (2001, 2006) requires the trial court to consider "all relevant factors, including but not limited to:"

(1) the duration of the marriage;
(2) the age, health, occupation, amount, and sources of income, vocational skills, employability, assets, debts, and needs of each of the parties;
(3) provisions for the custody of minor children;
(4) whether the distribution is in lieu of or in addition to alimony;

(5) each party's obligation from a prior marriage or for prior children;

(6) the opportunity of each party for future acquisition of assets and income;

(7) each party's contribution as a homemaker or otherwise to the family unit;

(8) each party's contribution to the education of the other party which enhanced the other party's earning ability;

(9) each party's increase or decrease in income as a result of the marriage or duties of homemaking and child care;

(10)    each party's contribution to the acquisition, preservation, appreciation, dissipation, or depreciation in value of the assets which are subject to distribution, the taxability of these assets, and whether the asset was acquired or the debt incurred after separation;

(11)    the effects of taxation on the value of assets subject to distribution; and

(12)    the circumstances which contributed to the estrangement of the parties.[1]

Confining my inquiry to the narrow subject on which I have been asked to render an opinion, the sixth factor, the "opportunity of each party for future acquisition of assets and income" provides a good starting point. In the District, as in all 49 states except for Massachusetts, the treatment of a Nobel Prize would present an issue of first impression. Courts in the District routinely consider opinions from other equitable distribution jurisdictions in crafting their decisions. Therefore, I assume that a District court would begin by examining the opinion in *Ketterle* (discussed at page 3 of this letter), assuming that the opinion was released before a court in the District ruled on the Stiglitz/Hannaway divorce. The *Ketterle* court considered the Nobel Prize in light of the Massachusetts equitable distribution factors, in particular the factor requiring the court to consider "the ability to acquire future income and assets" which is substantively the same as the District's formulation. Significantly, Massachusetts, like the District, does not recognize what New York calls "enhanced earnings capacity." Nonetheless, the *Ketterle* court concluded that the prize-winner's future income and assets would be greatly enhanced by receipt of the prize, and took that fact into consideration in crafting an equitable disposition. A court in the District could be expected to reach a similar conclusion, especially after factoring in other developments during the marriage including Stiglitz's highly visible government service.

To be sure, the instant case can be distinguished from *Ketterle* on both the facts and the law. While there are great disparities in the earning potential of Stiglitz and Hannaway, the discrepancies were much starker in *Ketterle* where the wife suffered from "fragile" mental health and worked as a part-time teacher's aide. However, the *Ketterle* court expressly found that while the "husband's brilliance and hard work made the family financially secure[,] 'the wife's total commitment to child rearing and tending to the home permitted the husband to pursue his career." 814 N.E.2d 387, 387. This division of labor, it concluded, justified awarding a larger share of assets to the wife in light of her more limited future expectations. A court in the District might make similar findings

---

[1] I understand that factors 3, 5 and 8 have no application to the Stigliz/Hannaway divorce. Under 12, however, a court in the District could have taken Stiglitz's fault in the termination of the marriage into account in dividing the marital assets.

8

here. The disparity in the law – that Massachusetts permits the court to distribute separate property where needed to achieve equity, but the District only permits distribution of marital property – would, in my opinion, be unlikely to have a major impact in a case like this one where the bulk of assets are marital, and the amount of marital assets more than sufficient to support both parties in a manner comparable to their standard of living during the marriage.

In a subsequent case, a Massachusetts appellate court expressly rejected the husband's claim that he was entitled to keep more of the marital assets than his wife of 24 years who had been a homemaker for roughly 15 years because he worked "exceptionally long hours" to become the head of litigation at a large firm. The court affirmed the trial court's decision to award the wife 51% of the assets in accordance with the lower court judge's stated intent to leave "both parties with relatively equivalent assets and resources." *T.C. v. J.L.*, WL 3019223 * 1 (Mass. App. Ct. 2006) (unpublished opinion). This kind of consideration might also enter a District court's application of the factors to the Stiglitz/Hannaway marriage: a marriage that lasted 32 years to which both spouses contributed in different ways, and in which one spouse looks forward to much higher earnings than the other in the future.

Another way to approach analysis of the impact of the Nobel Prize and related recognition is through the concept of goodwill – one of the murkiest and most difficult areas of family law. Like many other jurisdictions, the District of Columbia expressly recognizes that "professional goodwill is marital property subject to distribution". *McDiarmid v. McDiarmid*, 649 A.2d 810, 814 (D.C. 1994). In announcing this principle, the *McDiarmid* court rejected the view that "the concept of professional goodwill evanesces when one attempts to distinguish it from future earning capacity,'" (*quoting Holbrook v. Holbrook*, 309 N.W. 2d 343, 354 (Wis. App. 1981)) and aligned itself with jurisdictions that hold that professional reputation, including what Story called "common celebrity,' must be considered marital property subject to equitable distribution to avoid a "'windfall'" to the professional spouse. *McDiarmid*, 649 A.2d at 813-814, *quoting* J. Story, *Commentaries on the Law of Partnerships* § 99, at 170 (6[th] ed. 1868) (add'l citations omitted), *Russell v. Russell*, 399 S.E.2d 166, 168 (Va. App. 1990). Many of the cases in the jurisdictions with which the District aligned itself in *McDiarmid* apply the concept of professional goodwill to professional practices in law, medicine, etc. with a result that may be difficult to distinguish from the division that results in New York under the concept of enhanced earning capacity.

More to the point for purposes of analyzing the Stiglitz/Hannaway divorce, the lead case for the proposition that professional goodwill not only exists but is divisible marital property holds that such goodwill exists and can be measured even where the business is not for sale (or, as in this case, could not be sold); the measure of the goodwill is the present value of the "excess earnings" the professional receives when compared to others with similar education and experience. *Dugan v. Dugan*, 457 A.2d 1, 9 (N.J. 1983), *cited in McDiarmid*, 649 A.2d at 814. The view that professional goodwill is a marital asset has been applied to a variety of solo practitioners, including at least one consulting business whose "only product [was] the personal service" rendered by the

divorcing spouse. *Hardy* v. *Hardy*, 2005 WL 2660627 (Ohio App. 2 Dist.) *5 (but holding that there was no value in the consulting business at issue). To the extent that Stiglitz's consulting business is an interest that the couple acquired during marriage, the professional goodwill in it constitutes a marital asset under District law. To be sure, the resulting problems of valuation can be tricky to say the least. But its present value at divorce can be valued in relation to its anticipated future revenues in much the same way goodwill in an enterprise may be valued. Courts will accept a variety of approaches to such valuation, all of which are beyond my competency and would require the presentation of competing expert opinions. I have not been able to find a case directly on point in the District, and suspect that numerous difficult questions would have needed to be litigated in a court in that jurisdiction, including but not limited to: whether Stiglitz's excess earning capacity was already reflected in the couple's tangible marital assets; whether and to what extent the goodwill in Stiglitz's consulting practice and other income-generating activities beyond his university position had been created or appreciated in value during the marriage; and whether a dollar amount could be assigned to any goodwill that was shown to exist.

Given the level of judicial discretion in both New York and the District, it is plausible that a particular judge in either jurisdiction might have issued an order that was less (or more) advantageous to Stiglitz than were the terms of the Settlement Agreement. As indicated in my earlier analysis, after considering the applicable enumerated factors and other issues, a judge in the District would have had great flexibility to craft a financial resolution to the marriage that, in the court's view, achieved equity. Such a resolution could have included an equal or unequal division of marital assets as well as maintenance payments from Stiglitz to Hannaway.

It may be worth noting that District statute governing maintenance, like the statute governing equitable distribution, was revised in 2002. D.C. Code § 16-912, which was in effect from the time Stiglitz and Hannaway separated until after Stiglitz filed for divorce in New York, provided for the award of permanent maintenance and allowed the court, where appropriate, to allow either spouse to retain the right of dower in the other spouse's estate. In 2002 the legislature repealed § 16-912 and expanded the language of § 16-913 "Alimony." Whereas in 2001 § 16-913 provided only that the court could order either spouse to pay the other alimony "if it seems just and proper," the version that became effective in late 2002 also provided that, among other things, the "award of alimony may be indefinite or term-limited and structured as appropriate to the facts," and set forth a number of factors that should be considered, which significantly overlap with the factors set forth in § 16-910 (distribution). A 2000 opinion of the District's Court of Appeals reiterating that decisions respecting alimony are entrusted to the sound discretion of the trial court also points out that since 1966 courts in the District have been instructed, as a matter of common law, to consider the many of the factors currently set forth in § 16-913 in deciding whether or not to award alimony and in what amount. *Lake* v. *Lake*, 756 A.2d 917, 921 (D.C. 2000), *quoting McEachnie* v. *McEachnie*, 216 A.2d 169, 170 (D.C. 1966).

Based on what I initially knew about the premise of the instant lawsuit, I had hypothesized that Stiglitz's dissatisfaction with the Settlement Agreement he executed in

10

New York might stem from terms that either gave Hannaway more than 50% of the marital property, or committed Stiglitz to continue to make payments to Hannaway after the divorce either as maintenance or as distribution for her share of his reputation, or that all of those terms made up part of the Settlement Agreement.

Upon reviewing the Settlement Agreement, I was struck that it appears to be a fairly standard equitable distribution agreement, very much in line with what we might anticipate a court in either New York or the District to have ordered. Each party kept the home in which he or she currently resided. Virtually all of the measurable assets were divided 50/50 with a handful of exceptions: (i) although the bulk of the retirement accounts were divided 50/50, Hannaway received 100% of Stiglitz's World Bank Pension, and each party kept one separately-named IRA account; and (ii) Hannaway received rights to Stiglitz's publications that reflected work performed during the marriage, in amounts ranging from 10% to 50%, while Stiglitz did not receive any share in her much less valuable publications. It is standard in both jurisdictions for a spouse to receive a fair share of future payments (including payments whose exact value is unclear at the time they are awarded, such as a share of stock options or pension plans) that constitute compensation for labor performed during the marriage. Such future payments are not in any way comparable to payments for expected future earnings, enhanced earnings capacity or maintenance. The terms of the Settlement Agreement reinforce my initial view that the choice of forum for the divorce litigation made little or no difference to the negotiated outcome.

Very truly yours,

Catherine J. Ross
Professor of Law

**BY TELECOPY AND FIRST CLASS MAIL**

11