# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSEPH E. STIGLITZ,<br><br>　　　　Plaintiff,<br><br>RITA M. BANK,<br><br>　　　　Defendant | Civil Action No. 05-1826RJL |

# EXPERT REPORT OF MICHAEL CRAGG

# Table of Contents

Introduction ........................................................................................................................... 3
   Qualifications, Past Testimony, Publications, Compensation and Documents
   Considered ......................................................................................................................... 3
   Assignment ........................................................................................................................ 4
   Conclusions ....................................................................................................................... 4
Discussion .............................................................................................................................. 4
   Assumptions ...................................................................................................................... 4
   Analysis ............................................................................................................................. 5

# INTRODUCTION

Qualifications, Past Testimony, Publications, Compensation and Documents Considered

1. My name is Michael I. Cragg, and my business address is 955 Massachusetts Avenue, Cambridge, Massachusetts, 02139.

2. I am a Managing Director in Cambridge Finance Partners, LLC, which is an economic consulting company based in Cambridge, Massachusetts. I have a Ph.D. in economics from Stanford University. I was an economics professor at Columbia University and University of California at Los Angeles where I published broadly and taught courses in corporate finance and microeconomics at both the undergraduate and graduate level. My research has been sponsored by a variety of foundations as well as the National Bureau of Economic Research and the National Science Foundation

3. Prior to starting Cambridge Finance Partners, I was a partner in the economic consulting firm Bates, White and Ballentine, and before that I was a Vice President at the economic consulting firm Analysis Group/Economics. I was a Senior Economist at the Milken Institute, a "think tank" in Santa Monica. I have also been an economist at the RAND Corporation and a consultant in the strategy practice at A.T. Kearney.

4. Valuation and the calculation of damages, the analysis of finance and human capital issues, and the study of economic incentives have been a focus of my consulting practice and research.

5. I have presented at professional conferences and published a number of articles on privatization, corporate finance, human capital and public finance. A detailed curriculum vitae is attached as Exhibit 1 and includes instances where I have provided deposition and trial testimony for the past four years. Exhibit 1 also includes all my publications and accordingly would include publications from the last 10 years.

6. My firm is being compensated for my work on this case at a rate of $400 per hour.

7. As discovery is on-going, I expect to receive further documents and depositions. I may add to or otherwise modify this report as new evidence is presented in this matter.

3

## Assignment

8. I have been asked by attorneys for Joseph Stiglitz ("Stiglitz") to measure the damages suffered had the divorce proceedings between Stiglitz and Jane Hannaway ("Hannaway") not been delayed by a failure to represent Stiglitz in accordance with a reasonable standard of care by by Rita Bank, Stiglitz's divorce attorney ("Bank"). The counter factual I have been asked to consider assumes the same separation date of approximately June, 2000 ("Separation") but a filing for divorce shortly after Separation under the laws of the District of Columbia with a resolution occurring no later than June, 2002. I have been asked to compare this counterfactual to what actually occurred following the laws of the State of New York with final resolution in September, 2004.

## Conclusions

9. Damages are:

**Summary**

| | Low | High |
|---|---|---|
| Costs due to enhanced earnings claim | | |
| Additional legal costs | $892,500.00 | $892,500.00 |
| Settlement of enhanced earnings claim | 600,000.00 | 600,000.00 |
| Opportunity cost of time | 500,000.00 | 500,000.00 |
| Distribution of assets | | |
| Vanguard account #0040-000976157207 | 395,481.43 | 395,481.43 |
| World Bank Pension | 197,736.52 | 197,736.52 |
| Mortgage payments | 150,000.00 | 150,000.00 |
| Chase and Citibank accounts | 127,441.82 | 127,441.82 |
| Royalties | 177,431.73 | 239,672.39 |
| **Total** | **$3,040,591.49** | **$3,102,832.15** |

## DISCUSSION

### Assumptions

10. I have been advised by Counsel for Stiglitz to assume that an attorney representing Stiglitz pursuant to a reasonable standard of care would have filed for divorce more quickly than Bank. One economic incentive for Stiglitz to file quickly was that he was a potential Nobel price winner in economics which carried with it prize money of approximately $1 million (he subsequently did win this prize in September, 2001, but shared it with two others). Another economic incentive was that following the Separation, Stiglitz began developing several manuscripts which would yield income in the form of royalties which were for the creation of an asset after the marriage had failed. Stiglitz's actions are

4

consistent with these economic incentives. My understanding is that the ordinary practice for DC divorce attorneys was to file expeditiously in such situations.

11. I have been advised by Counsel for Stiglitz to also assume that filing in Washington, D.C. is favorable to filing in New York because Washington, D.C. laws do not allow for an enhanced earnings and celebrity status claim.

12. I have been advised by Counsel for Stiglitz that divorce hearings in Washington, D.C. are tracked for trial within six to twelve months from the date of filing. Therefore, I am assuming that the date of final divorce in Washington D.C. would have occurred no later than June, 2002, two years earlier than in New York. This is a conservative estimate, since a Washington, D.C. settlement could have occurred in 2001.

13. I am assuming that any assets of Stiglitz or Hannaway available for distribution (the "Marital Estate") in a hearing under a Washington, D.C. filing would have been reinvested and earned the same return between the date of the D.C. hearing and the date of the actual settlement, August 4, 2004.

14. Economic damages caused by Bank can be measured by what Stiglitz actually paid to settle the case on August 4, 2004 per the Stipulation of Settlement (the "Actual Settlement") and the resolution which I can infer would have been reached had Stiglitz filed for divorce in Washington D.C., and settled no later than June 30, 2002 (the "DC Settlement"). The actual payments include additional costs of litigation.

## Analysis

15. Damages are the difference between the Actual Settlement and the costs that could have been avoided by Stiglitz had the case been settled by June 30, 2002.

16. There are several sources of damages that affected the settlement due to the venue and the timing of litigation.

    a) First, a New York venue caused Stiglitz to incur additional litigation costs due to the enhanced earnings claims and celebrity status. Stiglitz and Hannaway both engaged experts to identify the enhanced earnings claims which led to considerable discovery costs as to when Stiglitz's career developed relative to the date of marriage and initiation of divorce proceedings. The increased litigation complexity caused Stiglitz to earn less money due to focusing his efforts on the delayed New York litigation.

    b) Second, the delay caused Stiglitz to incur damages due to the creation of assets and income that would have occurred after the

5

ordinary execution of divorce proceedings under a Washington, D.C. timeline. Assets created and income received after June, 2002 (or even earlier) would not have been split with Hannaway.

17. The following lists damages arising from the enhanced earnings claims.

   a) **Difference in Stiglitz's Actual versus Expected legal costs:** Stiglitz's New York legal fees and expert reports were $980,000[1], whereas the expected legal fees for the D.C. litigation would have been approximately $175,000.[2] In addition, if Hannaway's Washington, D.C. legal expenses would have been like Stiglitz's and hence only $175,000, then her legal expenses were overstated by approximate $175,000, of which Stiglitz bore $87,500 since they were paid out of the Marital Estate. Therefore in total Stiglitz suffered damages of $892,500 due to increased litigation expenses relative to what they would have been under a Washington, D.C. filing;

   b) **Settlement of Enhance earnings claims:** The enhanced earning claim was settled for $600,000.[3] Therefore, Stiglitz suffered damages of $600,000; and

   c) **Opportunity cost of Stiglitz's time:** Stiglitz spent additional time on the enhanced earnings claims that cost him. He estimated to have lost 500 hours of consulting time valued at $1,000 per hour, amounting to $500,000.[4] Stiglitz therefore suffered damages of $500,000.

18. Certain of Stiglitz's assets were split unfavorably in the Actual Settlement relative to how they would have been split under a D.C. filing. In particular, some property that was premarital was split 50/50, some property that was joint was not split 50/50 and income and expenses that accrued post June, 2002 would not have been relevant.

   a) **Vanguard account** #0040-000976157207 was funded with pre-marital money in 1979 and 1980 and was worth $790,962.85 on August 4, 2004.[5] Under the terms of the Actual Settlement, that asset was split between the parties.[6] However, under a D.C. filing, that asset would have been recognized as pre-marital property and would have belonged 100 percent to Stiglitz. Therefore, Stiglitz suffered damages of $395,481.43.

---

[1] Plantiff's Revised Supplemental Response to Defendant's First Set of Interrogatories and Objection to Second Set of Interrogatories, July 5, 2006, ("Plaintiff's Revised Response"), p. 4.
[2] Plaintiff's Revised Response, pp 4-5. D.C. litigation costs are taken from the middle of the range.
[3] Exhibit A Stipulation of Settlement.
[4] Plaintiff's Revised Response, p. 5.
[5] Balance from the 6/30/02 Vanguard statement was $710,660.47. Net Asset Value for the Vanguard 500 Index Admiral Shares was $91.33 on 6/30/02 and $101.65 on 8/4/04, an increase of 11.3 percent. That increase applied to the original balance equals a balance of $790,962.85 on 8/4/04.
[6] Stipulation of Settlement, pp. 7-8.

6

b) **World Bank Pension** Under the terms of the Actual Settlement, Hannaway received 100 percent of Stiglitz's World Bank pension. The World Bank pension is indexed for inflation. However, under a D.C. filing, that asset would have been split equally between the parties. Therefore, half of the lost World Bank pension represents damages caused by Bank. This is calculated as the present value under a life expectancy of 20 years (based on Social Security Actuaries[7]) using a real rate of interest calculated as either the difference between the 10-year rate on government securities less actual inflation for 2002. The total value is $395,473.04[8] and therefore, Stiglitz suffered damages of $197,736.52.

c) **Mortgage Payments** Stiglitz made mortgage payments on the Ordway house until August, 2004. Had the divorce been resolved by June, 2002, such payments would not have been made. At $6,000 per month, Stiglitz suffered damages of $150,000.[9]

d) **Income** Stiglitz's net earned income accrued through funds deposited in the Chase and Citibank accounts out of which his consumption was paid. These accounts were opened approximately April 2002 and September 2001 and hence would not have been part of the Marital Estate since they are funded predominantly after a Washington, DC settlement would have occurred. Therefore, Hannaway would not have received half of these accounts which results in damages of $127,441.82.

e) **Book royalties** In the Actual Settlement, Hannaway received both an after-tax lump-sum payment covering royalties between the commencement of proceedings in New York and the Actual Settlement date, as well as a schedule of future royalty shares she would receive. I have received from W.W. Norton an accounting of all royalties relevant to this analysis paid to Stiglitz. From this, I have been able to compute the total actual royalties paid to Hannaway (see Exhibit 2).

Hannaway received a lump-sum payment from the Actual Settlement of $260,802, net of taxes, which covered royalties from the commencement of proceedings in New York to the date of settlement.[10] I computed royalty payments made by Stiglitz to Hannaway from August 4, 2004 through March 31, 2007 equal to $61,015.86 ($138,672.40 before taxes of 44 percent).[11] Total after-

---

[7] See http://www.ssa.gov/OACT/STATS/table4c6.html
[8] If a 3% real rate of interest is used, the value is $378,008.44
[9] Payments made in July and August of 2002 would have come out of the Marital Estate, and therefore damages are only half of this amount for these two months. This has been incorporated in to the damages calculation
[10] Exhibit A Stipulation of Settlement.
[11] Computed using Hannaway's share of the Stipulation of Settlement, pp 22-24 and actual royalties paid by W.W. Norton to Stigltiz.

7

tax royalties paid by Stiglitz to Hannaway through March 31, 2007 equal $338,458.55.

I next computed the total royalties that would have been paid to Hannaway under two scenarios: settlement of litigation in D.C. on April 1, 2002 and settlement on August 1, 2002. For each settlement date, I assumed a high and low scenario for Hannaway's future royalties. In the high royalty scenario, I assumed that Hannaway received 25 percent of the royalties from the third editions of Economics, Principles of Macroeconomics and Principles of Macroeconomics, while in the low royalty scenario I assumed that Hannaway received 15 percent of those textbooks. In the high royalty scenario, I assumed that Hannaway received 20 percent of the royalties for Globalization and its Discontents, while in the low royalty scenario I assumed she received 15 percent. In both royalty scenarios, Hannaway received no royalties from subsequent editions of the aforementioned textbooks, the Roaring 90s or Making Globalization Work, and half the royalties from all other books (see Exhibit 2 for hypothetical royalty calculations).

For each scenario, I tax-effected the royalties at 44 percent, and computed the hypothetical after-tax royalty payment to Hannaway. Damages were the difference between these after-tax royalty payments and the actual payment made to Hannaway of $338,458.55. The result was a range of damage estimates from $177,431.73 to $238,982.75.

8

The opinions I express in this Expert Report are based upon the materials I have reviewed to date, and are subject to change in the event that additional materials become available to me. I intend to continue my analysis and any changes in my analysis will be provided in a timely manner.

November 9, 2007

_____
Michael I. Cragg, Ph.D.