# Transcript of

## Catherine Ross, Esq.

**Date:** November 14, 2007

**Case:** Joseph E. Stiglitz v. Rita M. Bank

---

Phone: 410-268-6006
Fax: 410-268-7006
Email: corbinandhook@corbinandhook.com
Internet: www.corbinandhook.com



*- Specializing in Interactive Realtime & Rough ASCII Transcripts -*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

JOSEPH E. STIGLITZ

    Plaintiff

    vs.       CA No. 05-1826 RJL

RITA M. BANK

    Defendant

_____/

Deposition of CATHERINE J. ROSS, ESQ., was

taken on Wednesday, November 14, 2007, commencing at

10:09 A.M., at 2001 K Street, N.W., Washington,

D.C., before Susan Farrell Smith, Notary Public.

    - - - - - -

Corbin & Hook Reporting and Videoconferencing

Serving MD, DC, No.VA & DE

Reported by SUSAN FARRELL SMITH

---

**Page 2**

1  APPEARANCES:

2      DAVID G. WHITWORTH, JR., ESQUIRE

3      dwhitworth@wstlaw.com

4      Whitworth & Trunnell, P.A.

5      2101 Defense Highway

6      MD Rt. 450

7      Crofton, MD 21114

8      301.261.0035

9      On behalf of the Plaintiff

10 MEREDITH WERNER, ESQUIRE

11     mwerner@rdblaw.com

12 RICHARD A. SIMPSON, ESQUIRE

13     rsimpson@rdblaw.com

14     Ross Dixon & Bell, LLP

15     2011 K Street, N.W.

16     Washington, D.C. 20006

17     202.662.2000

18     On behalf of the Defendant

19

20 REPORTED BY:  Susan Farrell Smith

21

---

**Page 3**

1          EXAMINATION INDEX

2

3  CATHERINE J. ROSS, ESQ.
   BY MR. WHITWORTH        4

4         EXHIBIT INDEX

5             PREMARKED
ROSS DEPOSITION EXHIBIT

6  1    Curriculum vitae

7  2    Brief description of bio

8  3    Statement if facts

9  4    2/8/07 draft

10 5    Handwritten notes

11 6    First request for production of documents

12 7    2/2/07 draft

13 8    2/9/07 report

14 9    Invoice

15

16

   (Exhibits attached to original transcript.)

17

18

19

20

21

---

**Page 4**

1      CATHERINE J. ROSS, ESQ.,

2  the Witness, called for oral examination by counsel

3  for the Plaintiff, having declared and affirmed

4  under the penalties of perjury to tell the truth,

5  was examined and testified as follows:

6          EXAMINATION

7  BY MR. WHITWORTH:

8    Q.   Good morning.

9    **A.   Good morning.**

10   Q.   As we have introduced ourselves earlier,

11 as you know, I'm David Whitworth, and I represent

12 Joseph Stiglitz in his claim against Rita Bank.  And

13 I understand you've been retained as an expert in

14 the case.

15   **A.   That's correct.**

16   Q.   I also have of course had the benefit of

17 seeing your curriculum vitae and reviewing the

18 materials that you have prepared.  But I want to

19 just know what experience you've had with

20 depositions previously first.

21   **A.   I have taken depositions, I have defended**

---

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 5

1  **depositions, and I have never been deposed.**
2  Q.   Have you ever been involved as a party in
3  a lawsuit?
4  **A.   Once.**
5  Q.   What was that occasion?
6  **A.   A landlord who didn't return our security**
7  **deposit.**
8  Q.   Where did that occur?
9  **A.   New Haven, Connecticut.**
10  Q.   How did you make out?
11  **A.   I won.**
12  Q.   Good.
13  **A.   Her lawyer played golf with the judge, and**
14  **I still won.**
15  Q.   You must have been in the right.
16  **A.   I was.**
17  Q.   The experience that you've had doing
18  depositions, are you -- have you -- when is the last
19  time you did a deposition?
20  **A.   Over 10 years ago.**
21  Q.   Have you represented clients in the past

Page 6

1  10 years?
2  **A.   Only on a pro bono basis.**
3  Q.   What legal representation experience have
4  you had in the last 10 years?
5  **A.   I represented on a pro bono basis a client**
6  **whose husband left the country with their life**
7  **savings, and I got her a TRO to block the bank**
8  **accounts and investment accounts.**
9  Q.   What jurisdiction was that in?
10  **A.   In New York.**
11  Q.   Now, I checked but don't recall, have you
12  maintained an active New York license?
13  **A.   I have a New York license.  I also have a**
14  **Connecticut license.**
15  Q.   Do you have a D.C. license?
16  **A.   No, I don't.**
17  Q.   Have you ever practiced law in the
18  District of Columbia?
19  **A.   No.**
20  Q.   Prior to 10 years ago, what is the, in
21  general, what was your representation experience of

Page 7

1  clients?
2  **A.   I was a litigation associate at the law**
3  **firm Paul Weiss Rifkind Wharton & Garrison in New**
4  **York.**
5  Q.   And for how many years did you do that?
6  **A.   Seven years.**
7  Q.   And as a litigation associate, were you
8  predominantly handling matrimonial-related cases?
9  **A.   No.  I was at a firm that believed that**
10  **litigators should handle a wide variety of cases.**
11  **The bulk of the practice was corporate law, but I**
12  **did handle some matrimonial matters, none of which**
13  **went to litigation.**
14  Q.   So they were like negotiated settlements?
15  **A.   Exactly.**
16  Q.   And none of them were actually filed as a
17  suit in court?
18  **A.   Not to my recollection.**
19  Q.   Did any of those individuals you
20  represented or brought a claim or were opposed to,
21  the opposite party, they weren't really a claim

Page 8

1  because they weren't in litigation yet, but you were
2  negotiating with a spouse of a client, did any of
3  those clients or their spouses have issues that
4  involved enhanced earning capacity?
5  **A.   No.**
6  Q.   Did any of those clients have issues
7  involving celebrity status?
8  **A.   No.**
9  Q.   Have you ever worked on a case as in a
10  representative capacity where you were the lawyer
11  involving either of those issues?
12  **A.   No.**
13  Q.   Well, let's just take a look at your CV
14  for a minute.  I've marked that as Exhibit 1 if we
15  may.
16  **A.   Uh-huh.**
17  Q.   And by the way, I have dispensed with the
18  normal preamble about the mechanics of a deposition,
19  and I am going forward assuming that you're familiar
20  with your rights as a deponent, and the two and us
21  will try not to talk over each other and so forth.

*2 (Pages 5 to 8)*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 9

1    A.    I appreciate all of those things. And I'm
2  totally dependent on my attorneys too.
3    Q.    And you have had a chance to review and
4  prepare with the attorneys for Rita Bank in this
5  case?
6    A.    Yes.
7    Q.    The -- and you refer to them as your
8  attorneys?
9    A.    No, that was a misstatement obviously.
10  The attorneys who have retained me and who are
11  representing me here.
12    Q.    Okay. The experience that you had in
13  testifying, the only time you ever testified
14  previously was that landlord and tenant matter?
15    A.    Yes.
16    Q.    Have you ever been asked to serve as an
17  expert previously?
18    A.    Yes.
19    Q.    And what was that occasion or occurrence?
20  How long ago, what was the -- what was involved?
21    A.    I served as an expert, you know, my

Page 10

1  recollection is not clear, it may have been as long
2  as five years ago. Something like that. In a
3  contested divorce arising under D.C. law being tried
4  in Colorado.
5    Q.    Who retained you in that case?
6    A.    The attorney for the husband.
7    Q.    Who was?
8    A.    You know, I would have to go back to my
9  files. He wasn't somebody I had dealt with before
10  or since.
11    Q.    What was the complete, you know, from
12  beginning to end, scope of your involvement in that
13  case?
14    A.    There was a question concerning the
15  appreciation of the husband's business during that
16  time which in some ways you could say had an
17  intellectual relationship to some of the issues here
18  but not specifically enhanced earning capacity. And
19  they wanted me to do an opinion letter on what a
20  district court, District of Columbia court, would be
21  likely to do under the facts as they were given to

Page 11

1  me.
2    Q.    How far did that case progress in the
3  court system to your knowledge?
4    A.    They settled almost immediately after
5  receiving my opinion letter.
6    Q.    Did your opinion letter have -- were you
7  involved at all in the issue of whether D.C. law or
8  some other jurisdiction's law would apply?
9    A.    No. The matter was clearly under D.C.
10  law. There was a disagreement about what the
11  District of Columbia law was. They received my
12  letter. They showed it to the other side. They
13  received a very favorable settlement on the terms
14  they were seeking.
15    Q.    And you can't recall what the law firm was
16  that retained you?
17    A.    I actually can't. It was a small firm.
18  I'd never heard of it. They were referred to me. I
19  never met the attorneys. It was by phone and
20  e-mail.
21    Q.    Have you advertised or held yourself out

Page 12

1  as an expert at any time?
2    A.    No.
3    Q.    If you know, how was it that you were
4  contacted in this case?
5    A.    I believe the attorneys asked around who
6  teaches family law in the District of Columbia.
7    Q.    Now, I saw something in one of the
8  e-mails, and correct me if I'm wrong, between -- you
9  know, we've had disclosed e-mails back and forth
10  between you and the Ross Dixon & Bell --
11    A.    Yes.
12    Q.    -- attorneys as part of the disclosure in
13  this case.
14    A.    Uh-huh.
15    Q.    And it had something to do with the change
16  of the address in Armand Kuter's office. And it may
17  have just been a combined e-mail --
18    A.    It's first I've ever heard it.
19    Q.    -- and you were involved -- okay. Do you
20  have any relationship at all with Armand Cooter?
21    A.    No.

3 (Pages 9 to 12)

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

*Page 13*

1    Q.   Okay.  Or his firm?
2    A.   No.
3    Q.   Okay.  It may have been just a sequence of
4    e-mails that were not connected.  I just saw that on
5    the same page with an e-mail that you were involved
6    in.  May have been something being forwarded onto
7    you or something of that nature.  Because his office
8    changed and so his e-mail had that notice on it.
9    A.   If he transmitted one of the expert
10   reports or something, it might have been attached.
11   I wouldn't have focused on it.
12   Q.   Okay.  Do you know Armand Cooter?
13   A.   No.
14   Q.   Never met him?
15   A.   Nope.
16   Q.   Do you belong to any matrimonial lawyer
17   associations?
18   A.   Most years I belong to the family law
19   section of the American Bar Association if I
20   remember to send my dues in.
21   Q.   Have you attended any of their meetings or

*Page 14*

1    seminars --
2    A.   I've spoken -- I'm sorry.
3        THE REPORTER:  You're interrupting his
4    question.  Do you want to start again, please?
5    Q.   I didn't -- I was trying to be inclusive
6    and so I was -- you didn't realize I was continuing
7    my question.  Please answer as best you can.
8    A.   I have spoken at CLE sessions sponsored by
9    the family law section.
10   Q.   Of the American Bar Association?
11   A.   Of the American Bar Association.  Yes.
12   Q.   Do you have any materials that you
13   prepared for any of those presentations?
14   A.   I don't know.
15   Q.   Can you -- when is the last time you did
16   such an activity?
17   A.   Probably six years ago or maybe a bit
18   more.
19   Q.   Okay.  Can you recall the last topic that
20   you presented?
21   A.   It would have had to do either with

*Page 15*

1    unified family courts or something concerning child
2    custody.
3    Q.   Is there an area of focus in your own
4    studies or educational activities that you tend to
5    focus on within the broad spectrum of divorce or
6    matrimonial law, a subspecialty, if you will?
7    A.   I would probably be regarded as focusing
8    more on issues concerning children.  But I'm the
9    author of the chapters on marital property or the
10   chapter on marital property in the case book of
11   which I'm a coauthor.
12   Q.   Okay.  And that's referenced in your
13   publications?
14   A.   West publications, yes.
15   Q.   What courses do you teach or have you
16   taught in the last five years?
17   A.   I teach family law.  I teach a course
18   called Child, Family and State.  I have taught
19   evidence, although I may not have taught it in the
20   last five years.  And I usually teach a seminar on
21   constitutional issues that bear on families and

*Page 16*

1    children.  That changes from year to year in terms
2    what the topic --
3    Q.   Families with children, is that what
4    you're saying?
5    A.   Families and children --
6    Q.   And children.
7    A.   -- and the way in which constitutional
8    rights come into play.
9    Q.   Have you conducted any seminars or
10   advanced courses that are more of an individual
11   study nature, not just classroom presentations?
12   A.   Not advanced courses.  We don't have room
13   in our curriculum for advanced courses on family
14   law.  But I have supervised quite a few students who
15   have done independent research under my supervision.
16   Q.   What areas, specifically, have you worked
17   with students on research?
18   A.   Over the years, quite a range of family
19   law-related topics.
20   Q.   Give me a feel for how many we're talking
21   about.  Are we talking a dozen or several dozen?

*4 (Pages 13 to 16)*

*Corbin & Hook Reporting and Videoconferencing*
*410-268-6006   1-866-337-6778*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 17

1    A.    Several dozen.
2    Q.    Okay.  Have you given any presentations to
3    any District of Columbia bar group?
4    A.    No.
5    Q.    Have you attended any of the District of
6    Columbia matrimonial bar functions?
7    A.    No.
8    Q.    Have you -- have you maintained any
9    professional associations with any matrimonial bar
10   groups in New York?
11   A.    No.
12   Q.    And just so I'm clear, are you a member of
13   the D.C. bar?
14   A.    No.
15   Q.    Okay.  So you have never represented,
16   other than that one pro bono matter, anybody in the
17   District of Columbia?
18   A.    The pro bono matter was in New York.
19   Q.    In New York.  Right.
20   A.    I'm not licensed in the District.  I would
21   have needed to file a motion to appear.  I wouldn't

Page 18

1    practice in the District without a license.
2    Q.    Now, you were a professor of law at the
3    University of Pennsylvania; is that correct?
4    A.    I was a visiting professor.
5    Q.    And you were there for the 2001/2002 time
6    period?
7    A.    I was teaching at the law school for the
8    Fall term.  I taught their family law course.  I was
9    associated with the university for the full year in
10   my position as senior legal consultant to an
11   interdisciplinary group working on children's
12   issues.
13   Q.    And did you ever practice in the State of
14   Pennsylvania?
15   A.    No.
16   Q.    And you never became a member of the
17   Pennsylvania bar?
18   A.    No.
19   Q.    That was while you were still associate
20   professor here, I gather?
21   A.    Yes.

Page 19

1    Q.    That was --
2    A.    I was a tenured associate professor at
3    that time.
4    Q.    So you were an associate professor here
5    from '96 to '99, then was there a break or was that
6    contiguous --
7    A.    No, then I received tenure, and then I
8    became a tenured associate professor.
9    Q.    What occurred between June of '99 and July
10   of 2000?
11   A.    I'm sorry.  Where are you?
12   Q.    I'm looking at your Exhibit 1, your CV,
13   from -- you're saying from 2005 to the present
14   you've been a professor.
15   A.    Well, that's very interesting.
16   Q.    But there seems to be a gap --
17   A.    Yeah, I have --
18   Q.    -- of a year in there.
19        THE REPORTER:  You have to let him finish.
20   One at a time.
21        THE WITNESS:  Thank you.

Page 20

1    A.    I have a mistake on my CV that nobody else
2    has caught.  It's been there probably for years.
3    That would be actually until June 2000.
4    Q.    So it was continuous.  You --
5    A.    Yes.
6    Q.    -- were not on hiatus in there?
7    A.    No.
8        THE REPORTER:  Please let him finish his
9    question.
10   Q.    Have you ever prepared any presentation
11   notes or outlines related to either the concepts of
12   enhanced earnings and enhanced earning capacity or
13   celebrity status in the State of New York?
14   A.    If I have, it would have been in
15   connection with my teaching.
16   Q.    Do you recall one way or the other if you
17   have?
18   A.    I know that I have covered those topics
19   some years.  I certainly teach the Holterman case.
20   And to that extent, I have some lecture notes.  I
21   don't know.

*5 (Pages 17 to 20)*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

*Page 21*

1    Q.   You want to give her the spelling on any
2   cases you cite.
3    A.   Sure.  H-O-L-T-E-R-M-A-N, maybe two Ns,
4   I'm not sure.  I just don't know how comprehensive
5   my notes for my class lectures on that topic would
6   be.  Sometimes they are a line or two, and sometimes
7   they are more detailed.
8    Q.   Have you ever in your presentations or
9   teaching gone into a comparison of projected
10  outcomes for litigants regarding the issues of
11  enhanced earnings capacity or celebrity status,
12  comparing the District of Columbia law and the New
13  York law?
14   A.   No.  That really wouldn't come up.  Excuse
15  me.  I would like to supplement one of my answers.
16   Q.   Sure.
17   A.   There actually is a teacher's manual that
18  goes with the textbook, and in the teacher's manual
19  I'm sure that I have written something about the
20  Holterman problem.
21   Q.   Okay.  Since the textbook is obviously

*Page 22*

1   readily available and the teacher's manual isn't,
2   could we get a copy of that portion?
3    MR. SIMPSON:  We'll take the request under
4   advisement and respond to it.
5    MR. WHITWORTH:  Okay.
6    Q.   Now, you were also a visiting associate
7   professor of law at Boston College; is that correct?
8    A.   Yes.
9    Q.   And you didn't become a member of the bar
10  in Massachusetts or represent anybody there either?
11   A.   No.
12   Q.   When you were with that firm from '87 to
13  '94, the Paul Weiss, et cetera, firm, did you
14  actually try any cases in court?
15   A.   Yes.
16   Q.   What kind of cases?
17   A.   I tried a case involving the hazards in
18  congregate shelters for homeless men.  Received an
19  injunction against the City of New York that was
20  reported on the front page of the New York Times.
21   I tried another case, I took over another

*Page 23*

1   case in the middle of trial, a case I had not worked
2   on in preparation, because the lead attorney on that
3   case was pregnant and was unable to continue.  And
4   that involved the failure of the City of New York to
5   comply with laws regarding the services that had to
6   be provided to people being released from
7   psychiatric hospitals.  From public psychiatric
8   hospitals.
9    The corporate matters in my firm almost
10  never went to trial.  So it was largely a motion
11  practice, and I did argue quite a few motions.
12   Q.   So there was never a domestic matter that
13  you were even in court on on motions; is that
14  correct?
15   A.   A matrimonial matter?
16   Q.   A matrimonial matter.
17   A.   No.
18   Q.   So when I went to law school, they called
19  it domestic relations in Maryland.  What do they
20  call it here?
21   A.   Family law.

*Page 24*

1    Q.   Family law.  It's broader than just
2   matrimonial then?
3    A.   That's why I asked.  My question intended
4   to clarify.
5    Q.   Now, when you were at Yale, did you do any
6   representation of clients?
7    A.   As a law student?
8    Q.   Yes.
9    A.   Yes.  I participated in a prisoners'
10  rights clinic.
11   Q.   But nothing in the matrimonial law area?
12   A.   No.  I also prepared expert testimony
13  while I was a law student for a pro bono matter
14  involving medical coverage for reproductive medical
15  care.  That was brought by the Connecticut Civil
16  Liberties Union.
17   Q.   Okay.  I have a second exhibit that I
18  would like you to look at that is just a few
19  paragraphs about your background, and that was
20  within, it's in the materials that was provided, and
21  I was -- wanted to ask you what the origin of that

*6 (Pages 21 to 24)*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 25

1  document was.
2  **A.  I believe that I wrote this in response to**
3  **a request from either Rick or Meredith for a brief**
4  **description of my bio.**
5  Q.  So it was prepared for this case?
6  **A.  Yes.  It was redacted from other**
7  **descriptions.  I've used different lengths,**
8  **different levels of detail.**
9  Q.  It's intended as a summary?
10  **A.  Yes.**
11  Q.  There is a few questions that are
12  typically asked of an expert deponent that I'm going
13  to ask you now, so don't take offense.  I need to
14  know if you have ever been convicted of a crime.
15  **A.  No.**
16  Q.  I need to know if you've ever had a public
17  censure, reprimand, suspension or disbarment.
18  **A.  No.**
19  Q.  And I need to know if you've ever been
20  sued, and I think we covered that, but related to
21  anything in the practice of law?

Page 26

1  **A.  No.**
2  Q.  Been a part of any malpractice litigation,
3  anything like that?
4  **A.  No.  And just to clarify, the prior**
5  **litigation, the personal litigation, I was a**
6  **Plaintiff.**
7  Q.  I understand.  I'm going to jump ahead a
8  little bit out of order here in the terms of the
9  numbering of the documents.  I have an Exhibit 6
10  that I have had marked, and you may not have seen
11  this, but it has a list of items that I have
12  requested that counsel for the Defendant provide to
13  me regarding each of their experts.
14  And if you will turn to the top of
15  actually the sixth page on here, you will see
16  beginning with No. 18 things that I have requested
17  that they provide for each of the experts.  And I
18  want to just go -- use this as a bullet point so we
19  can make sure we covered all these things.
20  **A.  Sure.**
21  Q.  I have been provided with a whole sheaf of

Page 27

1  documents.  I just want to make sure it was
2  complete.
3  **A.  Uh-huh.**
4  Q.  The first item was all written reports of
5  each person expected to be called as an expert
6  witness of which, of course, you are one.  And I
7  have, of course, the written report in its final
8  form and what appear to be drafts with specific
9  dates on them which we'll address in a few moments.
10  MR. SIMPSON:  If I can interrupt for just
11  one second.  May I see the exhibit?
12  **A.  (Complies.)**
13  MR. SIMPSON:  Okay.  Thank you.
14  MR. WHITWORTH:  You have a copy there.
15  MR. SIMPSON:  Where are you?
16  MR. WHITWORTH:  On Page 6, Item 18.
17  MR. SIMPSON:  Thank you.
18  Q.  The drafts that we've been provided are in
19  the February time period.  Did you provide -- did
20  you make any drafts that were not provided to
21  counsel for the Defendant?

Page 28

1  **A.  No.**
2  Q.  How were the drafts done?  Were they
3  dictated or hand-typed yourself?  How did you
4  prepare them?
5  **A.  I entered them onto a computer.**
6  Q.  So you hand did them by yourself?
7  **A.  Hand, yes.  I did not use a secretary.**
8  Q.  Okay.  Thank you.  Did you make any notes
9  while you were reviewing the cases or doing your
10  research?
11  **A.  I produced to Ms. Bank's attorneys all of**
12  **the handwritten notes that I ever made and that I**
13  **had in my file.**
14  Q.  Let's address those notes for a moment
15  just to make sure we have them all.  I have marked
16  as Exhibit 5, and just keep that other exhibit
17  handy, because we'll finish that checkoff list --
18  **A.  Yes.**
19  Q.  -- what I have gleaned from all the
20  materials that I was provided that were -- appear to
21  be your notes.  Would you tell me, please, what

*Corbin & Hook Reporting and Videoconferencing*
**410-268-6006   1-866-337-6778**

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 29

1  document that is, has the No. 960 on the bottom
2  right-hand corner, which is the first page of
3  Exhibit 5, what that is?
4  **A.    This appears to be notes that I made in**
5  **connection -- in preparation for a phone call with**
6  **Rick.**
7  Q.    Meaning Rick Simpson?
8  **A.    With Rick Simpson.**
9  Q.    Defense counsel?
10  **A.    And notes that I made during that**
11  **conversation.**
12  Q.    Do we -- I see something down there, it
13  looks to be a date, 2/9 --
14  **A.    No.**
15  Q.    -- 10-page better, what is that about?  If
16  you can clarify it.
17  **A.    It's not a date.**
18  Q.    Thank you.
19  **A.    What I recall is -- what we had originally**
20  **discussed because he retained -- I was retained.  I**
21  **think we had our first conversation around the third**

Page 30

1  **week of January.  Although I'm not certain, because**
2  **now that I'm not in practice, I do not keep a**
3  **diary.**
4  **And the letter was needed in early**
5  **February.  And so, when we talked initially, we**
6  **discussed perhaps doing a preliminary opinion letter**
7  **that could be supplemented later, depending on how**
8  **complicated it turned out to be.**
9  **And so, as we were talking, what I recall,**
10  **as I said, when you mean a short preliminary letter,**
11  **do you mean a two-page summary or, you know, a**
12  **nine-page summary?  He said, 10 pages would be**
13  **good.  That's what those notes.**
14  Q.    Maybe he figured that would be longer than
15  my attention span.
16  **A.    I doubt that very much.**
17  Q.    Maybe sometime I'll get to ask him why 10
18  pages as opposed to 9.
19  **A.    I was really trying to get at the level of**
20  **detail that he wanted in the first letter, although**
21  **it turned out to be sufficient for what was needed.**

Page 31

1  Q.    Now, I have gotten a dearth of material
2  about your billing and your activities in this case
3  other than these few notes and this summary invoice,
4  and I'll just refer to that as Exhibit 9 which I've
5  marked.
6  **A.    Uh-huh.**
7  Q.    Is there anything else other than
8  Exhibit 9 that in any way evidences what work you
9  actually did in terms of the dates you worked on it,
10  the time you worked on it, what sources you went to,
11  that sort of thing?
12  **A.    No.**
13  Q.    Why not?
14  **A.    Because I am not -- when I was in practice**
15  **at a large firm, I kept a very detailed diary.  That**
16  **was required.  There was -- those were entered into**
17  **a computer.  I could always go back and find out**
18  **what I had done with every five minutes of my time.**
19  **That is not how I work at present.**
20  **So I keep very informal notes on the**
21  **number of hours that I've worked on a matter like**

Page 32

1  **this.  And I know what I have done, but I don't need**
2  **to reduce it to writing, because I don't need to**
3  **share it with anyone else.**
4  Q.    Well, in this case, if you've made notes
5  contemporaneous with your activities, I believe they
6  are within the scope of what we've requested.
7  **A.    I did not make notes about what I was**
8  **doing.  I make notes that I actually do not retain**
9  **after I enter them into the total that's going to go**
10  **on my bill.  They are like little stickies.  I don't**
11  **have the little stickies.**
12  Q.    And I didn't see like a letter of
13  retainage.  I may have missed it, but was there some
14  engagement letter or something that was done by
15  either party in this case for your engagement?
16  **A.    I don't believe so.**
17  Q.    Tell me how it came about that you were
18  retained.
19  **A.    By oral agreement.**
20  Q.    When was the call?
21  **A.    As I said, I first spoke to Rick I believe**

*Corbin & Hook Reporting and Videoconferencing*
*410-268-6006  1-866-337-6778*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 33

1  roughly the third week in January.  He gave me the
2  general outlines of the issue.
3     Q.   Orally over the phone?
4     A.   Orally over the phone.  We agreed to talk
5  a few days later, because I wanted to think about
6  whether this was something I wanted to do.  And I
7  also wanted to find out what kind of time commitment
8  would be entailed.  And then we needed to talk about
9  my fee.
10    Q.   Did he tell you how it was that he
11 happened to make the call to you?
12    A.   I believe he knows the dean of my law
13 school.
14    Q.   Okay.  Who is that?
15    A.   Fred Lawrence.
16    Q.   Do you know if Fred Lawrence recommended
17 you or gave him your name?
18    A.   I don't know.
19    Q.   Had you ever heard of Joseph Stiglitz
20 before?
21    A.   Yes.

Page 34

1     Q.   What context were you familiar with his
2  name?
3     A.   I knew of him as a leading economist.  My
4  husband is on the faculty at Columbia University.
5  My son a few years ago when he was taking an
6  economic course at Harvard forwarded me an article
7  written by Stiglitz that he thought I would find
8  interesting.
9         And also put me on a -- not a blog, but
10 some sort of e-mail mailing list from which I get a
11 report every six weeks or so that Stiglitz and
12 another economist, whose name escapes me, put
13 together articles or summaries of recent research by
14 other economists, not their own research, that might
15 be of interest to people who read things like the
16 Wall Street Journal.
17    Q.   Do you recall what the article was your
18 son sent you?
19    A.   I don't.
20    Q.   Did it have anything to do with
21 matrimonial or domestic law at all?

Page 35

1     A.   No.
2     Q.   It was purely an economic issue?
3     A.   Yes.
4     Q.   And your interest, is it related at all to
5  your professional activities or more just interest
6  in investing and the economy in general?
7     A.   Both.
8     Q.   Has anything that's been published or that
9  you have read that Doctor Stiglitz has written been
10 utilized by you in any of your courses?
11    A.   No.
12    Q.   Has -- are you aware of anything that he's
13 written that in any way relates to domestic or
14 matrimonial law?
15    A.   No.
16    Q.   Was this before or after he became a Nobel
17 Prize winner, if you recall?  That was, would have
18 been in October of '01 that it was announced and
19 prize monies were distributed the following --
20    A.   After.
21    Q.   -- early the following year.  After that

Page 36

1  point?
2     A.   Yes.
3     Q.   So you were aware he was a Nobel Prize
4  winner then?
5     A.   I don't recollect clearly.  I knew he was
6  an important economist.
7     Q.   Were you aware of his tenure in D.C. as in
8  the Clinton administration or the World Bank?
9     A.   I probably was aware.  I'm not sure -- I
10 could have, you know, easily pulled that together if
11 I hadn't been reminded of it.  But I am something of
12 a news junkie, so I was aware of people in major
13 roles in the administration.
14    Q.   I will go ahead and throw it out there.
15 Did you think he was a celebrity?
16    A.   Absolutely not.
17    Q.   Okay.  Why not?
18    A.   I'm interpreting your question to mean a
19 celebrity within the meaning of New York law.  And
20 celebrity --
21    Q.   That was a fair interpretation.

9 (Pages 33 to 36)

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 37

1    A.   I would have answered no even if you had
2  meant it in a broader context.  He's certainly not
3  going to be on the front page of, you know, Us
4  Magazine.  But in the context of New York law, the
5  scope of celebrity has been confined to
6  entertainers.
7    Q.   No one other than entertainers?
8    A.   No one other than entertainers.
9    Q.   And you're talking about reported
10  opinions; is that correct?
11    A.   Yes.
12    Q.   Because, in fact, you don't know what's
13  gone on in the matrimonial courts where the files
14  are sealed; do you?
15    A.   No.
16    Q.   So, in fact, someone other than an
17  entertainer could have been determined to have been
18  a celebrity under New York law that would not have
19  necessarily been a reported opinion?
20    MR. SIMPSON:  Object to the form.
21    Q.   Isn't that true?

Page 38

1    THE WITNESS:  Are you instructing me?
2    MR. SIMPSON:  No.  No.  You can answer.
3  I'm just object to the form of the question.
4    A.   It -- all things are possible.  However,
5  as far as the doctrine is concerned, the only thing
6  that is relevant is reported opinions.  And I would
7  say beyond reported opinions, we sometimes have
8  small clips in the New York Law Journal which might
9  not cover a sealed matrimonial opinion, but
10  certainly go beyond formally published opinions.
11    And since this has been a subject of great
12  interest to the New York bar, I would be -- and all
13  of the published discussions of the doctrine cite to
14  the very small number of cases, there are also
15  reported cases declining to extend celebrity status
16  beyond the very narrow framework in which it has
17  been found.  So I'm relying on those reported cases
18  as well.
19    Q.   Now, you will agree with me, I would
20  think, that a court could make a determination of
21  enhanced earning capacity for a spouse without

Page 39

1  finding celebrity status; is that correct?
2    A.   Absolutely.
3    Q.   So is it fair to say that celebrity status
4  is one way that you could find an enhanced earning
5  capacity?
6    A.   Yes.  Let me just say I would not put it
7  that way, but one could.
8    Q.   I will bite.  How would you put it?
9    A.   The celebrity status cases have a couple
10  of components.  And one is that in all the
11  instances, three reported cases, one in New Jersey,
12  in all the instances the spouse has contributed
13  directly through services to -- the noncelebrity
14  spouse has contributed directly to the career of the
15  so-called celebrity spouse.  I would distinguish
16  that from other enhanced earnings cases.
17    Q.   And based on the facts that you've been
18  given -- and let me just clarify that.  I have
19  Exhibit 3 here that I believe to be a statement of
20  facts that you were working from, and I would like
21  to show that to you.

Page 40

1    Please identify what I've given to you as
2  Exhibit 3 which also has the identification number
3  of 1349 on the bottom right-hand corner.
4    A.   Yes.  This appears to be the statement of
5  facts that Ms. Bank's attorneys gave me and asked me
6  to work with.
7    Q.   And as I understand the materials that
8  I've been provided, if my interpretation is correct,
9  you have not reviewed depositions or pleadings or
10  other sources of facts other than Exhibit 3; is that
11  correct?
12    A.   Not entirely.
13    Q.   Tell me what other sources of fact that
14  you're relying on in any way to form your -- any
15  opinions that you hold in this case beyond
16  Exhibit 3?
17    A.   On the first page of my opinion letter, I
18  detail some expert opinions that were shared with
19  me.
20    Q.   Thank you.  Those were the economic
21  reports done in the underlying case?

*10 (Pages 37 to 40)*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 41

1  A.  Yes.
2  Q.  In addition to that statement of facts --
3  A.  Yes, sir.
4  Q.  -- does that summarize the sum total of
5  your fact investigation before you did your
6  research?
7  A.  Yes.
8  Q.  Okay.  And all those were provided to you
9  by Ms. Bank's counsel?
10  A.  Yes.
11  Q.  And you had all those before you began
12  your inquest?
13  A.  At some point very early on.
14  MR. SIMPSON:  Object.
15  A.  Yes.
16  Q.  Have you at any time asked the attorneys
17  for Ms. Bank or any -- inquired of any other source
18  of additional factual information in order to
19  supplement what we've identified as your universe of
20  facts?
21  A.  Yes.  As my letter indicates, after I had

Page 42

1  **already drafted my opinion letter, I asked them**
2  **whether I could see the settlement agreement, and**
3  **they shared it with me.**
4  Q.  And that's a settlement agreement that was
5  done in 2004 in New York?
6  A.  Yes.
7  Q.  Now, have we identified your total source
8  of facts upon which you base your opinions?
9  A.  Yes.
10  Q.  Let me go back to Exhibit 9.  I apologize
11  for hopping around, that's your invoice, but I'm
12  trying to piece this together.  So you kept small
13  pieces of paper, little yellow Post-it notes, that
14  you then at some point gathered up and totaled up
15  and came up with the 26 hours and 45 minutes?
16  A.  Yes.
17  Q.  Did you keep it like in 10-minute,
18  15-minute intervals, or what's your increment?
19  A.  10 minutes.
20  Q.  10 minutes.  Okay.  Which makes it a
21  little tough to come out with 45 minutes, but in any

Page 43

1  case, and how --
2  A.  Excuse me.
3  MR. SIMPSON:  Objection.
4  A.  That is not correct.  Because if I worked
5  45 minutes, I didn't round it up to 50.
6  Q.  Okay.
7  A.  And on a project like this, I tend to work
8  in fairly concentrated periods.
9  Q.  So you did it in blocks of time?
10  A.  Yes.
11  Q.  How much before February the 9th were you
12  retained?  Was it two or three weeks or --
13  MR. SIMPSON:  Objection.
14  Q.  You indicated that you thought you had
15  been called in January, but I was just trying to
16  get --
17  A.  Yes.
18  Q.  -- when in January?
19  A.  I told you I thought roughly the third
20  week of January.
21  Q.  So it was only a relatively couple of

Page 44

1  weeks time then?
2  A.  It was a --
3  MR. SIMPSON:  Object to the form.  Asked
4  and answered.
5  A.  Yes.
6  Q.  This 26 hours was done within a couple of
7  week -- two-week time period?
8  MR. SIMPSON:  Objection.
9  A.  Yes.
10  Q.  Okay.  And how did you derive your hourly
11  rate?
12  A.  Based on the last -- two things.  Based on
13  the last time I had served as an expert witness,
14  based on what I had been paid for consultations not
15  as an expert witness but for other purposes.  And
16  the -- what I am accustomed to being paid when I do
17  work that is requested by other people that is not
18  the work that I would normally pick up and choose to
19  do as a professor.
20  Q.  And I take it as a professor at your
21  university, there are no restrictions on your

*Corbin & Hook Reporting and Videoconferencing*
*410-268-6006   1-866-337-6778*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

*Page 45*

1  outside work?
2    **A.  The formal requirement is no more than 20**
3  **percent of your time over the course of the academic**
4  **year.  In other words, roughly one day a week.**
5    Q.  Okay.
6    **A.  But you can work during a two-week period,**
7  **more than two days.**
8    Q.  A concentrated amount.
9    **A.  Yes.**
10    Q.  I understand.  Now, I see your address is
11  in New York.  Is that your residence?
12    **A.  Yes.**
13    Q.  And what, you commute down here to teach?
14    **A.  Yes.**
15    Q.  During the year, this past year, let's say
16  the 2007 year, have you approached that 20 percent
17  of outside activities?
18    **A.  Nowhere near.**
19    Q.  So you keep it at a significantly lower
20  level than the maximum you're allowed to do?
21    **A.  Yes.**

*Page 46*

1    Q.  Okay.  Let's go back to Exhibit 5, those
2  notes we were looking at a few moments ago.  It's
3  the one with your handwritten notes there.  Some of
4  your writing is readable to me.  Some is not.  Why
5  don't you just read through what Exhibit 5 says?
6    **A.  I appreciate your tact.  Okay.**
7    Q.  And what I would like you to do is read
8  what it says --
9    **A.  What it actually says and then explain**
10  **it?**
11    Q.  Not the shorthand.
12    **A.  Absolutely.**
13    Q.  Just what that shorthand means.
14    **A.  Okay.  Up in the upper right-hand it says**
15  **two hours.  It says, Rick, need more facts, re**
16  **timing of work leading to prize.**
17      **On the right it says args, I believe, but**
18  **I am not certain, it says fight against something**
19  **marital P property.**
20    Q.  Do you know what that reference is?
21    **A.  Yes.  That would be I think when Rick and**

*Page 47*

1  I spoke, he was telling me that Stiglitz was arguing
2  that the prize was not marital property based on the
3  timing.
4      Then under that, nature of settlement.
5    Q.  Is that a question that you were asking?
6    **A.  Yes.  What were the terms of the**
7  **settlement.**
8    Q.  And then the next, the two bullet points 1
9  and 2 there with arrows?
10    **A.  Yeah.  This was a -- I believe at a very**
11  **early point in my thinking, and I was thinking how**
12  **do I structure my findings.  What's the best way to**
13  **compare the two jurisdictions.**
14      **In other words, point-by-point on each**
15  **item of law, or the approach that I ultimately used**
16  **which is one, to show a D.C. court could have**
17  **awarded -- arrived at, arrived at similar result by**
18  **different route.  Two, to show that -- reading it in**
19  **the actual words, to show outside scope of unique**
20  **New York jurisprudence.**
21    Q.  What do those two items mean first in

*Page 48*

1  terms of were they your thoughts or something that
2  Rick said to you?
3    **A.  They were my thoughts.**
4    Q.  And what does particularly that second
5  item mean?
6    **A.  Well, I was certainly before having**
7  **researched it completely familiar with the notion of**
8  **celebrity status in New York.  And my initial view**
9  **was that this -- that Stiglitz would not fall within**
10  **that.  And that, therefore, I would need to explain**
11  **why he didn't.**
12    Q.  How about enhanced earnings, were you
13  focusing on that at all?
14    **A.  Not at that point.**
15    Q.  Okay.  Were you aware that enhanced
16  earning capacity was an issue in his case in New
17  York?
18      MR. SIMPSON:  At the time of his --
19    Q.  At the time of this.
20    **A.  I am not certain when I focused on it.  I**
21  **believe that in our early conversation, Rick had**

*Corbin & Hook Reporting and Videoconferencing*
*410-268-6006   1-866-337-6778*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 49

1  asked me something about, you know, was I familiar
2  with the celebrity goodwill notion, and I was. And
3  I'm not sure whether we got beyond that in the
4  conversation. This was very early.
5      Q.   And then the next notations there ending
6  in the items MY, and then the circled amount or
7  numbers, what is that about?
8      A.   Okay. When we then spoke on the phone,
9  these were my notes of what I wanted to just -- I
10 had these two questions, and then I also just wrote
11 down my current thinking. I'm not sure whether I
12 actually shared that with him or not in our
13 conversation.
14          I pulled this piece of paper in front of
15 me when we were on the phone. And I believe I asked
16 or he volunteered that there would be competing --
17 no, there were competing experts in New York. So,
18 this was I guess before I saw the expert reports.
19 And he said, one or two, you know, on each side.
20 Something like that.
21     Q.   And what's the circled indication down

Page 50

1  below the things, the information we already
2  discussed about the 9 or 10-page length?
3      A.   It's says formal opinion letter. Formal
4  OP letter later.
5      Q.   Over on the left-hand side there is a
6  No. 5, appears to be 515K. What do those relate to?
7      A.   That I was asking $500 an hour. And that
8  I wanted a minimum number of hours that would amount
9  to $15,000.
10     Q.   And as of that bill, Exhibit 9, you showed
11 me or we discussed earlier, you hadn't quite gotten
12 there, but you felt with the additional work you
13 will, so that will be --
14     A.   Actually, no. They agreed to 500 an hour
15 but not to 15,000 guaranteed.
16     Q.   Okay. And you were willing to go forward
17 anyway?
18     A.   Yes.
19     Q.   Okay. And your hourly rate for your time
20 in deposition is the same as your hourly rate for
21 doing the other work?

Page 51

1      A.   Yes.
2      Q.   And I take it that same rate will apply if
3  you testify at trial?
4      A.   I would assume so.
5      Q.   Let's continue through the notes if we can
6  just to accomplish that task. Can you tell me in
7  sequence, if you can just look through these, are
8  these in some chronological order one way or the
9  other, or are they just random in the order that I
10 have them here? I put them in the same order they
11 were numbered and given to me.
12     A.   If you will give me a minute to review
13 them.
14     Q.   I will give you a minute to look at them,
15 sure.
16         (Discussion off the record.)
17         MR. WHITWORTH:  We can take a break.
18         MR. SIMPSON:  Okay.
19         (Whereupon a brief break was taken, after
20     which the following was heard:
21     Q.   Before we took a break, I was asking you

Page 52

1  to look through your notes and tell me if, first, if
2  they were in some sort of time sequence.
3      A.   These notes appear to be in the correct
4  sequence.
5      Q.   Meaning the one on the top is the
6  earliest?
7      A.   No. Meaning the one that we already
8  discussed actually is out of order.
9      Q.   Thank you.
10     A.   But the next three sheets are in order.
11     Q.   In which order? In other words, is it --
12         MR. SIMPSON:  Which is the oldest, you
13     mean?
14     Q.   The 961, 962, and 963.
15     A.   961 and 962 come first. The 960 comes
16 after 962. And then 963 would be the last set of
17 the notes.
18     Q.   Okay. Let's go through then first with
19 961, and tell me what the occasion was for these
20 notes and what they indicate.
21     A.   This was my first conversation with Rick.

13 (Pages 49 to 52)

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 53

1    Q.    Okay.
2    A.    My notes.
3    Q.    That's in that third week of January time
4    period?
5    A.    Yes.
6    Q.    And this is when he's just telling you the
7    overview and the parties, that sort of thing?
8    A.    Uh-huh.  Yes.
9    Q.    Tell me what they specifically say and
10   stating the complete statement for any abbreviations
11   you may have used.
12   A.    Okay.  Right at the top it says he's a
13   friend of Fred's, that would be my dean.
14   Q.    Rick is?
15   A.    Huh?
16   Q.    You mean Rick is?
17   A.    That Rick is a friend of Fred's.
18   Q.    Say hi to Fred for me.
19   A.    Exactly.  So that's where I formed the
20   impression that perhaps Fred had mentioned me.
21         On the top here, New York.  He wanted to

Page 54

1    know was I admitted to New York, I guess.
2    202-662-203 something.  Is that perhaps Rick's
3    number?
4          And he told me that he's in a firm that --
5    a civil litigation firm that does general
6    litigation, mostly professional liability,
7    especially lawyers.  Coverage litigation.  And that
8    he was working with Meredith Werner on this matter.
9          And after he had briefed me, I think on
10   the top here, I wrote, we should talk on Thursday
11   afternoon.  I should call him on Thursday.  He would
12   be in his -- he would be in and reachable.  And --
13   Q.    After the legal malpractice case in D.C,
14   needs expert, the W stands for with?
15   A.    Witness.
16   Q.    Witness.  Thank you.  What's the rest of
17   that?
18   A.    For the general case.  Initially, when he
19   told me -- again, this is my recollection.  When he
20   told me that it was a legal malpractice case,
21   involving issues such as standards of care, I said

Page 55

1    that I would not be the right expert for that
2    question.
3    Q.    And why was that?
4    A.    I guess I was interrupting him, because I
5    don't work in the area of professional
6    responsibility.  And he said, no.  So he was saying
7    we need an expert witness for the general case.  And
8    he said, no, no.  That wasn't what I had in mind.
9    There is somebody else we use, whatever, for that.
10         And he said, this is a pure legal
11   question.  So then he gave me the facts that lay
12   behind the pure legal question.  He wanted to ask me
13   about family law in the two jurisdictions.
14   Q.    So your expertise was focused purely on a
15   legal question of analysis of law?
16   A.    Yes.
17   Q.    And then he told you his client was Rita
18   Bank, lawyer in D.C., matrimonial law; is that what
19   that says?
20   A.    Yes.
21   Q.    The client, meaning Rita's client, was

Page 56

1    Joseph Stiglitz is suing her and it was versus Jane
2    Hannaway was the --
3    A.    With reference to the case Stiglitz V. --
4    Q.    The underlying case name?
5    A.    Yes.
6    Q.    What's that, Bank represented Stiglitz?
7    A.    Yes.
8    Q.    What's the next line there?
9    A.    He left in June in D.C. or something and
10   then he moved to New York.  Joe moved to New York.
11   Q.    Lived in D.C.  Is that what it says?
12   A.    No.  I believe it --
13   Q.    June in D.C.
14   A.    June in D.C.
15         MR. SIMPSON:  Jane in D.C.?
16         THE WITNESS:  Oh, Jane in D.C.  Thank
17   you.
18         MR. WHITWORTH:  Thank you, Rick.
19   A.    We may need to get one of my former
20   secretaries in here actually.  Okay.  Jane in D.C.
21   Joe moved to New York.  Negotiations over the --

*14 (Pages 53 to 56)*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 57

1  regarding divorce in D.C.
2     Q.   Please continue.
3     A.   Hannaway sued Joe in New York.  Litigated
4  in New York and settled.  Joe sued Rita for
5  malpractice.  One, she should have filed in D.C.
6  before he was sued in New York.  He says he
7  instructed her.
8        Hannaway deposition supports our client,
9  Rick's client.  Issues re what was nonmarital.  He
10  had girlfriend.  Standard of care.  Question,
11  differences between New York and D.C. law.  Stiglitz
12  contends New York recognizes celebrity status so
13  unfavorable to him.  We, Rita's attorneys, argue --
14  the last line is cut off.
15     Q.   We need to see the original so we know
16  what the last line is, because it's cut off on the
17  copies we got.
18     A.   On the left, settled without court
19  opinion.  Standard of care in D.C., expert, are
20  arguments regarding equitable distribution, ED,
21  equitable distributions.  Ultimate result in range

Page 58

1  reasonable in D.C. if to trial.
2     Q.   Are these notes on the left things that
3  Rick was telling you?
4     A.   I don't remember.  I know the one, I know
5  I would have asked him is there a reported opinion,
6  and he said, no, they settled.  Not even reported.
7  Is there -- did the court issue any opinions that I
8  could see, and he said no.  But the other, I'm not
9  sure.
10        MR. WHITWORTH:  Counsel, do we have the
11     original available that we could -- she could
12     read what the rest of it looks like.
13        MR. SIMPSON:  I don't believe we have it
14     here, but we'll follow up during the next
15     break.
16        MR. WHITWORTH:  Thank you.
17        MR. SIMPSON:  So we know where we are.
18     Q.   Okay.  Is there anything else that
19  occurred contemporaneous with these notes that your
20  memory is refreshed from having reviewed them that
21  you haven't stated on the record?

Page 59

1     A.   No.
2     Q.   And I understand from your earlier
3  statement that 962 is a continuation of the notes
4  from 961?
5     A.   I believe so.  I'm not positive, but I
6  believe so.  Yeah.  Because I question, first
7  question at the bottom of the proceeding page, now
8  question simple facts to assume.  Adultery alleged.
9  Again, simple facts.  Legal opinion comparing --
10  compares New York and D.C.
11     Q.   Is this what he's telling you he needs?
12     A.   Yes.
13     Q.   The Q stands for question?
14     A.   Yes.
15     Q.   Are you asking him to give you a statement
16  of facts?
17     A.   No.  I'm putting -- he's saying here's
18  what we're looking for somebody to answer these
19  questions.  So I'm putting the question what is.  He
20  will give me simple facts that I can take for
21  granted.  I don't need to go out and collect the

Page 60

1  facts.  Adultery is alleged.  Simple facts.  Legal
2  opinion, compare New York and D.C.
3        While D.C. does not have established case
4  law, some factors can't say division or decision --
5  I'm not entirely sure -- was totally different.
6     Q.   Again, is this your statement or Rick's or
7  part of a question?
8     A.   Part of a question.
9     Q.   That you made to him?
10     A.   I don't know.
11     Q.   I mean, off the top of your head, did you
12  understand the issue, or did you need to look into
13  the case law?
14     A.   I understood the issue.
15     Q.   Could you have given him a written report
16  without spending the 23 hours going into the case
17  law or --
18     A.   Not --
19        MR. SIMPSON:  Object to the form.
20     A.   Not as I understand my obligations.  No.
21     Q.   So you knew the basic concepts, but you

15 (Pages 57 to 60)

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 61

1  needed to review the cases and flesh out the
2  details?
3      **A.   That's correct.  And one could always be**
4  **surprised by a recent decision.**
5      Q.   Okay.
6      **A.   It would be -- I would never give an**
7  **opinion without researching my assumptions.  And**
8  **when I was in practice, I would never have answered**
9  **even a relatively simple question from a client**
10 **without checking that my understanding of the law**
11 **was accurate and up-to-date.**
12     Q.   Okay.  And you believe that's an
13 obligation any attorney has representing a client?
14     **A.   Yes, I do.**
15     Q.   What's the next statement on there?
16     **A.   Dispel notion New York exceptional.  And**
17 **that was part of the question, it wasn't an**
18 **instruction.  He wanted to know could we dispel the**
19 **notion.**
20     Q.   So he was asking you this question?
21     **A.   Yes.**

Page 62

1      Q.   What does narrow Q refer to?
2      **A.   He was emphasizing to me that he didn't,**
3  **he was not retaining me to look at all of the legal**
4  **issues in the case.  But that there were very narrow**
5  **group of matrimonial law questions where he was**
6  **asking me to compare the two jurisdictions.**
7      Q.   And that is summarized in your letter as
8  well; is it not?
9      **A.   Yes.**
10     Q.   The opinion letter, I'll refer to it, it's
11 dated February 9th?
12     **A.   Yes.**
13     Q.   Please continue on with what the rest of
14 your notes on 962 referred to.
15     **A.   Oh, that Rick and his colleagues would**
16 **need to disclose who their experts were somewhere**
17 **between January 31 and early February.  So we really**
18 **needed to determine quickly whether I was doing**
19 **this, which was I think why we said we would talk**
20 **again in a few days.  It's in Federal Court.  Bank**
21 **lives in Maryland, and they moved the case to**

Page 63

1  Federal Court.
2      Q.   Did they tell you why?
3      **A.   No.  It wasn't pertinent to what I'd be**
4  **doing.**
5      Q.   That's fine.
6      **A.   Expert -- oh, they were going to do these**
7  **expert disclosures, then they were going to go to**
8  **mediation.  Something in writing initial opinion**
9  **somewhere between the 31st and the 7th.  And if**
10 **needed, a more detailed -- more --**
11     Q.   Does that say prior to deposition perhaps?
12     **A.   Yes.  No, no.  I was trying to see if it**
13 **detailed it.  I'm not sure what it really says.  D,**
14 **to something, something more, prior to dep.**
15         **On the left, admitted in New York.  That's**
16 **my note.  I'm just speaking to him, yes, I'm**
17 **admitted in New York, and I'm writing notes.  I do**
18 **that when I'm on the phone.  It keeps me awake.  And**
19 **that my knowledge of D.C. law is as an academic and**
20 **not as a practitioner.**
21     Q.   Page 963, the last of these four pages of

Page 64

1  Exhibit 5 to this deposition, as I recall, you said
2  the sequence is this was the latest --
3      **A.   Yes.**
4      Q.   -- of the four pages --
5      **A.   Yes.**
6      Q.   -- after the 960 that we looked at first?
7      **A.   Correct.**
8      Q.   Can you tell me the occasion that these
9  notes were taken?
10     **A.   This is a very early preliminary outline**
11 **of what I want to put in the letter, how I'm going**
12 **to structure the letter.**
13     Q.   Then we have a draft of Thursday, February
14 the 8th that I've been provided, and I'm not saying
15 that's the only draft.  But -- and we know the final
16 letter was dated February 9th.  Can you put that in
17 timeframe for me when you did 963?
18     **A.   Well, let's see.  I spent after we had**
19 **this agreement, I wanted -- I looked at the expert**
20 **opinions.  I did some reviewing of the cases I knew**
21 **were essential.  Began to shepherdize them to make**

*16 (Pages 61 to 64)*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 65

1  sure of changes and so forth before I really -- I'm
2  not sure if I did this before I actually started to
3  look at the cases again or whether I did this based
4  on my knowledge of the general outlines of the case
5  law.  I'm just really not sure.
6        But I believe I did this as I was starting
7  to read the expert -- the expert evaluations on the
8  property from --
9    Q.   The economic experts analyzing Joe
10  Stiglitz's good will.
11    A.   I was starting to get a sense of what the,
12  the conflicts and claims were about the good will
13  and the enhanced earning capacity.  I think that's
14  when I did this.  So --
15    Q.   Did you retain any notes from looking at
16  the cases?
17    A.   No.  I gave you all of the notes.  What I
18  do is sometimes I write notes in margins.  And I
19  gave Ms. Bank's attorneys everything I had that had
20  handwritten notes on it to produce.
21    Q.   So the cases that we got that might have a

Page 66

1  note or underline on them, those are the totality --
2    A.   Those are my notes.
3    Q.   -- of the notes that you made on those
4  cases?
5    A.   That's correct.
6    Q.   Did you highlight things in yellow?
7    A.   I gave them everything that I had marked
8  up.
9    Q.   Well, the reason I ask, if you highlight
10  things in yellow, because they don't come across in
11  photocopying, that's why I'm trying to find that
12  out.
13    A.   I may have.  I more commonly underline
14  with a pen.
15    Q.   Okay.  Because I highlight things all the
16  time.  When you copy them --
17    A.   I think I was working with a pen most of
18  the time.  I can't say that I didn't highlight
19  anything.
20    Q.   Thank you.
21    A.   So I was just sort of -- because both in

Page 67

1  terms of thinking about how I was going to organize
2  it so that I would know what research I needed to
3  do.  So as I think about it, I'm pretty sure this is
4  before I did research, because I was trying to
5  organize what research I needed to -- break it into
6  pieces that I could start to work on and start to
7  reduce some things to writing in my computer.
8        So, you know, first, what was the
9  question?  What are my qualifications?  A
10  conclusionary statement.
11    Q.   What's that mean when you say an
12  exclusionary (sic) statement?
13    A.   Well, one, two, three.  Qualifications.
14  Three, conclusions.
15    Q.   Oh, conclusory statement.  Thank you.
16    A.   I don't know if you want me to read this
17  to you or not?
18    Q.   Yes, go ahead.  In case I can't understand
19  something.
20    A.   If reach decision in court, each court's
21  -- each court's -- each court -- I'm sorry, no, I

Page 68

1  crossed out each.  Courts in each jurisdiction had
2  discretion to reach similar results by different
3  reasoning.
4    Q.   And you have a statement in your report to
5  that effect?
6    A.   Yes.  I didn't find anything that made me
7  decide that I was wrong in that conclusion.
8        Four, Nobel Prize, one case on point is
9  Ketterle.
10    Q.   And that was a 2004 case; is that correct?
11    A.   Yes.  And I said in my opinion, if it had
12  been published in time to bear on this.  In other
13  words, they settled, but if they had gone to trial,
14  presumably that would have been later, the court
15  might have been aware of Ketterle, it might not
16  have, depending on the timing.
17    Q.   Were you ever made aware that there are
18  issues in this case about whether they should have
19  gone to court earlier?
20    A.   Yes.
21    Q.   So you discounted that entirely?

*17 (Pages 65 to 68)*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 69

1     MR. SIMPSON: Object to form.
2     A.   No. That wasn't the question that I was
3 asked.
4     Q.   I got you.
5     A.   The only question I was asked was what is
6 the difference in law in the two jurisdictions.
7 What difference would it have made to the outcome if
8 they had proceeded in D.C. as opposed to New York.
9 I was not asked about the timing.
10    Q.   Okay. But you will concede because you
11 mentioned it in your report that, for example, the
12 D.C. law section you cited in your report was
13 October of 2004, changed in the previous section, in
14 the previous iteration of that?
15    A.   I remember it changed in the Fall. I
16 don't remember exactly which year offhand.
17    Q.   We will go over that later.
18    A.   Yeah. So yes, there certainly might be a
19 question which that, too, would have applied.
20 Okay. Distinguish work during M, marriage.
21    Q.   Where are you reading now?

Page 70

1     A.   I'm reading right to the right of the word
2 Ketterle. I'm sorry. Which is K-E-T-T-E-R-L-E.
3 And I was aware of that case before my first
4 conversation with Rick. Distinguish during M,
5 marriage, arg life course.
6     Q.   What's that mean?
7     A.   It's my shorthand for expectations of
8 future earnings based on enhancement of reputation
9 and professional good will and accomplishments
10 during the marriage.
11    Q.   Thank you. Immediately to the left of
12 that item are some notes, looks like may be a
13 question mark or something there.
14    A.   Uh-huh.
15    Q.   Would you clarify what those notes refer
16 to?
17    A.   CF, the Nobel, to stock options.
18 Intangible. Accumulated things. Patents.
19 Copyrights.
20    Q.   You were just writing down some examples
21 of things that would be intangibles?

Page 71

1     A.   Yes, and that increased your earning
2 capacity. And also that represent things that where
3 you are rewarded in a form that may be difficult to
4 value today for work that you performed during the
5 marriage and where it is clear that the payoff down
6 the road is marital property.
7     Q.   Did you ever focus on the issue that Joe
8 Stiglitz claimed that the work that led to the Nobel
9 Prize was all premarital work?
10    A.   I did.
11    Q.   And how did that factor if at all into
12 your opinion?
13    A.   Well, I said in my opinion that ultimately
14 that would have been an issue at trial, in which
15 they would have had to present evidence going both
16 ways. My own view is that it is not very credible.
17    Q.   Why?
18    A.   First of all, he had several coauthors on
19 the article that actually won the Nobel Prize. They
20 did not win the Nobel Prize. Secondly, while it is
21 true that the Nobel Prize recognizes specific pieces

Page 72

1 of work, it tends to go to people for -- who have a
2 broader reputation and they choose a piece of work
3 as being the most distinguished work.
4         And it's my view, although I'm not an
5 expert in how the Nobel Prize is awarded, but
6 certainly if I were representing him at trial on
7 this question and arguing that the Nobel Prize
8 wasn't celebrity, for example, I would say -- no
9 actually, let me retract that. I misspoke.
10        But the argument would be if he had
11 written that article with his colleagues and decided
12 to go take up pottery in Vermont, I would be shocked
13 if he ultimately won the Nobel Prize.
14        So his continued prodigious productivity,
15 his visibility, I would venture to bet, not being an
16 expert, and including all the work he did during the
17 marriage, contributed to the visibility that
18 reminded the Nobel Prize awarders to look at him and
19 to ultimately award the work for that, the award for
20 that earlier piece of work which he alone got and
21 not his coauthors.

*18 (Pages 69 to 72)*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

---

*Page 73*

1    Q.    You're aware that there was a period of
2  time that passed between when he did the work that
3  was cited and his marriage to Jane Hannaway; is that
4  correct?
5    **A.  Yes.**
6    Q.    And did you as part of your analysis
7  consider what activities he did during that time
8  period versus what he did post marriage to Jane
9  Hannaway?
10   **A.  No, I didn't.  In part because that really**
11 **wasn't the question I was asked.**
12   Q.    That's fine.
13   **A.    And I would like to tell you some of the**
14 **other reasons.**
15   Q.    Go ahead.
16   **A.    Because my reading of the expert reports**
17 **again convinced me that this was a matter for**
18 **trial.  There were differences as to what the facts**
19 **were.  I don't think it's a question we can answer**
20 **based on what we know without a hearing.**
21        **I would also just add that the length of**

---

*Page 74*

1  **the marriage suggests that an awful lot of work was**
2  **accomplished during the marriage as does his**
3  **curriculum vitae.**
4    Q.    Okay.  Please continue with the remainder
5  of your notes on 963.
6    **A.  Five.  New York celebrity status.  Elkus**
7  **case.  E-L-K-U-S.**
8    Q.    Which, of course, is in your opinion, and
9  we're familiar with it.
10   **A.  Yes.  Might not reach.  Limited to**
11 **achieved during marriage.**
12   Q.    I need you to explain what you mean by
13 those notes might not reach.
14   **A.  I didn't -- I was saying I didn't think he**
15 **would come within the confines of the celebrity**
16 **status doctrine.**
17   Q.    Okay.
18   **A.    Then I moved but without saying so in my**
19 **notes to this second group of cases that I think**
20 **you've -- or some of your questions suggest you've**
21 **collapsed into celebrity status, which are also, if**

---

*Page 75*

1  **not unique, certainly at a high-water mark in New**
2  **York.  And these are the enhanced earnings linked to**
3  **professional licenses.  And then I put CEOs, law Ps,**
4  **et cetera.**
5    Q.    What does that mean?
6    **A.    There are cases involving claims against**
7  **such people, they do not fit into that doctrine,**
8  **those are professional license cases.**
9    Q.    P, what is Ps referring to?
10   **A.  Law Ps, partners.**
11   Q.    Partners.  Thank you.
12   **A.    People, big high earners where spouses**
13 **have tried to piggyback on these what I regard as**
14 **professional license cases, and say that New York's**
15 **special doctrine extends beyond doctors and so**
16 **forth, for their schooling and residency, that's**
17 **what those cases are about, and to other**
18 **achievements.  And the courts have said no, that the**
19 **doctrine doesn't go that far.  So the CEO, Law Ps,**
20 **et cetera.**
21        **Here if his experts prevailed, the**

---

*Page 76*

1  **question would be status prior to marriage.  And --**
2    Q.    And tell me what that means, just so I'm
3  clear what you're saying.
4    **A.  Whether his professional status prior to**
5  **the marriage was as high and his earning capacity**
6  **was as high as it was some 32 years later when the**
7  **marriage ended.  And I would say that for a person**
8  **of his current status to say I haven't really**
9  **achieved much in the last 30 years would be fairly**
10 **surprising to me.**
11   Q.    Okay.
12   **A.    In terms of how people's careers develop.**
13   Q.    All right.
14   **A.    Now, this is refreshing my memory about**
15 **when I made these notes, and why even within the**
16 **general pathetic nature of my handwriting they are**
17 **even more illegible.  I had taken a number of the**
18 **expert reports with me on the Acela and -- where I**
19 **had several quiet hours to read them.  And as I was**
20 **reading about these issues concerning the**
21 **development of his career from both sides, I made**

---

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 77

1 these notes on the train.
2   Q.   I take it that's how you go and come from
3 your residence to your job?
4   A.   Frequently. But that's a nice, you know,
5 three, four hours of uninterrupted time, which could
6 even result in a 45-minute component. So then --
7 pardon my sarcasm. But in D.C., different question,
8 looks to future earnings, accumulation of future
9 assets.
10   Q.   And what do you mean by that?
11   A.   In the District of Columbia one of the
12 factors in equitable distribution is the capacity of
13 each party to accumulate assets in the future.
14   Q.   And on a continuum of spouses, Jane
15 Hannaway was particularly well-positioned to have
16 future accumulation; isn't that true?
17     MR. SIMPSON: Object to the form.
18   A.   Yes. But that isn't the question. The
19 question is the respective capacity of the two
20 spouses going, now going their separate ways.
21   Q.   So you're saying Joe's was greater because

Page 78

1 of the Nobel Prize --
2   A.   Exactly.
3   Q.   -- and his other status?
4   A.   Exactly.
5     MR. SIMPSON: Object to the form.
6   A.   And that that is something that the court
7 could take into account in crafting an equitable
8 division.
9   Q.   And then what's your -- what, No. 6, Point
10 No. 6?
11   A.   D.C. law equitable. Confer other jurs.
12 And then I had distinguish and, you know, I'm not
13 sure if this says MD or if I started to write MA,
14 which would bring me back to Ketterle, which is an
15 equitable -- if it was MA for Mass, Ketterle is also
16 an equitable jurisdiction, but it is a peculiar one.
17   Q.   Tell me what the CF other jurisdictions
18 means. Compare?
19   A.   Oh, yes, compare other jurisdictions. And
20 the reason that I would put that is that when there
21 is an issue of unsettled law in D.C., they look to

Page 79

1 other equitable jurisdiction states. And they quote
2 quite liberally, they cite to other equitable
3 jurisdictions when they consider new questions.
4   Q.   It is true, is it not, that D.C. does look
5 to Maryland particularly?
6   A.   Yes.
7   Q.   Isn't that what you were indicating by
8 distinguish Maryland?
9   A.   I don't remember.
10   Q.   Well, but D.C.'s law in terms of equitable
11 jurisdiction is more akin to Maryland's than, say,
12 Virginia; isn't it?
13   A.   Yes.
14   Q.   Of the immediate geographically close by
15 jurisdiction?
16   A.   So I might have been saying I should look
17 at Maryland, or I might have been saying talk about
18 Massachusetts, and if necessary, explain the
19 difference between equitable distribution in D.C.
20 and in Massachusetts. And I really don't remember.
21   Q.   I don't recall - and you can correct me if

Page 80

1 I didn't remember everything - you mentioning a
2 comparison with Maryland in your report?
3   A.   I don't believe I did, and I know I did
4 look at some Maryland cases. I don't recall finding
5 anything that I thought I needed to deal with one
6 way or the other. And in the cases I was looking
7 at, the D.C. court, there was one where they relied
8 very heavily on a Pennsylvania case, which is also
9 an equitable jurisdiction. And it just didn't
10 happen within the cases that I was looking at for
11 this, in preparation of the opinion letter that any
12 of the Maryland cases popped up as being
13 particularly important.
14   Q.   Now, how do you do your research? What
15 tools do you use?
16     MR. SIMPSON: Did she use in this case, do
17   you mean?
18     MR. WHITWORTH: Yes. The research in this
19   case. Of course.
20   A.   Well, I go into West Law or Lexis, one or
21 the other.

*20 (Pages 77 to 80)*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

*Page 81*

1    Q.    That's what I'm trying to find out.  Do
2  you subscribe to both services --
3    **A.    Yes.**
4    Q.    -- through the university?
5    **A.    Yes.**
6    Q.    Do you know, did you use both in this
7  particular endeavor?
8    **A.    I don't recall.**
9    Q.    And I take it your research was done
10  totally on-line?
11    **A.    No.**
12    Q.    Didn't go to the books or you did?
13    **A.    I always go to the books.**
14    Q.    Tell me what you did in this case.
15        MR. SIMPSON:  For legal research.
16    Q.    Your legal research.  What searches did
17  you make?
18    **A.    I probably looked at some things in**
19  **Oldham, which I have in hard copy.**
20    Q.    Spell that and reference it.
21    **A.    O-L-D-H-A-M.  In fact, I cite Oldham.**

*Page 82*

1  **Thomas Oldham.  He has a constantly updated summary**
2  **of matrimonial law economic distribution issues.**
3  **State by state.  Which also has very good footnotes**
4  **to leading cases for every concept.**
5        **I looked at the American Law Institute**
6  **notes, the comments.  Also, to lead me to something**
7  **that I might not have picked up on-line.  I started**
8  **of course with cases that I knew, Ketterle and**
9  **Elkus, and shepherdized them.**
10    Q.    Did you keep your shepherdization notes?
11    **A.    No, I don't.  You know, if I do it**
12  **on-line --**
13    Q.    You don't print those out?
14    **A.    -- you're jumping.  Yeah, if I printed**
15  **them, I gave them to you.**
16    Q.    Okay.
17    **A.    I sometimes print them, but I don't**
18  **always.**
19    Q.    Now, were there cases that you looked at
20  beyond the ones you printed that we were provided?
21    **A.    I provided you with all of the cases that**

*Page 83*

1  **I printed and did not cite.  I did not provide you**
2  **with cases I cited if I did not write on them.**
3    Q.    Okay.  In other words, you have cited the
4  case, but there were no comments that you made in
5  the margins or something like that?
6    **A.    Yes.**
7    Q.    Is there anything else you did in the
8  course of your investigation or research that you
9  haven't stated on this record?
10    **A.    Well, I read some annotations, some of**
11  **which I cited.**
12    Q.    What annotations did you read that you
13  didn't cite?
14    **A.    I gave them to you if I read them and**
15  **didn't cite them.**
16    Q.    They are within the materials that you
17  provided --
18    **A.    Yes.**
19    Q.    -- to counsel?  Okay.
20    **A.    Well, if I printed them.  I may have**
21  **pulled something up and said this isn't on point, or**

*Page 84*

1  I know all of this already.
2    Q.    Anything else that you did?
3    **A.    Not to my recollection.**
4    Q.    Okay.  Did you speak with anyone, a
5  colleague, another professor, a research student
6  that you exchanged views and exchanged information
7  about your project in this case?
8    **A.    No.**
9    Q.    When you were drafting, were there any
10  communications that you had with counsel for Rita
11  Bank or anyone else about the material that was
12  being put into your opinion letter?
13    **A.    No.**
14    Q.    The first, I believe, the first draft that
15  I have, and I will show it to you, I have marked as
16  Exhibit 4, it's February 8 of '07.  It's been
17  numbered 939 through 957.  Do you know if there was
18  a prior draft to this one?
19    **A.    There are two issues.  One is I didn't**
20  **start a new draft every day when I returned to work**
21  **on this.  So I don't believe there is a prior draft.**

*21 (Pages 81 to 84)*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 85

1    Q.    In terms of one being printed out?
2    **A.    Exactly.**
3    Q.    So this was a work in progress on your
4  screen, on your computer.  And obviously, it's quite
5  lengthy, so it took you a while to do it.
6    **A.    Exactly.  This was a work in progress,**
7  **continuing work.  I produced everything that I had**
8  **printed and everything that I had in my computer.  I**
9  **didn't have anything earlier than this.**
10    Q.    Can you give me, if not a breakdown, an
11  estimate of how much of that 26 hours and 45 minutes
12  you spent doing the digging, doing the exhuming the
13  law in the cases, annotations and shepherdization
14  versus the writing?
15    **A.    I would say maybe it's kind of hard to**
16  **separate out, because I was working on the letter in**
17  **pieces.  So that I would be going from fresh**
18  **research into the letter to write a paragraph based**
19  **on what I had just been researching.  And then I'm**
20  **not sure that I could break it down exactly that**
21  **way.**

Page 86

1    Q.    Give me a ballpark.
2        MR. SIMPSON:  Object to the form.  If you
3  can give a fair estimate, do that.  That's my
4  objection.
5        MR. WHITWORTH:  A fair estimate is another
6  way of saying it.  Certainly.
7        MR. SIMPSON:  If you're able.
8    Q.    And I apologize, I inadvertently stapled
9  two drafts together with this exhibit.  I didn't
10  intend to do it that way.  I thought there were
11  two.  And the first one is underneath the second.
12  We'll just leave them together as an exhibit.
13  That's fine.
14        But it's February 5th, so I want to
15  clarify that on the record.  That was my oversight.
16  I thought I had two.
17        But in any case, we have a February 5th
18  and February 8th version, and so let's start at the
19  bottom of the February 5th one, and it starts at
20  Page 949 --
21    **A.    I --**

Page 87

1    Q.    Let me finish, please.  It runs through
2  957.  Now you may respond?
3    **A.    The second issue I wanted to mention in**
4  **terms of the dates is that I -- occasionally this**
5  **date line might change itself automatically, even if**
6  **I wasn't doing any work but just opening a draft.**
7  **And so, I'm not entirely sure that the dates**
8  **accurately reflect the last day that I worked on the**
9  **particular version, but I'm assuming they did.**
10    Q.    I think I understand what you're saying.
11  But in any case, it's fair to say that the
12  February 5th version preceded the February 8th
13  version?
14    **A.    I hope so.**
15    Q.    Let's -- focusing at, beginning at
16  Page 949, you have something written in the upper
17  right-hand quadrant there.
18    **A.    Yeah, enter the changes at the office.**
19    Q.    This is something you had on a laptop, and
20  you were traveling back and forth with?
21    **A.    I was working in my home office over the**

Page 88

1  weekend.
2    Q.    And at the office, you mean when you got
3  back down here to school?
4    **A.    Yes.  At George Washington University.**
5    Q.    And so, you printed this out and took it
6  with you on the train or wherever.  And you --
7    **A.    Or even just, you know, sat in the living**
8  **room with it.  I don't know.**
9    Q.    You don't remember specifically?
10    **A.    Where I did the mark-up, no.**
11    Q.    And your notations, are they stylistic
12  changes mostly?
13        MR. SIMPSON:  Object to the form.
14    Q.    Were there any substantive changes you
15  were making at this point?
16    **A.    Well, I will have to look.  On the first**
17  **page, 949, I had omitted one of the expert reports.**
18    Q.    When you were listing what you had looked
19  at?
20    **A.    Yes.  At the last full paragraph on 950.**
21  **I wanted to add that Hannaway moved to follow**

22 (Pages 85 to 88)

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 89

1   Stiglitz when he pursued his career in government.
2       Q.   Let me ask you what the note above that
3   says.  It's a little unclear to me.
4       A.   We do not have the benefit of a court
5   opinion.
6       Q.   Thank you.
7       A.   At the bottom of 951, these are
8   substantive adjustments.  The, in Elkus, Mr. Elkus
9   was Von Stade.  I'm sorry.  V-O-N, new word,
10  S-T-A-D-E.  Voice coach both before and during the
11  marriage.
12          And the next line, professional licenses,
13  I thought it was important to put out professional
14  training and licenses, because these often include
15  the period of time -- these cases often include the
16  period of time when someone is getting a degree that
17  enables them to work in a professional capacity.
18          And to spouses, I wanted to add under
19  certain conditions, which I think is a substantial
20  modification.
21          Some of these are stylistic.  Some of them

Page 90

1   I need to fill in a cite.
2       Q.   Let me just stop you there and ask you a
3   couple of general questions.  When you were doing
4   these changes, had you provided a draft to counsel
5   for Rita Bank?
6       A.   No.
7       Q.   You were -- the final version was what
8   they saw, the one that's February 9th, or did they
9   see a prior version?
10      A.   I sent them a penultimate version.  I made
11  one change based on a subsequent conversation with
12  them.
13      Q.   Okay.
14      A.   I sent it as a draft.
15      Q.   Okay.  We'll get to that.  Thank you.  All
16  right.  I don't have any more questions on the
17  February 5th version.
18      A.   You don't want me to continue?
19      Q.   No.  I have flipped through those.  I'm
20  satisfied with how they came out on the next
21  version.

Page 91

1          Let me have you look at the first version
2   there on Exhibit 4, which is the February 8th
3   version that starts at 939 and goes through 948.
4          Was this the draft that you gave to
5   counsel, or was this still a prior draft of what you
6   gave to counsel for Rita Bank?
7       A.   This is still a prior draft.
8       Q.   Okay.  And again, did anyone give you any
9   input for any of the changes that were here made
10  here, or were they all of your own doing?
11      A.   They are all my own.
12      Q.   And obviously based on a comparison
13  between this and the final one, you really didn't
14  make a whole lot of changes between February 8th and
15  February 9th?
16      A.   No, I'm something of perfectionist, and I
17  keep fiddling, you know, trying to improve.
18      Q.   I know.
19      A.   The substance was all there.
20      Q.   I had an ex-law professor as a partner for
21  a number of years.  I suffered through many drafts

Page 92

1   and redrafts of everything I wrote.
2       A.   Oh, actually -- okay.  Now, I'm looking at
3   Page 947 -- yeah, Page 947, I suddenly put in I had
4   not dealt with the change in the law in the
5   District.
6       Q.   In the District of Columbia?
7       A.   Exactly.
8       Q.   And that's where your note is on the
9   left-hand border in the third paragraph down?
10      A.   Yes, sir.
11      Q.   We'll get to that in your final opinion.
12          MR. WHITWORTH:  Do you want to take a
13      little break, then we'll go on to the final
14      opinion?
15          MR. SIMPSON:  Okay.
16      Q.   Let me just clarify that before we go off
17  the record, now we have the February 9th version,
18  and I don't have any mark-up on that.  How did the
19  version go to counsel for Ms. Bank, and how did it
20  get changed?  Because I don't see another mark-up
21  version in the materials I was provided.  You may

23 (Pages 89 to 92)

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

*Page 93*

1  not have actually marked one up, you may have just
2  changed it on your computer and then printed it.
3        But what I'm looking for is what change
4  was made between this February 8th version that we
5  have and the February 9th version that's been
6  published to --
7        A.   I can tell you --
8        Q.   -- in the case.
9        MR. SIMPSON:  You're asking other than
10  what's marked on the February 8th draft?
11        MR. WHITWORTH:  Yes.  As I understood what
12  she said, she sent you all a copy I guess
13  electronically or whatever, and it had after
14  input from counsel for Rita Bank, it had some
15  change.  I'm trying to identify what that
16  change was.
17        A.   I actually made it on the Thursday,
18  February 8th version that we've been looking at.
19        Q.   Okay.  Tell me what it is and where it
20  is.
21        A.   I will tell you exactly where it is.  And

*Page 94*

1  I guess I wrote it -- all the other comments are
2  mine.  And I cleaned those up, and I e-mailed it at
3  some point.  If you look under the summary of
4  conclusions, I know that this is the area.
5        Q.   The final paragraph?  No?
6        A.   No.  Summary of conclusions right at the
7  top of 940.
8        Q.   Pardon me.  Thank you.
9        A.   I had sent Rick a cleaned up version of
10  this letter with all of the other correction that I
11  had said I needed to fill in and dealing with the
12  change in law.  And Rick simply suggested that I
13  take out my somewhat -- I don't want to characterize
14  it, but my unnecessary comments where I said
15  Stiglitz as much -- didn't disadvantage Stiglitz as
16  much as I understand he alleges nor would it have
17  advantaged him as much as he apparently believes.
18        And I thought that was quite a valid
19  comment which did not change the substance of my
20  views at all.
21        Q.   That was suggested by Rick?

*Page 95*

1        A.   Yes.
2        Q.   Okay.  And then --
3        A.   With great diffidence.
4        Q.   I'm sorry?
5        A.   With great diffidence.  He didn't want me
6  to feel that he had in any way sculpted or affected
7  my letter.
8        Q.   And now that we've concluded this
9  Exhibit 4, I find that I do have a February 7th
10  draft of -- a February 2nd draft which I have marked
11  as Exhibit 7, so we'll address that before we get to
12  the final draft.
13        MR. SIMPSON:  Do you want to take a
14  five-minute break?
15        MR. WHITWORTH:  Yes, thank you.
16        (Whereupon a brief recess was taken, after
17  which the following was heard:
18        Q.   Okay.  Let's go to what I have marked as
19  No. 7 that I found underneath the No. 4 that we just
20  discussed that had two versions of your opinion
21  letter.

*Page 96*

1        A.   This is now the earliest of the ones --
2        Q.   Now, we've found an earlier one.
3        And I'm not really going to ask you any
4  questions about this other than to just confirm that
5  this was the earliest of the printed iterations of
6  your opinion?
7        A.   I can't confirm that without looking at
8  all the documents that were produced.
9        Q.   Okay.  Well, I'm telling you that I've now
10  unearthed three from the documents that were given
11  to me.
12        A.   I'm happy to accept that.  I just can't
13  tell you that I know for a fact that this is the
14  earliest one I produced.
15        Q.   But all the ones you printed out, you gave
16  to counsel to give to me?
17        A.   Yes.
18        Q.   Just looking at it, if you can just review
19  it quickly to confirm that this is the earliest one
20  that you recall having printed.
21        A.   It certainly appears to be the earliest of

*24 (Pages 93 to 96)*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 97

1  the ones that I have looked at today.
2     Q.  Thank you.  Now, let's get to the final
3  version.  Actually, although I've given you all that
4  fanfare, I want to go back and just make sure that I
5  have got everything.  Let's go back and take a look
6  at that exhibit that I had marked.  It's the very
7  first one.  You've got it right there.  I believe,
8  double-check the number on that for me?
9        MR. SIMPSON:  Exhibit 6.
10    Q.  Is it 6?
11    **A.  Yes.**
12    Q.  Thank you.  Exhibit 6.  And we've gotten
13  through your CV.  We've looked at that.  We didn't
14  go into great detail on it.  Let me just ask you on
15  that, if I can have you go back and take a quick
16  look at your CV, it's Exhibit --
17    **A.  Yes.**
18    Q.  -- 1.  Is that pretty up-to-date?  Is
19  there anything that's of any significance that's not
20  included on that version?  I understand that it was
21  probably produced February of this year or earlier.

Page 98

1     **A.  Nothing that would be significant to what**
2  **we're doing here.**
3     Q.  All right.  Now, Item 20 on Exhibit 6, if
4  I can go back to that point with you, we ask for all
5  notes, diagrams, photographs or other documents
6  prepared or reviewed in connection with your
7  assignment.
8        Have you provided to counsel for Ms. Bank
9  all such documents?
10    **A.  Yes.  With the following caveat.  As I**
11  **said earlier, it was their view that I did not need**
12  **to produce copies of cases that I cited or materials**
13  **that I cited in my opinion letter unless I had**
14  **marked or annotated them in some way.  So I did not**
15  **produce clean copies of materials that I cited.**
16    Q.  That's fair enough.  Those cases are
17  identified and can be pulled up by anybody with a
18  reporting service.  I will accept that.
19        And I think you've clarified that you
20  didn't exchange oral -- didn't have oral discussions
21  with other people that help formulate your opinion

Page 99

1  other than what you've told me about your
2  conversations with Rick Simpson.
3     **A.  That's correct.**
4     Q.  And you didn't exchange any written
5  materials with anyone else including counsel for
6  Ms. Bank beyond what you've provided to them to
7  disclose to us; is that correct?
8     **A.  That's correct.**
9     Q.  Have you provided -- Item 22, I'm looking
10  at now, each publication or paper that was written
11  or worked on by you that refers or relates to the
12  opinions and the subjects upon which you're expected
13  to testify?
14    **A.  I believe so.**
15    Q.  Are there any other documents that you
16  intend to rely on in support of your testimony at
17  trial that are beyond the documents that you
18  provided to counsel to exchange as part of our
19  document request?
20    **A.  Not at this time.**
21    Q.  We would ask that we be seasonably

Page 100

1  informed and provide a copy should that response
2  change between now and trial.
3        MR. SIMPSON:  We will comply with the
4     rules.
5        MR. WHITWORTH:  Thank you.
6     Q.  And just -- well, actually, we didn't have
7  this one marked so I won't bother.
8        Okay.  Now, we'll go to what I marked as
9  No. 8 which is your February 9th report.  I guess
10  we'll call that the final report, or do you have
11  another name for it?
12    **A.  The final opinion letter.  Yes.**
13    Q.  Now, I apologize that this is actually a
14  copy that we made from our own file that was
15  provided to us.  I don't know why it has a
16  February 8th date up in the upper left-hand corner,
17  but that's the way it came to us.
18        MR. SIMPSON:  It also has some
19     highlighting and handwriting on it.
20        MR. WHITWORTH:  Well, I must confess that
21     I actually got my co-counsel Linda Hamilton's

*25 (Pages 97 to 100)*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 101

1    copy, because I marked mine up even worse. So
2    I will put on the record that I believe the
3    question marks on the side of a couple of those
4    paragraphs were done by my co-counsel Linda
5    Hamilton, and I didn't clean it up further when
6    I made a copy of it yesterday.
7        And as Mr. Simpson pointed out, you can
8    see some dark smudges where apparently there
9    had been some highlighting done. And again, I
10   think it's -- this version is readable, but I
11   will put on the record that that's not the way
12   it came to us. Those were added after we
13   received it.
14   Q.   I'm going to work from my own highlighted
15   copy. Now, we've already discussed the fact that
16   that Ketterle case, is that the way you pronounce
17   it? K-E-T-T-E-R-L-E?
18   **A.   I believe it's Ketterle.**
19   Q.   Ketterle. Thank you. I'm putting an R in
20   it where it doesn't belong. Ketterle case was a
21   Massachusetts appellate 2004 opinion?

Page 102

1    **A.   Yes.**
2    Q.   Did you -- and that case quoted a 2000
3    case in Massachusetts which --
4    **A.   Excuse me. What page are you on?**
5    Q.   I'm looking at Page 3.
6    **A.   Thank you.**
7    Q.   Your second paragraph there.
8    **A.   Yep.**
9    Q.   And you indicated that that case quoted
10   the Williams versus Massa, M-A-S-S-A, a 2000 case.
11   **A.   Yes.**
12   Q.   But it's true, is it not, if someone had
13   done a search of the case law across the many
14   jurisdictions in this country looking for a Nobel
15   Prize distribution case prior to 2004, you wouldn't
16   have found one using that approach; is that fair to
17   say?
18   **A.   You wouldn't have found a case at all.**
19   Q.   Thank you. Now, the next item I want to
20   discuss is on Page 4 where you discuss the Elkus
21   case, am I pronouncing that the way it's pronounced?

Page 103

1    **A.   Yes.**
2    Q.   E-L-K-U-S. A 1991 New York opinion, and
3    that case was preceded by the Golub, G-O-L-U-B, a
4    1988 case?
5    **A.   Yes.**
6    Q.   And then you say at the last sentence of
7    that paragraph: No New York court has found an
8    increase in celebrity status meriting division in
9    more than 15 years since Elkus was decided. What do
10   you base that statement on?
11   **A.   My search of all of the reported opinions**
12   **and all of the published discussions of this line of**
13   **cases.**
14   Q.   But as we discussed earlier, that really
15   is an overly broad statement since it doesn't -- you
16   cannot search the sealed trial court or nisi prius
17   decisions in New York; is that correct?
18       MR. SIMPSON: Object to the form of the
19   question.
20   **A.   I'm not sure what your question is.**
21   Q.   Well, you say no New York court, you can't

Page 104

1    really say that with certainty; isn't that true?
2    **A.   I suppose if one were going to be really a**
3    **stickler, one could say no reported opinion. But it**
4    **would be my position that as far as the development**
5    **of a doctrine, the unreported opinions are less than**
6    **irrelevant. They are a nullity. They don't exist.**
7    **They can't be used. They have not extended the**
8    **doctrine or commented on the doctrine. We don't**
9    **know what happened, and we don't know the**
10   **reasoning. They are as if they never existed.**
11   Q.   No New York court has overturned those two
12   opinions; is that correct?
13   **A.   That's correct.**
14   Q.   And, therefore, every litigant who has
15   exposure or is claimed by their spouse to have
16   exposure as -- to the celebrity status doctrine, has
17   to take those cases and that law into account when
18   they're analyzing their litigation prospects; is
19   that correct?
20   **A.   Yes.**
21   Q.   And similarly in Joseph Stiglitz's case,

26 (Pages 101 to 104)

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

---

Page 105

1  that was an issue because it was raised by counsel
2  for his wife; isn't that correct?
3      **A.   If counsel for his wife told him it was an**
4  **issue, then I guess he thought it was an issue.**
5      Q.   Oh, isn't that why they did the economic
6  reports on his good will and so forth?
7          MR. SIMPSON:  Object to form.
8      **A.   I don't know why they did the economic**
9  **reports.**
10     Q.   Okay.  And, and also enhanced earnings
11  comes into play to have that good will analyzed as
12  well; isn't that correct?
13     **A.   As I believe I explained earlier, I'm not**
14  **sure that enhanced earnings is limited to celebrity**
15  **status or is the same doctrine.**
16     Q.   You're not sure?
17     **A.   I would argue that it's not.  Although, I**
18  **know that many people would lump them together, and**
19  **we've been discussing that.**
20     Q.   Let's just assume for the moment that you
21  don't lump them together.  Joe Stiglitz had exposure

---

Page 106

1  for an enhanced earning capacity finding on behalf
2  of his wife; did he not?
3      **A.   In both the District of Columbia and New**
4  **York, yes.**
5      Q.   Well, I'm focusing on New York at the
6  moment, because that's the -- the cases that we're
7  talking about were New York.
8      **A.   But we are talking about celebrity status**
9  **cases in New York.**
10     Q.   Okay.  All right.  Now, it's true, is it
11  not, that the District of Columbia does not follow
12  the same line of cases as the enhanced earning
13  capacity cases of New York?
14     **A.   I cannot give a simple yes or no answer to**
15  **that question.**
16     Q.   Well, give me your best shot.  Give me
17  your less than --
18         MR. SIMPSON:  You're asking for her view
19    of the relationship if any?
20     Q.   Give me your explanation of why you can't
21  say yes or no to that.

---

Page 107

1      **A.   Because the District of Columbia is free**
2  **to look at any other equitable jurisdiction state to**
3  **answer a question that it is trying to answer, and**
4  **New York is an equitable distribution state.**
5      Q.   Is there any case law in D.C. that you're
6  familiar with that specifically relies on enhanced
7  earning capacity doctrine?
8      **A.   Not offhand.**
9      Q.   And of course, you did a research to
10  identify whether or not there was case law related
11  to that in D.C.?
12     **A.   Well, let me go to a different section of**
13  **my opinion letter.**
14     Q.   Could you just answer that question?
15     **A.   Yes.**
16     Q.   Now, do you want to explain further?
17     **A.   Yes.  What I found in D.C. --**
18     Q.   And reference what you're looking at for
19  me, so I can be on the same --
20     **A.   I'm looking at Page 9.**
21     Q.   Thank you.

---

Page 108

1      **A.   Literally on the same page.**
2      Q.   What are you referencing?
3      **A.   I'm looking at the discussion of**
4  **professional good will, which in the District of**
5  **Columbia is marital property subject to**
6  **distribution, and which is frequently seen as**
7  **something very much akin to future earning capacity.**
8      Q.   And that's based on which cases?
9      **A.   McDiarmid, M-C, capital D, I-A-R-M-I-D, in**
10  **1994, District of Columbia case.**
11     Q.   Any other cases that support that?
12     **A.   Well, McDiarmid cites a long line of cases**
13  **from a variety of equitable distribution**
14  **jurisdictions.  And I wasn't able to find a court --**
15  **a case directly on point in the District.  I will**
16  **say that McDiarmid remains good law in the District.**
17     Q.   Are you aware of any difference in the
18  approach that the New York courts take in their
19  enhanced earning capacity cases and the District of
20  Columbia takes in its equitable distribution line of
21  cases regarding that issue?

*Corbin & Hook Reporting and Videoconferencing*
*410-268-6006   1-866-337-6778*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 109

1    A.   Well, that's not comparing apples and
2  oranges.  Equitable distribution is the overall
3  regime of property distribution in both the District
4  and New York.
5    Q.   Now, let's talk about that change of law
6  in the District of Columbia.  I think you cited --
7  and I'll have to get it in front of me.
8         Section 16-910, where is that in your
9  report?  Do you remember?
10   A.   Page 7.
11   Q.   Thank you.  Now, the section that you
12  cited and that you had a document in with your
13  materials, and I may not have copied it, but it said
14  it was the October of 2004 edition of that section.
15  Do you recall that?
16   A.   Yes.
17   Q.   Excuse me.  I misspoke.  2002 edition.  In
18  fact, it's noted right here in your letter.  It's
19  October 19, 2002.
20   A.   Right.
21   Q.   What was the difference between 16-910 in

Page 110

1  its preOctober of 2002 as compared to 16-910 after
2  October 19th of 2002?
3    A.   As I've said in my letter, the differences
4  are trivial.
5    Q.   Is what?  I beg your pardon?
6    A.   The differences are trivial.
7    Q.   Well, I know that's what you said, but I'm
8  asking you what the differences were.
9    A.   Well, both provide for equitable
10  distributions, and both instruct the court to
11  consider all relevant factors including but not
12  limited to the duration of the marriage, the age,
13  health, occupation, amount and sources of income,
14  vocational skills, employability, assets, debts and
15  needs of each of the parties.  Provisions for the
16  custody of minor children.  Whether the distribution
17  is in lieu of or in addition to maintenance.  The
18  opportunity for future acquisition of assets and
19  income.
20        Then there are some additional factors
21  which go into greater detail than the 2001 edition,

Page 111

1  but that would not change the issues under dispute
2  here because all of them were also factors that the
3  court could take into consideration under the 2001
4  code.
5    Q.   Well, there was a new section added in
6  October of 2002.  Item 8.  Each party's contribution
7  to the education of the other party which enhanced
8  the other party's earning capacity --
9    A.   Right.  In this --
10   Q.   -- or ability?  Excuse me.
11   A.   In this instance both of the parties, as I
12  understand it, had completed their degrees when they
13  married.  The only really important thing as I'm
14  looking at it now would be Item 12 in the 2004 law,
15  the circumstances which contributed to the
16  estrangement of the parties.
17   Q.   Which wasn't in the prior code section?
18   A.   Which was not in the prior code section.
19   Q.   Well, the effects of taxation on the value
20  of the assets subject to distribution was added as
21  well; was it not?

Page 112

1    A.   Yes, but that's something all family court
2  judges take into account.  That's a very routine
3  consideration.
4    Q.   And also new was Section 9, each party's
5  increase or decrease in income as a result of the
6  marriage or the duties of homemaking and child care?
7    A.   Yes.  And that was handled in the older
8  statute.  I didn't cite the language.  I don't know
9  if you have a copy of the statute here, but the 2001
10  instructed the court to consider each party's
11  contributions to assets and to the family unit,
12  which is a different way of getting at the same
13  point.
14        And Item 10, specifically in the 2004,
15  adds dissipation, but that is also a standard
16  consideration.
17   Q.   And the taxability of the assets was added
18  in the new section?
19   A.   Yes.  And that is a standard
20  consideration.
21   Q.   With that law changing in October of 2002,

28 (Pages 109 to 112)

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

---

Page 113

1  what cases would that apply to in terms of cases
2  that are in litigation at that time?
3      **A.  In process?**
4      Q.  Already filed.
5      **A.  I actually did not research that.  And so,**
6  **I don't know if it became effective for all**
7  **decisions not yet entered or whether there was a**
8  **grandfathering.**
9      Q.  By grandfathering, explain what you mean
10  on the record.
11      **A.  I mean, that if you had already filed your**
12  **Complaint, that the court would apply prior law. I**
13  **don't know the answer to that.**
14      Q.  Okay.
15      **A.  I didn't look at that question in part**
16  **because I thought that Stiglitz would only be worse**
17  **off under the new statute.  But if that had kicked**
18  **in, that would have disadvantaged him.**
19      Q.  Explain in what way you mean that.
20      **A.  I think that the instruction that the**
21  **court may consider the circumstances that**

---

Page 114

1  **contributed to the estrangement of the parties would**
2  **allow the trial court to consider his alleged**
3  **adultery in crafting an equitable distribution.**
4      Q.  Now, do you know of any basis in D.C. law
5  for the court to consider a distinction between
6  assets accrued while the marriage -- while the
7  parties are still living together as married couple
8  before the ultimate divorce hearing as opposed to
9  assets accrued during the period of separation?
10      **A.  No.  In fact, the statute is quite clear**
11  **that the court is to divide assets as of the date of**
12  **the divorce decree.**
13      Q.  The date of the decree which can't occur
14  until the hearing is concluded; is that correct?
15      **A.  That's correct.  And to value them on that**
16  **date.**
17      Q.  How does --
18      **A.  Not all jurisdictions are so clear, and**
19  **many actually leave that to the discretion of the**
20  **judge.**
21      Q.  As to evaluation date?

---

Page 115

1      **A.  Yes.**
2      Q.  How does a judge value them as of that
3  date when a hearing may have occurred and it takes
4  some time to get a decree put together?
5      **A.  Well, I would imagine one could ask for**
6  **post motion submissions.**
7      Q.  But you don't know practically?
8      **A.  I don't know practically.  I don't**
9  **practice in the District.**
10      Q.  Are you aware of a reason why Rita Bank
11  would have had Joe Stiglitz start putting money in a
12  separate account in the Spring of 2002, April
13  specifically?
14      MR. SIMPSON:  Object to the form.  Beyond
15   the scope.
16      **A.  No.  I don't know what was on Rita Bank's**
17  **mind.**
18      Q.  Are you aware that there is a practice of
19  some of the judges in the District of Columbia of
20  taking into account assets accrued in the period of
21  separation differently than those that accrued while

---

Page 116

1  the marriage was still intact?
2      MR. SIMPSON:  Object to the form.
3      **A.  No.  But it is not inconsistent with my**
4  **emphasis on the discretion accorded to trial judges**
5  **in the District.**
6      Q.  They would have broad enough discretion to
7  do that if they chose to do so you're saying?
8      **A.  They might.**
9      Q.  Are you aware of what the practice is
10  among the matrimonial law judges in the District of
11  Columbia?
12      **A.  No.  I was asked to comment on the law and**
13  **not the practice by the judges.**
14      MR. WHITWORTH:  Let's take another short
15   break.  I think I may be close to concluding.
16   I just want to look through my notes for a
17   minute.
18      MR. SIMPSON:  Five minutes.
19      (Whereupon a brief recess was taken, after
20   which the following was heard:
21      MR. WHITWORTH:  Back on the record.  You

---

29 (Pages 113 to 116)

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 117

1  will be pleased to hear I don't have any
2  further questions.
3      MR. SIMPSON:  Thank you.  We have no
4  questions.
5      THE REPORTER:  Read and sign?
6      MR. SIMPSON:  Yes.  Please.
7      (Whereupon at 12:51 the deposition
8  concluded.)
9
10
11
12
13
14
15
16
17
18
19
20
21

Page 119

1      ACKNOWLEDGEMENT OF DEPONENT
2
3  I, CATHERINE J. ROSS, ESQ., acknowledge that I have
4  read and examined the foregoing testimony, and the
5  same is a true, correct and complete transcription
6  of the testimony given by me, and any corrections
7  appear on the attached errata sheet signed by me.
8
9
10
11  _____    _____
12    (Signature)              (Date)
13
14
15
16
17
18
19
20
21

Page 118

1      DISTRICT OF COLUMBIA
2
3      I, Susan Farrell Smith, Notary Public of
4  the District of Columbia, do hereby certify that
5  CATHERINE J. ROSS, ESQ. personally appeared before
6  me at the time and place herein set out, and, after
7  having been duly sworn by me, was examined by
8  counsel.
9      I further certify that the examination was
10  recorded stenographically by me and that this
11  transcript is a true record of the proceedings.
12      I further certify that I am not of counsel
13  to any of the parties, nor an employee of counsel,
14  nor related to any of the parties, nor in any way
15  interested in the outcome of this action.
16      As witness my hand and notarial seal this
17  19th day of November, 2007.
18      _____
19      Susan Farrell Smith
20      Notary Public
21  (My Commission expires February 29, 2012)

*Corbin & Hook Reporting and Videoconferencing*
*410-268-6006  1-866-337-6778*

Deposition of Catherine Ross, Esq.
Taken on November 14, 2007

**A**

abbreviations
  53:10
ability 111:10
able 86:7 108:14
Absolutely
  36:16 39:2
  46:12
academic 45:3
  63:19
accept 96:12
  98:18
accomplish 51:6
accomplished
  74:2
accomplishme...
  70:9
accorded 116:4
account 78:7
  104:17 112:2
  115:12,20
accounts 6:8,8
accrued 114:6,9
  115:20,21
accumulate
  77:13
Accumulated
  70:18
accumulation
  77:8,16
accurate 61:11
accurately 87:8
accustomed
  44:16
Acela 76:18
achieved 74:11
  76:9
achievements
  75:18
acknowledge
  119:3
ACKNOWLE...

119:1
acquisition
  110:18
action 118:15
active 6:12
activities 15:4
  31:2 32:5 35:5
  45:17 73:7
activity 14:16
actual 47:19
add 73:21 88:21
  89:18
added 101:12
  111:5,20
  112:17
addition 41:2
  110:17
additional 41:18
  50:12 110:20
address 12:16
  27:9 28:14
  45:10 95:11
adds 112:15
adjustments
  89:8
administration
  36:8,13
admitted 54:1
  63:15,17
adultery 59:8
  60:1 114:3
advanced 16:10
  16:12,13
advantaged
  94:17
advertised
  11:21
advisement 22:4
affirmed 4:3
afternoon 54:11
age 110:12
ago 5:20 6:20

9:20 10:2
  14:17 34:5
  46:2
agree 38:19
agreed 33:4
  50:14
agreement
  32:19 42:2,4
  64:19
ahead 26:7
  36:14 67:18
  73:15
akin 79:11
  108:7
alleged 59:8
  60:1 114:2
alleges 94:16
allow 114:2
allowed 45:20
American 13:19
  14:10,11 82:5
amount 45:8
  49:6 50:8
  110:13
analysis 55:15
  73:6
analyzed 105:11
analyzing 65:9
  104:18
annotated 98:14
annotations
  83:10,12 85:13
announced
  35:18
answer 14:7
  38:2 59:18
  73:19 106:14
  107:3,3,14
  113:13
answered 37:1
  44:4 61:8
answers 21:15

anybody 17:16
  22:10 98:17
anyway 50:17
apologize 42:10
  86:8 100:13
apparently
  94:17 101:8
appear 17:21
  27:8 28:20
  52:3 119:7
APPEARAN...
  2:1
appeared 118:5
appears 29:4
  40:4 50:6
  96:21
appellate 101:21
apples 109:1
applied 69:19
apply 11:8 51:2
  113:1,12
appreciate 9:1
  46:6
appreciation
  10:15
approach 47:15
  102:16 108:18
approached
  45:16
April 115:12
area 15:3 24:11
  55:5 94:4
areas 16:16
arg 70:5
args 46:17
argue 23:11
  57:13 105:17
arguing 47:1
  72:7
argument 72:10
arguments
  57:20

arising 10:3
Armand 12:16
  12:20 13:12
arrived 47:17,17
arrows 47:9
article 34:6,17
  71:19 72:11
articles 34:13
asked 9:16 12:5
  24:3 25:12
  40:5 41:16
  42:1 44:3 49:1
  49:15 58:5
  69:3,5,9 73:11
  116:12
asking 47:5 50:7
  51:21 59:15
  61:20 62:6
  93:9 106:18
  110:8
assets 77:9,13
  110:14,18
  111:20 112:11
  112:17 114:6,9
  114:11 115:20
assignment 98:7
associate 7:2,7
  18:19 19:2,4,8
  22:6
associated 18:9
Association
  13:19 14:10,11
associations
  13:17 17:9
assume 51:4
  59:8 105:20
assuming 8:19
  87:9
assumptions
  61:7
attached 3:16
  13:10 119:7

attended 13:21
  17:5
attention 30:15
attorney 10:6
  23:2 61:13
attorneys 9:2,4
  9:8,10 11:19
  12:5,12 28:11
  40:5 41:16
  57:13 65:19
author 15:9
automatically
  87:5
available 22:1
  58:11
awake 63:18
award 72:19,19
awarded 47:17
  72:5
awarders 72:18
aware 35:12
  36:3,7,9,12
  48:15 68:15,17
  70:3 73:1
  108:17 115:10
  115:18 116:9
awful 74:1
A.M 1:13

**B**

back 10:8 12:9
  31:17 42:10
  46:1 78:14
  87:20 88:3
  97:4,5,15 98:4
  116:21
background
  24:19
ballpark 86:1
bank 1:7 4:12
  6:7 9:4 36:8
  41:17 55:18

56:6 62:20
84:11 90:5
91:6 92:19
93:14 98:8
99:6 115:10
**Bank's** 28:11
40:5 41:9
65:19 115:16
**bar** 13:19 14:10
14:11 17:3,6,9
17:13 18:17
22:9 38:12
**base** 42:8
103:10
**based** 39:17
44:12,12,14
47:2 65:3 70:8
73:20 85:18
90:11 91:12
108:8
**basic** 60:21
**basis** 6:2,5 114:4
**bear** 15:21
68:12
**beg** 110:5
**began** 41:11
64:21
**beginning** 10:12
26:16 87:15
**behalf** 2:9,18
106:1
**believe** 12:5
25:2 32:5,16
32:21 33:12
39:19 46:17
47:10 48:21
49:15 56:12
58:13 59:5,6
61:12 65:6
80:3 84:14,21
97:7 99:14
101:2,18

105:13
**believed** 7:9
**believes** 94:17
**Bell** 2:14 12:10
**belong** 13:16,18
101:20
**benefit** 4:16
89:4
**best** 14:7 47:12
106:16
**bet** 72:15
**better** 29:15
**beyond** 38:7,10
38:16 40:15
49:3 75:15
82:20 99:6,17
115:14
**big** 75:12
**bill** 32:10 50:10
**billing** 31:2
**bio** 3:7 25:4
**bit** 14:17 26:8
**bite** 39:8
**block** 6:7
**blocks** 43:9
**blog** 34:9
**bono** 6:2,5 17:16
17:18 24:13
**book** 15:10
**books** 81:12,13
**border** 92:9
**Boston** 22:7
**bother** 100:7
**bottom** 29:1
40:3 59:7
86:19 89:7
**break** 19:5
51:17,19,21
58:15 67:5
85:20 92:13
95:14 116:15
**breakdown**

85:10
**brief** 3:7 25:3
51:19 95:16
116:19
**briefed** 54:9
**bring** 78:14
**broad** 15:5
103:15 116:6
**broader** 24:1
37:2 72:2
**brought** 7:20
24:15
**bulk** 7:11
**bullet** 26:18
47:8
**business** 10:15

**C**

**CA** 1:6
**call** 23:20 29:5
32:20 33:11
54:11 100:10
**called** 4:2 15:18
23:18 27:5
43:15
**capacity** 8:4,10
10:18 20:12
21:11 38:21
39:5 48:16
65:13 71:2
76:5 77:12,19
89:17 106:1,13
107:7 108:7,19
111:8
**capital** 108:9
**care** 24:15 54:21
57:10,19 112:6
**career** 39:14
76:21 89:1
**careers** 76:12
**case** 4:14 8:9 9:5
10:5,13 11:2

12:4,13 15:10
20:19 22:17,21
23:1,1,3 25:5
31:2 32:4,15
40:15,21 43:1
48:16 54:13,18
54:20 55:7
56:3,4 60:3,13
60:16 62:4,21
65:4 67:18
68:8,10,18
70:3 74:7 80:8
80:16,19 81:14
83:4 84:7
86:17 87:11
93:8 101:16,20
102:2,3,9,10
102:13,15,18
102:21 103:3,4
104:21 107:5
107:10 108:10
108:15
**cases** 7:8,10
21:2 22:14,16
28:9 38:14,15
38:17 39:9,11
39:16 61:1
64:20 65:3,16
65:21 66:4
74:19 75:6,8
75:14,17 80:4
80:6,10,12
82:4,8,19,21
83:2 85:13
89:15 98:12,16
103:13 104:17
106:6,9,12,13
108:8,11,12,19
108:21 113:1,1
**CATHERINE**
1:11 3:2 4:1
118:5 119:3

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

caught 20:2
caveat 98:10
celebrity 8:7
  20:13 21:11
  36:15,19,20
  37:5,18 38:15
  39:1,3,9,15
  48:8 49:2
  57:12 72:8
  74:6,15,21
  103:8 104:16
  105:14 106:8
censure 25:17
CEO 75:19
CEOs 75:3
certain 30:1
  46:18 48:20
  89:19
certainly 20:19
  37:2 38:10
  48:6 69:18
  72:6 75:1 86:6
  96:21
certainty 104:1
certify 118:4,9
  118:12
cetera 22:13
  75:4,20
CF 70:17 78:17
chance 9:3
change 12:15
  87:5 90:11
  92:4 93:3,15
  93:16 94:12,19
  100:2 109:5
  111:1
changed 13:8
  69:13,15 92:20
  93:2
changes 16:1
  65:1 87:18
  88:12,14 90:4

91:9,14
changing 112:21
chapter 15:10
chapters 15:9
characterize
  94:13
checked 6:11
checking 61:10
checkoff 28:17
child 15:1,18
  112:6
children 15:8
  16:1,3,5,6
  110:16
children's 18:11
choose 44:18
  72:2
chose 116:7
chronological
  51:8
circled 49:6,21
circumstances
  111:15 113:21
cite 21:2 38:13
  79:2 81:21
  83:1,13,15
  90:1 112:8
cited 69:12 73:3
  83:2,3,11
  98:12,13,15
  109:6,12
cites 108:12
City 22:19 23:4
civil 24:15 54:5
claim 4:12 7:20
  7:21
claimed 71:8
  104:15
claims 65:12
  75:6
clarified 98:19
clarify 24:4 26:4

29:16 39:18
  70:15 86:15
  92:16
class 21:5
classroom 16:11
CLE 14:8
clean 98:15
  101:5
cleaned 94:2,9
clear 10:1 17:12
  71:5 76:3
  114:10,18
clearly 11:9 36:5
client 6:5 8:2
  55:17,21,21
  57:8,9 61:9,13
clients 5:21 7:1
  8:3,6 24:6
clinic 24:10
Clinton 36:8
clips 38:8
close 79:14
  116:15
coach 89:10
coauthor 15:11
coauthors 71:18
  72:21
code 111:4,17
  111:18
collapsed 74:21
colleague 84:5
colleagues 62:15
  72:11
collect 59:21
College 22:7
Colorado 10:4
Columbia 1:2
  6:18 10:20
  11:11 12:6
  17:3,6,17
  21:12 34:4
  77:11 92:6

106:3,11 107:1
  108:5,10,20
  109:6 115:19
  116:11 118:1,4
combined 12:17
come 16:8 21:14
  42:21 52:15
  66:10 74:15
  77:2
comes 52:15
  105:11
commencing
  1:12
comment 94:19
  116:12
commented
  104:8
comments 82:6
  83:4 94:1,14
Commission
  118:21
commitment
  33:7
commonly
  66:13
communicatio...
  84:10
commute 45:13
compare 47:13
  60:2 62:6
  78:18,19
compared 110:1
compares 59:10
comparing
  21:12 59:9
  109:1
comparison
  21:9 80:2
  91:12
competing
  49:16,17
Complaint

113:12
complete 10:11
  27:2 53:10
  119:5
completed
  111:12
completely 48:7
complicated
  30:8
Complies 27:12
comply 23:5
  100:3
component 77:6
components
  39:10
comprehensive
  21:4
computer 28:5
  31:17 67:7
  85:4,8 93:2
concede 69:10
concentrated
  43:8 45:8
concept 82:4
concepts 20:11
  60:21
concerned 38:5
concerning
  10:14 15:1,8
  76:20
concluded 95:8
  114:14 117:8
concluding
  116:15
conclusion 68:7
conclusionary
  67:10
conclusions
  67:14 94:4,6
conclusory
  67:15
conditions 89:19

conducted 16:9
Confer 78:11
confess 100:20
confined 37:5
confines 74:15
confirm 96:4,7
 96:19
conflicts 65:12
congregate
 22:18
connected 13:4
Connecticut 5:9
 6:14 24:15
connection
 20:15 29:5
 98:6
consider 73:7
 79:3 110:11
 112:10 113:21
 114:2,5
consideration
 111:3 112:3,16
 112:20
constantly 82:1
constitutional
 15:21 16:7
consultant
 18:10
consultations
 44:14
contacted 12:4
contemporane...
 32:5 58:19
contends 57:12
contested 10:3
context 34:1
 37:2,4
contiguous 19:6
continuation
 59:3
continue 23:3
 51:5 57:2

62:13 74:4
 90:18
continued 72:14
continuing 14:6
 85:7
continuous 20:4
continuum
 77:14
contributed
 39:12,14 72:17
 111:15 114:1
contribution
 111:6
contributions
 112:11
conversation
 29:11,21 48:21
 49:4,13 52:21
 70:4 90:11
conversations
 99:2
convicted 25:14
convinced 73:17
Cooter 12:20
 13:12
copied 109:13
copies 57:17
 98:12,15
copy 22:2 27:14
 66:16 81:19
 93:12 100:1,14
 101:1,6,15
 112:9
Copyrights
 70:19
Corbin 1:19
corner 29:2 40:3
 100:16
corporate 7:11
 23:9
correct 4:15
 12:8 18:3 22:7

23:14 37:10
 39:1 40:8,11
 43:4 52:3 61:3
 64:7 66:5
 68:10 73:4
 79:21 99:3,7,8
 103:17 104:12
 104:13,19
 105:2,12
 114:14,15
 119:5
correction 94:10
corrections
 119:6
counsel 4:2
 26:12 27:21
 29:9 41:9
 58:10 83:19
 84:10 90:4
 91:5,6 92:19
 93:14 96:16
 98:8 99:5,18
 105:1,3 118:8
 118:12,13
country 6:6
 102:14
couple 39:9
 43:21 44:6
 90:3 101:3
 114:7
course 4:16
 15:17 18:8
 27:6,7 34:6
 45:3 70:5 74:8
 80:19 82:8
 83:8 107:9
courses 15:15
 16:10,12,13
 35:10
court 1:1 7:17
 10:20,20 11:3
 22:14 23:13

38:20 47:16
 57:18 58:7
 62:20 63:1
 67:20,21 68:14
 68:19 78:6
 80:7 89:4
 103:7,16,21
 104:11 108:14
 110:10 111:3
 112:1,10
 113:12,21
 114:2,5,11
courts 15:1
 37:13 68:1
 75:18 108:18
court's 67:20,21
cover 38:9
coverage 24:14
 54:7
covered 20:18
 25:20 26:19
co-counsel
 100:21 101:4
crafting 78:7
 114:3
credible 71:16
crime 25:14
Crofton 2:7
crossed 68:1
current 49:11
 76:8
curriculum 3:6
 4:17 16:13
 74:3
custody 15:2
 110:16
cut 57:14,16
CV 8:13 19:12
 20:1 97:13,16

—— D ——
D 63:13 108:9

dark 101:8
date 29:13,17
 87:5 100:16
 114:11,13,16
 114:21 115:3
 119:12
dated 62:11
 64:16
dates 27:9 31:9
 87:4,7
David 2:2 4:11
day 45:4 84:20
 87:8 118:17
days 33:5 45:7
 62:20
DC 1:20
DE 1:20
deal 80:5
dealing 94:11
dealt 10:9 92:4
dean 33:12
 53:13
dearth 31:1
debts 110:14
decide 68:7
decided 72:11
 103:9
decision 60:4
 61:4 67:20
decisions 103:17
 113:7
declared 4:3
declining 38:15
decrease 112:5
decree 114:12
 114:13 115:4
Defendant 1:8
 2:18 26:12
 27:21
defended 4:21
Defense 2:5 29:9
degree 89:16

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

degrees 111:12
dep 63:14
dependent 9:2
depending 30:7
  68:16
deponent 8:20
  25:12 119:1
deposed 5:1
deposit 5:7
deposition 1:11
  3:5 5:19 8:18
  50:20 57:8
  63:11 64:1
  117:7
depositions 4:20
  4:21 5:1,18
  40:9
derive 44:10
description 3:7
  25:4
descriptions
  25:7
detail 25:8
  30:20 40:18
  97:14 110:21
detailed 21:7
  31:15 63:10,13
details 61:2
determination
  38:20
determine 62:18
determined
  37:17
develop 76:12
development
  76:21 104:4
diagrams 98:5
diary 30:3 31:15
dictated 28:3
difference 69:6
  69:7 79:19
  108:17 109:21

differences
  57:11 73:18
  110:3,6,8
different 25:7,8
  47:18 60:5
  68:2 77:7
  107:12 112:12
differently
  115:21
difficult 71:3
diffidence 95:3
  95:5
digging 85:12
directly 39:13
  39:14 108:15
disadvantage
  94:15
disadvantaged
  113:18
disagreement
  11:10
disbarment
  25:17
disclose 62:16
  99:7
disclosed 12:9
disclosure 12:12
disclosures 63:7
discounted
  68:21
discretion 68:2
  114:19 116:4,6
discuss 102:20
  102:20
discussed 29:20
  30:6 50:2,11
  52:8 95:20
  101:15 103:14
discussing
  105:19
discussion 51:16
  108:3

discussions
  38:13 98:20
  103:12
dispel 61:16,18
dispensed 8:17
dispute 111:1
dissipation
  112:15
distinction
  114:5
distinguish
  39:15 69:20
  70:4 78:12
  79:8
distinguished
  72:3
distributed
  35:19
distribution
  57:20 77:12
  79:19 82:2
  102:15 107:4
  108:6,13,20
  109:2,3 110:16
  111:20 114:3
distributions
  57:21 110:10
district 1:1,2
  6:18 10:20,20
  11:11 12:6
  17:3,5,17,20
  18:1 21:12
  77:11 92:5,6
  106:3,11 107:1
  108:4,10,15,16
  108:19 109:3,6
  115:9,19 116:5
  116:10 118:1,4
divide 114:11
division 60:4
  78:8 103:8
divorce 10:3

  15:5 57:1
  114:8,12
Dixon 2:14
  12:10
Doctor 35:9
doctors 75:15
doctrine 38:5,13
  74:16 75:7,15
  75:19 104:5,8
  104:8,16
  105:15 107:7
document 25:1
  29:1 99:19
  109:12
documents 3:11
  26:9 27:1 96:8
  96:10 98:5,9
  99:15,17
doing 5:17 28:9
  30:6 32:8
  50:21 62:18
  63:4 85:12,12
  87:6 90:3
  91:10 98:2
domestic 23:12
  23:19 34:21
  35:13
double-check
  97:8
doubt 30:16
dozen 16:21,21
  17:1
draft 3:9,12
  64:13,15 84:14
  84:18,20,21
  87:6 90:4,14
  91:4,5,7 93:10
  95:10,10,12
drafted 42:1
drafting 84:9
drafts 27:8,18
  27:20 28:2

  86:9 91:21
dues 13:20
duly 118:7
duration 110:12
duties 112:6
dwhitworth@...
  2:3
D.C 1:14 2:16
  6:15 10:3 11:7
  11:9 17:13
  36:7 47:16
  54:13 55:18
  56:9,11,13,14
  56:15,16,20
  57:1,5,11,19
  58:1 59:10
  60:2,3 63:19
  69:8,12 77:7
  78:11,21 79:4
  79:10,19 80:7
  107:5,11,17
  114:4

**E**

E 1:4
earlier 4:10
  50:11 59:2
  68:19 72:20
  85:9 96:2
  97:21 98:11
  103:14 105:13
earliest 52:6
  96:1,5,14,19
  96:21
early 30:4 35:21
  41:13 47:11
  48:21 49:4
  62:17 64:10
earners 75:12
earning 8:4
  10:18 20:12
  38:21 39:4

48:16 65:13
71:1 76:5
106:1,12 107:7
108:7,19 111:8
**earnings** 20:12
21:11 39:16
48:12 70:8
75:2 77:8
105:10,14
**easily** 36:10
**economic** 34:6
35:2 40:20
65:9 82:2
105:5,8
**economist** 34:3
34:12 36:6
**economists**
34:14
**economy** 35:6
**ED** 57:20
**edition** 109:14
109:17 110:21
**education** 111:7
**educational**
15:4
**effect** 68:5
**effective** 113:6
**effects** 111:19
**either** 8:11
14:21 20:11
22:10 25:3
32:15
**electronically**
93:13
**Elkus** 74:6 82:9
89:8,8 102:20
103:9
**emphasis** 116:4
**emphasizing**
62:2
**employability**
110:14

**employee**
118:13
**enables** 89:17
**endeavor** 81:7
**ended** 76:7
**engagement**
32:14,15
**enhanced** 8:4
10:18 20:12,12
21:11 38:21
39:4,16 48:12
48:15 65:13
75:2 105:10,14
106:1,12 107:6
108:19 111:7
**enhancement**
70:8
**entailed** 33:8
**enter** 32:9 87:18
**entered** 28:5
31:16 113:7
**entertainer**
37:17
**entertainers**
37:6,7,8
**entirely** 40:12
60:5 68:21
87:7
**equitable** 57:20
57:21 77:12
78:7,11,15,16
79:1,2,10,19
80:9 107:2,4
108:13,20
109:2 110:9
114:3
**errata** 119:7
**escapes** 34:12
**especially** 54:7
**ESQ** 1:11 3:2
4:1 118:5
119:3

**ESQUIRE** 2:2
2:10,12
**essential** 64:21
**established** 60:3
**estimate** 85:11
86:3,5
**estrangement**
111:16 114:1
**et** 22:13 75:4,20
**evaluation**
114:21
**evaluations** 65:7
**evidence** 15:19
71:15
**evidences** 31:8
**exactly** 7:15
53:19 69:16
78:2,4 85:2,6
85:20 92:7
93:21
**examination** 3:1
4:2,6 118:9
**examined** 4:5
118:7 119:4
**example** 69:11
72:8
**examples** 70:20
**exceptional**
61:16
**exchange** 98:20
99:4,18
**exchanged** 84:6
84:6
**exclusionary**
67:12
**Excuse** 21:14
43:2 102:4
109:17 111:10
**exhibit** 3:4,5
8:14 19:12
24:17 26:9
27:11 28:16,16

29:3 31:4,8
39:19 40:2,10
40:16 42:10
46:1,5 50:10
64:1 84:16
86:9,12 91:2
95:9,11 97:6,9
97:12,16 98:3
**Exhibits** 3:16
**exhuming** 85:12
**exist** 104:6
**existed** 104:10
**expectations**
70:7
**expected** 27:5
99:12
**experience** 4:19
5:17 6:3,21
9:12
**expert** 4:13 9:17
9:21 12:1 13:9
24:12 25:12
27:5 40:18
44:13,15 49:18
54:14 55:1,7
57:19 63:6,7
64:19 65:7,7
72:5,16 73:16
76:18 88:17
**expertise** 55:14
**experts** 26:13,17
49:17 62:16
65:9 75:21
**expires** 118:21
**explain** 46:9
48:10 74:12
79:18 107:16
113:9,19
**explained**
105:13
**explanation**
106:20

**exposure** 104:15
104:16 105:21
**extend** 38:15
**extended** 104:7
**extends** 75:15
**extent** 20:20
**ex-law** 91:20
**E-L-K-U-S** 74:7
103:2
**e-mail** 11:20
12:17 13:5,8
34:10
**e-mailed** 94:2
**e-mails** 12:8,9
13:4

**F**

**fact** 37:12,16
40:13 41:5
81:21 96:13
101:15 109:18
114:10
**factor** 71:11
**factors** 60:4
77:12 110:11
110:20 111:2
**facts** 3:8 10:21
39:17,20 40:5
40:10 41:2,20
42:8 46:15
55:11 59:8,9
59:16,20 60:1
60:1 73:18
**factual** 41:18
**faculty** 34:4
**failure** 23:4
**fair** 36:21 39:3
86:3,5 87:11
98:16 102:16
**fairly** 43:8 76:9
**fall** 18:8 48:9
69:15

**familiar** 8:19
34:1 48:7 49:1
74:9 107:6
**families** 15:21
16:3,5
**family** 12:6
13:18 14:9
15:1,17,18
16:13,18 18:8
23:21 24:1
55:13 112:1,11
**fanfare** 97:4
**far** 11:2 38:5
75:19 104:4
**Farrell** 1:14,21
2:20 118:3,19
**favorable** 11:13
**February** 27:19
30:5 43:11
62:11,17 64:13
64:16 84:16
86:14,17,18,19
87:12,12 90:8
90:17 91:2,14
91:15 92:17
93:4,5,10,18
95:9,10 97:21
100:9,16
118:21
**Federal** 62:20
63:1
**fee** 33:9
**feel** 16:20 95:6
**felt** 50:12
**fiddling** 91:17
**fight** 46:18
**figured** 30:14
**file** 17:21 28:13
100:14
**filed** 7:16 57:5
113:4,11
**files** 10:9 37:13

**fill** 90:1 94:11
**final** 27:7 64:15
90:7 91:13
92:11,13 94:5
95:12 97:2
100:10,12
**find** 31:17 33:7
34:7 39:4
66:11 68:6
81:1 95:9
108:14
**finding** 39:1
80:4 106:1
**findings** 47:12
**fine** 63:5 73:12
86:13
**finish** 19:19
20:8 28:17
87:1
**firm** 7:3,9 11:15
11:17 13:1
22:12,13 23:9
31:15 54:4,5
**first** 3:11 4:20
12:18 27:4
29:2,21 30:20
32:21 40:17
47:21 52:1,15
52:18,21 59:6
64:6 67:8 70:3
71:18 84:14,14
86:11 88:16
91:1 97:7
**fit** 75:7
**five** 10:2 15:16
15:20 31:18
74:6 116:18
**five-minute**
95:14
**flesh** 61:1
**flipped** 90:19
**focus** 15:3,5

71:7
**focused** 13:11
48:20 55:14
**focusing** 15:7
48:13 87:15
106:5
**follow** 58:14
88:21 106:11
**following** 35:19
35:21 51:20
95:17 98:10
116:20
**follows** 4:5
**footnotes** 82:3
**foregoing** 119:4
**form** 27:8 37:20
38:3 40:14
44:3 60:19
69:1 71:3
77:17 78:5
86:2 88:13
103:18 105:7
115:14 116:2
**formal** 45:2 50:3
50:3
**formally** 38:10
**formed** 53:19
**former** 56:19
**formulate** 98:21
**forth** 8:21 12:9
65:1 75:16
87:20 105:6
**forward** 8:19
50:16
**forwarded** 13:6
34:6
**found** 38:17
95:19 96:2
102:16,18
103:7 107:17
**four** 63:21 64:4
68:8 77:5

**framework**
38:16
**Fred** 33:15,16
53:18,20
**Fred's** 53:13,17
**free** 107:1
**frequently** 77:4
108:6
**fresh** 85:17
**friend** 53:13,17
**front** 22:20 37:3
49:14 109:7
**full** 18:9 88:20
**functions** 17:6
**further** 101:5
107:16 117:2
118:9,12
**future** 70:8 77:8
77:8,13,16
108:7 110:18

**G**
**G** 2:2
**gap** 19:16
**Garrison** 7:3
**gather** 18:20
**gathered** 42:14
**general** 6:21
33:2 35:6 54:5
54:18 55:7
65:4 76:16
90:3
**geographically**
79:14
**George** 88:4
**getting** 89:16
112:12
**girlfriend** 57:10
**give** 16:20 21:1
51:12,14 59:15
59:20 61:6
85:10 86:1,3

91:8 96:16
106:14,16,16
106:20
**given** 10:21 17:2
39:18 40:1
51:11 60:15
96:10 97:3
119:6
**gleaned** 28:19
**go** 10:8 26:18
31:17 32:9
36:14 38:10
42:10 46:1
50:16 52:18
59:21 63:7
67:18 69:17
72:1,12 73:15
75:19 77:2
80:20 81:12,13
92:13,16,19
95:18 97:4,5
97:14,15 98:4
100:8 107:12
110:21
**goes** 21:18 91:3
**going** 8:19 25:12
26:7 32:9 37:3
60:16 63:6,7
64:11 67:1
71:15 77:20,20
85:17 96:3
101:14 104:2
**golf** 5:13
**Golub** 103:3
**good** 4:8,9 5:12
30:13 65:10,12
70:9 82:3
105:6,11 108:4
108:16
**goodwill** 49:2
**gotten** 31:1
50:11 97:12

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

government
  89:1
grandfathering
  113:8,9
granted 59:21
great 38:11 95:3
  95:5 97:14
greater 77:21
  110:21
group 17:3
  18:11 62:5
  74:19
groups 17:10
guaranteed
  50:15
guess 49:18 54:1
  55:4 93:12
  94:1 100:9
  105:4
G-O-L-U-B
  103:3

H
Hamilton 101:5
Hamilton's
  100:21
hand 28:6,7
  118:16
handle 7:10,12
handled 112:7
handling 7:8
handwriting
  76:16 100:19
handwritten
  3:10 28:12
  46:3 65:20
handy 28:17
hand-typed 28:3
Hannaway 56:2
  57:3,8 73:3,9
  77:15 88:21
happen 80:10

happened 33:11
  104:9
happy 96:12
hard 81:19
  85:15
Harvard 34:6
Haven 5:9
hazards 22:17
head 60:11
health 110:13
hear 117:1
heard 11:18
  12:18 33:19
  51:20 95:17
  116:20
hearing 73:20
  114:8,14 115:3
heavily 80:8
held 11:21
help 98:21
hi 53:18
hiatus 20:6
high 75:12 76:5
  76:6
highlight 66:6,9
  66:15,18
highlighted
  101:14
highlighting
  100:19 101:9
Highway 2:5
high-water 75:1
hold 40:15
Holterman
  20:19 21:20
home 87:21
homeless 22:18
homemaking
  112:6
Hook 1:19
hope 87:14
hopping 42:11

hospitals 23:7,8
hour 50:7,14
hourly 44:10
  50:19,20
hours 31:21
  42:15 44:6
  46:15 50:8
  60:16 76:19
  77:5 85:11
Huh 53:15
husband 6:6
  10:6 34:4
husband's 10:15
H-O-L-T-E-R...
  21:3

I
identification
  40:2
identified 41:19
  42:7 98:17
identify 40:1
  93:15 107:10
illegible 76:17
imagine 115:5
immediate
  79:14
immediately
  11:4 70:11
important 36:6
  80:13 89:13
  111:13
impression
  53:20
improve 91:17
inadvertently
  86:8
include 89:14,15
included 97:20
including 72:16
  99:5 110:11
inclusive 14:5

income 110:13
  110:19 112:5
inconsistent
  116:3
increase 103:8
  112:5
increased 71:1
increment 42:18
independent
  16:15
INDEX 3:1,4
indicate 52:20
indicated 43:14
  102:9
indicates 41:21
indicating 79:7
indication 49:21
individual 16:10
individuals 7:19
informal 31:20
information
  41:18 50:1
  84:6
informed 100:1
initial 48:8 63:8
initially 30:5
  54:18
injunction 22:19
input 91:9 93:14
inquest 41:12
inquired 41:17
instance 111:11
instances 39:11
  39:12
Institute 82:5
instruct 110:10
instructed 57:7
  112:10
instructing 38:1
instruction
  61:18 113:20
intact 116:1

Intangible 70:18
intangibles
  70:21
intellectual
  10:17
intend 86:10
  99:16
intended 24:3
  25:9
interdisciplin...
  18:11
interest 34:15
  35:4,5 38:12
interested
  118:15
interesting
  19:15 34:8
interpretation
  36:21 40:8
interpreting
  36:18
interrupt 27:10
interrupting
  14:3 55:4
intervals 42:18
introduced 4:10
investigation
  41:5 83:8
investing 35:6
investment 6:8
invoice 3:14
  31:3 42:11
involved 5:2 8:4
  9:20 11:7
  12:19 13:5
  23:4
involvement
  10:12
involving 8:7,11
  22:17 24:14
  54:21 75:6
irrelevant 104:6

**issue** 11:7 33:2
35:2 48:16
58:7 60:12,14
71:7,14 78:21
87:3 105:1,4,4
108:21
**issues** 8:3,6,11
10:17 15:8,21
18:12 21:10
54:21 57:9
62:4 68:18
76:20 82:2
84:19 111:1
**item** 27:4,16
47:15 48:5
70:12 98:3
99:9 102:19
111:6,14
112:14
**items** 26:11
47:21 49:6
**iteration** 69:14
**iterations** 96:5
**I-A-R-M-I-D**
108:9

— **J** —

**J** 1:11 3:2 4:1
118:5 119:3
**Jane** 56:1,15,16
56:20 73:3,8
77:14
**January** 30:1
33:1 43:15,18
43:20 53:3
62:17
**Jersey** 39:11
**job** 77:3
**Joe** 56:10,21
57:3,4 65:9
71:7 105:21
115:11

**Joe's** 77:21
**Joseph** 1:4 4:12
33:19 56:1
104:21
**Journal** 34:16
38:8
**JR** 2:2
**judge** 5:13
114:20 115:2
**judges** 112:2
115:19 116:4
116:10,13
**July** 19:9
**jump** 26:7
**jumping** 82:14
**June** 19:9 20:3
56:9,13,14
**junkie** 36:12
**jurisdiction** 6:9
68:1 78:16
79:1,11,15
80:9 107:2
**jurisdictions**
47:13 55:13
62:6 69:6
78:17,19 79:3
102:14 108:14
114:18
**jurisdiction's**
11:8
**jurisprudence**
47:20
**jurs** 78:11

— **K** —

**K** 1:13 2:15
**keep** 28:16 30:2
31:20 42:17
45:19 82:10
91:17
**keeps** 63:18
**kept** 31:15

42:12
**Ketterle** 68:9,15
70:2 78:14,15
82:8 101:16,18
101:19,20
**kicked** 113:17
**kind** 22:16 33:7
85:15
**knew** 34:3 36:5
60:21 64:20
82:8
**know** 4:11,19
9:21 10:8,11
12:3,9 13:12
14:14 20:18,21
21:4 25:14,16
25:19 30:11
32:1 33:16,18
36:10 37:3,12
46:20 49:1,19
54:1 57:15
58:4,4,17
60:10 61:18
64:15 67:2,8
67:16 73:20
77:4 78:12
80:3 81:6
82:11 84:1,17
88:7,8 91:17
91:18 94:4
96:13 100:15
104:9,9 105:8
105:18 110:7
112:8 113:6,13
114:4 115:7,8
115:16
**knowledge** 11:3
63:19 65:4
**knows** 33:12
**Kuter's** 12:16
**K-E-T-T-E-R...**
70:2 101:17

— **L** —

**landlord** 5:6
9:14
**language** 112:8
**laptop** 87:19
**large** 31:15
**largely** 23:10
**latest** 64:2
**law** 6:17 7:2,11
10:3 11:7,8,10
11:11,15 12:6
13:18 14:9
15:6,17 16:14
18:2,7,8 21:12
21:13 22:7
23:18,21 24:1
24:7,11,13
25:21 33:12
34:21 35:14
36:19 37:4,18
38:8 47:15
55:13,15,18
57:11 60:4,13
60:17 61:10
62:5 63:19
65:5 69:6,12
75:3,10,19
78:11,21 79:10
80:20 82:2,5
85:13 92:4
94:12 102:13
104:17 107:5
107:10 108:16
109:5 111:14
112:21 113:12
114:4 116:10
116:12
**Lawrence** 33:15
33:16
**laws** 23:5
**lawsuit** 5:3
**lawyer** 5:13

8:10 13:16
55:18
**lawyers** 54:7
**law-related**
16:19
**lay** 55:11
**lead** 23:2 82:6
**leading** 34:3
46:16 82:4
**leave** 86:12
114:19
**lecture** 20:20
**lectures** 21:5
**led** 71:8
**left** 6:6 56:9
57:18 58:2
63:15 70:11
**left-hand** 50:5
92:9 100:16
**legal** 6:3 18:10
54:13,20 55:10
55:12,15 59:9
60:1 62:3
81:15,16
**length** 50:2
73:21
**lengths** 25:7
**lengthy** 85:5
**letter** 10:19 11:5
11:6,12 30:4,6
30:10,20 32:12
32:14 40:17
41:21 42:1
50:3,4 62:7,10
64:11,12,16
80:11 84:12
85:16,18 94:10
95:7,21 98:13
100:12 107:13
109:18 110:3
**let's** 8:13 28:14
45:15 46:1

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

51:5 52:18
64:18 86:18
87:15 95:18
97:2,5 105:20
109:5 116:14
**level** 30:19
45:20
**levels** 25:8
**Lexis** 80:20
**liability** 54:6
**liberally** 79:2
**Liberties** 24:16
**license** 6:12,13
6:14,15 18:1
75:8,14
**licensed** 17:20
**licenses** 75:3
89:12,14
**lieu** 110:17
**life** 6:6 70:5
**limited** 74:10
105:14 110:12
**Linda** 100:21
101:4
**line** 21:6 56:8
57:14,16 87:5
89:12 103:12
106:12 108:12
108:20
**linked** 75:2
**list** 26:11 28:17
34:10
**listing** 88:18
**Literally** 108:1
**litigant** 104:14
**litigants** 21:10
**Litigated** 57:3
**litigation** 7:2,7
7:13 8:1 26:2,5
26:5 54:5,6,7
104:18 113:2
**litigators** 7:10

**little** 26:8 32:10
32:11 42:13,21
89:3 92:13
**Lived** 56:11
**lives** 62:21
**living** 88:7
114:7
**LLP** 2:14
**long** 9:20 10:1
108:12
**longer** 30:14
**look** 8:13 24:18
51:7,14 52:1
60:12 62:3
65:3 72:18
78:21 79:4,16
80:4 88:16
91:1 94:3 97:5
97:16 107:2
113:15 116:16
**looked** 64:6,19
81:18 82:5,19
88:18 97:1,13
**looking** 19:12
46:2 59:18
65:15 80:6,10
92:2 93:3,18
96:7,18 99:9
102:5,14
107:18,20
108:3 111:14
**looks** 29:13
58:12 70:12
77:8
**lot** 74:1 91:14
**lower** 45:19
**lump** 105:18,21

**M**

**M** 1:7 69:20
70:4
**MA** 78:13,15

**Magazine** 37:4
**mailing** 34:10
**maintained** 6:12
17:8
**maintenance**
110:17
**major** 36:12
**making** 88:15
**malpractice**
26:2 54:13,20
57:5
**manual** 21:17
21:18 22:1
**margins** 65:18
83:5
**marital** 15:9,10
46:19 47:2
71:6 108:5
**mark** 70:13 75:1
**marked** 8:14
26:10 28:15
31:5 66:7
84:15 93:1,10
95:10,18 97:6
98:14 100:7,8
101:1
**marks** 101:3
**mark-up** 88:10
92:18,20
**marriage** 69:20
70:5,10 71:5
72:17 73:3,8
74:1,2,11 76:1
76:5,7 89:11
110:12 112:6
114:6 116:1
**married** 111:13
114:7
**Maryland** 23:19
62:21 79:5,8
79:17 80:2,4
80:12

**Maryland's**
79:11
**Mass** 78:15
**Massa** 102:10
**Massachusetts**
22:10 79:18,20
101:21 102:3
**material** 31:1
84:11
**materials** 4:18
14:12 24:20
28:20 40:7
83:16 92:21
98:12,15 99:5
109:13
**matrimonial**
7:12 13:16
15:6 17:6,9
23:15,16 24:2
24:11 34:21
35:14 37:13
38:9 55:18
62:5 82:2
116:10
**matrimonial-r...**
7:8
**matter** 9:14 11:9
17:16,18 23:12
23:15,16 24:13
31:21 54:8
73:17
**matters** 7:12
23:9
**maximum** 45:20
**McDiarmid**
108:9,12,16
**MD** 1:20 2:6,7
78:13
**mean** 30:10,11
36:18 47:21
48:5 52:13
53:16 60:11

**Maryland's**
67:11 70:6
74:12 75:5
77:10 80:17
88:2 113:9,11
113:19
**meaning** 29:7
36:19 52:5,7
55:21
**means** 46:13
76:2 78:18
**meant** 37:2
**mechanics** 8:18
**mediation** 63:8
**medical** 24:14
24:14
**meetings** 13:21
**member** 17:12
18:16 22:9
**memory** 58:20
76:14
**men** 22:18
**mention** 87:3
**mentioned**
53:20 69:11
**mentioning** 80:1
**Meredith** 2:10
25:3 54:8
**meriting** 103:8
**met** 11:19 13:14
**middle** 23:1
**mind** 55:8
115:17
**mine** 94:2 101:1
**minimum** 50:8
**minor** 110:16
**minute** 8:14
51:12,14
116:17
**minutes** 31:18
42:15,19,20,21
43:5 85:11
116:18

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

missed 32:13
misspoke 72:9
  109:17
misstatement
  9:9
mistake 20:1
modification
  89:20
moment 28:14
  105:20 106:6
moments 27:9
  46:2
money 115:11
monies 35:19
morning 4:8,9
motion 17:21
  23:10 115:6
motions 23:11
  23:13
moved 56:10,10
  56:21 62:21
  74:18 88:21
mwerner@rd...
  2:11
M-A-S-S-A
  102:10
M-C 108:9

**N**

name 33:17 34:2
  34:12 56:4
  100:11
narrow 38:16
  62:1,4
nature 13:7
  16:11 47:4
  76:16
near 45:18
necessarily
  37:19
necessary 79:18
need 25:13,16

25:19 32:1,2
46:15 48:10
55:7 56:19
57:15 59:21
60:12 62:16
74:12 90:1
98:11
needed 17:21
  30:4,21 33:8
  61:1 62:18
  63:10 67:2,5
  80:5 94:11
needs 54:14
  59:11 110:15
negotiated 7:14
negotiating 8:2
Negotiations
  56:21
never 5:1 11:18
  11:19 13:14
  17:15 18:16
  23:10,12 61:6
  61:8 104:10
new 5:9 6:10,12
  6:13 7:3 17:10
  17:18,19 20:13
  21:12 22:19,20
  23:4 36:19
  37:4,18 38:8
  38:12 39:11
  42:5 45:11
  47:20 48:8,16
  49:17 53:21
  54:1 56:10,10
  56:21 57:3,4,6
  57:11,12 59:10
  60:2 61:16
  63:15,17 69:8
  74:6 75:1,14
  79:3 84:20
  89:9 103:2,7
  103:17,21

104:11 106:3,5
106:7,9,13
107:4 108:18
109:4 111:5
112:4,18
113:17
news 36:12
nice 77:4
nine-page 30:12
nisi 103:16
Nobel 35:16
  36:3 68:8
  70:17 71:8,19
  71:20,21 72:5
  72:7,13,18
  78:1 102:14
noncelebrity
  39:13
nonmarital 57:9
Nope 13:15
normal 8:18
normally 44:18
notarial 118:16
Notary 1:14
  118:3,20
notations 49:5
  88:11
note 63:16 66:1
  89:2 92:8
noted 109:18
notes 3:10 20:11
  20:20 21:5
  28:8,12,14,21
  29:4,10 30:13
  31:3,20 32:4,7
  32:8 42:13
  46:2,3 49:9
  51:5 52:1,3,17
  52:20 53:2
  58:2,19 59:3
  62:14 63:17
  64:9 65:15,17

65:18,20 66:2
66:3 70:12,15
74:5,13,19
76:15 77:1
82:6,10 98:5
116:16
notice 13:8
notion 48:7 49:2
  61:16,19
November 1:12
  118:17
No.VA 1:20
Ns 21:3
nullity 104:6
number 31:21
  38:14 40:2
  50:8 54:3
  76:17 91:21
  97:8
numbered 51:11
  84:17
numbering 26:9
numbers 49:7
N.W 1:13 2:15

**O**

object 37:20
  38:3 41:14
  44:3 60:19
  69:1 77:17
  78:5 86:2
  88:13 103:18
  105:7 115:14
  116:2
objection 43:3
  43:13 44:8
  86:4
obligation 61:13
obligations
  60:20
obviously 9:9
  21:21 85:4

91:12
occasion 5:5
  9:19 52:19
  64:8
occasionally
  87:4
occupation
  110:13
occur 5:8 114:13
occurred 19:9
  58:19 115:3
occurrence 9:19
October 35:18
  69:13 109:14
  109:19 110:2
  111:6 112:21
offense 25:13
offhand 69:16
  107:8
office 12:16 13:7
  87:18,21 88:2
oh 56:16 62:15
  63:6 67:15
  78:19 92:2
  105:5
okay 9:12 12:19
  13:1,3,12
  14:19 15:12
  17:2,15 21:21
  22:5 24:17
  27:13 28:8
  33:14 36:17
  41:8 42:20
  43:6 44:10
  45:5 46:1,6,14
  48:15 49:8
  50:16,19 51:18
  52:18 53:1,12
  56:20 58:18
  61:5,12 66:15
  69:10,20 74:4
  74:17 76:11

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

82:16 83:3,19
84:4 90:13,15
91:8 92:2,15
93:19 95:2,18
96:9 100:8
105:10 106:10
113:14
**older** 112:7
**oldest** 52:12
**Oldham** 81:19
81:21 82:1
**omitted** 88:17
**Once** 5:4
**ones** 82:20 96:1
96:15 97:1
**on-line** 81:10
82:7,12
**OP** 50:4
**opening** 87:6
**opinion** 10:19
11:5,6 30:6
37:19 38:9
40:17 42:1
50:3 57:19
58:5 59:9 60:2
61:7 62:10
63:8 68:11
71:12,13 74:8
80:11 84:12
89:5 92:11,14
95:20 96:6
98:13,21
100:12 101:21
103:2 104:3
107:13
**opinions** 37:10
38:6,7,10
40:15,18 42:8
58:7 64:20
99:12 103:11
104:5,12
**opportunity**

110:18
**opposed** 7:20
30:18 69:8
114:8
**opposite** 7:21
**options** 70:17
**oral** 4:2 32:19
98:20,20
**Orally** 33:3,4
**oranges** 109:2
**order** 26:8 41:18
51:8,9,10 52:8
52:10,11
**organize** 67:1,5
**origin** 24:21
**original** 3:16
57:15 58:11
**originally** 29:19
**outcome** 69:7
118:15
**outcomes** 21:10
**outline** 64:10
**outlines** 20:11
33:2 65:4
**outside** 45:1,17
47:19
**overall** 109:2
**overly** 103:15
**oversight** 86:15
**overturned**
104:11
**overview** 53:7
**O-L-D-H-A-M**
81:21

_____
**P**
**P** 46:19 75:9
**page** 13:5 22:20
26:15 27:16
29:2 37:3
40:17 59:7
63:21 86:20

87:16 88:17
92:3,3 102:4,5
102:20 107:20
108:1 109:10
**pages** 30:12,18
63:21 64:4
**paid** 44:14,16
**paper** 42:13
49:14 99:10
**paragraph**
85:18 88:20
92:9 94:5
102:7 103:7
**paragraphs**
24:19 101:4
**pardon** 77:7
94:8 110:5
**part** 12:12 26:2
60:7,8 61:17
73:6,10 99:18
113:15
**participated**
24:9
**particular** 81:7
87:9
**particularly**
48:4 77:15
79:5 80:13
**parties** 53:7
110:15 111:11
111:16 114:1,7
118:13,14
**partner** 91:20
**partners** 75:10
75:11
**party** 5:2 7:21
32:15 77:13
111:7
**party's** 111:6,8
112:4,10
**passed** 73:2
**Patents** 70:18

**pathetic** 76:16
**Paul** 7:3 22:13
**payoff** 71:5
**peculiar** 78:16
**pen** 66:14,17
**penalties** 4:4
**Pennsylvania**
18:3,14,17
80:8
**penultimate**
90:10
**people** 23:6
34:15 36:12
44:17 72:1
75:7,12 98:21
105:18
**people's** 76:12
**percent** 45:3,16
**perfectionist**
91:16
**performed** 71:4
**period** 18:6
27:19 44:7
45:6 53:4 73:1
73:8 89:15,16
114:9 115:20
**periods** 43:8
**perjury** 4:4
**person** 27:5
76:7
**personal** 26:5
**personally**
118:5
**pertinent** 63:3
**phone** 11:19
29:5 33:3,4
49:8,15 63:18
**photocopying**
66:11
**photographs**
98:5
**pick** 44:18

**picked** 82:7
**piece** 42:12
49:14 72:2,20
**pieces** 42:13
67:6 71:21
85:17
**piggyback** 75:13
**place** 118:6
**Plaintiff** 1:5 2:9
4:3 26:6
**play** 16:8 105:11
**played** 5:13
**pleadings** 40:9
**please** 14:4,7
20:8 28:21
40:1 57:2
62:13 74:4
87:1 117:6
**pleased** 117:1
**point** 26:18 36:1
41:13 42:14
47:11 48:14
68:8 78:9
83:21 88:15
94:3 98:4
108:15 112:13
**pointed** 101:7
**points** 47:8
**point-by-point**
47:14
**popped** 80:12
**portion** 22:2
**position** 18:10
104:4
**positive** 59:5
**possible** 38:4
**post** 73:8 115:6
**Post-it** 42:13
**pottery** 72:12
**practically**
115:7,8
**practice** 7:11

Deposition of Catherine Ross, Esq.
Taken on November 14, 2007

Page 132

18:1,13 23:11
25:21 30:2
31:14 61:8
115:9,18 116:9
116:13
**practiced** 6:17
**practitioner**
63:20
**preamble** 8:18
**preceded** 87:12
103:3
**predominantly**
7:8
**pregnant** 23:3
**preliminary**
30:6,10 64:10
**premarital** 71:9
**PREMARKED**
3:5
**preOctober**
110:1
**preparation**
23:2 29:5
80:11
**prepare** 9:4 28:4
**prepared** 4:18
14:13 20:10
24:12 25:5
98:6
**present** 19:13
31:19 71:15
**presentation**
20:10
**presentations**
14:13 16:11
17:2 21:8
**presented** 14:20
**presumably**
68:14
**pretty** 67:3
97:18
**prevailed** 75:21

**previous** 69:13
69:14
**previously** 4:20
9:14,17
**print** 82:13,17
**printed** 82:14
82:20 83:1,20
85:1,8 88:5
93:2 96:5,15
96:20
**prior** 6:20 26:4
63:11,14 76:1
76:4 84:18,21
90:9 91:5,7
102:15 111:17
111:18 113:12
**prisoners** 24:9
**prius** 103:16
**prize** 35:17,19
36:3 46:16
47:2 68:8 71:9
71:19,20,21
72:5,7,13,18
78:1 102:15
**pro** 6:2,5 17:16
17:18 24:13
**probably** 14:17
15:7 20:2 36:9
81:18 97:21
**problem** 21:20
**proceeded** 69:8
**proceeding** 59:7
**proceedings**
118:11
**process** 113:3
**prodigious**
72:14
**produce** 65:20
98:12,15
**produced** 28:11
85:7 96:8,14
97:21

**production** 3:11
**productivity**
72:14
**professional**
17:9 35:5 54:6
55:5 70:9 75:3
75:8,14 76:4
89:12,13,17
108:4
**professor** 18:2,4
18:20 19:2,4,8
19:14 22:7
44:19,20 84:5
91:20
**progress** 11:2
85:3,6
**project** 43:7
84:7
**projected** 21:9
**pronounce**
101:16
**pronounced**
102:21
**pronouncing**
102:21
**property** 15:9
15:10 46:19
47:2 65:8 71:6
108:5 109:3
**prospects**
104:18
**provide** 26:12
26:17 27:19
83:1 100:1
110:9
**provided** 23:6
24:20 26:21
27:18,20 28:20
40:8 41:8
64:14 82:20,21
83:17 90:4
92:21 98:8

99:6,9,18
100:15
**Provisions**
110:15
**Ps** 75:3,9,10,19
**psychiatric** 23:7
23:7
**public** 1:14 23:7
25:16 118:3,20
**publication**
99:10
**publications**
15:13,14
**published** 35:8
38:10,13 68:12
93:6 103:12
**pulled** 36:10
49:14 83:21
98:17
**pure** 55:10,12
**purely** 35:2
55:14
**purposes** 44:15
**pursued** 89:1
**put** 34:9,12 39:6
39:8 51:10
64:11,16 75:3
78:20 84:12
89:13 92:3
101:2,11 115:4
**putting** 59:17,19
101:19 115:11
**P.A** 2:4

**Q**

**quadrant** 87:17
**qualifications**
67:9,13
**question** 10:14
14:4,7 20:9
24:3 36:18
38:3 47:5 55:2

55:11,12,15
57:10 59:6,7,8
59:13,19 60:7
60:8 61:9,17
61:20 67:9
69:2,5,19
70:13 72:7
73:11,19 76:1
77:7,18,19
101:3 103:19
103:20 106:15
107:3,14
113:15
**questions** 25:11
49:10 59:19
62:5 74:20
79:3 90:3,16
96:4 117:2,4
**quick** 97:15
**quickly** 62:18
96:19
**quiet** 76:19
**quite** 16:14,18
23:11 50:11
79:2 85:4
94:18 114:10
**quote** 79:1
**quoted** 102:2,9

**R**

**R** 101:19
**raised** 105:1
**random** 51:9
**range** 16:18
57:21
**rate** 44:11 50:19
50:20 51:2
**reach** 67:20 68:2
74:10,13
**reachable** 54:12
**read** 34:15 35:9
46:5,7 58:12

Deposition of Catherine Ross, Esq.
Taken on November 14, 2007

65:7 67:16
76:19 83:10,12
83:14 117:5
119:4
**readable** 46:4
101:10
**readily** 22:1
**reading** 47:18
69:21 70:1
73:16 76:20
**realize** 14:6
**really** 7:21
21:14 30:19
62:17 63:13
65:1,5 73:10
76:8 79:20
91:13 96:3
103:14 104:1,2
111:13
**reason** 66:9
78:20 115:10
**reasonable** 58:1
**reasoning** 68:3
104:10
**reasons** 73:14
**recall** 6:11 11:15
14:19 20:16
29:19 30:9
34:17 35:17
64:1 79:21
80:4 81:8
96:20 109:15
**received** 11:11
11:13 19:7
22:18 101:13
**receiving** 11:5
**recess** 95:16
116:19
**recognizes**
57:12 71:21
**recollect** 36:5
**recollection**

7:18 10:1
54:19 84:3
**recommended**
33:16
**record** 51:16
58:21 83:9
86:15 92:17
101:2,11
113:10 116:21
118:11
**recorded** 118:10
**redacted** 25:6
**redrafts** 92:1
**reduce** 32:2 67:7
**refer** 9:7 31:4
62:1,10 70:15
**reference** 46:20
56:3 81:20
107:18
**referenced**
15:12
**referencing**
108:2
**referred** 11:18
62:14
**referring** 75:9
**refers** 99:11
**reflect** 87:8
**refreshed** 58:20
**refreshing** 76:14
**regard** 75:13
**regarded** 15:7
**regarding** 21:10
23:5 26:13
57:1,20 108:21
**regime** 109:3
**relate** 50:6
**related** 20:11
25:20 35:4
107:10 118:14
**relates** 35:13
99:11

**relations** 23:19
**relationship**
10:17 12:20
106:19
**relatively** 43:21
61:9
**released** 23:6
**relevant** 38:6
110:11
**relied** 80:7
**relies** 107:6
**rely** 99:16
**relying** 38:17
40:14
**remainder** 74:4
**remains** 108:16
**remember** 13:20
58:4 69:15,16
79:9,20 80:1
88:9 109:9
**reminded** 36:11
72:18
**report** 3:13 27:7
34:11 60:15
68:4 69:11,12
80:2 100:9,10
109:9
**reported** 1:21
2:20 22:20
37:9,19 38:6,7
38:15,17 39:11
58:5,6 103:11
104:3
**REPORTER**
14:3 19:19
20:8 117:5
**reporting** 1:19
98:18
**reports** 13:10
27:4 40:21
49:18 73:16
76:18 88:17

105:6,9
**represent** 4:11
22:10 71:2
**representation**
6:3,21 24:6
**representative**
8:10
**represented**
5:21 6:5 7:20
17:15 56:6
**representing**
9:11 61:13
72:6
**reprimand**
25:17
**reproductive**
24:14
**reputation** 70:8
72:2
**request** 3:11
22:3 25:3
99:19
**requested** 26:12
26:16 32:6
44:17
**required** 31:16
**requirement**
45:2
**research** 16:15
16:17 28:10
34:13,14 41:6
67:2,4,5 80:14
80:18 81:9,15
81:16 83:8
84:5 85:18
107:9 113:5
**researched** 48:7
**researching**
61:7 85:19
**residence** 45:11
77:3
**residency** 75:16

**respective** 77:19
**respond** 22:4
87:2
**response** 25:2
100:1
**responsibility**
55:6
**rest** 54:16 58:12
62:13
**restrictions**
44:21
**result** 47:17
57:21 77:6
112:5
**results** 68:2
**retain** 32:8
65:15
**retainage** 32:13
**retained** 4:13
9:10 10:5
11:16 29:20,20
32:18 43:12
**retaining** 62:3
**retract** 72:9
**return** 5:6
**returned** 84:20
**review** 9:3 51:12
61:1 96:18
**reviewed** 40:9
58:20 98:6
**reviewing** 4:17
28:9 64:20
**rewarded** 71:3
**RICHARD** 2:12
**Rick** 25:3 29:6,7
29:8 32:21
46:15,21 48:2
48:21 52:21
53:14,16,17
56:18 58:3
62:15 70:4
94:9,12,21

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 134

| | | | | |
|---|---|---|---|---|
| 99:2 | s 79:10 | secretaries | 39:13 81:2 | signed 119:7 |
| **Rick's** 54:2 57:9 | **sarcasm** 77:7 | 56:20 | **Serving** 1:20 | **significance** |
| 60:6 | **sat** 88:7 | **secretary** 28:7 | **sessions** 14:8 | 97:19 |
| **Rifkind** 7:3 | **satisfied** 90:20 | **section** 13:19 | **set** 52:16 118:6 | **significant** 98:1 |
| **right** 5:15 17:19 | **savings** 6:7 | 14:9 69:12,13 | **settled** 11:4 57:4 | **significantly** |
| 46:17 53:12 | **saw** 12:7 13:4 | 107:12 109:8 | 57:18 58:6 | 45:19 |
| 55:1 70:1,1 | 49:18 90:8 | 109:11,14 | 68:13 | **similar** 47:17 |
| 76:13 90:16 | **saying** 16:4 | 111:5,17,18 | **settlement** 11:13 | 68:2 |
| 94:6 97:7 98:3 | 19:13 55:6 | 112:4,18 | 42:2,4 47:4,7 | **similarly** 104:21 |
| 106:10 109:18 | 59:17 64:14 | **security** 5:6 | **settlements** 7:14 | **simple** 59:8,9,20 |
| 109:20 111:9 | 74:14,18 76:3 | **see** 26:15 27:11 | **Seven** 7:6 | 60:1 61:9 |
| **rights** 8:20 16:8 | 77:21 79:16,17 | 29:12 32:12 | **share** 32:3 | 106:14 |
| 24:10 | 86:6 87:10 | 42:2 45:10 | **shared** 40:18 | **simply** 94:12 |
| **right-hand** 29:2 | 116:7 | 57:15 58:8 | 42:3 49:12 | **Simpson** 2:12 |
| 40:3 46:14 | **says** 46:5,8,9,14 | 63:12 64:18 | **sheaf** 26:21 | 22:3 27:10,13 |
| 87:17 | 46:15,17,18 | 90:9 92:20 | **sheet** 119:7 | 27:15,17 29:7 |
| **Rita** 1:7 4:12 9:4 | 50:3 53:12 | 101:8 | **sheets** 52:10 | 29:8 37:20 |
| 55:17 57:4 | 55:19 56:11 | **seeing** 4:17 | **shelters** 22:18 | 38:2 41:14 |
| 84:10 90:5 | 57:6 63:13 | **seeking** 11:14 | **shepherdization** | 43:3,13 44:3,8 |
| 91:6 93:14 | 78:13 89:3 | **seen** 26:10 108:6 | 82:10 85:13 | 48:18 51:18 |
| 115:10,16 | **school** 18:7 | **seminar** 15:20 | **shepherdize** | 52:12 56:15 |
| **Rita's** 55:21 | 23:18 33:13 | **seminars** 14:1 | 64:21 | 58:13,17 60:19 |
| 57:13 | 88:3 | 16:9 | **shepherdized** | 69:1 77:17 |
| **RJL** 1:6 | **schooling** 75:16 | **send** 13:20 | 82:9 | 78:5 80:16 |
| **road** 71:6 | **scope** 10:12 32:6 | **senior** 18:10 | **shocked** 72:12 | 81:15 86:2,7 |
| **roles** 36:13 | 37:5 47:19 | **sense** 65:11 | **short** 30:10 | 88:13 92:15 |
| **room** 16:12 88:8 | 115:15 | **sent** 34:18 90:10 | 116:14 | 93:9 95:13 |
| **Ross** 1:11 2:14 | **screen** 85:4 | 90:14 93:12 | **shorthand** 46:11 | 97:9 99:2 |
| 3:2,5 4:1 12:10 | **sculpted** 95:6 | 94:9 | 46:13 70:7 | 100:3,18 101:7 |
| 118:5 119:3 | **seal** 118:16 | **sentence** 103:6 | **shot** 106:16 | 103:18 105:7 |
| **roughly** 33:1 | **sealed** 37:14 | **separate** 77:20 | **show** 39:21 | 106:18 115:14 |
| 43:19 45:4 | 38:9 103:16 | 85:16 115:12 | 47:16,18,19 | 116:2,18 117:3 |
| **round** 43:5 | **search** 102:13 | **separation** | 84:15 | 117:6 |
| **route** 47:18 | 103:11,16 | 114:9 115:21 | **showed** 11:12 | **sir** 41:3 92:10 |
| **routine** 112:2 | **searches** 81:16 | **sequence** 13:3 | 50:10 | **six** 14:17 34:11 |
| **rsimpson@rd...** | **seasonably** | 51:7 52:2,4 | **sic** 67:12 | **sixth** 26:15 |
| 2:13 | 99:21 | 64:2 | **side** 11:12 49:19 | **skills** 110:14 |
| **Rt** 2:6 | **second** 24:17 | **serve** 9:16 | 50:5 101:3 | **small** 11:17 38:8 |
| **rules** 100:4 | 27:11 48:4 | **served** 9:21 | **sides** 76:21 | 38:14 42:12 |
| **runs** 87:1 | 74:19 86:11 | 44:13 | **sign** 117:5 | **Smith** 1:14,21 |
| | 87:3 102:7 | **service** 98:18 | **Signature** | 2:20 118:3,19 |
| **S** | **Secondly** 71:20 | **services** 23:5 | 119:12 | **smudges** 101:8 |

**somebody** 10:9
   55:9 59:18
**somewhat** 94:13
**son** 34:5,18
**sorry** 14:2 19:11
   67:21 70:2
   89:9 95:4
**sort** 31:11 34:10
   52:2 53:7
   66:21
**source** 41:17
   42:7
**sources** 31:10
   40:10,13
   110:13
**so-called** 39:15
**span** 30:15
**speak** 84:4
**speaking** 63:16
**special** 75:15
**specific** 27:8
   71:21
**specifically**
   10:18 16:16
   53:9 88:9
   107:6 112:14
   115:13
**spectrum** 15:5
**Spell** 81:20
**spelling** 21:1
**spending** 60:16
**spent** 64:18
   85:12
**spoke** 32:21
   47:1 49:8
**spoken** 14:2,8
**sponsored** 14:8
**spouse** 8:2 38:21
   39:12,14,15
   104:15
**spouses** 8:3
   75:12 77:14,20

89:18
**Spring** 115:12
**Stade** 89:9
**standard** 57:10
   57:19 112:15
   112:19
**standards** 54:21
**stands** 54:14
   59:13
**stapled** 86:8
**start** 14:4 67:6,6
   84:20 86:18
   115:11
**started** 65:2
   78:13 82:7
**starting** 65:6,11
**starts** 86:19 91:3
**state** 15:18
   18:13 20:13
   82:3,3 107:2,4
**stated** 58:21
   83:9
**statement** 3:8
   39:19 40:4
   41:2 53:10
   59:3,15 60:6
   61:15 67:10,12
   67:15 68:4
   103:10,15
**states** 1:1 79:1
**stating** 53:10
**status** 8:7 20:13
   21:11 38:15
   39:1,3,9 48:8
   57:12 74:6,16
   74:21 76:1,4,8
   78:3 103:8
   104:16 105:15
   106:8
**statute** 112:8,9
   113:17 114:10
**stenographica...**

118:10
**stickies** 32:10,11
**stickler** 104:3
**Stiglitz** 1:4 4:12
   33:19 34:7,11
   35:9 47:1 48:9
   56:1,3,6 57:11
   71:8 89:1
   94:15,15
   105:21 113:16
   115:11
**Stiglitz's** 65:10
   104:21
**stock** 70:17
**stop** 90:2
**Street** 1:13 2:15
   34:16
**structure** 47:12
   64:12
**student** 24:7,13
   84:5
**students** 16:14
   16:17
**studies** 15:4
**study** 16:11
**stylistic** 88:11
   89:21
**subject** 38:11
   108:5 111:20
**subjects** 99:12
**submissions**
   115:6
**subscribe** 81:2
**subsequent**
   90:11
**subspecialty**
   15:6
**substance** 91:19
   94:19
**substantial**
   89:19
**substantive**

88:14 89:8
**suddenly** 92:3
**sued** 25:20 57:3
   57:4,6
**suffered** 91:21
**sufficient** 30:21
**suggest** 74:20
**suggested** 94:12
   94:21
**suggests** 74:1
**suing** 56:1
**suit** 7:17
**sum** 41:4
**summaries**
   34:13
**summarize** 41:4
**summarized**
   62:7
**summary** 25:9
   30:11,12 31:3
   82:1 94:3,6
**supervised**
   16:14
**supervision**
   16:15
**supplement**
   21:15 41:19
**supplemented**
   30:7
**support** 99:16
   108:11
**supports** 57:8
**suppose** 104:2
**sure** 21:3,4,16
   21:19 26:19,20
   27:1 28:15
   36:9 49:3,11
   51:15 58:9
   60:5 63:13
   65:1,2,5 67:3
   78:13 85:20
   87:7 97:4

103:20 105:14
   105:16
**surprised** 61:4
**surprising** 76:10
**Susan** 1:14,21
   2:20 118:3,19
**suspension**
   25:17
**sworn** 118:7
**system** 11:3
**S-T-A-D-E**
   89:10

T

**tact** 46:6
**take** 8:13 22:3
   25:13 44:20
   51:2,17 59:20
   72:12 77:2
   78:7 81:9
   92:12 94:13
   95:13 97:5,15
   104:17 108:18
   111:3 112:2
   116:14
**taken** 1:12 4:21
   51:19 64:9
   76:17 95:16
   116:19
**takes** 108:20
   115:3
**talk** 8:21 33:4,8
   54:10 62:19
   79:17 109:5
**talked** 30:5
**talking** 16:20,21
   30:9 37:9
   106:7,8
**task** 51:6
**taught** 15:16,18
   15:19 18:8
**taxability**

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

112:17
taxation 111:19
teach 15:15,17
  15:17,20 20:19
  45:13
teacher's 21:17
  21:18 22:1
teaches 12:6
teaching 18:7
  20:15 21:9
tell 4:4 28:21
  32:17 33:10
  40:13 51:6
  52:1,19 53:9
  63:2 64:8
  73:13 76:2
  78:17 81:14
  93:7,19,21
  96:13
telling 47:1 53:6
  58:3 59:11
  96:9
tenant 9:14
tend 15:4 43:7
tends 72:1
tenure 19:7 36:7
tenured 19:2,8
term 18:8
terms 11:13
  16:1 26:8 31:9
  47:6 48:1 67:1
  76:12 79:10
  85:1 87:4
  113:1
testified 4:5
  9:13
testify 51:3
  99:13
testifying 9:13
testimony 24:12
  99:16 119:4,6
textbook 21:18

21:21
thank 19:21
  27:13,17 28:8
  29:18 40:20
  52:9 54:16
  56:16,18 58:16
  66:20 67:15
  70:11 75:11
  89:6 90:15
  94:8 95:15
  97:2,12 100:5
  101:19 102:6
  102:19 107:21
  109:11 117:3
thing 31:11 38:5
  53:7 111:13
things 9:1 26:16
  26:19 34:15
  38:4 44:12
  50:1 58:2 66:6
  66:10,15 67:7
  70:18,21 71:2
  81:18
think 25:20
  29:21 33:5
  36:15 38:20
  46:21 54:9
  62:19 65:13
  66:17 67:3
  73:19 74:14,19
  87:10 89:19
  98:19 101:10
  109:6 113:20
  116:15
thinking 47:11
  47:11 49:11
  67:1
third 29:21 33:1
  43:19 53:3
  92:9
Thomas 82:1
thought 34:7

43:14,19 80:5
  86:10,16 89:13
  94:18 105:4
  113:16
thoughts 48:1,3
three 39:11
  43:12 52:10
  67:13,14 77:5
  96:10
throw 36:14
Thursday 54:10
  54:11 64:13
  93:17
time 5:19 9:13
  10:16 12:1
  14:15 18:5
  19:3,20 27:19
  31:10,18 33:7
  41:16 43:9
  44:1,7,13 45:3
  48:18,19 50:19
  52:2 53:3
  66:16,18 68:12
  73:2,7 77:5
  89:15,16 99:20
  113:2 115:4
  118:6
timeframe 64:17
Times 22:20
timing 46:16
  47:3 68:16
  69:9
today 71:4 97:1
told 43:19 54:4
  54:19,20 55:17
  99:1 105:3
tools 80:15
top 26:14 52:5
  53:12,21 54:10
  60:11 94:7
topic 14:19 16:2
  21:5

topics 16:19
  20:18
total 32:9 41:4
  42:7
totaled 42:14
totality 66:1
totally 9:2 60:5
  81:10
tough 42:21
train 77:1 88:6
training 89:14
transcript 3:16
  118:11
transcription
  119:5
transmitted
  13:9
traveling 87:20
trial 23:1,10
  51:3 58:1
  68:13 71:14
  72:6 73:18
  99:17 100:2
  103:16 114:2
  116:4
tried 10:3 22:17
  22:21 75:13
trivial 10:4,6
TRO 6:7
true 37:21 71:21
  77:16 79:4
  102:12 104:1
  106:10 118:11
  119:5
Trunnell 2:4
truth 4:4
try 8:21 22:14
trying 14:5
  30:19 42:12
  43:15 63:12
  66:11 67:4
  81:1 91:17

93:15 107:3
turn 26:14
turned 30:8,21
two 8:20 21:3,6
  43:12 44:12
  45:7 46:15
  47:8,13,18,21
  49:10,19 55:13
  62:6 67:13
  69:6 77:19
  84:19 86:9,11
  86:16 95:20
  104:11
two-page 30:11
two-week 44:7
  45:6
typically 25:12

_____

U

Uh-huh 8:16
  12:14 27:3
  31:6 53:8
  70:14
ultimate 57:21
  114:8
ultimately 47:15
  71:13 72:13,19
unable 23:3
unclear 89:3
underline 66:1
  66:13
underlying
  40:21 56:4
underneath
  86:11 95:19
understand 4:13
  26:7 40:7
  45:10 59:2
  60:12,20 67:18
  87:10 94:16
  97:20 111:12
understanding

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

61:10

**understood**
60:14 93:11
**unearthed** 96:10
**unfavorable**
57:13
**unified** 15:1
**uninterrupted**
77:5
**Union** 24:16
**unique** 47:19
75:1
**unit** 112:11
**UNITED** 1:1
**universe** 41:19
**university** 18:3
18:9 34:4
44:21 81:4
88:4
**unnecessary**
94:14
**unreported**
104:5
**unsettled** 78:21
**updated** 82:1
**upper** 46:14
87:16 100:16
**up-to-date**
61:11 97:18
**use** 26:18 28:7
55:9 80:15,16
81:6
**usually** 15:20
**utilized** 35:10

**V**

**V** 56:3
**valid** 94:18
**value** 71:4
111:19 114:15
115:2
**variety** 7:10

108:13

**venture** 72:15
**Vermont** 72:12
**version** 86:18
87:9,12,13
90:7,9,10,17
90:21 91:1,3
92:17,19,21
93:4,5,18 94:9
97:3,20 101:10
**versions** 95:20
**versus** 56:1 73:8
85:14 102:10
**Videoconfere...**
1:19
**view** 48:8 71:16
72:4 98:11
106:18
**views** 84:6 94:20
**Virginia** 79:12
**visibility** 72:15
72:17
**visiting** 18:4
22:6
**vitae** 3:6 4:17
74:3
**vocational**
110:14
**Voice** 89:10
**volunteered**
49:16
**Von** 89:9
**vs** 1:6
**V-O-N** 89:9

**W**

**W** 54:14
**Wall** 34:16
**want** 4:18 14:4
21:1 26:18
27:1 64:11
67:16 86:14

90:18 92:12
94:13 95:5,13
97:4 102:19
107:16 116:16
**wanted** 10:19
24:21 30:20
33:5,6,7 49:9
50:8 53:21
55:12 61:18
64:19 87:3
88:21 89:18
**Washington**
1:13 2:16 88:4
**wasn't** 10:9 55:8
61:17 63:3
69:2 72:8
73:11 87:6
108:14 111:17
**way** 8:17 16:7
20:16 31:8
35:13 39:4,7
40:14 47:12
51:8 80:6
85:21 86:6,10
95:6 98:14
100:17 101:11
101:16 102:21
112:12 113:19
118:14
**ways** 10:16
71:16 77:20
**Wednesday**
1:12
**week** 30:1 33:1
43:20 44:7
45:4 53:3
**weekend** 88:1
**weeks** 34:11
43:12 44:1
**Weiss** 7:3 22:13
**well-positioned**
77:15

**went** 7:13 23:10
23:18 31:10
**weren't** 7:21 8:1
**Werner** 2:10
54:8
**West** 15:14
80:20
**we'll** 22:3 27:9
28:17 58:14
86:12 90:15
92:11,13 95:11
100:8,10
**we're** 16:20
59:18 74:9
98:2 106:6
**we've** 12:9
27:18 32:6
41:19 93:18
95:8 96:2
97:12,13
101:15 105:19
**Wharton** 7:3
**Whitworth** 2:2
2:4 3:4:7,11
22:5 27:14,16
51:17 56:18
58:10,16 80:18
86:5 92:12
93:11 95:15
100:5,20
116:14,21
**wide** 7:10
**wife** 105:2,3
106:2
**Williams** 102:10
**willing** 50:16
**win** 71:20
**winner** 35:17
36:4
**witness** 4:2
19:21 27:6
38:1 44:13,15

54:15,16 55:7
56:16 118:16
**won** 5:11,14
71:19 72:13
**word** 70:1 89:9
**words** 45:4
47:14,19 52:11
68:13 83:3
**work** 31:8,19
40:6 43:7
44:17,18 45:1
45:6 46:16
50:12,21 55:5
67:6 69:20
71:4,8,9 72:1,2
72:3,16,19,20
73:2 74:1
84:20 85:3,6,7
87:6 89:17
101:14
**worked** 8:9
16:16 23:1
31:9,10,21
43:4 87:8
99:11
**working** 18:11
39:20 54:8
66:17 85:16
87:21
**World** 36:8
**worse** 101:1
113:16
**wouldn't** 13:11
17:21 21:14
102:15,18
**write** 65:18
78:13 83:2
85:18
**writing** 32:2
46:4 63:8,17
67:7 70:20
85:14

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 138

27:4,7 34:7
35:9,13 60:15
72:11 87:16
99:4,10
**wrong** 12:8 68:7
**wrote** 25:2
49:10 54:10
92:1 94:1

**Y**

**Yale** 24:5
**yeah** 19:17
47:10 59:6
69:18 82:14
87:18 92:3
**year** 16:1,1 18:9
19:18 35:21
45:4,15,15,16
69:16 97:21
**years** 5:20 6:1,4
6:20 7:5,6 10:2
13:18 14:17
15:16,20 16:18
20:2,19 34:5
76:6,9 91:21
103:9
**yellow** 42:13
66:6,10
**Yep** 102:8
**yesterday** 101:6
**York** 6:10,12,13
7:4 17:10,18
17:19 20:13
21:13 22:19,20
23:4 36:19
37:4,18 38:8
38:12 42:5
45:11 47:20
48:8,17 49:17
53:21 54:1
56:10,10,21
57:3,4,6,11,12

59:10 60:2
61:16 63:15,17
69:8 74:6 75:2
103:2,7,17,21
104:11 106:4,5
106:7,9,13
107:4 108:18
109:4
**York's** 75:14

**$**

**$15,000** 50:9
**$500** 50:7

**0**

**01** 35:18
**05-1826** 1:6
**07** 84:16

**1**

**1** 3:6 8:14 19:12
47:8 97:18
**10** 5:20 6:1,4,20
30:12,17 42:19
42:20 112:14
**10-minute** 42:17
**10-page** 29:15
50:2
**10:09** 1:13
**12** 111:14
**12:51** 117:7
**1349** 40:3
**14** 1:12
**15** 103:9
**15,000** 50:15
**15-minute** 42:18
**16-910** 109:8,21
110:1
**18** 26:16 27:16
**19** 109:19
**19th** 110:2
118:17
**1988** 103:4

**1991** 103:2
**1994** 108:10

**2**

**2** 3:7 47:9
**2nd** 95:10
**2/2/07** 3:12
**2/8/07** 3:9
**2/9** 29:13
**2/9/07** 3:13
**20** 45:2,16 98:3
**2000** 19:10 20:3
102:2,10
**20006** 2:16
**2001** 1:13
110:21 111:3
112:9
**2001/2002** 18:5
**2002** 109:17,19
110:1,2 111:6
112:21 115:12
**2004** 42:5 68:10
69:13 101:21
102:15 109:14
111:14 112:14
**2005** 19:13
**2007** 1:12 45:16
118:17
**2011** 2:15
**2012** 118:21
**202-662-203**
54:2
**202.662.2000**
2:17
**2101** 2:5
**21114** 2:7
**22** 99:9
**23** 60:16
**26** 42:15 44:6
85:11
**29** 118:21

**3**

**3** 3:8 39:19 40:2
40:10,16 102:5
**30** 76:9
**301.261.0035**
2:8
**31** 62:17
**31st** 63:9
**32** 76:6

**4**

**4** 3:3,9 84:16
91:2 95:9,19
102:20
**45** 42:15,21 43:5
85:11
**45-minute** 77:6
**450** 2:6

**5**

**5** 3:10 28:16
29:3 46:1,5
50:6 64:1
**5th** 86:14,17,19
87:12 90:17
**50** 43:5
**500** 50:14
**515K** 50:6

**6**

**6** 3:11 26:9
27:16 78:9,10
97:9,10,12
98:3

**7**

**7** 3:12 95:11,19
109:10
**7th** 63:9 95:9

**8**

**8** 3:13 84:16
100:9 111:6
**8th** 64:14 86:18

87:12 91:2,14
93:4,10,18
100:16
**87** 22:12

**9**

**9** 3:14 30:18
31:4,8 42:10
50:2,10 107:20
112:4
**9th** 43:11 62:11
64:16 90:8
91:15 92:17
93:5 100:9
**939** 84:17 91:3
**94** 22:13
**940** 94:7
**947** 92:3,3
**948** 91:3
**949** 86:20 87:16
88:17
**950** 88:20
**951** 89:7
**957** 84:17 87:2
**96** 19:5
**960** 29:1 52:15
64:6
**961** 52:14,15,19
59:4
**962** 52:14,15,16
59:3 62:14
**963** 52:14,16
63:21 64:17
74:5
**99** 19:5,9