# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOSEPH E. STIGLITZ,                        )
                                           )
                Plaintiff,                 )
                                           )
        v.                                 )        Civil Action No. 05-1826 RJL
                                           )
RITA M. BANK,                              )
                                           )
                Defendant.                 )
                                           )

### DEFENDANT'S EXPERT WITNESS DESIGNATION

Defendant, Rita M. Bank ("Bank" or "Defendant"), by and through her undersigned

counsel, designates the following experts expected to be called at trial in accordance with

Federal Rule of Civil Procedure 26(a)(2):

    1.      Robert F. Aucone, CPA
            BKD, LLP
            1700 Lincoln Street, Suite 3400
            Denver, CO 80203

Robert F. Aucone, CPA, has been retained as a damages expert who is expected to testify

at the time of trial in the above-captioned matter on behalf of the Defendant. A letter

summarizing Mr. Aucone's opinion is attached hereto as Exhibit 1.

Mr. Aucone is a certified public accountant and is accredited in Business Valuation by

the American Institute of Certified Public Accountants. Mr. Aucone is employed as the leader of

litigation support services for BKD. BKD is among the nation's ten largest public accounting

and advisory firms. For the past 20 years, Mr. Aucone has focused on litigation support, which

has included providing expert witness services, calculation of damages and testimony in many

industries in both federal and state courts. Mr. Aucone has significant experience in calculating

damages in divorce cases, which constitute about 20 to 30 percent of his time.

During the last four years, Mr. Aucone has testified as an expert witness on numerous occasions. A list of that testimony is attached as Exhibit 2. Mr. Aucone has been retained by the Defendant for $300 an hour for consultation and document review and $350.00 an hour for deposition and trial testimony. Mr. Aucone's opinions are based on his training and experience and on his review of the written materials provided to him in connection with this matter, which are included in Exhibit 1. Mr. Aucone will rely on supplemental documentation, discovery and witness testimony that will be provided to him as discovery continues. Mr. Aucone will also base his trial testimony on the evidence presented at trial. Mr. Aucone may also express opinions related to the opinions of other experts presented by the Plaintiff.

2.    Armin U. Kuder, Esq.
      Kuder, Smollar & Friedman, P.C.
      1925 K Street, N.W., Suite 200
      Washington, D.C. 20006

Armin U. Kuder, Esq. has been retained as a standard of care expert who is expected to testify at the time of trial in the above-captioned matter on behalf of the Defendant. Mr. Kuder will testify that Ms. Bank did not breach the standard of care required of a District of Columbia matrimonial attorney in her representation of Mr. Stiglitz. A letter summarizing Mr. Kuder's opinion is attached hereto as Exhibit 3.

Mr. Kuder is a founding partner in the law firm of Kuder, Smollar & Friedman, PC, which opened in 1978. Mr. Kuder's practice focuses on matrimonial law, and he has appeared in many high-profile matrimonial cases in the trial and appellate level. He has been recognized for his achievements in the area of matrimonial law on many occasions. For instance, since 1968, Mr. Kuder has been named in every article in Washingtonian Magazine's issue identifying the region's best family law attorneys. He was also named in The Best Lawyers in America by Steven Naifeh and Gregory White Smith (Woodward/White 1999).

Mr. Kuder is a fellow of the American Academy of Matrimonial Lawyers and the International Academy of Matrimonial Lawyers. He has lectured on a variety of family law matters. Mr. Kuder has participated in a leadership capacity in a number of Bar activities, including acting as Chair of a Hearing Committee for the Board of Professional Responsibility for the District of Columbia Bar from 1984 to 1990 and as Chair of the Clients' Security Fund of the District of Columbia Bar from 1983 to 1991.

During the last four years, Mr. Kuder has not testified at trial or in a deposition as an expert witness. In the last ten years, Mr. Kuder has co-authored one published article: "Controversies in Managed Mental Health Care," A. Lazarus, M.D., editor (APA Press 1996). Mr. Kuder has been retained on Defendant's behalf for a rate of $475.00 per hour. Mr. Kuder's opinions are based on his training and experience and on his review of the written materials provided to him in connection with this matter, which are included in Exhibit 3. Mr. Kuder will rely on supplemental documentation, discovery and witness testimony that will be provided to him as discovery continues. Mr. Kuder will also base his trial testimony on the evidence presented at trial. Mr. Kuder may also express opinions related to the opinions of other experts presented by the Plaintiff.

       3.     Prof. Catherine J. Ross
              The George Washington University Law School
              Stuart Hall
              2013 G Street, Suite 419
              Washington, D.C. 20052

Professor Catherine J. Ross has been retained as a standard of care expert who is expected to testify at the time of trial in the above-captioned matter on behalf of the Defendant. Professor Ross will testify as to the differences between matrimonial law in New York and the District of Columbia during the relevant time period as those differences would pertain to the resolution of the Stiglitz/Hannaway divorce, with particular reference to how each jurisdiction

would have been likely to treat Mr. Stiglitz's Nobel Prize and any accompanying material advantages related to it. A letter summarizing Professor Ross' opinion is attached hereto as Exhibit 4.

Professor Ross has been a member of the George Washington University Law School faculty since 1996. Professor Ross focuses her research and teaching in the areas of family law and constitutional law. Professor Ross has also been a visiting professor at the University of Pennsylvania Law School and Boston College Law School. She serves on the editorial board of the Family Courts Review and has served on the editorial board of the Family Law Quarterly. Prior to becoming a law professor, she was a litigator at Paul, Weiss, Rifkind, Wharton & Garrison in New York City.

During the last four years, Professor Ross has not testified at trial or in a deposition as an expert witness. Professor Ross' publications in the last ten years are set forth in Exhibit 5. Professor Ross has been retained on Defendant's behalf for a rate of $500.00 per hour, and was guaranteed a minimum of 20 hours of work on the project. Professor Ross' opinions are based on her training and experience and on her review of the written materials provided to her in connection with this matter, which are included in Exhibit 4. Professor Ross will rely on supplemental documentation, discovery and witness testimony that will be provided to her as discovery continues. Professor Ross will also base her trial testimony on the evidence presented at trial. Professor Ross may also express opinions related to the opinions of other experts presented by the Plaintiff.

Respectfully submitted,

DATED: February 8, 2007

_s/ Meredith E. Werner_
Richard A. Simpson, D.C. Bar No. 411893
Charles A. Jones, D.C. Bar No. 449127
Meredith E. Werner, D.C. Bar No. 493455
ROSS, DIXON & BELL, LLP
2001 K Street, N.W.
Washington, D.C. 20006-1040
Phone: (202) 662-2000
Fax: (202) 662-2134

*Attorneys for Defendant*

349088 v 1

5

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Defendant's Expert Witness

Designation was filed electronically with the Court on February 8, 2007.


_s/ Meredith E. Werner_
Meredith E. Werner

349088 v 1

# EXHIBIT 1



February 9, 2007

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
2001 K Street NW
Washington, D.C. 20006

Re:    Joseph E. Stiglitz v. Rita M. Bank
       Civil Action No. 05-1826 RJL

Dear Mr. Simpson,

As requested, I reviewed the amounts claimed as damages by Dr. Stiglitz as a result of
the alleged professional negligence by Rita M. Bank. In my opinion, the calculation of
monetary damages, if any, should have been determined by an individual recognized as
an expert in calculating such damages. To the best of my knowledge, Dr. Stiglitz has not
been named as an expert in this regard, and the determination of damages, if any, is
beyond the scope of a lay witness. Further, the damages as expressed by Dr. Stiglitz do
not meet the minimum standards for determination of damages. Specifically, little or no
specific documentation has been offered by Dr. Stiglitz to support the amounts, no
calculations have been provided by Dr. Stiglitz which could be checked for accuracy and
reasonableness, and most amounts are, at best, estimates and are for unusually large, even
dollar amounts. In addition, while Dr. Stiglitz claims that much of the damages are due to
the fact that the proceedings were filed in New York City as opposed to Washington,
D.C., in two of his three calculations of damages he fails to reduce his estimates of
damages by reasonable costs that likely would have been incurred had the proceedings
taken place in Washington, D.C., or to consider that additional costs would have been
incurred had a settlement ultimately been reached in Washington, D.C. Finally, many of
his assumptions are based upon conclusions as to what the likely legal outcome would
have been had the trial taken place in Washington, D.C. as compared to the settlement
reached in New York City. Dr. Stiglitz does not provide information or documentation as
to the basis for his conclusions.

Dr. Stiglitz bases two of his alleged damages calculations on a comparison with a May
16, 2002, plaintiff settlement offer and the third is based on a comparison with Dr.
Stiglitz's July 2, 2002, settlement offer, as modified. As will be seen later, the form and
format of the two settlement offers are so significantly different from one another and
from the Stipulation of Settlement that a meaningful comparison is almost impossible
and, if anything, indicates that the ultimate agreement reached in the Stipulation of
Settlement results in a favorable settlement to Dr. Stiglitz as compared to the two

K:\Clients\9958\2006\Wordreport.doc

Beyond Your Numbers



Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 2

settlement proposals. As a result, it is my opinion that Dr. Stiglitz is not qualified to
present expert testimony, there is no basis for any of the amounts claimed by Dr. Stiglitz,
they cannot be recalculated or tested, and they are not supported by appropriate
documentation. Therefore, his testimony and damage claims should be excluded.

The remainder of this report addresses the differences between lay and expert witnesses,
the documentation standards required for determination of damages by an expert, the
sources of the alleged damages asserted by Dr. Stiglitz, and my analysis of each of the
damage scenarios. In addition, I will assess the overall lack of reasonableness of each of
the individual damage claims presented in the three alleged damage scenarios.
Attachment I to this report is a listing of the documents received in this matter.

## Expert Testimony

Federal Rule of Evidence 701 addresses opinion testimony offered by lay witnesses. Rule
701 states in part that a witness who has not been qualified as an expert may offer only
opinions that are "rationally based on the perception of the witness." The advisory notes
for Rule 701 specify the differences between lay opinion testimony and expert testimony.
Lay testimony "results from a process of reasoning familiar in everyday life," while
expert testimony "results from a process of reasoning which can be mastered only by
specialists in the field." Hence, per the advisory notes, a non-expert expert may offer only
opinions such as "the appearance of persons or things, the identity, the manner of conduct
[or] competency of a person, degrees of light or darkness, sound, size, weight [or]
distance." Hence, a lay witness may not provide expert testimony opinions without those
opinions being subject to scrutiny under the Daubert factors. Accordingly, Rule 702
states that an individual qualified as an expert may give opinions or testimony "if (1) the
testimony is based upon sufficient facts or data, (2) the testimony is a product of reliable
principles and methods, and (3) the witness has applied the principles and methods
reliably to the facts of the case." Non-scientific opinions on financial or accounting issues
clearly fall within the expert testimony outlined above.

While Dr. Stiglitz has not been offered as an expert witness and a report regarding his
damage calculations has not been offered, his testimony regarding damages, as proffered
in his depositions, is clearly beyond the scope of that of a lay witness. Accordingly, if he
is to be allowed to offer opinions as to his economic losses, then those opinions should be
subject to the same standards as an expert witness as defined in Rule 702 and elsewhere. I
will address each of his damage claims with some specificity later in this report.
However, none of his claims are "based upon sufficient facts or data" or are "the product
of reliable principles and methods" which can, in any way, be tested for accuracy and
reliability. Further, Rule 26 requires that an expert provide a signed, written report, which
must include the following:

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 3

1. A complete statement of all opinions to be expressed by the witness and the basis and reasons for the opinions.
2. The data or other information the witness considered in forming his or her opinions.
3. Any exhibits to be used as a summary or in support of the opinions.
4. A list of the qualifications of the witness, including a list of all publications authored within the last ten years.
5. A statement of the compensation to be paid the witness for the study and testimony.
6. A list of any other cases in which the witness has testified as an expert at trial or by deposition within the last four years.

The advisory committee notes referred to above require that expert reports be "detailed and complete." In *Salgado v. General Motors Corp.* 150 F.3d 735, 742 & n.6 (7th Cir. 1998), the court held that reports issued in accordance with Rule 26 should be "complete such that opposing counsel is not forced to depose an expert to avoid ambush at trial." Dr. Stiglitz has not provided such a report, nor has he provided specific documents or calculations supporting his damages claims.

As a certified public accountant, I look to other sources for guidance regarding providing expert services related to damage assessments and reporting requirements. One such resource is Consulting Services Special Report 03-01 prepared by the American Institute of Certified Public Accountants titled "Litigation Services and Applicable Professional Standards." Paragraph 23 addresses sufficient relevant data stating "A practitioner attempts to obtain relevant data that is sufficient to provide a reasonable basis for conclusions or recommendations for any professional services performed. In litigation, data are usually obtained through discovery, including depositions, interrogatories, and document production motions. In addition, the data-gathering process may include a review of relevant documents, research and analysis, and interviews. The nature and extent of the data will vary with each engagement and may include the practitioner's computations and analysis and other information-supporting conclusions."

Practice Aid 06-4 prepared by the Business Valuation and Forensic & Litigation Services Section of the American Institute of Certified Public Accountants titled "Calculating Lost Profits" stresses the need for sufficient relevant data. Appendix B of that publication is a Testimony Pyramid. The base of the pyramid is titled "Source Data, Facts and Assumptions." Only with sufficient source data and facts can an accurate data analysis be performed based upon accepted methodology applied in a reliable manner. All of these factors must be present before admissible opinions can be formed.

The American Institute of Certified Public Accountants Statement of Standards for Consulting Services also addresses sufficient relevant data, stating "Obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation

K:\Clients\3958\2006\Word\report.doc

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 4

to any professional services performed." Finally, the American Institute of Certified
Public Accountants Code of Professional Conduct with regard to sufficient relevant data
states "Obtain sufficient relevant data to afford a reasonable basis for conclusions or
recommendations in relation to any professional services performed."

In my opinion, and as will be seen in greater detail below, Dr. Stiglitz does not meet the
standards necessary to testify as an expert and he has not supported his conclusions with
required documents, calculations or other means.

### Plaintiff's Damages Claims

As noted above, Dr. Stiglitz has not been named as an expert witness, nor has he
provided an expert report or other documents that outline the damages claimed in this
matter. Rather, the specific components of alleged damages and the respective amounts
are identified in several different sources. In addition, each of the damages analyses is
different and inconsistent with one another, even though they were presented within
approximately three months of one another. Further, in his deposition, Dr. Stiglitz leaves
open the possibility of additional changes to his damages analyses.

The first analysis is reflected on page 4 of Plaintiff's Answers to Defendant's First Set of
Interrogatories signed and dated by Joseph E. Stiglitz on March 30, 2006. The analysis
shows total damages of $3,015,222.99. The response on page 3 states in part, "Plaintiff's
measure of damages is the difference between the settlement offer proposed by
Hannaway on or around May 16, 2002, and the value of monies the Plaintiff was required
to pay Hannaway pursuant to the August 2004 Stipulation. Had the Defendant acted in an
expeditious way to file suit for divorce in the District of Columbia, pursuant to the
Plaintiff's instructions, the following approximate amounts would not have been subject
to division with Hannaway." In his Second Deposition, Dr. Stiglitz states in part, "And
the claim I am making is this offer of May 16, 2002, provides a way of thinking about
where they thought a court would have settled had it gone to court."

The second and third calculations are included in Plaintiff's Revised Supplemental
Response to Defendant's First Set of Interrogatories and Objection to Second Set of
Interrogatories signed and dated July 6, 2005, by David G. Whitworth Jr., Esq. Damages
alleged on pages 2 and 3 are in the range of $2,875,000 to $3,565,000. Damages alleged
on pages 4 and 5 are in the range of $3,460,000 to $3,950,000. Once again, the response
to interrogatory #2 states in part, "Plaintiff's measure of damages is the difference
between the settlement offer proposed by Hannaway in or around May 16, 2002, and the
value of monies the Plaintiff was required to pay Hannaway pursuant to the August 2004
stipulation." These alleged damages on pages 4 and 5 "are based on Stiglitz's July 2
offer, with two modifications: (a) dropping all claims for repayment for expenses in the
repair of the California house; (b) dropping most of the claim on the Nobel Prize."

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 5

Using either settlement proposal as a basis of comparison is, on its face, suspect as
neither resulted in a settlement. At best, they represent a base from which settlement
could be negotiated. This is especially true with regard to <u>his</u> settlement offer of July 2,
2002. There is no basis for believing this was a proper offer, no showing that Ms.
Hannaway would have accepted the offer, and no showing that it would have resulted in a
reasonable resolution to the matter. Also, Dr. Stiglitz was a party to rejecting the May 16,
2002, settlement offer. His e-mail to Ms. Bank dated September 22, 2002, Bates stamped
AA994, wherein he outlines a proposal he sent directly to Ms. Hannaway, further
supports this conclusion. This e-mail is a clear indication that he personally was rejecting
the May 16, 2002, settlement offer.

### Analysis of the Damages Claims

As noted, the first damages claim was included on page 3 of Plaintiff's Answers to
Defendant's First Set of Interrogatories (hereinafter "Initial Damages Calculation" or
"First Damages Calculation"). The other two damage calculations were included on
pages 2 and 3 and 4 and 5, respectively, of the Plaintiff's Revised Supplemental
Response to Defendant's First Set of Interrogatories and Objection to Second Set of
Interrogatories (hereinafter "Second Damages Calculation" and "Third Damages
Calculation," respectively).

*Initial Damages Calculation*

A copy of the Initial Damages calculation is included as Attachment II to this report.
There are nine damage descriptions totaling $3,015,222.99.

The first item is "Plaintiff's earnings after June of 2001, including Nobel Prize monies
and other monies earned after the Action Commencement Date in New York, including
'adjustments' to those earnings for receivables due for work performed before the Action
Commencement Date." The amount attributed to this item is $220,000. No specific
documentation has been provided by Dr. Stiglitz to support this amount. Without specific
documentation, there is no way to determine how much of the claimed amount is
attributable to the Plaintiff's earnings after June 2001, how much is attributable to the
Nobel Prize monies, how much is attributable to "other monies" earned after the Action
Commencement Date, how much is related to the purported "adjustments" to those
earnings, and the amount and source of the "receivables due for work performed before
the Action Commencement Date." Without the appropriate documentation, there is no
way of knowing, for example, whether or not this represents pre-tax or after-tax amounts,
or why receivables due for work performed <u>before</u> the Action Commencement Date
would be excluded. Without an explanation and documentation by Dr. Stiglitz, work
performed before the Action Commencement Date would normally be considered a
marital asset. In addition, use of an "after June of 2001" cutoff date appears arbitrary and
Dr. Stiglitz has not provided any support for the appropriateness of that date. Further, and

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 6

more importantly, he states that these amounts are based upon "the difference between
the settlement offer proposed by Hannaway on or around May 16, 2002, and the value of
monies the Plaintiff was required to pay Hannaway pursuant to the August 2004
Stipulation." Based upon my review of the schedules attached to the May 16, 2002,
settlement offer, most assets were valued as of the end of February 2002 through March
25, 2002. There was no reduction for any earnings, or other assets, acquired subsequent
to June 2001, and the Nobel Prize was specifically <u>included</u> in the proposal. Accordingly,
this item specifically attempts to include amounts as damages that were, in fact, included
in the May 16, 2002, settlement offer.

The next item is "*Royalties on Roaring Nineties, Globalization and Its Discontents, the
3rd Edition of Principles, the 4th Edition of Principles,* New Paradigm." The amount
attributed to this item is $350,000. Once again, Dr. Stiglitz provides no specific
documentation as to how this amount was calculated. In addition, it is unclear as to the
time frame when these royalties were earned. Given the fact that the next line item is
"Future Royalties," it would appear that these royalties represent royalties earned
subsequent to June 2001, through the date of the Stipulation of Settlement. As with the
previous line item, these amounts were included on the assets listed on the schedule
attached to the May 16, 2002, settlement offer. The first full paragraph on page 3 of the
settlement offer addresses the royalties to be received and states in part, "We can resolve
the issue of the book royalties and alimony by taking Joe's income, subtracting Jane's,
and having Joe pay Jane an amount equal to 27½% of the difference." Hence, the
settlement offer included payment of royalties to Ms. Hannaway in addition to the
division of assets listed on the schedules to the May 16, 2002, settlement offer. Therefore,
this item attempts to include amounts as damages that were, in fact, included in the May
16, 2002, settlement offer.

As noted, the next item is "Future Royalties." The amount attributed to this item is
$200,000. As with the previous amounts, Dr. Stiglitz provided no specific documentation
to support this amount. In addition, it is unclear whether future royalties relate to those
subsequent to June 2001, or subsequent to the August 4, 2004, Stipulation of Settlement.
Finally, as with the previous two damages items, payment of royalties was specifically
included in the May 16, 2002, settlement offer.

As noted in the previous two paragraphs, royalties were part of the May 16, 2002,
settlement offer and ultimately part of the Stipulation of Settlement. It would be
impossible to calculate the monetary difference as both approaches would be impacted by
the gradual decline in royalties over time. However, the May 16, 2002, settlement offer
was open ended. That is, it provided that Dr. Stiglitz pay Ms. Hannaway 27½% of the
difference in their incomes without a termination date. It is likely Dr. Stiglitz would have
paid Ms. Hannaway significantly more under the May 16, 2002, settlement offer given
the disparity in their incomes, even without taking the royalties into consideration.

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 7

The next item is "1/2 of Vanguard Accounts and other accounts funded with pre-marital
money." The amount attributed to this item is $425,000. Once again, Dr. Stiglitz provided
no specific documentation to support this amount. In addition, no specific documents
were provided by Dr. Stiglitz indicating how much of the amount is a result of the
"Vanguard Accounts" and how much is from "Other Accounts" or what other accounts
there are that make up a portion of the balance. It is also not clear why the amounts
represent "1/2" of the totals. A pre-marital asset should be a specific amount owned prior
to the date of marriage and maintained as separate property throughout the duration of the
marriage, not some percentage of an account. Dr. Stiglitz must provide specific
documents that show the separate character of the asset at the date of marriage, as well as
specific documents supporting the fact that the assets maintained their separate character
throughout the marriage. Finally, the Vanguard accounts were included on the schedules
to the May 16, 2002, settlement offer. However, the total balances, including retirement
accounts, were approximately $691,100 at that point. Fifty percent of that would be
$345,550, not the $425,000 claimed. In addition, it is likely that some of those balances
represent growth, which would be a marital, not separate, asset.

The next item is "100% of World Bank Pension (1/2 = loss)." The amount attributed to
this item is $200,000. Dr. Stiglitz provided no specific documentation to support the
amount claimed. In addition, it is unclear as to whether or not the $200,000 represents
100% of the World Bank pension, or one-half of the total value of the pension. Also,
while a dollar amount was not attributed, the World Bank pension plan was listed on the
schedule to the May 16, 2002, settlement offer with the caption "Unknown" under the
fair market value column. Finally, it is my understanding that the benefits of this plan
were earned entirely during the marriage and that monthly benefits are being received by
Dr. Stiglitz. Accordingly, the "unknown" in the settlement offer allows for the possibility
that the monthly benefits could have been divided by way of a Qualified Domestic
Relations Order, plan permitting, or the net present value of the future benefits could
have been included on the schedule attached to the settlement offer as an asset, taken into
consideration with regard to the division of all of the other assets and liabilities. Clearly,
however, it was considered as part of the May 16, 2002, settlement offer.

The next item is "Mortgage payments paid during 37 month negotiation." The amount
attributed to this item is $222,000. In addition to the fact that no specific documents have
been provided by Dr. Stiglitz supporting the calculation of this amount, no specific
documents have been provided supporting the assumption that separate funds were used
to make the mortgage payments. If the payments were made from marital funds, then this
amount should not be included as a damage amount. The schedule to the May 16, 2002,
settlement offer includes the marital residence as well as the related mortgage. As a
result, the payments made in part reduced the outstanding liability, hence, increasing the
net fair market value of the marital residence on that schedule. In addition, if Dr. Stiglitz
received a benefit in the way of an income tax deduction for interest and/or real estate
taxes paid on the marital residence, then this benefit should likewise reduce the claimed

*K:\Clients\3958\2006\Word\report.doc*

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 8

damage amount. Given the fact that his income tax return for 2001 reflected real estate
taxes of $30,097 and home mortgage interest of $98,456, it is likely that he claimed both
the interest and real estate taxes on that return. As noted, the tax savings realized should
serve to reduce any damage amounts. Finally, Dr. Stiglitz does not specify which 37
months are encompassed in his calculation.

The next item is "Payments for enhanced earnings and Hannaway's legal bills." The
amount attributed to this item is $535,000. Dr. Stiglitz provided no specific
documentation supporting this amount. In addition, legal fees are an inherent part of
divorce proceedings. Further, payment of legal fees decreases the marital estate,
irrespective of whose checking account they are paid from. Finally, while "enhanced
earnings" may be a term of art in New York, the earnings capacity of the parties is always
a consideration in arriving at an equitable settlement and determining the appropriateness
of alimony. Accordingly, Dr. Stiglitz must substantiate why the amounts included for
enhanced earnings represent the amounts that exceed what would have been incurred to
determine his earnings capacity had the matter been settled based upon the May 16, 2002,
settlement offer, or had the matter been adjudicated in Washington, D.C.

The next item is "New York Legal Bills and Expert Reports." The amount is
$723,037.27. Dr. Stiglitz provided no specific documentation supporting this amount.
Further, no documentation has been provided supporting the allegation that these
expenses were above and beyond the expenses that would have been incurred had the
matter been settled based upon the May 16, 2002, settlement offer, or based upon
adjudication at trial in Washington, D.C. The correspondence indicates the parties were
far apart as of May 16, 2002, and yet Dr. Stiglitz does not provide any offset to the
amounts claimed for additional expenses that would have been incurred to either
complete the negotiations for settlement or to try the case in Washington, D.C.

The final item is "Experts for New York litigation: Kroll, Cambridge & Klein." The
respective amounts were $41,747.31, $61,051.91 and $37,188.50. Of these amounts, the
Plaintiff's Revised Supplemental Response to Defendant's First Set of Interrogatories and
Objection to Second Set of Interrogatories did include a copy of an invoice from
Cambridge Financial Partners, LLC in the amount of $61,051.94. However, no
supporting documentation has been provided relating to the $41,747.31 or $37,188.50
balances. Dr. Stiglitz does not provide support as to why these amounts represent expert
fees that would have been above and beyond the expert fees required to ultimately reach
a settlement based upon the May 16, 2002, settlement offer or trial in Washington, D.C.

For the reasons noted, none of these amounts have been substantiated and they should not
be included as damages. Also, the total of the individual damages listed is $3,015,024.99,
not the $3,015,222.99 reflected as the total on the schedule.

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 9

*Second Damages Calculation*

A copy of the Second Damages Calculation is included as Attachment III to this report.
There are nine damage descriptions totaling between $3,405,000 and $4,095,000. In
addition, there are two credits totaling $530,000. Hence, the net damages alleged are
between $2,875,000 and $3,565,000.

The first item is "Cash as of September 17, 2000: Plaintiff's earnings deposited in
separate bank account after April 1, 2002 upon advise [*sic*] of Bank." The amount
attributed to this item is $110,000. Dr. Stiglitz provided no specific documentation to
support this amount. In addition to not knowing the source of the funds, there is no basis
to assume that the funds are non-marital. Further, the stated basis of comparison is the
May 16, 2002, settlement offer which, by definition, would indicate any claim would
have to be limited to the timeframe subsequent to May 16, 2002. Whether Dr. Stiglitz
deposited the funds into a separate bank account or not does not impact the character of
the funds as marital or non-marital.

In his Second Deposition regarding these funds, Dr. Stiglitz states in part, "and of those
amounts, I am claiming that those are amounts that were put into a separate bank account
after April 1. They were all money earned after—most of it was earned after June 15 in
fact, actually, over the summer." In addition, Dr. Stiglitz states, "So that if the settlement
offer had been accepted or if there had been an expeditious going to court, these amounts
would not have been a subject of division." As noted above, Dr. Stiglitz clearly provides
for the possibility that the matter may have gone to court in Washington, D.C. Had that
been the case, earnings up to the date of trial would likely have been included as a marital
asset.

The next item is "Royalties paid to J.H. August, 2004." The amount attributed to this
item is $260,000. The Stipulation of Settlement does provide for payment of $260,802,
listed as "Wife receives from Husband her share of post-commencement payments of
book royalties, after reduction of 44 percent for husband's payment of income taxes." As
noted above, however, royalties were included in the May 16, 2002, settlement offer.
Hence, the settlement offer contemplated payment of royalties to Ms. Hannaway in
addition to the division of assets listed on the schedules to the May 16, 2002, settlement
proposal. Therefore, this item includes as alleged damages amounts that were, in fact,
included in the May 16, 2002, settlement offer. Further, paragraph 8 of Article VI, Book
Royalties, of the Stipulation of Settlement identifies royalties received by Dr. Stiglitz
from January 1, 2003, through August 4, 2004. The total represented by Dr. Stiglitz is
$1,236,970.89. After taxes, the net amount would be $692,703.69. Fifty percent of that
would be $346,351.85, not the $260,802 that was ultimately agreed to in the Stipulation
of Settlement.

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 10

The next item is "Royalties after August 2004 (estimated)[4]." The amount attributed to
this item is between $500,000 and $700,000. Dr. Stiglitz provided no specific
documentation or calculations as to how these amounts were derived. The footnote does
state that royalties vary greatly and "average payment on half-yearly basis to J.H. for the
three periods Feb. 03, Aug. 04, and Feb. 04 (the basis of the August settlement) were
slightly greater than $85,000, i.e., $170,000 a year, on an after-tax basis, or $386,000 on a
pre-tax basis." First, it is unclear why this amount is different from the Future Royalties
of $200,000 in the Initial Damages Calculation. In addition, as noted above, treatment of
royalties as marital property was contemplated in the May 16, 2002, settlement offer.
Therefore, this item again attempts to include amounts as damages that were, in fact,
included in the May 16, 2002, settlement offer. Finally, the footnote implies that the
amounts paid to Ms. Hannaway were after payment of income taxes. That is not the case.
Paragraph 10 of Article VII specifically states, "It is the intention and the agreement of
parties that the Wife shall be solely responsible for the payment of any taxes on payments
assigned or transferred to her pursuant to this Article, and the Wife agrees to reimburse
the Husband and to hold him harmless and indemnified with respect to any payment by
the Husband of taxes that should have been paid by the Wife relating to payments which
are to be assigned and transferred to her pursuant to this Article."

In his Second Deposition, Dr. Stiglitz attempts to explain the two royalty items by stating
in part, "Let me try to explain those next two entries in the context of—in the second
page there is the 27-1/2% of the difference in income. That's the alimony payment
commitment on the next page. In her proposal. In her proposal we're making a comparison
between her proposal and what I had to pay. In her proposal, that particular proposal,
said, 'We don't want any royalties as a separate claim, we will let you treat that as your
own property but we want 27-1/2% of your earned income.'" At that point, Mr.
Whitworth interjected to clarify, "Of the difference." Dr. Stiglitz continued by stating,
"Of the difference of your earned income. And these two items then are the royalties I
paid, and I am expected to pay to Jane under the stipulation. So I have to back those out
because those are monies that I would not have to give in the—[settlement proposal]." He
then states, "Most of that is recaptured in a different form. On the next page. It's just
moving monies around from one category to another, but there is a difference in the way
that they are treated." While this is true, as will be seen below, Dr. Stiglitz takes liberties
as to what is included as his income as compared to the May 16, 2002, settlement offer. A
comparison of the differences is further complicated by the fact that the May 16, 2002,
settlement offer incorporated the royalty payments into a proposed maintenance payment.
The Stipulation of Settlement provided for a specific percentage of royalties on each
publication. It would be virtually impossible to determine with any degree of certainty the
amount of royalties to be received on each of the publications. Accordingly, detail
calculations and analyses are required in order to substantiate these amounts. As noted,
such calculations and analyses have not been provided.

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 11

As to the royalties to be received after August 2004, estimated to be $500,000 to
$700,000, in his Second Deposition, Dr. Stiglitz states in part, "The amount I had turned
over to her was $260,000, but that was equivalent to close to—around $400,000 on a pre-
tax basis. So I guess are just the two numbers that they did. They were fair enough to say
that since I had to pay tax on it, I didn't have to—I didn't have to turn over the pre-tax
basis." He then states, "It is going on to be very difficult. So basically as we said it was
386 over the preceding year and-a-half. I used as my one conservative that basically the
royalty payments would last for another roughly two years and then drop off to zero. So
that's how you get a 500,000. That is very conservative." Accordingly, Dr. Stiglitz is
admitting that these estimates are based on pre-tax royalties to be received by him, even
though it was anticipated that the net amount would be paid to Ms. Hannaway. Further,
the Stipulation of Settlement provides that the payments would be made, when possible,
directly to Ms. Hannaway, therefore, automatically making her responsible for the
income tax consequences.

The next item is "100% of World Bank Pension (1/2=Loss).[5]" The amount attributed to
this item is $200,000 to $400,000. The comments related to this item above under the
Initial Damages Calculation are also appropriate here. In addition, it is unclear as to how
the amounts changed from $200,000 in the Initial Damages Calculation to $200,000 to
$400,000 here. The footnote does state that "Payments are approximately $24,000 a year,
but indexed to inflation. A 25 year life expectancy at a modest 3% inflation would put
total payments at $750,000 so the *loss* should be $375,000. Higher inflation numbers
would, however, increase the number substantially." While it is appropriate to include
cost of living adjustments if provided by the plan, it is also appropriate to discount the
future payments to net present value based upon some reasonable discount rate. Dr.
Stiglitz indicates a 25-year life expectancy, yet he provided no information or
documentation as to the source of that expectation. In addition, this was the only
retirement account where the marital portion was not divided equally by the Stipulation
of Settlement. Dr. Stiglitz, however, fails to consider the fact that no maintenance was
claimed or agreed to in the Stipulation of Settlement. Maintenance was a consideration in
the May 16, 2002, settlement offer. In addition, in his initial deposition, Dr. Stiglitz states
in part "She came back and we offered basically something like $3,500 a month for three
years." He also states that the 27 ½% difference in income between him and Ms.
Hannaway "is more than $50,000." Both of these amounts are significantly greater than
the additional 50% of the monthly benefit assigned to Ms. Hannaway in the Stipulation of
Settlement. Hence, payment of maintenance should have been considered as an offset to
these alleged damages by Dr. Stiglitz.

The next item is "Payments for enhanced earnings and Hannaway's legal bills.[6]" The
amount attributed to this item is between $710,000 and $800,000. Dr. Stiglitz provided
no specific documentation to support this amount. In addition, no explanation is provided
as to why the amount claimed in the Initial Damages Calculation was $535,000, and now
it is in the range of $710,000 to $800,000. The footnote to this item states in part, "These

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 12

include $350,000 J.H. paid out of marital assets, half the cost of which therefore was
borne by Stiglitz." It is not clear what this statement means. There is no breakout as to the
amount that represents enhanced earnings and the amount that represents legal bills. In
addition, legal bills related to a divorce represent a marital expense that should be paid
out of marital assets. Finally, Exhibit A – Asset Division to the Stipulation of Settlement
does include a line item referring to enhanced earnings capacity; however, in total it
states, "Wife receives $600,000 from Husband in settlement of various claims including
Husband's payments to/on behalf of Anya Schiffrin, consulting fees earned from
Microsoft Litigation Fund and Sebago, and enhanced earning capacity." While no
amounts were assigned to these items, wife's claimed adjustments related to Ms.
Schiffrin were approximately one-half of this amount. Without a further breakdown,
which was not provided, it is impossible to determine the amount that was attributable to
"enhanced earning capacity."

Regarding the payments on the enhanced earnings and Ms. Hannaway's legal bills, Dr.
Stiglitz states in part, "There are actually three or four items which are listed in that, if
you look on the Stipulation as a reference point. And the easiest and simplest is not in the
stipulation. I had to pay $350,000 up front for her legal bills in New York. So that was
just a simple amount. The second part was that roughly—$350,000 of Ms. Hannaway's
legal bills came out of marital assets after the date of commencement of the actions in
New York, and so it was as if I paid half of that. The third element was in the stipulation
there was $500,000 or in the settlement negotiations under the settlement that was made
that provided the basis of the stipulation. There was $500,000 for enhanced earnings and
her legal bills. That's the direct part of that. And then the fourth part, there was a
$100,000 that was for a category of things that was mixed together of claims that she
made, Hannaway made, that varied from—she was—even though I normally do cash
accounting, she said that there was some elements of accrual income that I would have
earned but didn't earn, that I hadn't yet received as of September 17 and that she was
entitled to those." Clearly, this explanation is insufficient to test the alleged damages
claimed, is inconsistent with the amounts in the Stipulation of Settlement, as noted above,
and Dr. Stiglitz provided no additional specific documentation to substantiate the
amounts claimed.

The next item is "New York Legal bills and expert reports.[7]" The amount attributed to
this item is $980,000. The same experts are listed in footnote 7, Kroll, Cambridge and
Klein, as in the Initial Damages Calculation above. The amounts for Kroll and Klein are
identical to the Initial Damages Calculation, namely, $41,747.31 and $37,188.50,
respectively. The amount attributed to Cambridge increased from $61,051.91 to
$148,743.57, an increase of $87,691.61. Dr. Stiglitz provided no explanation, however, as
to why the total claimed increased from $723,037.27 in the Initial Damages Calculation
to $980,000 in the Second Damages Calculation, an increase of $256,962.73. As with the
Initial Damages Calculation, no additional documents were provided to support these
amounts, nor was an analysis provided supporting the claim that these expenses were

*K:\Clients\3958\2006\Word\report.doc*

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 13

above and beyond expenses that would have been incurred to negotiate a settlement based upon the May 16, 2002, settlement offer or those that would have been incurred had the matter gone to trial in Washington, D.C.

In his Second Deposition, in response to the question "The New York legal bills and expert report, that is just a straight calculation of a set bills that if you added up they added up to 980,000?" Dr. Stiglitz's answer was, "That's right." However, as noted, he did not provide specific documents supporting these amounts.

The next item is "Mortgage Payments.[8]" The amount attributed to this item is $220,000. This item is also listed under the Initial Damages Calculation above in the amount of $222,000. The comments related to this item under Initial Damages Calculation above are also appropriate here. Footnote 8 indicates that the amount is based upon "estimated on the basis of 36 extra months." There is no indication as to why the number of months changed from the Initial Damages Calculation and the Second Damages Calculation.

In his Second Deposition, Dr. Stiglitz states, "What I am making a claim, this is not really covered in the discussion in the settlement. What I am making a claim here is had Rita Banks [sic] acted expeditiously, it would not have gone on for 49 months. And so what I am putting here that's an estimate based upon 36 months because of the extension. I probably should have put in a range to reflect that there is obviously some uncertainty about how fast it could have been done, even if she had acted expeditiously." While this explains how the number of months was determined by Dr. Stiglitz, it does not provide answers to the remaining questions raised and, if anything, adds additional speculation as to the appropriate amount, if any, attributable to this item.

The next item is "Additional time required by Stiglitz, largely as a result of the change in venue, largely associated with enhanced earnings claim, 400 hours @ 1000 hour.[9]" The amount attributed to this item is $400,000 to $600,000. The footnote states in part, "Conservative estimate of additional time required and cost of foregone earnings. Hourly rate in private sector litigation (Microsoft, Visa, Realnetwork) cases for which there was substantial demand for my services was $1200. Speaking engagements, some of which were precluded because of my lack of time, pay between $10,000 and $40,000 (for approximately 6 to 12 hours net time). Alternatively, I could have made substantial progress in the incremental time writing another book. The advance on my last book was 1 million dollar [sic] in 400 hours of work, I could have completed an estimated 50% of the book, for a value of $500,000." This is consistent with statements in his Initial Deposition where he stated in part "I do know I turned down speaking opportunities. I'd have to look at, you know, which were turned down because of conflicts that were specifically related, but if I had more, you know, time spent." While Dr. Stiglitz provided reams of documents relating to his calendar, professional speaking engagements, contracts, and other related documents, it would be virtually impossible to determine whether or not any private sector litigation cases were not undertaken as a result of the

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 14

divorce proceedings, whether or not any speaking engagements had been precluded, or
the amount of time that had been spent with counsel preparing for the New York
litigation. Further, with regard to speaking engagements, most of the arrangements are
made months in advance. The documents provided support this. It is highly unlikely,
therefore, that meetings with counsel could be anticipated far enough in advance such
that speaking engagements were turned down so that Dr. Stiglitz could be available for
the meetings. Further, that would have been inconsistent with the way Dr. Stiglitz
operated prior to moving to New York. Essentially, meetings related to the divorce were
scheduled when Dr. Stiglitz was available. The documents provided do show that Dr.
Stiglitz turned down a number of speaking opportunities; however, they were
substantially all for $0 or minimal stipends. Finally, Dr. Stiglitz provides no estimate of
the time that would have otherwise been spent had the settlement proposal been
negotiated or had the matter gone to trial in Washington, D.C.

The next item is "Division of Columbia University Pension." The amount attributed to
this item is $25,000. Dr. Stiglitz provided no specific documentation or calculations
supporting this amount. Further, paragraph 11 of Article V, Retirement Accounts, of the
Stipulation of Settlement states that the total balance in the Columbia account was
$54,225.38, of which 46% is marital. Paragraph 12 states that Ms. Hannaway is to
receive 23% of that total, or $12,427.53, as her property. Dr. Stiglitz, however, fails to
document why this amount should not be included as a marital asset, when the
Stipulation of Settlement specifically refers to it as the "Marital Portion" of the account.

In his Second Deposition, Dr. Stiglitz states, "The reason why this particular is singled
out is that this is all money earned after—earned pre-commencement of the action, but
more than a year after, 14 months after, separation. So had she acted expeditiously, these
are monies that would not have to have been divided." As noted, Dr. Stiglitz provides no
documentation supporting the amount, nor support as to why these amounts would not
have been divided had the matter gone to trial in Washington, D.C.

The next item is "(Credit for Pre-Marital Assets in New York Settlement beyond that in
Hannaway Proposed Settlement).[10]" The amount attributed to this item is $(100,000). Dr.
Stiglitz provided no specific documentation or explanation as to how this amount was
determined. Further, the amount could not be determined after a review of the Stipulation
of Settlement and the schedules attached to the May 16, 2002, settlement offer.

In his Second Deposition, Dr. Stiglitz states in part, "In that first entry, that was in fact in
the stipulation, there is a small credit for my assets I brought to the marriage in 1978." In
fact, Exhibit A – Asset Division has a line item titled "Less Husband's $207,000 separate
property credit" in the amount of $207,000, not $100,000.

The next item is "(27½% of difference in earned taxable income July 1, 2002, to June 30,
2005 (estimated) (after tax value))." The amount attributed to this item is ($430,000).

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 15

Footnote 10 states in part, "2002 earned taxable income estimated at approximately
$900,000, 2003 at $1.6 million, 2004 at $900,000, calculated by subtracting out from
taxable income the income from retirement payments, dividends, interest, capital gains,
and W-2 earnings to Anya. No account is taken of Anya Stiglitz's share of Schedule C
income, which would lower 2004 income substantially." Dr. Stiglitz provided no specific
documentation or calculations in support of this amount. It would appear that the "27.5%
of difference in earned taxable income" is referring to the May 16, 2002, settlement offer,
which states in part, "We can resolve the issue of the book royalties and alimony by
taking Joe's income, subtracting Jane's, and having Joe pay Jane an amount equal to
27½% of the difference." There is no provision in this statement for reducing Dr.
Stiglitz's income for retirement payments, dividends, interest, capital gains, and W-2
earnings to Anya. Accordingly, the Form 1040 for Dr. Stiglitz for 2002 reflects income of
$1,452,618, not $900,000. For 2003, his income was $1,942,935, not $1,600,000, and for
2004, his income was $1,424,339, not $900,000.

For the reasons noted above, none of these amounts have been substantiated and they
should not be included as damages.

### Third Damages Calculation

A copy of the Third Damages Calculation is included as Attachment IV to this report.
There are nine damage descriptions totaling between $3,660,000 and $4,300,000. In
addition, there are two credits totaling between $200,000 and $350,000. Hence the net
damages alleged are between $3,460,000 and $3,950,000. As noted on Attachment IV,
"plaintiff claims that damages may be measured as the difference between what Bank
advised Stiglitz that he would be reasonably expected to receive, were the matter litigated
in D.C. and/or as a result of negotiations in D.C. (assuming that the legal framework
within which those negotiations were conducted was that of D.C.). These damages are
based on Dr. Stiglitz's July 2 offer, with two modifications: (a) dropping all claims for a
repayment for expenses in the repair of the California House; (b) dropping most of the
claim on the Nobel Prize.)"

The first item is "Cash on hand from earnings from June 1 to September 17 divided in
marital settlement plus portion of Nobel Prize.") The amount attributed to this item is
$130,000. Dr. Stiglitz provided no specific documentation to support this amount. In
addition, it is unclear as to why this amount differs from the first item listed in the Second
Damages Calculation, discussed above, of $120,000. The comments related to this item
under the Second Damages Calculation above are also appropriate here.

The next item is "Royalties paid to J. H. August, 2004 less royalties payable under July 2
offer (estimated)." The amount attributed to this item is $220,000. Once again, it is
unclear why this amount differs from the "Royalties paid to J. H. August, 2004" included

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 16

under the Second Damages Calculation above in the amount of $260,000. The comments
related to this item under Second Damages Calculation above are also appropriate here.

The next item is "Royalties after August 2004 (estimated)[12,13]." The amount attributable
to this item is between $350,000 and $500,000. This item is also listed under the Second
Damages Calculation with a range of damages between $500,000 and $700,000. Footnote
13 explains the difference as "differs from previous methodology because there was some
book royalties under July 2 offer." As noted above, given the fact that royalties were, in
fact, included under the May 16, 2002, offer as well, this item specifically attempts to
include amounts as damages that were already included in that settlement offer.

The next item is "100% of World Bank Pension (1/2 = loss)[14]." The amount attributable
to this item is between $200,000 and $400,000. This item is identical to the item included
in the Second Damages Calculation above, and comments related to this item above are
also appropriate here.

The next item is "Payments for enhanced earnings and Hannaway's legal bills[15]." The
amount attributed to this item is between $710,000 and $800,000. This item is identical to
the item included in the Second Damages Calculation above, and comments related to
this item above are also appropriate here.

The next item is "New York Legal bills and expert reports[16]." The amount attributable to
this item is $980,000. This item is identical to the item included in the Second Damages
Calculation above, and comments related to this item above are also appropriate here.

The next item is "Mortgage payments[17]." The amount attributed to this item is $220,000.
This item is identical to the item included in the Second Damages Calculation above, and
comments related to this item above are also appropriate here.

The next item is "Additional time required by Dr. Stiglitz, largely as a result of a change
in venue, largely associated with enhanced earnings claims, 400 to 600 hours at 1000
hour[18]." The amount attributed to this item is between $400,000 to $600,000. This item is
identical to the item included in the Second Damages Calculation above, and comments
related to this item above are also appropriate here.

The next item is "Division of Columbia University pension." The amount attributed to
this item is $25,000. This item is identical to the item included in the Second Damages
Calculation above, and comments related to this item above are also appropriate here.

The next item is "(Credit for pre-marital assets in New York settlement beyond that in
July offer.)" The amount attributed to this item is ($100,000). This item is identical to the
item included in the Second Damages Calculation above, and comments related to this
item above, and are also appropriate here.

*K:\Clients\3958\2006\Word\report.doc*

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 17

The next item is "Vanguard Account Purchased with Pre-marital funds." The amount
attributable to this item is $425,000. The Initial Damages Calculation above includes an
amount titled "½ of Vanguard Accounts and other accounts funded with pre-marital
money," also the amount of $425,000. The comments related to that item above are also
appropriate here. Dr. Stiglitz provided no explanations or documents as to how this
amount was determined, nor why the description differs from the similar amount
included in the Initial Damages Calculation above.

The next item is "Less litigation/negotiations/mediation cost in D.C." The amount
attributed to this item is between ($100,000) and ($250,000). Dr. Stiglitz provided no
documentation or explanations supporting these amounts. Also, based upon the
documents provided related to the negotiations resulting in the Stipulation of Settlement,
there were <u>numerous</u> settlement offers and <u>significant</u> negotiations and correspondence in
arriving at the Stipulation of Settlement. Further, the documents indicate significant time
and resources were spent negotiating the actual wording of the Stipulation of Settlement.
It is likely a similar process would have taken place had settlement negotiations
proceeded subsequent to the May 16, 2002, settlement offer. Dr. Stiglitz has not
documented how he takes this into consideration when determining this credit.

### Comparison of Stipulation of Settlement with May 16, 2002, and July 2, 2002, Settlement Offers

As noted above, it is difficult to compare the final settlement as documented in Exhibit A
– Asset Division to the Stipulation of Settlement with the May 16, 2002, and July 2,
2002, settlement offers due to the significant differences in form and format between the
documents. For example, the first page of Exhibit A includes a line item "Total Value of
Joint Tangible Assets (Page 2)" in the amount of $1,860,140.12. Page 2 is a listing of the
accounts, primarily checking and savings accounts, with the then-current balances.
However, certain accounts listed on Exhibit A, such as Union Bank of California, are not
included on the May 16, 2002, or July 2, 2002, settlement offers. Likewise, page 2 of
Exhibit A includes items such as "Add-back for portion of Vanguard securities sold to
pay Kroll," "Add-back for ML Securities sold for 6/04 residence purchase," and "Add-
back for Fidelity securities sold for 6/04 residence purchase," none of which were
included in the May 16, 2002, or July 2, 2002, settlement offers.

#### Comparison with May 16, 2002 Settlement Offer

Page 2 of Exhibit A lists "Total: Husband's Non-retirement Assets" at $325,380.26. It
also lists "Total: Wife's Non-retirement Assets" at $177,372.23. Finally, it lists "Total:
Joint Assets" of $1,860,140.12. These amounts total $2,362,892.61. On the first page of
Exhibit A, a credit of $207,000 is attributed against these assets as "Less Husband's
$207,000 separate property credit," resulting in a net amount of $2,155,892.61. The
comparable amounts listed on the schedule to the May 16, 2002, settlement offer, total

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 18

$2,346,796 and include the categories of cash accounts of $1,962,671, life insurance of
$50,792, and Nobel Peace Prize of $333,333. These amounts do not include other items
listed on Exhibit A, including a life insurance policy in the amount of $3,505.43, an
amount for the World Bank pension payments of $19,001.00, Folio*FN* in the amount of
$9,589.79, and a 2000 Saab in the amount of $11,870. When these amounts are added to
the schedule attached to the May 16, 2002, settlement offer, the total becomes
$2,390,762.22, which is $234,869.61 greater than the amounts listed on the Stipulation of
Settlement.

In total, Exhibit A reports the "Subtotal tangible non-retirement assets to be divided
equally" to be $2,155,892.61. One-half of that amount, or $1,077,946.30, was attributed
to each party. One-half of the $2,390,762.22 would be $1,195,381.11. Hence, at this
point, Dr. Stiglitz is ahead $117,434.81. All retirement accounts were essentially divided
equally, with the exception of the World Bank pension plan, both in the Stipulation of
Settlement as well as proposed in the May 16, 2002, settlement offer. However, the
Stipulation of Settlement did provide for payment of $600,000 described as "Wife
receives $600,000 from Husband in settlement of various claims, including Husband's
payments to/on behalf of Anya Schiffrin, consulting fees earned from Microsoft
Litigation Fund and Sebago, and enhanced earning capacity." As mentioned above, no
breakout has been provided as to when these amounts were earned, amounts attributable
to the various categories, nor why they would be considered non-marital assets. Further,
many of these amounts likely would have been included in the earnings of Dr. Stiglitz
subsequent to the May 16, 2002, settlement offer and taken into account when
determining the payments to Ms. Hannaway in accordance with calculation of the 27.5%
difference in Dr. Stiglitz's and Ms. Hannaway's income.

In addition, Exhibit A includes an item titled "Wife receives from Husband her share of
post-commencement payments of book royalties after reduction of 44 percent for
Husband's payment of income taxes," in the amount of $260,802. Again, Ms. Hannaway
would have likely been entitled to a portion of this as having been earned during the
pendancy of the marriage and a portion as part of the calculation of the 27.5% of the
difference in Dr. Stiglitz's and Ms. Hannaway's income, in accordance with the May 16,
2002, settlement offer.

In summary, the ultimate settlement as reflected in the Stipulation of Settlement was not
significantly different than the May 16, 2002, settlement offer made by Ms. Hannaway.
As noted above, when compared to the assets listed on the Asset Summary of the May
16, 2002, settlement offer, Dr. Siglitz is ahead approximately $117,500 as compared to
the Stipulation of Settlement. In addition, the remaining $860,800 awarded to Ms.
Hannaway likely would have been received by Ms. Hannaway under the terms of the
May 16, 2002, settlement offer.

*K:\Clients\3958\2006\Word\report.doc*

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 19

### *Comparison with July 2, 2002, Settlement Offer*

As noted above, the July 2, 2002, settlement offer is a settlement offer made by Dr. Stiglitz to Ms. Hannaway. This offer was rejected by Ms. Hannaway and, as noted above, there is no basis for believing this was a proper offer, especially considering that Ms. Hannaway rejected the offer, and there has been no showing that it could possibly have resulted in a reasonable resolution to the matter. Accordingly, on its face any comparison to the Stipulation of Settlement should be given little weight.

Comparison with the Stipulation of Settlement is further complicated by the fact that the July 2, 2002, settlement offer does not provide a schedule of the assets and liabilities or the proposed division of those assets and liabilities. However, an e-mail from Dr. Stiglitz to Ms. Bank dated September 22, 2002, Bates stamped AA994, does provide that breakdown. According to Dr. Stiglitz, the July 2, 2002, settlement offer would provide Ms. Hannaway with 50% of the California home, valued at $730,000, 50% of the Kensington home, valued at $200,000, Vanguard accounts, valued at $576,000, 50% of the Ordway residence, valued at $200,000, 50% of stocks (not including Dr. Stiglitz's claimed premarital Vanguard 500 account) valued at $576,000, 50% of the cash accounts, valued at $100,000, 50% of the marital pension plans, valued at $1.5 million, 50% of the World Bank pension, estimated at $0.3 million, royalties on books, estimated at $0.1 million, and three years of maintenance, valued at $.126 million. According to Dr. Stiglitz, the total value of this package was approximately $3.93 million.

In order to make a comparison, these amounts must be adjusted for items that were not included on Exhibit A – Asset Division to the Stipulation of Settlement. Specifically, the $200,000 for the 50% of Kensington, the $1.5 million for the 50% of the marital pension, the $.1 million of royalties on books, and the $.126 million of maintenance are not included on Exhibit A. After reduction for these amounts, Dr. Stiglitz's proposed settlement with Ms. Hannaway is $2 million.

At the time of the Stipulation of Settlement, the California and Washington, D.C. homes had been sold; hence, they were included in the cash accounts at that time. The Stipulation of Settlement also includes some things that were not included in the July 2, 2002, settlement offer. These included the cash surrender value of life insurance policies, the 2000 Saab, and the add-backs for the post-commencement royalties, after reduction of 44% for Husband's payment of income taxes of $260,802 and the $600,000 in settlement of various claims. However, even with those items included, Ms. Hannaway received assets valued at $1,942,161. If rounded to $1,942,000, this means that she received approximately $58,000 less in the Stipulation of Settlement than Dr. Stiglitz proposed in his settlement offer of July 2, 2002.

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 20

In summary, the Stipulation of Settlement resulted in assets being distributed to Ms. Hannaway that were not significantly different in amount with the July 2, 2002, settlement offer.

## Comparison of May 16, 2002, and July 2, 2002 Settlement Offers

The Asset Summary attached to the May 16, 2002, settlement offer reflected net marital assets of $5,466,307, with a proposed division of $2,571,819 to Ms. Hannaway. The July 2, 2002, settlement offer purportedly allocated total assets to Ms. Hannaway of $3.93 million. Given the fact that Ms. Hannaway's settlement offer was the May 16, 2002, offer, it would appear that the settlement offer of Dr. Stiglitz was significantly higher than that proposed by Ms. Hannaway. However, as with the comparisons above, there are significant differences in the assets included in the two proposals.

The May 16, 2002, proposal does not include a specific value for the World Bank pension, which the July 2, 2002, settlement offer values at $300,000. In addition, the May 16, 2002, settlement offer listed two TIAA-CREF accounts but only one had a value attributed to it. The value of the second account, which was included in the value of the marital pension in the July 2, 2002, settlement offer, was $2,062,936. Finally, the May 16, 2002, settlement offer did not include the 50% of California house at $730,000, royalties on books (est.) at $100,000 and three years maintenance at $126,000, all of which were included in the July 2, 2002, settlement offer. Offsetting this, the May 16, 2002, settlement offer did include the Nobel Peace Prize valued at $333,333, which was not included in the July 2, 2002, settlement offer. When the $2,571,800 proposed division of assets by Ms. Hannaway in the May 16, 2002, settlement offer is adjusted for 50% of the additional TIAA-CREF account and 100% of the other items above, the adjusted value of the May 16, 2002, settlement offer, is $4,526,000, as compared to the $3,930,000 proposed by Dr. Stiglitz in the July 2, 2002, settlement offer. Hence, when a complete comparison is performed, and when all of the assets and income are included, the July 2, 2002, settlement offer by Dr. Stiglitz was actually for less income and a smaller share of the marital estate than what was proposed by Ms. Hannaway in the May, 16, 2002, settlement offer.

## Summary of Conclusions

In my opinion, Dr. Stiglitz has not documented his alleged damages calculations such that they can be tested and verified. In addition, he has failed to prove that the settlement reached in the Stipulation of Settlement was, in fact, materially different from the settlement offers proposed on May 16, 2002, and July 2, 2002, and, more importantly, that it resulted in payments to Ms. Hannaway that were greater than either settlement offer. As a result, Dr. Stiglitz's testimony and damages claims should be excluded.

Mr. Richard A. Simpson, Esq., Partner
Ross, Dixon & Bell, LLP
February 9, 2007
Page 21

Attached is a copy of my curriculum vitae and list of testimony. I am being compensated
at the rate of $300 per hour and $325 per hour for deposition and testimony. I have not
published in the past ten years.


Sincerely,

Robert F. Aucone, CPA

Attachments

RFA/lam

Documents Received

The following is a list of documents received in this matter.

1.  Complaint for Professional Negligence Received by the Civil Clerk's Office, August 17, 2005.
2.  Defendant Rita M. Bank's Responses to Plaintiff's Request for Admission of Facts.
3.  Defendant Rita M. Bank's Responses to Plaintiff's First Set of Interrogatories.
4.  Plaintiff's Answers to Defendant's First Set of Interrogatories.
5.  Plaintiff's Revised Supplemental Response to Defendant's First Set of Interrogatories and Objection to Second Set of Interrogatories.
6.  Stipulation of Settlement Dated August 4, 2004.
7.  Deposition of Rita M. Bank Taken April 20, 2006.
8.  Deposition of Rita M. Bank Taken August 17, 2006.
9.  Deposition Exhibits of Rita M. Bank.
10. Deposition of Joseph E. Stiglitz Taken April 21, 2006, hereinafter the "Initial Deposition."
11. Deposition of Joseph E. Stiglitz Taken July 21, 2006, hereinafter the "Second Deposition."
12.
13. Deposition Exhibits of Joseph E. Stiglitz.
14. Plaintiff's Expert Witness Designation.
15. An undated memorandum, Bates stamped AA778 through AA779 from Dr. Stiglitz to "Sharon and Rita."
16. An e-mail from Dr. Stiglitz to S. Siegel dated February 25, 2002, and attachment, collectively Bates stamped AA419 through AA421.
17. A letter from Rita M. Bank to Sanford K. Ain, Esq. dated April 16, 2002, Bates stamped AA758 through AA761.
18. A letter, and attachments, from Sanford K. Ain to Rita M. Bank, Esq. dated May 16, 2002, Bates stamped AA721 through AA723 (the three-page attachment is not Bates stamped).
19. A letter from Darrell A. Feldman to Rita M. Bank, Esq., and attachments, dated May 31, 2002. This document was not Bates stamped and consists of a one-page letter and four pages of schedules attached.
20. A letter from Rita M. Bank to Sanford K. Ain, Esq. and attachments dated July 2, 2002, Bates stamped AA624 through AA643.
21. An e-mail from Dr. Stiglitz to Ms. Bank dated September 22, 2002, Bates stamped AA994 through AA995.
22. The personal income tax returns on Form 1040 for Joseph Stiglitz and Jane Hannaway for 1998, 1999, and 2000.
23. The personal income tax return on Form 1040 for Joseph Stiglitz for 2001 and 2003.
24. The personal income tax return for Joseph and Anya Stiglitz on Form 1040 for 2004.
25. A draft report of Michael I. Cragg, Ph.D., dated January 26, 2004.

26.    A Reply to the Expert Report of Michael Cragg by John R. Johnson, Managing Partner, and John T. Kuznia, Manager of BST Valuation and Litigation Advisors, LLC dated March 10, 2004.

27.    The Expert Rebuttal Report of Michael Cragg titled "Final March 9, 2004."

28.    A Career Enhancement, Enhanced Earnings Capacity & Enhanced Earnings Report as of September 16, 2002, by Ronald J. Klein, CPA/ABV of Klein Lipton Liebman Gresen, LLC, to Alton Abramowitz, Esq.

29.    A report titled "Valuation of Dr. Joseph Stiglitz' Career/Celebrity Status" dated January 23, 2004, prepared by John R. Johnson, Managing Partner, BST Valuation & Litigation Advisors, LLC to Dr. Jane Hannaway.

30.    A series of documents referred to as the "New York Briefing on Enhanced Earnings" Bates stamped AA8427 through AA8514.

31.    Numerous documents related to Dr. Stiglitz's calendar, speaking engagements, speaking contracts, and related correspondence and memorandums.

32.    Numerous documents and correspondence related to the New York City litigation, including various settlement offers.

**Robert F. Aucone**

**PROFESSIONAL BACKGROUND**

| | |
|---|---|
| **EMPLOYMENT** | **BKD, LLP**<br>1700 Lincoln Street, Suite 1400<br>Denver, Colorado 80203 |
| **EDUCATION** | University of Colorado,<br>Boulder, Colorado<br>B.S. degree in accounting December 1972 |
| | Mercer County Community College<br>Trenton, New Jersey<br>A.S. degree in data processing, June 1970 |
| | Accredited in Business Valuations, AICPA<br>Certificate of Educational Achievement in Business Valuations,<br>AICPA |
| **EMPLOYMENT HISTORY** | Shareholder/Director<br>Robert F. Aucone & Associates, P.C.<br>Denver, Colorado 1992-2001 |
| | Shareholder<br>Barrett/Gurovich, P.C.<br>1988-1992 |

**PROFESSIONAL ASSOCIATION AFFILIATIONS**

American Institute of Certified Public Accountants
Colorado Society of Certified Public Accountants
Management Consulting Services Division of the AICPA
Board of Directors, Colorado Collaborative Law Professionals

**FIRM PROFILE**    BKD, LLP is among the nation's 10 largest public accounting and advisory firms. BKD's nearly 1,600 personnel, including 220 partners and principals, serve clients in many industries. BKD primarily provides services to middle-market companies, but clients also include small, closely-held businesses; large, publicly traded entities; governmental entities; not-for-profits; and a large number of individuals. Along with our 27 offices, we also have wholly owned subsidiaries – BKD Wealth Advisors, LLC, BKD Insurance, LLC, BKD Corporate Finance, LLC and BKD Foundation.

**EXPERT WITNESS TESTIMONY**

Robert F. Aucone has served as an expert witness in numerous federal and state courts.

# EXHIBIT 2



February 9, 2007

Testimony given by Robert F. Aucone, CPA, July 1, 2002, through date above:

1. Andrews v. Dillie & Kuhn;
2. District Court, El Paso County;
3. July 25, 2002 (Deposition);
4. Case No. 00CV2838.

1. Gilmer v. Gilmer;
2. District Court, Arapahoe County;
3. September 16, 2002;
4. Case No. 01DR1659.

1. Moritz v. Moritz;
2. District Court, City and County of Denver;
3. September 17, 2002;
4. Case No. 02DR770.

1. Robert Sanders, et al. v. Harvey G. Mozer, et al.;
2. Jefferson County District Court;
3. November 21, 2002 (Deposition);
4. Case No. 00CV792.

1. Weingarter v. Helfrich;
2. District Court, City and County of Denver;
3. January 29, 2003;
4. Case No. 02DR1642.

1. Haas v. Haas;
2. District Court, Jefferson County;
3. March 3, 2003;
4. Case No. 02DR1055.

1. Four Mile Condominium Association, Inc. v. Clifford N. Brandon III;
2. County Court, City and County of Denver;
3. April 28, 2003;
4. Case No. L74687.

Beyond Your Numbers 

1. Pinal Creek Group, et al. v. Newmont Mining et al.;
2. United States District Court for the District of Arizona;
3. May 9, 2003 (Deposition);
4. Docket No. CV 91-1764 PHX-DAE.

1. Heidi A. Jordan, M.D. v. Henry M. Heller, M.C., PC;
2. District Court, La Plata County;
3. June 12, 2003 (Deposition);
4. Case No. O3 CV 50.

1. Pollock v. Pollock;
2. Private Arbitration, Judge Sidel;
3. July 21, 2003;
4. Case No. 02 DR 726.

1. Christensen v. Christensen;
2. District Court, Arapahoe County;
3. August 26, 2003;
4. Case No. 02 DR 2852.

1. Guinn v. Guinn;
2. District Court, Jefferson County;
3. October 1, 2003;
4. Case No. 01 DR 1690.

1. Noonan Lundberg v. Lundberg;
2. District Court, Douglas County;
3. October 27, 2003;
4. Case No. 02 DR 404.

1. Blackfox Real Estate Group, LLC v. Donald B. Berland;
2. Judicial Arbiter Group Arbitration;
3. November 13, 2003;
4. Arbitration No. 230942.

1. Thrash v. Thrash;
2. District Court, Jefferson County;
3. November 20, 2003;
4. Case No. 03 DR 964.

1. EEOC and Mohr v. Norgren Company;
2. U.S. District Court for the District of Colorado;
3. November 21, 2003 (Deposition);
4. Case No. 01 B 565(PAC).

Page 3

1.  Graves v. Graves;
2.  District Court, City and County of Denver;
3.  April 27, 2004;
4.  Case No. 03 DR 2892.

1.  Huling v. Huling;
2.  District Court, Arapahoe County;
3.  May 6, 2004;
4.  Case No. 03 DR 1229.

1.  Chester P. Andrews Jr. v. Dillie & Kuhn;
2.  District Court, El Paso County;
3.  May 11, 2004;
4.  Case No. 00 CV 2838.

1.  Lundberg v. Lundberg;
2.  District Court, Douglas County;
3.  August 5, 2004;
4.  Case No. 02 DR 404.

1.  Hollinger v. Hollinger;
2.  District Court, Mesa County;
3.  August 6, 2004;
4.  Case No. 03 DR 947.

1.  Dorsey v. Dorsey;
2.  District Court, Arapahoe County;
3.  August 31, 2004;
4.  Case No. 87 DR 874.

1.  O'Donnell, Inc., A Colorado Corporation v. Farmers Insurance Exchange;
2.  District Court, El Paso County;
3.  September 2, 2004;
4.  Case No. 00 CV 1615.

1.  Haas v. Haas;
2.  District Court, Jefferson County;
3.  October 4, 2004;
4.  Case No. 02 DR 1055.

1. Hanson v. Hanson;
2. District Court, Arapahoe County;
3. October 20, 2004 (Arbitration);
4. Case No. 03 DR 864.

1. Liberty Savings Bank FSB v. Webb Crane Services, Inc., et al.;
2. Eagle County District Court;
3. October 21, 2004 (Deposition);
4. Case No. 03 RB 2218.

1. Chen v. Ye;
2. District Court, Arapahoe County;
3. November 1, 2004;
4. Case No. 03 DR 509.

1. Dorsey v. Dorsey;
2. District Court, Arapahoe County;
3. November 18, 2004;
4. Case No. 87 DR 874.

1. Hobbs v. Hobbs;
2. District Court, Douglas County;
3. February 2, 2005;
4. Case No. 03 DR 340.
1. Clark v. Clark;
2. District Court, City and County of Denver;
3. February 8, 2005;
4. Case No. 04 DR 148.

1. Palli v. Nair-Palli;
2. District Court, Arapahoe County;
3. March 1, 2005;
4. Case No. 02 DR 1521.

1. Gibson v. Gibson;
2. District Court, El Paso County;
3. March 7, 2005;
4. Case No. 03 DR 3447.

1. Gilligan v. Gilligan;
2. District Court, Jefferson County;
3. March 30, 2005;
4. Case No. 04 DR 2553.

Page 5

1. McSparin v. Lifland;
2. District Court, Summit County;
3. September 8, 2005;
4. Case No. 05 DR 24.

1. Paswaters v. Paswaters;
2. Private arbitration;
3. February 29, 2006;
4. Case No. 99 DR 1396.

1. Gress v. Gress;
2. District Court, Douglas County;
3. May 11, 2006;
4. Case No. 05 DR 740..

1. Paragon Health, LLC, et al. v. Big Sky Medicine, P.C., et al;
2. District Court, Jefferson County;
3. July 29, 2006 (Deposition);
4. Case No. 05CV2277.

1. Wiechman v. Wiechman;
2. District Court, City and County of Denver;
3. July 7, 2006;
4. Case No. 02DR2842.

1. Paragon Health, LLC, et al. v. Big Sky Medicine, P.C., et al.;
2. District Court, Jefferson County;
3. August 25, 2006;
4. Case No. 05CV2277.

1. Michael A. Fremling, M.D. v. William L. Saber, M.D., P.C., d/b/a Alpine Plastic
   Surgery, P.C.;
2. District Court, Adams County;
3. December 6, 2006;
4. Case No. 05CV657.

1. Fisher v. Fisher.;
2. District Court, Jefferson County;
3. February 1, 2007;
4. Case No. 06DR806.

# EXHIBIT 3

LAW OFFICES
# KUDER, SMOLLAR & FRIEDMAN, P.C.

1925 K STREET, N.W.
SUITE 200
WASHINGTON, D. C. 20006

(202) 331-7522

FAX: (202) 331-0388

LAWYERS@KSFLAW.COM

ARMIN U. KUDER†
PAUL R. SMOLLAR°
SUSAN M. FRIEDMAN†
THERESA M. MIHALIK°
KATHRINA S. PETERSON†
MERIDITH S. JACOBS†

† MARYLAND & D.C. BAR
° VIRGINIA & D.C. BAR

MARYLAND OFFICE
SUITE 300
110 NORTH WASHINGTON STREET
ROCKVILLE, MARYLAND 20850

February 9, 2007

Richard A. Simpson, Esquire
Ross, Dixon & Bell, LLP
2001 K Street, N.W.
Washington, D.C. 20006

      Re:    **Joseph E. Stiglitz v. Rita M. Bank**
              **Civil Action No. 05-1826-RJL**

Dear Richard:

      You have engaged me to review and comment upon certain aspects of the claim of professional malpractice asserted by Professor Joseph Stiglitz against your client Rita M. Bank, Esquire, and especially the opinions proffered by Glenn C. Lewis, Esquire, relating to the matter. I also have reviewed the opinions of Marcy L. Wachtel, Esquire, concerning the outcome and costs of negotiations and proceedings in New York City.

      Pursuant to our engagement agreement, I am being paid at my customary hourly rate for the review of records and information provided to me, and for the formulation of my conclusions and opinions. My remuneration is not contingent upon any particular result or the outcome of the litigation against Ms. Bank. Should I be required to participate further in the litigation, I will continue to be compensated on an hourly basis.

      In order to carry out this assignment, I have reviewed the deposition testimony of Professor Stiglitz, Ms. Bank and Ms. Jane Hannaway, and the pleadings, motions, and exhibits listed on Exhibit A attached to this report.

## Overview

      The basic facts behind this litigation are not in dispute. However, there are a number of important facts which are disputed between Professor Stiglitz and Ms. Bank. For example, Professor Stiglitz asserts that Ms. Bank failed to file suit when instructed to do so; whereas Ms. Bank recalls that notwithstanding following instructions to set deadlines in correspondence with opposing counsel, Professor Stiglitz was anxious to avoid litigation and did not

Richard A. Simpson, Esquire
February 7, 2007
Page 2

unambiguously authorize initiating a court case. Depending on the resolution of this and other factual disputes, it is possible to conclude that Ms. Bank's representation did not meet the standard of care appropriate for the practice of matrimonial law in the District of Columbia. I believe Mr. Lewis, in fact, has resolved contested factual issues in favor of Professor Stiglitz in order to arrive at several of his conclusions. He has not made that clear in his statement of "facts." In other instances, Mr. Lewis sets forth as facts matters of opinion or prognostication, such as costs for litigation in the District of Columbia and his prediction of the outcome of a settlement, or of litigation, in the District of Columbia. I conclude differently for reasons set forth below.

### Standard of Care

Mr. Lewis – and Ms. Wachtel – satisfactorily set forth Ms. Bank's obligation as an attorney to exercise that degree of care and skill reasonable for an attorney of her experience acting under similar circumstances. (Battle v. Thornton, 646 A.2d 315 (D.C. 1994))

### Resolution of Factual Disputes

I have read the depositions of the parties and Ms. Hannaway. There are obvious matters of dispute. Professor Stiglitz states that he requested advice as to the most favorable jurisdiction in which to base his proceeding. (See Mr. Lewis's letter of March 14, 2006 ("Lewis Op.," page 2, paragraph 2)) Ms. Bank describes only general conversations and a client eager to negotiate without court proceedings. Ms. Hannaway describes Professor Stiglitz as "stonewalling" and trying to negotiate "asymmetrically" (without equal knowledge of his financial information), the subject of Professor Stiglitz's renown. She says she filed suit in New York where Professor Stiglitz's financial information was located, but still preferred to negotiate in the District of Columbia. Her view gives some support to Ms. Bank's recitation.

Professor Stiglitz states he gave explicit orders to file suit in September 2002, which Ms. Bank ignored or overlooked. She states that Professor Stiglitz equivocated, wanting to avoid rancor and contention.

It is not my role to resolve, nor could I resolve, these, and other, matters where Ms. Bank and Mr. Stiglitz dispute the facts. **If**, in fact, Ms. Bank ignored an explicit direction to file suit, unless the client order were countermanded, that would constitute professional malpractice. There is no basis in the record I have which permits me to make a final determination that Ms. Bank ignored an explicit direction.

Richard A. Simpson, Esquire
February 7, 2007
Page 3

### Mr. Lewis' Findings Concerning Fees and Costs

Without distinguishing between facts (Mr. Stiglitz's actual expenses in New York) and opinion (possible D.C. fees and expenses), Mr. Lewis asserts that attorney's fees in D.C. would have been "substantially less" and that there would have been no expert witness fees based on "enhanced earnings" and "celebrity status." He states such costs in D.C. would have been $100,000 to $200,000. (Lewis Op. p. 3) In my opinion, this is way off the mark.

First, Mr. Lewis assumes that there would have been no issue as to celebrity status or enhanced earning. This is extremely unlikely. Ms. Hannaway's attorney, Sanford K. Ain, was very familiar with the theories of celebrity status and enhanced earnings, and various state decisions dealing with such issues. He has written on them. There are no District of Columbia legal decisions denying nor affirming those theories. It is highly likely that had there been contested litigation in D.C., those issues would have been briefed and tried, given Professor Stiglitz's receipt of the Nobel Prize, and Mr. Ain's professional competence. In negotiations, he would have argued these points. Further, in contested litigation, the losing side likely would have appealed if there were sufficient dollars involved. To determine the dollars involved, experts would have been required, just as in New York. The favorable decisions in New York may have made the law clearer, but they did not increase the legal fees and related costs of truly contested litigation.

Ms. Hannaway complains under oath that Professor Stiglitz's failure to give her information generated delay and fees. She is clear that she would not settle in D.C. without receipt of the financial information she sought by filing in New York. If a party is dilatory in producing information, it can be quite costly for that party. In one such case more than 15 years ago, fees were awarded to the wife from the husband in the amount of approximately $150,000, which were two thirds of her total fees. More recently a judge entered an award of $875,000 to a wife <u>pendente lite</u>, with on-going additional fees. I have participated in cases with Ms. Bank's former firm where their clients' fees exceeded $500,000. There are numerous variables which can affect fees and costs in litigation, especially how helpful and responsible one's own client is, the novelty of issues or factual circumstances, and how the other side conducts the case. In this case, if it had gone to litigation in D.C., all of those factors would appear to be present in a way that would have greatly increased the costs. Recognizing the extreme range of the possibilities, I would be more comfortable with estimating Professor Stiglitz's own fees to be in the $400,000 to $700,000 range, not counting any appeal. There also would have been substantial expert fees. Without a settlement, I do not see any significant difference between the two jurisdictions in this case.

Richard A. Simpson, Esquire
February 7, 2007
Page 4

### Other Damages

Mr. Lewis opines that Professor Stiglitz suffered damages of $3,460,000 to $3,950,000 including some unspecified amounts for (1) "Plaintiff's income, future royalties enhanced earnings and celebrity status"; (2) payments of Ms. Hannaway's legal bills, and (3) the additional time required by the Plaintiff to defend himself in New York. (Lewis Op., p.3) In my opinion there is no such causation nor damages.

With respect to income, royalties and the enhanced earnings and celebrity status claims, it appears that Mr. Lewis is saying that the final settlement in the New York litigation varied greatly from what would have happened in the District of Columbia if suit had been initiated here, either in a court decision or settlement. Since the New York settlement presumably took into account judgments about what the Court would have decided,[1] I have to compare what a reasonable settlement in the District of Columbia might have been as an alternative to litigation. In making that judgment, I have to assume that litigation in D.C. would have involved the same course of discovery as Ms. Hannaway demanded and pursued in New York with respect to income, assets, and claims of non-marital property. I also assume that Mr. Ain would have demanded substantiation of claims of non-marital property, would have sought compensation for Mr. Stiglitz's prize money, royalties and other income, would have claimed marital income and property to the date of divorce,[2] would have argued the factors set forth in D.C. Code, Section 16-910(b), and would have requested attorney's fees for his client. I conclude that a settlement at the same stage in District of Columbia proceedings would not have been significantly different than the New York settlement in its overall economic impact. I note that Ms. Hannaway testified to this effect (except for the diminution caused by increased attorneys fees).

As for payment of Ms. Hannaway's fees (element (2)), I believe there likely would not have been a difference between the two jurisdictions in this case. In fact, Professor Stiglitz ultimately did not pay Ms. Hannaway's fees in the settlement.[3]

With respect to the value of Prof. Stiglitz's time (element (3)), it is clear that New York was the more convenient forum for Prof. Stiglitz, not for Ms. Hannaway, and it would have

---

[1] New York counsel has characterized the settlement as reasonable on that basis.

[2] An apparent difference from New York. See Stipulation and Settlement of the parties.

[3] He did pay 80% of certain mutually retained experts. In the District, the most likely scenario would have been the employment of opposing experts as Mr. Ain tried to forge new principles of law.

Richard A. Simpson, Esquire
February 7, 2007
Page 5

required less of his time to proceed there than in the District of Columbia, with less incidental
expense. In conclusion, I see no proximate cause whatsoever for Mr. Lewis's assertion of
damages, nor any basis for his numbers.

### Failure to Exercise Due Care

I will address Mr. Lewis's six (6) specific claims of deficient representation by Ms. Bank
(Op., pages 3-4).

1.    Failure to commence settlement negotiation within a reasonable time. Even after
Ms. Bank began negotiations, it is clear that collecting data, and Ms. Hannaway's perception of
Professor Stiglitz's "stonewalling," makes it highly unlikely the Nobel Prize would not have
been an issue. I see no professional negligence in the advice to wait some time for the
abandoned party to cool down, to gather information, and to see where one is going. Nor did the
client seem to object. Ms. Hannaway felt her husband was delaying things for his own purposes.

2.    Filing a complaint early in the District of Columbia would have been contrary to
the client's stated goals, and provoked more immediate expenses. It could only be justified in
hindsight, and only if one assumes Ms. Hannaway's attorney would not have sought vigorously
to enhance her position. Not filing immediately was reasonable for the client and the attorney.

3.    I agree that it would be professional malpractice to ignore specific instructions
from a client to file suit. The record on this is not as clear as Mr. Lewis says, nor, in my opinion,
would proceedings in the District of Columbia have produced a greatly different result.
Litigation in the District would have been assigned to any of several judges, or to the
Domestic "I" calendar upon motion of a party. Time to trial can vary greatly, from judge to
judge and case to case, but never in any complex case would it have been in six (6) months. Ten
(10) to twelve (12) months is a better estimate, and trial dates of more than twelve (12) months
after filing are common.

4.    I agree that learning that her client was contemplating a move, Ms. Bank should
have discussed that with the client. Again, the parties have different recollections about such
discussions. For reasons stated above, it is my opinion that even if Professor Stiglitz's version
were accepted completely, it is speculative whether he would have acted differently. And it is
my opinion that the ultimate outcome was not materially affected by his choice of residence.

5.    Mr. Lewis states that Ms. Bank had a duty to inform her client in May or June
2002 that she was negotiating with Mr. Ain to form a partnership. There is no evidence that they
were negotiating in May or June. Ms. Bank was clear that she had no such intent in May or June.
I do not believe there was an obligation to inform the client until the project moved from the
thinking stage to the formation of a partnership. Lawyers are called professionals in part because

Richard A. Simpson, Esquire
February 7, 2007
Page 6

they are required to put the client's interest before a personal interest. There is nothing in what I have reviewed that suggests that Ms. Bank did otherwise. Reviewing the mutual rejections of settlement proposals in 2002, and the eventual outcome, I see no selling out of a client and no connection between Ms. Bank's eventual partnership and the settlement.

      6.    Filing suit in the District of Columbia after suit had been filed in New York would have increased litigation costs considerably as the contending sides filed motions, oppositions and affidavits. Under general legal principles, a plaintiff's (Ms. Hannaway) choice of forum is to be respected absent compelling circumstances, and the first of two actions concerning the identical subject will take priority, again absent unusual circumstances. I disagree that failing to file after Ms. Hannaway filed was a violation of the standard of care.

      Please let me know if you have any questions or other matters for me to address. I thank you for the opportunity to participate in this interesting matter.

                  Very truly yours,

                  Armin U. Kuder

AUK:lls
Enclosure

*F:\CLIENT.6\6253.01\Letters.07\2-7cl-auk.wpd*

**EXHIBIT A**

**DOCUMENTS REVIEWED BY ARMIN U. KUDER:**

Stipulation of Settlement in Index no. 350584/02 (Supreme Court of the State of New York County of New York) signed by Jane Hannaway and Joseph Eugene Stiglitz on August 4, 2004.

Plaintiff's Complaint for Professional Negligence filed with the Court on August 17, 2005

Defendant's Answer to Plaintiff's Complaint for Professional Negligence filed with the Court on October 6, 2005

Plaintiff's Answer to Defendant's First Set of Interrogatories sent to Meredith Werner on April 3, 2006

Defendant Rita M. Bank's Response to Plaintiff's Request for Admissions sent on March 17, 2006 to David G. Whitworth Jr.

Plaintiff's *Revised* Supplemental Response to Defendant's First Set of Interrogatories and Objection to Second Set of Interrogatories sent to Meredith Werner on July 6, 2006

Plaintiff's Expert Witness Designation filed with the Court on November 15, 2006

Transcript of the Video Taped Deposition of Plaintiff Joseph E. Stiglitz taken on April 21, 2006

Transcript of the Continued Video Taped Deposition of Plaintiff Joseph E. Stiglitz taken on July 21, 2006

Transcript of the Deposition of Rita M. Bank taken on April 20, 2006

Transcript of the Deposition of Rita M. Bank taken on August 17, 2006

Defendant Rita Bank's Supplemental Document Production (including handwritten notes discussed in August 17, 2006 deposition)

Recitals from the Supreme Court of the Sate of New York County of New York Index No. 350584/02 Stipulation of Settlement

Transcript of the Deposition of Jane Hannaway taken on January, 23, 2007

# EXHIBIT 4

Feb 08 07 01:57p                                                                            p.2



THE GEORGE
WASHINGTON
UNIVERSITY
LAW SCHOOL
WASHINGTON DC

CATHERINE J. ROSS                                          (202) 994-9456
*Professor of Law*                                        (202) 994-5614 (FAX)
                                                          cross@law.gwu.edu

                                                          February 9, 2007

Ricbard A. Simpson, Esq.
Ross, Dixon & Bell, LLP
2001 K Street, N.W.
Washington D.C. 20006

## Re: Joseph E. Stiglitz v. Rita M. Bank, Civ. No. 05-1826- RJL

Dear Mr. Simpson,

You have retained me on behalf of the defendant in the above-referenced matter.
As I understand it, the divorce action between Joseph F. Stiglitz ("Stiglitz"), the plaintiff
in this matter and his former wife, Jane Hannaway ("Hannaway"), was resolved pursuant
to a settlement agreement after Hannaway filed for divorce in New York. You have asked
me to advise you concerning the distinctions between law in the District of Columbia (the
"District") and in the State of New York during the relevant time period as those
distinctions would bear on the resolution of the Stiglitz/Hannaway divorce, with
particular reference to how each jurisdiction would have been likely to treat Stiglitz's
Nobel Prize and any accompanying material advantages related to it. As I understand it,
Stiglitz now claims that his position in negotiations was undermined or diminished by his
asserted "celebrity status" under New York law.

In preparing this opinion, I have examined the following materials which you
transmitted to me under cover of a letter dated February 1, 2007:

> (1) the Statement of Facts which your firm prepared for my review
> (the "Statement of Facts");
> (2) the Curriculum Vitae of Joseph E. Stiglitz; and
> (3) reports from experts forwarded to you under cover of a letter from
> David G. Whitworth, Jr. dated February 1, 2006 including a review of
> Stiglitz's Career Enhancement, Enhanced Earning Capacity and Enhanced
> Earnings as of September 16, 2002 prepared by Ron J. Klein, C.P.A., a
> Valuation of Dr. Joseph Stiglitz's Career/ Celebrity Status transmitted to
> Hannaway c/o her attorney Eleanor Alter by John R. Johnson on January 23,
> 2004, the report of Michael Cragg dated January 26, 2004, and a Reply to the
> Expert Report of Michael Cragg transmitted to Hannaway and her attorney on
> March 10, 2004 by John R. Johnson and John T. Kuznia.

After I had already formulated my general views of this matter, I asked you to provide me with the terms of the settlement agreement. In response, on February 5 your associate emailed me the settlement agreement between Stiglitz and Hannaway dated August 4, 2004 (the "Settlement Agreement"). I have reviewed that document as well.

In preparing this opinion letter I have relied on the facts as set forth in the Statement of Facts, which I do not replicate here. I have also noted unresolved issues of fact as set forth in the various expert reports, to which I refer as needed.

## SUMMARY OF CONCLUSIONS

As explained below, the reasoning by which courts in New York or the District of Columbia might have reached (or explained) their decisions, given the opportunity, would plausibly have rested on distinguishable grounds. Nonetheless courts in both jurisdictions could have distributed the intangible benefits of a Nobel Prize received during the course of a long marriage in similar dollar amounts or, equally plausible, could have declined to do so. Put more simply, the fact that Hannaway filed for divorce in the State of New York did not disadvantage Stiglitz, nor would it have advantaged him if he had chosen the jurisdiction by filing first in the District of Columbia. To the extent that the bargaining over the terms of the settlement occurred in the shadow of New York law, rather than the law of the District of Columbia, it is my opinion that the choice of jurisdiction did not make a significant difference to the outcome.

### Introduction

Both New York and the District of Columbia are equitable distribution regimes. N.Y. Dom. Rel. L. § 236, D.C. Code § 16-910. In both, trial courts have enormous discretion in crafting equitable distribution of the parties marital assets. *Holterman* v. *Holtermann* 3 N.Y.3d 1, 814 N.E.2d 765 (2004), *citing Arvantides* v. *Arvantides*, 64 N.Y. 2d 1033, 478 N.E. 2d 199 (1985); *Young-Jones* v. *Bell*, 905 A.2d 275 (D.C. Ct. App. 2006), *citing Barnes* v. *Sherman*, 758 A.2d 936 (D.C. 2000). The breadth of that discretion makes it difficult to predict accurately how courts in either jurisdiction would apply the law to the instant facts, which involve issues of first impression in both states. Since we do not have the benefit of a court opinion in the divorce litigation, we are dealing with each party's speculations about what a court in each jurisdiction might have done had the divorce case gone to trial, and with each party's presumptions during settlement negotiations about how they expected a New York court to treat their respective claims.

In the analysis that follows, I examine the range of plausibly predictable court decisions based on these facts in both jurisdictions. This exploration may involve seemingly contradictory interpretations of fact. The proper interpretation of the facts, insofar as they have been contested in the documents I have reviewed, is not, however,

2

my assignment. Indeed, my review of the expert opinions prepared in the New York litigation has led me to conclude that a court would have likely engaged in extensive fact-finding regarding a number of disputed claims bearing on Stiglitz's reputation before and during the marriage, as well as on Hannaway's contributions to the marital estate through the support she offered at home and in child rearing, as well as her willingness to relocate to advance Stiglitz's career and the extent to which such support allowed Stiglitz to continue his prodigious productivity. In the discussion that follows, I apply the law to interpretations or applications of the facts that might have resulted from a full exploration in an adversarial hearing.

At the outset, it is important to consider the only reported case in any jurisdiction involving the proceeds of a Nobel Prize in the context of a divorce. *Ketterle* v. *Ketterle*, 61 Mass. Ct. App. 758, 814 N.E.2d 385 (Mass. App. Ct. 2004). *Ketterle* was decided in Massachusetts which, like both New York and the District of Columbia, is an equitable distribution jurisdiction, in which the trial court has discretion in pursuing "'an equitable, rather than an equal, division of property [which is] the ultimate goal'" of the equitable distribution statute. *Id.* at 389, *quoting Williams* v. *Massa*, 431 Mass. 619, 626, 728 N.E.2d 932 (2000). On appeal, the court held that the district court did not abuse its discretion in finding that the "Nobel Prize identified the husband as a superstar in the scientific and academic universe" resulting in "his having substantial ability to acquire future income and assets," and accordingly did not err in awarding the physicist's wife more than half of the marital assets. *Id.* at 387.

It is possible to distinguish the facts in *Ketterle* from those in the instant case. For example, it is undisputed that the husband in *Ketterle* performed all of the work that led to his receipt of the Nobel Prize during the course of the marriage while the question of whether Stiglitz would have won the prize if he had stopped working in his field before his marriage to Hannaway appears to be hotly contested, and the wife in *Ketterle* could barely support herself while Hannaway earns a respectable salary, though far less than Stiglitz earns. Nonetheless, for the reasons explained below, it is my opinion that if the distribution of the assets in the marriage of Hannaway and Stiglitz had been decided by a court rather than through a negotiated settlement, the choice of jurisdiction would not have made a significant difference to the outcome insofar as it involved the treatment of Stiglitz's Nobel Prize and the continued development of his professional reputation during the course of the marriage.

## Treatment of "celebrity status" and related issues in New York

Only New York and New Jersey recognize "celebrity goodwill" as a marital asset subject to division upon divorce. Laurence J. Cutler and Robin C. Bogan, *Celebrity Goodwill*, 25-WTR Fam. Advoc. 20, 21 (2003). It is far from clear, however, that Hannaway could have convinced a New York court that Stiglitz qualified as a celebrity to whom the court should apply this rarely-used doctrine. The argument would have raised a question of first impression, and would arguably have required the trial court to expand the doctrine of celebrity good will considerably. Even in New York, courts have only

3

found divisible celebrity good will in two cases, both of which are distinguishable from the case at hand.

    *Elkus* v. *Elkus*, 169 A.D.2d 134, 572 N.Y.S.2d 901 (N.Y. A.D. 1'st Dep't 1991), concerned the value of the career of opera star Frederica von Stade Elkus, who, like Stiglitz, was well-established in her field before her marriage to Peter Elkus. Von Stade was already performing with the Metropolitan Opera in New York, albeit in minor roles, and earned very little money when she married Elkus, who served as her voice coach and teacher both before and during the marriage. By the time the marriage dissolved, von Stade was one of the leading opera stars in the world. Based on New York cases that, under certain conditions, assigned to spouses a portion of the value of professional training and licenses (discussed below), the intermediate appellate court recognized that the enhanced value of "a career as a performing artist, and its accompanying celebrity status, constitute marital property subject to distribution" where the non-celebrity spouse served as a voice coach, teacher and critic during the marriage. Similarly, in *Golub* v. *Golub*, 527 N.Y.S.2d 946 (Sup. Ct. N.Y. Co., 1988), the trial court held that the increase in value of actress Marissa Berenson's career during her marriage to a high profile attorney who helped to promote her career and provided her with legal and financial advice constituted divisible marital property. No New York court has found an increase in celebrity status meriting division in the more than 15 years since *Elkus* was decided.

    Commentators have observed that *Elkus* and *Golub* raise many questions, including whether "they apply to spouses who work in all fields, or are they limited to people who work in the entertainment field?" J. Thomas Oldham, Divorce, Separation and the Distribution of Property § 10.03[5] 10-57 (2005). Since no court in any jurisdiction has applied the doctrine since *Elkus* was decided over fifteen years ago, I doubt that a New York trial court would be inclined to expand the doctrine to encompass prize-winning economists such as Stiglitz. Even assuming for the sake of argument that Hannaway might have convinced an activist judge that Stiglitz is a "celebrity" with a proven track record (*see* *Sterling* v. *Sterling*, 2001 WL 968262 (N.Y. Sup.Ct. N.Y. Co. 2001) (unpublished opinion) (summarizing the requirements for celebrity status and declining to apply the doctrine), or that any increase in his earning capacity could be accurately valued, it is almost inconceivable that she could meet the "direct contribution" requirement established in the two celebrity status cases. The *Elkus* court emphasized that its holding would not extend where the spouse seeking a share of the celebrity spouse's enhanced career had made only indirect contributions of the sort all spouses make to the joint enterprise of marriage by sharing responsibilities (including contributions as homemakers). Instead, the court expressly noted, "it cannot be overlooked that the defendant's [Elkus's] contributions to plaintiff [von Stade's] career were direct and concrete, going far beyond child care and the like, which he also provided. . . . to the extent that the appreciation in the plaintiff's career was due to the defendant's efforts and contributions, this appreciation constitutes marital property." *Id.* at 139-140. Thus, even if a trial court were inclined to extend the *Elkus* approach to reach Stiglitz, Hannaway would have a heavy burden to show her "direct and concrete" contribution to Stiglitz's rising professional status during the marriage. *See* *Sterling* v. *Sterling*, *supra*, * 7 (in the three reported celebrity cases, *Elkus*, *Golub* and *Piscopo* v. *Piscopo*, 557 A.2d 1040 (N.J.

4

Super. Ct. App. Div. 1989) "the courts stressed the fact that the noncelebrity spouse had contributed meaningfully to the other spouse's success and was, indeed, an integral part of that success.").

As noted above, the New York celebrity goodwill cases build on a line of cases limited to claims arising from higher education and professional licenses. New York adopts a unique position by expressly awarding spouses an equitable share of enhanced earning capacity resulting from degrees or professional licenses earned in whole or in part during the marriage with the direct or indirect support of a spouse. *O'Brien* v. *O'Brien*, 66 N.Y.2d 576, 489 N.E.2d 712 (N.Y. 1985), *Holterman* v. *Holterman*, 3 N.Y.3d 1, 814 N.E.2d 765 (N.Y. 2004). However, *O'Brien*, *Holterman* and their prodigy are inapposite to the Hannaway/Stiglitz facts because it is undisputed that Stiglitz earned his professional credentials and had embarked on his career before meeting Hannaway, and certainly before marrying her. *See, e.g.*, *O'Brien* (medical degree earned entirely during a short marriage in which nonprofessional spouse provided support and did not reap the benefits of the degree); *Holterman*, (wife who earned income while husband completed his medical degree and residency entitled to 35% of the remaining economic value of the medical license after 19 years of marriage); *Duspiva* v. *Duspiva*, , 181 A.D. 2d 810 (2d Dep't 1992) (certified public accountant license acquired during marriage); *Holihan* v. *Holihan*, 159 A.D. 2d 823 (2d Dep't 1989) (law degree earned during marriage); *Anderson* v. *Anderson*, 153 A.D. 2d 823 (2d Dep't 1989) (teaching degree); *Farrell* v. *Cleary-Farrell*, 306 A.D. 597 (3rd Dep't 2003) (husband entitled to distributive award of a small portions of wife's enhanced earnings as a dental hygienist where he supported the family while wife was earning her license). *See also* Sandra Mulay Casey et al., *Domestic Relations XXIV*, N.Y. Jur. 2d Domestic Relations § 2503 (collecting recent cases to the same effect).

In short, "[t]here is great doubt as to whether any award can be made for the value of a professional license or degree which was earned in its entirety prior to the marriage. A professional license or degree earned prior to marriage constitutes separate property. While the appreciation in separate property can be considered marital property, there are substantial difficulties in establishing appreciation in the value of a professional license or degree. Post-marriage earnings of the licensed or degreed spouse would appear to be the natural outgrowth of the enhanced earning potential created by the separate property." Alan Sheinkman, *Equitable Distribution of Property*, 11 N.Y. Prac, New York Law of Domestic Relations § 14:28 (Oct. 2006) (collecting recent cases).

Moreover, any trial court judge confronted with an invitation to expand the scope of the celebrity status or professional degree cases to reach these facts would be well aware of the extensive criticism to which *Golub*, *Elkins* and even *O'Brien* and its prodigy have been subjected. No high court outside New York has accepted the claim that a professional license is marital property, much less that enhanced celebrity status is. Indeed, the New York Court of Appeals has never considered the latter issue. In 1996 the House of Delegates of the New York State Bar Association expressly called upon the New York legislature to overrule *O'Brien*. New York State Bar Association, *Report of the Task Force on Family Law* 15 (August 19, 1996), *cited in* American Law Institute,

*Principles of the Law of Family Dissolution*, § 4.07 cmt. a at 706 (2003). More recently, although after the execution of the settlement at issue here, the Report of the New York State Matrimonial Commission to the Chief Judge, recognizing the significant "expressions of concern" over the problems arising with the treatment of a spouses enhanced earnings capacity, recommended legislation that would eliminate "a party's 'enhanced earning capacity' as a marital asset" and specifically references "celebrity goodwill" and "career enhancement" as assets that shall not be considered marital property subject to division. (Report of the New York State Matrimonial Commission to the Chief Judge (2006), p. 65 and Appendix L, *quoted in F.M.C.* v. *F.A.C.*, 2006 WL 1642671 *10 (N.Y. Sup. Ct. Nassau Co. 2006) (slip op.). However, the proposed legislation would provide that "in arriving at an equitable division of marital property, the court shall consider the direct or indirect contributions to the development during the marriage of the enhanced earning capacity of the other spouse." *Id.* This approach would bring New York into line with many other jurisdictions, including the District of Columbia, as examined below, and expressly contemplates the use of compensatory maintenance as a means of achieving equity.

It is my understanding that Hannaway planned to argue in New York that the enhanced earning capacity created by Stiglitz's Nobel Prize and public service during the marriage constituted divisible marital property because they were the fruits of work performed during the marriage, and that Stiglitz claimed in contrast that he earned the Nobel Prize and other recognition based on work completed before the marriage. In my view, this debate constitutes a red herring insofar as the uniqueness of New York law is concerned. *O'Brien, Holterman* and their prodigy are inapposite, as demonstrated in the preceding paragraph. Properly conceptualized, the issue is that all of the money Stiglitz earned during the marriage constituted marital earnings. These earnings contributed to the family's affluent life style as well as to the accumulation of marital assets. Thus, the compensation Stiglitz earned for work performed during the marriage is already reflected in the tangible assets available for distribution in either New York or the District of Columbia. To the extent that a court would consider Stiglitz's ability to earn at similar levels after the divorce in crafting an equitable remedy, the analysis I posit below under the laws of the District of Columbia could also have come into play in a New York court applying the statutory factors set forth in the Domestic Relations Law § 236.

## Applying the District of Columbia's Equitable Distribution Regime to a Nobel Prize and Its Accompanying Benefits

My conclusion that Hannaway did not obtain a significant advantage by proceding in New York is not intended to suggest that she would not have been able to persuade a court to structure an order that would recognize the economic benefits of Stiglitz's Nobel Prize and other accomplishments during the marriage, and that would accord her a share of those benefits. In this section, I consider how a District of Columbia court, applying the statutory factors set forth in D.C. Code § 16-910, might have treated Stiglitz's prodigious earning capacity.

It has long been clear in the District of Columbia that "the trial court has considerable discretion and broad authority in distributing marital property as part of a judgment of divorce." *Barnes* v. *Sherman*, 758 A.2d 936, 939 (D.C. 2000) (*quoting Dews* v. *Dews*, 632 A. 2d 1160, 1164 (D.C. 1993). The trial court is charged by statute with distributing marital property 'in a manner that is equitable, just and reasonable, after considering all relevant [statutory] factors,' and 'so long as the trial court considers all relevant factors, its conclusions will not be disturbed on appeal.'" *Id.* Indeed the District's Court of Appeals concedes that different judges, applying the same factors, might well reach a "different result in terms of the division of marital property" but that both results would be virtually immune from reversal. *Young-Jones* v. *Bell*, 905 A.2d 275, 278 (D.C. 2006).

The 2001 edition of the D.C. Code, § 16-910 was entitled, "Dissolution of property rights; jurisdiction of court." It provided, in pertinent part, that the court shall award each party his or her separate property and shall:

> Distribute all other property accumulated during the marriage, regardless of whether title is held individually or by the parties in a form of joint tenancy or tenancy by the entireties, in a manner that is equitable, just and reasonable, after considering all relevant factors, including, but not limited to: the duration of the marriage, any prior marriage of either party, the age, health, occupation, amount and sources of income, vocational skills, employability, assets, debts, and needs of each of the parties, provision for minor children, whether the distribution is in lieu of or in addition to maintenance, and the opportunity of each for future acquisition of assets and income.

The statute also instructed the court to consider each party's contributions to assets and to the "family unit."

On October 19, 2002 § 16-910 was amended and retitled "Assignment and equitable distribution of property." The new section is, in most important respects, not notably different from the statute that was in effect from June 2000 when Stiglitz and Hannaway separated and September 16, 2002 when Hannaway filed for divorce. I continue my analysis based on the language that became effective in October 2002 and remains in effect today, but do not believe the results would differ under the former version of § 16-910.

D.C. Code § 16-910 (2001, 2006) requires the trial court to consider "all relevant factors, including but not limited to:"

(1) the duration of the marriage;
(2) the age, health, occupation, amount, and sources of income, vocational skills, employability, assets, debts, and needs of each of the parties;
(3) provisions for the custody of minor children;
(4) whether the distribution is in lieu of or in addition to alimony;

(5)  each party's obligation from a prior marriage or for prior children;

(6)  the opportunity of each party for future acquisition of assets and income;

(7)  each party's contribution as a homemaker or otherwise to the family unit;

(8)  each party's contribution to the education of the other party which enhanced the other party's earning ability;

(9)  each party's increase or decrease in income as a result of the marriage or duties of homemaking and child care;

(10)  each party's contribution to the acquisition, preservation, appreciation, dissipation, or depreciation in value of the assets which are subject to distribution, the taxability of these assets, and whether the asset was acquired or the debt incurred after separation;

(11)  the effects of taxation on the value of assets subject to distribution; and

(12)  the circumstances which contributed to the estrangement of the parties.[1]

Confining my inquiry to the narrow subject on which I have been asked to render an opinion, the sixth factor, the "opportunity of each party for future acquisition of assets and income" provides a good starting point. In the District, as in all 49 states except for Massachusetts, the treatment of a Nobel Prize would present an issue of first impression. Courts in the District routinely consider opinions from other equitable distribution jurisdictions in crafting their decisions. Therefore, I assume that a District court would begin by examining the opinion in *Ketterle* (discussed at page 3 of this letter), assuming that the opinion was released before a court in the District ruled on the Stiglitz/Hannaway divorce. The *Ketterle* court considered the Nobel Prize in light of the Massachusetts equitable distribution factors, in particular the factor requiring the court to consider "the ability to acquire future income and assets" which is substantively the same as the District's formulation. Significantly, Massachusetts, like the District, does not recognize what New York calls "enhanced earnings capacity." Nonetheless, the *Ketterle* court concluded that the prize-winner's future income and assets would be greatly enhanced by receipt of the prize, and took that fact into consideration in crafting an equitable disposition. A court in the District could be expected to reach a similar conclusion, especially after factoring in other developments during the marriage including Stiglitz's highly visible government service.

To be sure, the instant case can be distinguished from *Ketterle* on both the facts and the law. While there are great disparities in the earning potential of Stiglitz and Hannaway, the discrepancies were much starker in *Ketterle* where the wife suffered from "fragile" mental health and worked as a part-time teacher's aide. However, the *Ketterle* court expressly found that while the "husband's brilliance and hard work made the family financially secure[,] 'the wife's total commitment to child rearing and tending to the home permitted the husband to pursue his career." 814 N.E.2d 387, 387. This division of labor, it concluded, justified awarding a larger share of assets to the wife in light of her more limited future expectations. A court in the District might make similar findings

---

[1] I understand that factors 3, 5 and 8 have no application to the Stigliz/Hannaway divorce. Under 12, however, a court in the District could have taken Stiglitz's fault in the termination of the marriage into account in dividing the marital assets.

here. The disparity in the law – that Massachusetts permits the court to distribute separate property where needed to achieve equity, but the District only permits distribution of marital property – would, in my opinion, be unlikely to have a major impact in a case like this one where the bulk of assets are marital, and the amount of marital assets more than sufficient to support both parties in a manner comparable to their standard of living during the marriage.

In a subsequent case, a Massachusetts appellate court expressly rejected the husband's claim that he was entitled to keep more of the marital assets than his wife of 24 years who had been a homemaker for roughly 15 years because he worked "exceptionally long hours" to become the head of litigation at a large firm. The court affirmed the trial court's decision to award the wife 51% of the assets in accordance with the lower court judge's stated intent to leave "both parties with relatively equivalent assets and resources." *T.C.* v. *J.L.*, WL 3019223 * 1 (Mass. App. Ct. 2006) (unpublished opinion). This kind of consideration might also enter a District court's application of the factors to the Stiglitz/Hannaway marriage: a marriage that lasted 32 years to which both spouses contributed in different ways, and in which one spouse looks forward to much higher earnings than the other in the future.

Another way to approach analysis of the impact of the Nobel Prize and related recognition is through the concept of goodwill – one of the murkiest and most difficult areas of family law. Like many other jurisdictions, the District of Columbia expressly recognizes that "professional goodwill is marital property subject to distribution". *McDiarmid* v. *McDiarmid*, 649 A.2d 810, 814 (D.C. 1994). In announcing this principle, the *McDiarmid* court rejected the view that "the concept of professional goodwill evanesces when one attempts to distinguish it from future earning capacity,'" (*quoting Holbrook* v. *Holbrook*, 309 N.W. 2d 343, 354 (Wis. App. 1981)) and aligned itself with jurisdictions that hold that professional reputation, including what Story called "common celebrity,' must be considered marital property subject to equitable distribution to avoid a "'windfall'" to the professional spouse. *McDiarmid*, 649 A.2d at 813-814, *quoting* J. Story, *Commentaries on the Law of Partnerships* § 99, at 170 (6th ed. 1868) (add'l citations omitted). *Russell* v. *Russell*, 399 S.E.2d 166, 168 (Va. App. 1990). Many of the cases in the jurisdictions with which the District aligned itself in *McDiarmid* apply the concept of professional goodwill to professional practices in law, medicine, etc. with a result that may be difficult to distinguish from the division that results in New York under the concept of enhanced earning capacity.

More to the point for purposes of analyzing the Stiglitz/Hannaway divorce, the lead case for the proposition that professional goodwill not only exists but is divisible marital property holds that such goodwill exists and can be measured even where the business is not for sale (or, as in this case, could not be sold); the measure of the goodwill is the present value of the "excess earnings" the professional receives when compared to others with similar education and experience. *Dugan* v. *Dugan*, 457 A.2d 1, 9 (N.J. 1983), *cited in McDiarmid*, 649 A.2d at 814. The view that professional goodwill is a marital asset has been applied to a variety of solo practitioners, including at least one consulting business whose "only product [was] the personal service" rendered by the

9

divorcing spouse. *Hardy* v. *Hardy*, 2005 WL 2660627 (Ohio App. 2 Dist.) *5 (but holding that there was no value in the consulting business at issue). To the extent that Stiglitz's consulting business is an interest that the couple acquired during marriage, the professional goodwill in it constitutes a marital asset under District law. To be sure, the resulting problems of valuation can be tricky to say the least. But its present value at divorce can be valued in relation to its anticipated future revenues in much the same way goodwill in an enterprise may be valued. Courts will accept a variety of approaches to such valuation, all of which are beyond my competency and would require the presentation of competing expert opinions. I have not been able to find a case directly on point in the District, and suspect that numerous difficult questions would have needed to be litigated in a court in that jurisdiction, including but not limited to: whether Stiglitz's excess earning capacity was already reflected in the couple's tangible marital assets; whether and to what extent the goodwill in Stiglitz's consulting practice and other income-generating activities beyond his university position had been created or appreciated in value during the marriage; and whether a dollar amount could be assigned to any goodwill that was shown to exist.

Given the level of judicial discretion in both New York and the District, it is plausible that a particular judge in either jurisdiction might have issued an order that was less (or more) advantageous to Stiglitz than were the terms of the Settlement Agreement. As indicated in my earlier analysis, after considering the applicable enumerated factors and other issues, a judge in the District would have had great flexibility to craft a financial resolution to the marriage that, in the court's view, achieved equity. Such a resolution could have included an equal or unequal division of marital assets as well as maintenance payments from Stiglitz to Hannaway.

It may be worth noting that District statute governing maintenance, like the statute governing equitable distribution, was revised in 2002. D.C. Code § 16-912, which was in effect from the time Stiglitz and Hannaway separated until after Stiglitz filed for divorce in New York, provided for the award of permanent maintenance and allowed the court, where appropriate, to allow either spouse to retain the right of dower in the other spouse's estate. In 2002 the legislature repealed § 16-912 and expanded the language of § 16-913 "Alimony." Whereas in 2001 § 16-913 provided only that the court could order either spouse to pay the other alimony "if it seems just and proper," the version that became effective in late 2002 also provided that, among other things, the "award of alimony may be indefinite or term-limited and structured as appropriate to the facts," and set forth a number of factors that should be considered, which significantly overlap with the factors set forth in § 16-910 (distribution). A 2000 opinion of the District's Court of Appeals reiterating that decisions respecting alimony are entrusted to the sound discretion of the trial court also points out that since 1966 courts in the District have been instructed, as a matter of common law, to consider the many of the factors currently set forth in § 16-913 in deciding whether or not to award alimony and in what amount. *Lake* v. *Lake*, 756 A.2d 917, 921 (D.C. 2000), *quoting McEachnie* v. *McEachnie*, 216 A.2d 169, 170 (D.C. 1966).

Based on what I initially knew about the premise of the instant lawsuit, I had hypothesized that Stiglitz's dissatisfaction with the Settlement Agreement he executed in

New York might stem from terms that either gave Hannaway more than 50% of the marital property, or committed Stiglitz to continue to make payments to Hannaway after the divorce either as maintenance or as distribution for her share of his reputation, or that all of those terms made up part of the Settlement Agreement.

Upon reviewing the Settlement Agreement, I was struck that it appears to be a fairly standard equitable distribution agreement, very much in line with what we might anticipate a court in either New York or the District to have ordered. Each party kept the home in which he or she currently resided. Virtually all of the measurable assets were divided 50/50 with a handful of exceptions: (i) although the bulk of the retirement accounts were divided 50/50, Hannaway received 100% of Stiglitz's World Bank Pension, and each party kept one separately-named IRA account; and (ii) Hannaway received rights to Stiglitz's publications that reflected work performed during the marriage, in amounts ranging from 10% to 50%, while Stiglitz did not receive any share in her much less valuable publications. It is standard in both jurisdictions for a spouse to receive a fair share of future payments (including payments whose exact value is unclear at the time they are awarded, such as a share of stock options or pension plans) that constitute compensation for labor performed during the marriage. Such future payments are not in any way comparable to payments for expected future earnings, enhanced earnings capacity or maintenance. The terms of the Settlement Agreement reinforce my initial view that the choice of forum for the divorce litigation made little or no difference to the negotiated outcome.

Very truly yours,

Catherine J. Ross
Professor of Law

BY TELECOPY AND FIRST CLASS MAIL

11

# EXHIBIT 5

February 2007
Short version

## CURRICULUM VITAE

# *CATHERINE J. ROSS*

**ADDRESS**:

George Washington University Law School
2000 H St., N.W.
Washington D.C. 20052
Telephone: 202/ 994-9456
cross@law.gwu.edu

**EDUCATION:**

| | |
|---|---|
| Yale Law School | J.D., 1987 |
| Yale University | Ph.D. in History, 1977 |
| Yale College | B.A., *magna cum laude*, 1971, Honors in History |

**PROFESSIONAL EXPERIENCE:**

### Current Position: The George Washington University Law School

- Professor, January 2005-present
- Associate Professor with tenure (July 2000-December 2004)
- Associate Professor with term (July 1996-June 1999)

### Visiting Appointments

University of Pennsylvania:
- Visiting Associate Professor, Law School, Fall 2001 and Senior Visiting Scholar, Center for Children's Policy, Practice and Research, University of Pennsylvania, 2001-2002

Boston College:
- Visiting Associate Professor of Law, Boston College Law School with joint appointments in the School of Education and Department of History, August 1994-June 1996

1

## Professional History

Paul, Weiss, Rifkind, Wharton & Garrison:
- Associate (Litigation), 1987-1994

Yale University:
- Assistant Professor of History and Assistant Section Head, Section in History and Social Policy, Yale University School of Medicine, Child Study Center 1979-1983 (on leave 1983-1985); with joint appointments in History and Women's Studies.
- Bush Center in Child Development and Social Policy, Research Associate, 1978-1979, Post-Doctoral Fellow, 1977-1978.

## COURSES TAUGHT:

Lecture Courses: Family Law; Child, Family & State; Evidence

Seminars, *e.g.*, Parents, Pluralism and Public Schools; Children, Speech Rights and Forms of Communication; Topics in Children and the Law; The Child Welfare System

# BIBLIOGRAHY:

## BOOKS

Contemporary Family Law. (co-author, Abrams, Douglas, Cahn, Naomi, Ross, Catherine and Meyer, David). St. Paul, MN: Thomson West, 2006.

- Primary author:

    Chapter 9, Division of Marital Property at Dissolution
    Chapter 12, Child Custody
    Chapter 13, Visitation and Post-Dissolution Custody Disputes

    (with Cahn) Chapter 1, Marriage, Family and Privacy in Contemporary America
    (with Cahn) Chapter 4, Social and Economic Rights and Obligations

- Also authored the relevant sections of the accompanying Teacher's Manual (West, 2006)

2

America's Children at Risk: An Agenda for Legal Action. (Report of
the ABA Working Groups on the Unmet Legal Needs of
Children and their Families). Chicago: American Bar
Association Press, 1993.

Child Abuse: An Agenda for Action.  (co-editor with Gerbner, George
and Edward Zigler).  New York: Oxford University Press,
1980.

## LAW REVIEW ARTICLES & CHAPTERS IN BOOKS

"Choosing a Text for the Family Law Curriculum of the Twenty-First
Century," 44 Family Court Review 584-589 (Oct. 2006)
(Special Issue: The Family Law Education Reform Project).

"Legal Intersections: Foster Children Awaiting Adoption Under the
Adoption and Safe Families Act of 1997," Adoption Quarterly,
Vol. 9 (2/3) 2006.

"A Place at the Table: Creating Presence and Voice for Teenagers in
Dependency Proceedings." Special Issue on the Legal
Representation of Children, 6 Nevada Law Journal 1362-1373
(Spring 2006).

"Constitutional Obstacles to Regulating Violence in the Media." in
Handbook of Children, Culture, and Violence 291-310, edited
by Nancy Dowd, Dorothy G. Singer, & Robin Fretwell Wilson.
Thousand Oaks, CA: Sage, 2006.

"A Delicate Task: Balancing the Rights of Children and Mothers in
Parental Termination Proceedings." in 33 Studies in Law,
Politics and Society, edited by Austin Sarat & Patricia
Ewick. London: Elsevier Press, 2004.

"Society's Children: The Care of Indigent Youngsters in New York
City, 1875-1903." in Families by Law: An Adoption Reader 11-
18 , edited by Naomi R. Cahn & Joan Hollinger. New York:
New York University Press, 2004.

"The Tyranny of Time: Vulnerable Children, 'Bad' Mothers, and
Statutory Deadlines in Parental Termination Proceedings." 11
Virginia Journal of Social Policy and the Law 176-228 (2004).

"Implementing Constitutional Rights for Juveniles: The Parent-Child

Privilege in Context." 14 <u>Stanford Law and Policy Review</u> 85-120 (2003).

"Including Lawyers in the Mix: The Role of Law, Lawyers, and Legal Training in Child Advocacy." in 4 <u>Handbook of Applied Developmental Science: Promoting Positive Child, Adolescent, and Family Development through Research, Policies, and Programs</u> 353-370, edited by Richard M. Lerner, Francine Jacobs & Donald Wertlieb. Thousand Oaks, CA: Sage Publications, 2003.

"The Parent-Child Privilege in Context." 21 <u>Quinnipiac Law Review</u> 1139-1143 (2003) (Symposium Issue on AALS Evidence Conference).

"Anything Goes: Examining the State's Interest in Protecting Children from Controversial Speech." 53 <u>Vanderbilt Law Review</u> 427-524 (2000).

(with Adreienne Davis, Marion Crain, Bonnie Thornton Dill, Nancy Dowd, and Joan Williams). "Panel Two: Who's Minding the Baby?" 49 <u>American University Law Review</u> 901-942 (2002).

"An Emerging Right for Mature Minors to Receive Information." 2 <u>University of Pennsylvania Journal of Constitutional Law</u> 223-275 (1999).

"Families Without Paradigms: Child Poverty and Out-of-Home Placement in Historical Perspective." 60 <u>Ohio State Law Journal</u> 1249-1293 (1999).

(with Cahn, Naomi). "Subsidy for Caretaking in Families: Lessons from Foster Care." 8 <u>American University Journal of Gender, Social Policy and the Law</u> 55-71 (1999).

"Unified Family Courts: Good Sense, Good Justice." 35 <u>Trial</u> 30 (January 1999).

"The Failure of Fragmentation: The Promise of a System of Unified Family Courts." 32 <u>Family Law Quarterly</u> 3-30 (1998).

"Sex, Violence, Children and the Media: Legal, Historical and Empirical Perspectives. Transcript of Comments at AALS Annual Meeting. Mass Communications Program." <u>CommLaw Conspectus</u> (January 6, 1997).

4

"From Vulnerability to Voice: Appointing Counsel for Children in
Civil Litigation." 64 Fordham Law Review 1571-1620 (1996).

(with Emens, Elizabeth F., Nancy W. Hall and Edward F.
Zigler). "Preventing Juvenile Delinquency: An Ecological,
Developmental Approach." in Children, Families and
Government: Preparing for the Twenty-First Century, edited by
Edward F. Zigler, Sharon Lynn Kagan and Nancy W. Hall. New
York: Cambridge University Press, 1996.

"Disposition in a Discretionary Regime: Punishment and
Rehabilitation in the Juvenile Justice System." (Symposium -
Struggling for a Future: Juvenile Violence, Juvenile Justice). 36
Boston College Law Review 1037-1059 (1995).

(with Haynes, Margaret Campbell). "Negotiating the Child Support
Collection Maze." 30 Trial 47 (February 1994).

"Advocacy Movements in the Century of the Child." in Children,
Families and Government: Perspective on American Social
Policy, edited by Edward Zigler, Sharon Lynn Kagan and
Edward Klugman. New York: Cambridge University Press,
1983.

"Of Children and Liberty: An Historian's View." American Journal of
Orthopsychiatry (Special issue on children's rights). (July
1982).

(with Zigler, Edward). "An Agenda for Action." in Child Abuse: An
Agenda for Action, edited by George Gerbner, Catherine J.
Ross, and Edward Zigler. New York: Oxford University Press,
1980.

"The Lessons of the Past: Defining and Controlling Child Abuse in the
United States." in Child Abuse: An Agenda for Action, edited
by George Gerbner, Catherine J. Ross, and Edward Zigler. New
York: Oxford University Press, 1980

(with Aber, L., et al.). "Conference Recommendations on Child
Abuse, November 20-21, 1978, Philadelphia, PA." Abridged
version reprinted in Child Abuse in the International Year of the
Child, edited by Leslie Taylor and Eli H. Newberger. New
York: United Nations Secretariat Discussion Paper Series,
1979.
Available in English, French and Spanish.

5

"Early Skirmishes with Poverty: The Historical Roots of Head
    Start." in Project Head Start: A Legacy of the War on Poverty,
    edited by Edward Zigler and Jeanette Valentine. New York:
    The Free Press, 1979.

(with Valentine, Jeanette and Edward Zigler). "Epilogue." in Project
    Head Start: A Legacy of the War on Poverty, edited by Edward
    Zigler and Jeanette Valentine. New York: The Free Press, 1979.

(with Weitzman, L. and D. Eifler). "Sex Role Socialization in Picture
    Books for Pre-School Children." American Journal of
    Sociology (May 1972).
    Reprinted in Marriage and Family: A Critical Analysis
        and Proposals for Change, edited by Carolyn C.
        Perrucci and Dena B. Targ. New York: David
        McKay Co., 1974.

Selected Other Publications:

Kirk A. Bailey and Catherine J. Ross, School Safety & Youth Violence: A Legal Primer
(Hamilton Fish Institute, 2001) (funded by and available from Office of Juvenile Justice
and Delinquency Prevention, U.S. Department of Justice).

"Who Speaks for the Children?" Chicago Tribune, December 30, 1993, invited article in
a series with HHS Secretary Donna Shalala, the Rev. Jesse Jackson and others.

## WORKS IN PROGRESS:

Competing Values and Visions: Accommodation of Parental Preferences in Public
Schools. A book length project.

"Children's Religious Expression in School: A Comparative Treatment of the Veil and
Other Religion Symbols in Western Democracies,"   to be published in Competing
Paradigms: Rights and Responsibilities Towards Children , edited by Martha Fineman
and Karen Worthington. (currently being circulated to prospective publishers).

"Mothers and Children at Odds: Doing Justice to Conflicting Claims in the Child Welfare
System," to be published in Competing Paradigms: Rights and Responsibilities Towards
Children, edited by Martha Fineman and Karen Worthington. (currently being circulated
to prospective publishers).

A number of smaller pieces, including conference symposiums, book reviews and invited contributions to the Chicago Companion to the Child (Chicago: University of Chicago Press, in press) on Foster Care and (with Naomi Cahn) *Parens Patriae*.

## SELECTED PRESENTATIONS:

Invited Commentator, Grand Rounds, The National Institutes of Health, Bethesda Md., on a bioethics problem involving inheritable disease and adoption, February 7, 2007.

Violent Videogames Summit, University of Minnesota, Minneapolis, MN, October 20-21, 2006

"Balancing the Interests of the National Community and the Rights of Religious Minorities in State-Supported Schools," Society for the Advancement of Socio-Economics (SASE), Communitarian Ideals and Civil Society, Trier Germany, June 29-July 1, 2006.

Commentator, Historical Perspectives on the Welfare State in Sweden, France and the United States, interdisciplinary invitational working conference, Columbia University, N.Y., N.Y., May 25-26, 2006.

Moderator and Commentator, Panel on Teen Mothers and the Child Welfare System, Conference on "Law and Adolescence: The Legal Status, Rights and Responsibilities of Adolescents in the Child Welfare, Juvenile, and Criminal Justice Systems," at Temple University James E. Beasley
School of Law, Philadelphia PA, March 17-18, 2006.

"Reconciling Children's Brains with Children's Rights," invitational, interdisciplinary international colloquium on "Law, Mind & Brain," The Gruter Institute/ University College, London, England, February 13-14, 2006.

Keynote Panel, response to the comments of Chief Judge Judith Kaye, ABA Summit on Youth at Risk, Hofstra University Law School, February 2-4, 2006.

"Comparative Treatment of Religious Symbols in Public Schools: the Problem of the Veil and Related Issues," International Society of Family Law, 12th World Conference, Salt Lake City, Utah,  July 2005.

"The Problem of the Veil," Competing Paradigms of Rights and Responsibility: Children in the Discourses of Religion and International Human Rights, Emory School of Law, April 15-17, 2005

7

*"Mens Rea,"* Invitational interdisciplinary conference on "The Mind of a Child: The relationship Between Brain Development, Cognitive Functioning, and Accountability Under the Law," The Ohio State University Moritz College of Law, Columbus, OH, March 10-11, 2005.

"No Winners: Doing Justice to the Competing Rights of Mothers and Children in the Child Welfare System, Panel on Children," at the Law and Society Association Annual Meeting, Pittsburgh, PA. June 7, 2003.

Participant, Woodrow Wilson Center, United States Studies Division, Discussion of American Law Institute Report on child custody issues, May 20, 2003. Transcript available at the Wilson Center website.

Keynote Address, New York State Judicial Institute, Judicial Training on Domestic Violence Courts, May 1, 2003, White Plains, N.Y.

"Constitutional Obstacles to Regulating Violent Speech," Colloquium on Children, Culture and Violence, Florida State University, March 20-21, 2003

"The Parent-Child Privilege in Context: Implementing Constitutional Rights for Juveniles" presented at the American Association of Law Schools Conference on Evidence Law, June 3, 2002

"Mothers and Children at Odds: Doing Justice to Conflicting Claims in the Child Welfare" System, presented at the Conference on Feminism and Child Protection: Tensions and Possibilities, co-sponsored by the Baldy Center for Law and Social Policy, Buffalo School of Law and the Cornell Law School Feminism and Legal Theory Project, May 3-4, 2002

"The Parent-Child Privilege in Context: Implementing Constitutional Rights for Juveniles," Bush Center in Child Development and Social Policy, Yale University, February 22, 2002.

"The Parent-Child Privilege in Context: Implementing Constitutional Rights for Juveniles," Works-in-Progress, University of Pennsylvania Law School, December 11, 2001.

"Preventing Violence Via a Constitutional Standard of Care," American Psychological Association, Washington, D.C., December 2, 1999.

Panelist, AWho=s Minding the Baby?@ Symposium on Unbending Gender: Why Family and Work Conflict & What to Do About It, Gender, Work, & Family Project, American

8

University, Washington College of Law, November 19, 1999.

"From Indenture to Adoption:  Sources of Confusion About the Meaning of the Foster Family." Symposium on The Implications of Welfare Reform for Children, Ohio State University College of Law, March 12, 1999.

"Accommodation in Public Schools:  Who Decides What Children Learn?@ Communitarian Summit, Washington, D.C., February 27, 1999.

Moderator, APrivacy and the Family,@ Symposium on Privacy and the Law, George Washington University Law School, February 12, 1999.

"Toward an Emerging Right for Mature Minors to Receive Information; Symposium on the Emerging and Existing Constitutional Rights of Children," University of Pennsylvania Law School, February 5, 1999.

"Sex, Violence, Children, and the Media: Legal, Historical and Empirical Perspectives," AALS Annual Meeting, Mass Communications Law Program, January 6, 1997 (Washington D.C.).

> Transcript in COMMLAW CONSPECTUS, JOURNAL OF COMMUNICATIONS LAW AND POLICY,
> Summer 1997.

Moderator and Commentator, Colloquium on Unified Family Courts, New York Colloquium of the Second World Congress on Family Law and the Rights of Children, UNICEF, September 1996.

Moderator, Panel on Child Custody Disputes, Annual Meeting of the International Society of Family Law, Quebec, Canada, June 1996.

**SELECTED PROFESSIONAL ACTIVITIES:**

Chair, Section on Law and Communitarian Studies, Association of American Law Schools (AALS), 2006.

Member, Accreditation Committee, ABA Section of Legal Education and Admissions to the Bar,  July 2000-2005.

Chair or Co-Chair, Committee on Children's Rights, ABA Section of Individual Rights and Responsibilities, 1998- present.

9

Senior Legal Consultant, Center for Children's Policy, Practice and Research, University of Pennsylvania, academic year 2002-2003.

Elected Fellow, American Bar Foundation, 1998.

Reviewer of manuscripts for academic presses including Cornell, the University of California, LEXIS publishing.

Member, Editorial Board of the Family Courts Review (formerly the Family and Conciliation Courts Review) (sponsored by the Association of Family and Conciliation Courts), 1997- present.

Member, Editorial Board of the Family Law Quarterly, 1994- 2000

Member, Editorial Board, *Promoting Positive, Child, Adolescent and Family Development: A Handbook of Program and Policy Innovations* (four volumes) (Sage Publications, 2003).

Delegate, United States Delegation to the International Conference on Family Law, Havana, Cuba, 2002

Consultant, Hamilton Fish National Institute on School and Community Violence, 2000.

Member, American Bar Association Coalition for Justice (Presidential Committee), 1999- 2002

Member, Expert Working Group on Guidelines for Public Policy and State Legislation Governing Permanency for Children, U.S. Department of Health & Human Services and Department of Justice, 1997-99.

> Chair, Subcommittee on Standards for Legal Representation of Children, Parents and the Child Welfare Agency.

Member, Program Committee, AALS Section of Family Law 1999 Meeting.

Co-Chair, American Bar Association Steering Committee on the Unmet Legal Needs of Children, 1997– 98.

> · Program Chair, ABA Summit on Unified Family Courts: Exploring Solutions for
>> Woman and Children in Crisis, Philadelphia, PA May 14-16, 1998.
>> Chief Justices of 35 States and Puerto Rico sent official delegations.

10

Co-sponsors included the Conference of Chief Justices, the Conference of State Court Administrators, the National Council of Juvenile and Family Court Judges, the National Association of Women Judges and the National Judicial College. The Violence Against Women Grants Office, Office of Justice Programs, U.S. Department of Justice provided substantial funding.

Chair, American Bar Association Steering Committee on the Unmet Legal Needs of Children, 1994 –1997; Vice Chair 1993-1994 (Hon. A. Leon Higginbotham, Jr. served as Chair in 1993-94).

Vice Chair, American Bar Association Presidential Working Group on the Unmet Legal Needs of Children and Their Families, 1993.

· Primary responsibility for the day-to-day operation of the Working Group, chaired by the Honorable A. Leon Higginbotham, Jr.

Member, American Bar Association Coordinating Committee on Gun Violence, 1997-99.

Member, American Bar Association Section of Litigation Task Force on Children 1993-97.

Member, Executive Committee, Initiatives for Children, American Academy of Arts and Sciences, 1995-97.

Member, Advisory Committee, ABA Center for Children and the Law, 1995 –97.

Speaker, Presidential Showcase on the Report of the ABA Presidential Working Group on the Unmet Legal Needs of Children and Their Families (August 1993); numerous other ABA presentations, 1993-present.

Consulting and public appearances: Department of Health and Human Services; National Center for Child Abuse and Neglect (project on homeless children); frequent guest commentator on educational and commercial television and radio shows on legal issues affecting children and families including ABC World News Tonight, CNN=s Burden of Proof, Court TV Supreme Court Watch (Fred Graham), Barry Gray etc.

11

## LAW  SCHOOL AND UNIVERSITY SERVICE

University Committee on the Status of Women Faculty and Librarians (2004-present).

Law School: Academic Integrity Committee (2003-present, Chair 2006-7); Appointments Committee (elected, 2004-5); Curriculum Committee (1999- 2001); Works-in-Progress (1996-99; 2003-present).  Faculty Secretary (1997-98).


## HONORS:

Fellow, American Bar Foundation, elected 1998.

Who's Who in America, Who's Who in the World and Other Marquis Who's Who listings.

Aspen Institute for Humanistic Studies, Andrew Mellon Fellow, 1983-84.

Research Grants (1979-83): Edna McConnell Clark Foundation; Ehrmann Foundation; Ford Foundation; MacArthur Foundation.

Fellowships (1971-77): Danforth Foundation Kent Fellow; Carnegie Teaching Fellow; Sutherland Douglas Fellow (Yale).