# EXHIBIT A

# Transcript of

# **Catherine Ross, Esq.**

**Date:** November 14, 2007

**Case:** Joseph E. Stiglitz v. Rita M. Bank

---

Phone: 410-268-6006
Fax: 410-268-7006
Email: corbinandhook@corbinandhook.com
Internet: www.corbinandhook.com



# CORBIN & HOOK
## Reporting & Videoconferencing

*- Specializing in Interactive Realtime & Rough ASCII Transcripts -*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOSEPH E STIGLITZ
    Plaintiff

vs        CA No 05-1826 RJL

RITA M BANK
    Defendant
_____/

Deposition of CATHERINE J ROSS, ESQ, was
taken on Wednesday, November 14, 2007, commencing at
10:09 A M , at 2001 K Street, N W , Washington,
D C , before Susan Farrell Smith, Notary Public
. . . . . .

Corbin & Hook Reporting and Videoconferencing
Serving MD, DC, No VA & DE
Reported by SUSAN FARRELL SMITH

**Page 2**

```
 1   APPEARANCES:
 2        DAVID G WHITWORTH, JR , ESQUIRE
 3        dwhitworth@wstlaw com
 4        Whitworth & Trunnell, P A
 5        2101 Defense Highway
 6        MD Rt 450
 7        Crofton, MD 21114
 8        301 261 0035
 9            On behalf of the Plaintiff
10        MEREDITH WERNER, ESQUIRE
11        mwerner@rdblaw com
12        RICHARD A SIMPSON, ESQUIRE
13        rsimpson@rdblaw com
14        Ross Dixon & Bell, LLP
15        2011 K Street, N W
16        Washington, D C 20006
17        202 662 2000
18            On behalf of the Defendant
19
20   REPORTED BY: Susan Farrell Smith
21
```

**Page 3**

```
 1              EXAMINATION INDEX
 2
     CATHERINE J ROSS, ESQ
 3      BY MR WHITWORTH              4
 4              EXHIBIT INDEX
 5                      PREMARKED
     ROSS DEPOSITION EXHIBIT
 6   1     Curriculum vitae
 7   2     Brief description of bio
 8   3     Statement if facts
 9   4     2/8/07 draft
10   5     Handwritten notes
11   6     First request for production of documents
12   7     2/2/07 draft
13   8     2/9/07 report
14   9     Invoice
15
16
     (Exhibits attached to original transcript )
17
18
19
20
21
```

**Page 4**

```
 1          CATHERINE J ROSS, ESQ ,
 2   the Witness, called for oral examination by counsel
 3   for the Plaintiff, having declared and affirmed
 4   under the penalties of perjury to tell the truth,
 5   was examined and testified as follows:
 6              EXAMINATION
 7   BY MR WHITWORTH:
 8     Q    Good morning
 9     A    Good morning
10     Q    As we have introduced ourselves earlier,
11   as you know, I'm David Whitworth, and I represent
12   Joseph Stiglitz in his claim against Rita Bank  And
13   I understand you've been retained as an expert in
14   the case
15     A    That's correct
16     Q    I also have of course had the benefit of
17   seeing your curriculum vitae and reviewing the
18   materials that you have prepared  But I want to
19   just know what experience you've had with
20   depositions previously first
21     A    I have taken depositions, I have defended
```

*Deposition of Catherine Ross, Esq*
*Taken on November 14, 2007*

**Page 5**

1  depositions, and I have never been deposed.
2  Q   Have you ever been involved as a party in
3  a lawsuit?
4  A   Once.
5  Q   What was that occasion?
6  A   A landlord who didn't return our security
7  deposit.
8  Q   Where did that occur?
9  A   New Haven, Connecticut.
10  Q   How did you make out?
11  A   I won.
12  Q   Good.
13  A   Her lawyer played golf with the judge, and
14  I still won.
15  Q   You must have been in the right
16  A   I was.
17  Q   The experience that you've had doing
18  depositions, are you -- have you -- when is the last
19  time you did a deposition?
20  A   Over 10 years ago.
21  Q   Have you represented clients in the past

**Page 6**

1  10 years?
2  A   Only on a pro bono basis.
3  Q   What legal representation experience have
4  you had in the last 10 years?
5  A   I represented on a pro bono basis a client
6  whose husband left the country with their life
7  savings, and I got her a IRO to block the bank
8  accounts and investment accounts.
9  Q   What jurisdiction was that in?
10  A   In New York.
11  Q   Now, I checked but don't recall, have you
12  maintained an active New York license?
13  A   I have a New York license. I also have a
14  Connecticut license.
15  Q   Do you have a D C license?
16  A   No, I don't.
17  Q   Have you ever practiced law in the
18  District of Columbia?
19  A   No.
20  Q   Prior to 10 years ago, what is the, in
21  general, what was your representation experience of

**Page 7**

1  clients?
2  A   I was a litigation associate at the law
3  firm Paul Weiss Rifkind Wharton & Garrison in New
4  York.
5  Q   And for how many years did you do that?
6  A   Seven years.
7  Q   And as a litigation associate, were you
8  predominantly handling matrimonial-related cases?
9  A   No. I was at a firm that believed that
10  litigators should handle a wide variety of cases.
11  The bulk of the practice was corporate law, but I
12  did handle some matrimonial matters, none of which
13  went to litigation
14  Q   So they were like negotiated settlements?
15  A   Exactly.
16  Q   And none of them were actually filed as a
17  suit in court?
18  A   Not to my recollection
19  Q   Did any of those individuals you
20  represented or brought a claim or were opposed to,
21  the opposite party, they weren't really a claim

**Page 8**

1  because they weren't in litigation yet, but you were
2  negotiating with a spouse of a client, did any of
3  those clients or their spouses have issues that
4  involved enhanced earning capacity?
5  A   No
6  Q   Did any of those clients have issues
7  involving celebrity status?
8  A   No.
9  Q   Have you ever worked on a case as in a
10  representative capacity where you were the lawyer
11  involving either of those issues?
12  A   No.
13  Q   Well, let's just take a look at your CV
14  for a minute I've marked that as Exhibit 1 if we
15  may
16  A   Uh-huh
17  Q   And by the way, I have dispensed with the
18  normal preamble about the mechanics of a deposition,
19  and I am going forward assuming that you're familiar
20  with your rights as a deponent, and the two and us
21  will try not to talk over each other and so forth.

*Corbin & Hook Reporting and Videoconferencing*
*410-268-6006   1-866-337-6778*

*Deposition of Catherine Ross, Esq*
*Taken on November 14, 2007*

**Page 9**

1   A    I appreciate all of those things. And I'm
2   totally dependent on my attorneys too.
3   Q    And you have had a chance to review and
4   prepare with the attorneys for Rita Bank in this
5   case?
6   A    Yes.
7   Q    The -- and you refer to them as your
8   attorneys?
9   A    No, that was a misstatement obviously
10  The attorneys who have retained me and who are
11  representing me here
12  Q    Okay  The experience that you had in
13  testifying, the only time you ever testified
14  previously was that landlord and tenant matter?
15  A    Yes.
16  Q    Have you ever been asked to serve as an
17  expert previously?
18  A    Yes.
19  Q    And what was that occasion or occurrence?
20  How long ago, what was the -- what was involved?
21  A    I served as an expert, you know, my

**Page 10**

1   recollection is not clear, it may have been as long
2   as five years ago  Something like that  In a
3   contested divorce arising under D C law being tried
4   in Colorado.
5   Q    Who retained you in that case?
6   A    The attorney for the husband.
7   Q    Who was?
8   A    You know, I would have to go back to my
9   files  He wasn't somebody I had dealt with before
10  or since
11  Q    What was the complete, you know, from
12  beginning to end, scope of your involvement in that
13  case?
14  A    There was a question concerning the
15  appreciation of the husband's business during that
16  time which in some ways you could say had an
17  intellectual relationship to some of the issues here
18  but not specifically enhanced earning capacity  And
19  they wanted me to do an opinion letter on what a
20  district court, District of Columbia court, would be
21  likely to do under the facts as they were given to

**Page 11**

1   me
2   Q    How far did that case progress in the
3   court system to your knowledge?
4   A    They settled almost immediately after
5   receiving my opinion letter.
6   Q    Did your opinion letter have -- were you
7   involved at all in the issue of whether D C law or
8   some other jurisdiction's law would apply?
9   A    No  The matter was clearly under D C
10  law  There was a disagreement about what the
11  District of Columbia law was  They received my
12  letter  They showed it to the other side  They
13  received a very favorable settlement on the terms
14  they were seeking
15  Q    And you can't recall what the law firm was
16  that retained you?
17  A    I actually can't  It was a small firm.
18  I'd never heard of it  They were referred to me.
19  never met the attorneys  It was by phone and
20  e-mail
21  Q    Have you advertised or held yourself out

**Page 12**

1   as an expert at any time?
2   A    No
3   Q    If you know, how was it that you were
4   contacted in this case?
5   A    I believe the attorneys asked around who
6   teaches family law in the District of Columbia.
7   Q    Now, I saw something in one of the
8   e-mails, and correct me if I'm wrong, between -- you
9   know, we've had disclosed e-mails back and forth
10  between you and the Ross Dixon & Bell --
11  A    Yes.
12  Q    -- attorneys as part of the disclosure in
13  this case
14  A    Uh-huh
15  Q    And it had something to do with the change
16  of the address in Armand Kutter's office  And it may
17  have just been a combined e-mail --
18  A    It's first I've ever heard it.
19  Q    -- and you were involved -- okay  Do you
20  have any relationship at all with Armand Cooter?
21  A    No.

3 *(Pages 9 to 12)*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 13

1  Q  Okay  Or his firm?
2  A  No
3  Q  Okay  It may have been just a sequence of
4  e-mails that were not connected  I just saw that on
5  the same page with an e-mail that you were involved
6  in  May have been something being forwarded onto
7  you or something of that nature  Because his office
8  changed and so his e-mail had that notice on it
9  A  If he transmitted one of the expert
10  reports or something, it might have been attached
11  I wouldn't have focused on it
12  Q  Okay  Do you know Armand Cooter?
13  A  No.
14  Q  Never met him?
15  A  Nope
16  Q  Do you belong to any matrimonial lawyer
17  associations?
18  A  Most years I belong to the family law
19  section of the American Bar Association if I
20  remember to send my dues in.
21  Q.  Have you attended any of their meetings or

Page 14

1  seminars --
2  A  I've spoken -- I'm sorry
3  THE REPORTER:  You're interrupting his
4  question  Do you want to start again, please?
5  Q  I didn't -- I was trying to be inclusive
6  and so I was -- you didn't realize I was continuing
7  my question  Please answer as best you can
8  A  I have spoken at CLE sessions sponsored by
9  the family law section
10  Q  Of the American Bar Association?
11  A  Of the American Bar Association  Yes
12  Q  Do you have any materials that you
13  prepared for any of those presentations?
14  A  I don't know
15  Q  Can you -- when is the last time you did
16  such an activity?
17  A  Probably six years ago or maybe a bit
18  more
19  Q  Okay  Can you recall the last topic that
20  you presented?
21  A.  It would have had to do either with

Page 15

1  unified family courts or something concerning child
2  custody
3  Q  Is there an area of focus in your own
4  studies or educational activities that you tend to
5  focus on within the broad spectrum of divorce or
6  matrimonial law, a subspecialty, if you will?
7  A  I would probably be regarded as focusing
8  more on issues concerning children  But I'm the
9  author of the chapters on marital property or the
10  chapter on marital property in the case book of
11  which I'm a coauthor
12  Q  Okay  And that's referenced in your
13  publications?
14  A  West publications, yes.
15  Q  What courses do you teach or have you
16  taught in the last five years?
17  A  I teach family law  I teach a course
18  called Child, Family and State  I have taught
19  evidence, although I may not have taught it in the
20  last five years  And I usually teach a seminar on
21  constitutional issues that bear on families and

Page 16

1  children  That changes from year to year in terms
2  what the topic --
3  Q  Families with children, is that what
4  you're saying?
5  A  Families and children --
6  Q  And children
7  A  -- and the way in which constitutional
8  rights come into play.
9  Q  Have you conducted any seminars or
10  advanced courses that are more of an individual
11  study nature, not just classroom presentations?
12  A  Not advanced courses  We don't have room
13  in our curriculum for advanced courses on family
14  law  But I have supervised quite a few students who
15  have done independent research under my supervision
16  Q  What areas, specifically, have you worked
17  with students on research?
18  A  Over the years, quite a range of family
19  law-related topics
20  Q  Give me a feel for how many we're talking
21  about  Are we talking a dozen or several dozen?

4 (Pages 13 to 16)

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

**Page 17**

1    A    Several dozen.
2    Q    Okay. Have you given any presentations to
3    any District of Columbia bar group?
4    A    No.
5    Q    Have you attended any of the District of
6    Columbia matrimonial bar functions?
7    A    No.
8    Q    Have you -- have you maintained any
9    professional associations with any matrimonial bar
10   groups in New York?
11   A.    No.
12   Q    And just so I'm clear, are you a member of
13   the D.C. bar?
14   A    No.
15   Q    Okay. So you have never represented,
16   other than that one pro bono matter, anybody in the
17   District of Columbia?
18   A    The pro bono matter was in New York.
19   Q    In New York. Right.
20   A.    I'm not licensed in the District. I would
21   have needed to file a motion to appear. I wouldn't

**Page 18**

1    practice in the District without a license.
2    Q    Now, you were a professor of law at the
3    University of Pennsylvania; is that correct?
4    A    I was a visiting professor.
5    Q    And you were there for the 2001/2002 time
6    period?
7    A    I was teaching at the law school for the
8    Fall term. I taught their family law course. I was
9    associated with the university for the full year in
10   my position as senior legal consultant to an
11   interdisciplinary group working on children's
12   issues.
13   Q    And did you ever practice in the State of
14   Pennsylvania?
15   A.    No.
16   Q    And you never became a member of the
17   Pennsylvania bar?
18   A    No.
19   Q    That was while you were still associate
20   professor here, I gather?
21   A.    Yes.

**Page 19**

1    Q    That was --
2    A.    I was a tenured associate professor at
3    that time.
4    Q    So you were an associate professor here
5    from '96 to '99, then was there a break or was that
6    contiguous --
7    A.    No, then I received tenure, and then I
8    became a tenured associate professor.
9    Q    What occurred between June of '99 and July
10   of 2000?
11   A    I'm sorry. Where are you?
12   Q    I'm looking at your Exhibit 1, your CV,
13   from -- you're saying from 2005 to the present
14   you've been a professor
15   A    Well, that's very interesting.
16   Q.    But there seems to be a gap --
17   A    Yeah, I have --
18   Q    -- of a year in there.
19        THE REPORTER: You have to let him finish.
20   One at a time.
21        THE WITNESS: Thank you.

**Page 20**

1    A    I have a mistake on my CV that nobody else
2    has caught. It's been there probably for years.
3    That would be actually until June 2000.
4    Q    So it was continuous. You --
5    A    Yes.
6    Q    -- were not on hiatus in there?
7    A.    No.
8        THE REPORTER: Please let him finish his
9    question
10   Q    Have you ever prepared any presentation
11   notes or outlines related to either the concepts of
12   enhanced earnings and enhanced earning capacity or
13   celebrity status in the State of New York?
14   A    If I have, it would have been in
15   connection with my teaching
16   Q    Do you recall one way or the other if you
17   have?
18   A    I know that I have covered those topics
19   some years. I certainly teach the Holterman case.
20   And to that extent, I have some lecture notes. I
21   don't know.

*Corbin & Hook Reporting and Videoconferencing*
*410-268-6006  1-866-337-6778*

*Deposition of Catherine Ross, Esq*
*Taken on November 14, 2007*

**Page 21**

1  Q    You want to give her the spelling on any
2  cases you cite
3  A    Sure  H-O-L-I-E-R-M-A-N, maybe two Ns,
4  I'm not sure  I just don't know how comprehensive
5  my notes for my class lectures on that topic would
6  be  Sometimes they are a line or two, and sometimes
7  they are more detailed.
8  Q    Have you ever in your presentations or
9  teaching gone into a comparison of projected
10  outcomes for litigants regarding the issues of
11  enhanced earnings capacity or celebrity status,
12  comparing the District of Columbia law and the New
13  York law?
14  A    No  I hat really wouldn't come up  Excuse
15  me  I would like to supplement one of my answers
16  Q    Sure
17  A    There actually is a teacher's manual that
18  goes with the textbook, and in the teacher's manual
19  I'm sure that I have written something about the
20  Holterman problem
21  Q.    Okay.  Since the textbook is obviously

**Page 22**

1  readily available and the teacher's manual isn't,
2  could we get a copy of that portion?
3  MR. SIMPSON:  We'll take the request under
4  advisement and respond to it
5  MR. WHITWORTH:  Okay.
6  Q    Now, you were also a visiting associate
7  professor of law at Boston College; is that correct?
8  A    Yes
9  Q    And you didn't become a member of the bar
10  in Massachusetts or represent anybody there either?
11  A    No
12  Q    When you were with that firm from '87 to
13  '94, the Paul Weiss, et cetera, firm, did you
14  actually try any cases in court?
15  A    Yes
16  Q    What kind of cases?
17  A    I tried a case involving the hazards in
18  congregate shelters for homeless men  Received an
19  injunction against the City of New York that was
20  reported on the front page of the New York Times.
21  I tried another case, I took over another

**Page 23**

1  case in the middle of trial, a case I had not worked
2  on in preparation, because the lead attorney on that
3  case was pregnant and was unable to continue  And
4  that involved the failure of the City of New York to
5  comply with laws regarding the services that had to
6  be provided to people being released from
7  psychiatric hospitals  From public psychiatric
8  hospitals
9  The corporate matters in my firm almost
10  never went to trial  So it was largely a motion
11  practice, and I did argue quite a few motions
12  Q    So there was never a domestic matter that
13  you were even in court on on motions; is that
14  correct?
15  A    A matrimonial matter?
16  Q    A matrimonial matter
17  A    No.
18  Q    So when I went to law school, they called
19  it domestic relations in Maryland  What do they
20  call it here?
21  A    Family law.

**Page 24**

1  Q    Family law  It's broader than just
2  matrimonial then?
3  A    That's why I asked  My question intended
4  to clarify.
5  Q    Now, when you were at Yale, did you do any
6  representation of clients?
7  A    As a law student?
8  Q    Yes
9  A    Yes  I participated in a prisoners'
10  rights clinic
11  Q    But nothing in the matrimonial law area?
12  A    No  I also prepared expert testimony
13  while I was a law student for a pro bono matter
14  involving medical coverage for reproductive medical
15  care  That was brought by the Connecticut Civil
16  Liberties Union
17  Q    Okay  I have a second exhibit that I
18  would like you to look at that is just a few
19  paragraphs about your background, and that was
20  within, it's in the materials that was provided, and
21  I was -- wanted to ask you what the origin of that

*6 (Pages 21 to 24)*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

**Page 25**

1 document was
2   A. I believe that I wrote this in response to
3 a request from either Rick or Meredith for a brief
4 description of my bio
5   Q So it was prepared for this case?
6   A Yes. It was redacted from other
7 descriptions I've used different lengths,
8 different levels of detail.
9   Q It's intended as a summary?
10  A Yes.
11  Q There is a few questions that are
12 typically asked of an expert deponent that I'm going
13 to ask you now, so don't take offense I need to
14 know if you have ever been convicted of a crime
15  A No.
16  Q I need to know if you've ever had a public
17 censure, reprimand, suspension or disbarment
18  A No.
19  Q And I need to know if you've ever been
20 sued, and I think we covered that, but related to
21 anything in the practice of law?

**Page 26**

1   A No
2   Q Been a part of any malpractice litigation,
3 anything like that?
4   A No. And just to clarify, the prior
5 litigation, the personal litigation, I was a
6 Plaintiff
7   Q I understand I'm going to jump ahead a
8 little bit out of order here in the terms of the
9 numbering of the documents I have an Exhibit 6
10 that I have had marked, and you may not have seen
11 this, but it has a list of items that I have
12 requested that counsel for the Defendant provide to
13 me regarding each of their experts
14     And if you will turn to the top of
15 actually the sixth page on here, you will see
16 beginning with No 18 things that I have requested
17 that they provide for each of the experts And I
18 want to just go -- use this as a bullet point so we
19 can make sure we covered all these things
20  A Sure
21  Q. I have been provided with a whole sheaf of

**Page 27**

1 documents I just want to make sure it was
2 complete
3   A Uh-huh
4   Q The first item was all written reports of
5 each person expected to be called as an expert
6 witness of which, of course, you are one And I
7 have, of course, the written report in its final
8 form and what appear to be drafts with specific
9 dates on them which we'll address in a few moments.
10    MR SIMPSON: If I can interrupt for just
11  one second May I see the exhibit?
12  A (Complies)
13    MR SIMPSON: Okay. Thank you.
14    MR WHITWORTH: You have a copy there
15    MR SIMPSON: Where are you?
16    MR WHITWORTH: On Page 6, Item 18
17    MR SIMPSON: Thank you
18  Q The drafts that we've been provided are in
19 the February time period Did you provide -- did
20 you make any drafts that were not provided to
21 counsel for the Defendant?

**Page 28**

1   A No
2   Q How were the drafts done? Were they
3 dictated or hand-typed yourself? How did you
4 prepare them?
5   A I entered them onto a computer.
6   Q So you hand did them by yourself?
7   A Hand, yes I did not use a secretary
8   Q Okay Thank you Did you make any notes
9 while you were reviewing the cases or doing your
10 research?
11  A I produced to Ms Bank's attorneys all of
12 the handwritten notes that I ever made and that I
13 had in my file
14  Q Let's address those notes for a moment
15 just to make sure we have them all I have marked
16 as Exhibit 5, and just keep that other exhibit
17 handy, because we'll finish that checkoff list --
18  A Yes
19  Q -- what I have gleaned from all the
20 materials that I was provided that were -- appear to
21 be your notes. Would you tell me, please, what

*7 (Pages 25 to 28)*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 29

1  document that is, has the No. 960 on the bottom
2  right-hand corner, which is the first page of
3  Exhibit 5, what that is?
4      A    This appears to be notes that I made in
5  connection — in preparation for a phone call with
6  Rick
7      Q    Meaning Rick Simpson?
8      A    With Rick Simpson
9      Q    Defense counsel?
10     A    And notes that I made during that
11 conversation.
12     Q    Do we -- I see something down there, it
13 looks to be a date, 2/9 --
14     A    No
15     Q    -- 10-page better, what is that about?  If
16 you can clarify it
17     A    It's not a date
18     Q    Thank you
19     A    What I recall is — what we had originally
20 discussed because he retained — I was retained.  I
21 think we had our first conversation around the third

Page 30

1  week of January  Although I'm not certain, because
2  now that I'm not in practice, I do not keep a
3  diary.
4         And the letter was needed in early
5  February  And so, when we talked initially, we
6  discussed perhaps doing a preliminary opinion letter
7  that could be supplemented later, depending on how
8  complicated it turned out to be.
9         And so, as we were talking, what I recall,
10 as I said, when you mean a short preliminary letter,
11 do you mean a two-page summary or, you know, a
12 nine-page summary?  He said, 10 pages would be
13 good  That's what those notes.
14     Q    Maybe he figured that would be longer than
15 my attention span
16     A    I doubt that very much.
17     Q    Maybe sometime I'll get to ask him why 10
18 pages as opposed to 9
19     A    I was really trying to get at the level of
20 detail that he wanted in the first letter, although
21 it turned out to be sufficient for what was needed.

Page 31

1      Q    Now, I have gotten a dearth of material
2  about your billing and your activities in this case
3  other than these few notes and this summary invoice,
4  and I'll just refer to that as Exhibit 9 which I've
5  marked
6      A    Uh-huh.
7      Q    Is there anything else other than
8  Exhibit 9 that in any way evidences what work you
9  actually did in terms of the dates you worked on it,
10 the time you worked on it, what sources you went to,
11 that sort of thing?
12     A    No
13     Q    Why not?
14     A    Because I am not - when I was in practice
15 at a large firm, I kept a very detailed diary  That
16 was required  There was — those were entered into
17 a computer  I could always go back and find out
18 what I had done with every five minutes of my time.
19 That is not how I work at present
20        So I keep very informal notes on the
21 number of hours that I've worked on a matter like

Page 32

1  this  And I know what I have done, but I don't need
2  to reduce it to writing, because I don't need to
3  share it with anyone else
4      Q    Well, in this case, if you've made notes
5  contemporaneous with your activities, I believe they
6  are within the scope of what we've requested
7      A    I did not make notes about what I was
8  doing.  I make notes that I actually do not retain
9  after I enter them into the total that's going to go
10 on my bill  They are like little stickies.  I don't
11 have the little stickies
12     Q    And I didn't see like a letter of
13 retainage  I may have missed it, but was there some
14 engagement letter or something that was done by
15 either party in this case for your engagement?
16     A    I don't believe so.
17     Q    Tell me how it came about that you were
18 retained
19     A    By oral agreement
20     Q    When was the call?
21     A.   As I said, I first spoke to Rick  I believe

8 (Pages 29 to 32)

*Deposition of Catherine Ross, Esq*
*Taken on November 14, 2007*

1   roughly the third week in January. He gave me the
2   general outlines of the issue.
3       Q    Orally over the phone?
4       A    Orally over the phone. We agreed to talk
5   a few days later, because I wanted to think about
6   whether this was something I wanted to do. And I
7   also wanted to find out what kind of time commitment
8   would be entailed. And then we needed to talk about
9   my fee.
10      Q    Did he tell you how it was that he
11  happened to make the call to you?
12      A    I believe he knows the dean of my law
13  school.
14      Q    Okay. Who is that?
15      A    Fred Lawrence
16      Q    Do you know if Fred Lawrence recommended
17  you or gave him your name?
18      A    I don't know.
19      Q    Had you ever heard of Joseph Stiglitz
20  before?
21      A.   Yes.

1       Q    What context were you familiar with his
2   name?
3       A    I knew of him as a leading economist. My
4   husband is on the faculty at Columbia University.
5   My son a few years ago when he was taking an
6   economic course at Harvard forwarded me an article
7   written by Stiglitz that he thought I would find
8   interesting.
9           And also put me on a -- not a blog, but
10  some sort of e-mail mailing list from which I get a
11  report every six weeks or so that Stiglitz and
12  another economist, whose name escapes me, put
13  together articles or summaries of recent research by
14  other economists, not their own research, that might
15  be of interest to people who read things like the
16  Wall Street Journal.
17      Q    Do you recall what the article was your
18  son sent you?
19      A.   I don't.
20      Q    Did it have anything to do with
21  matrimonial or domestic law at all?

1       A    No.
2       Q    It was purely an economic issue?
3       A.   Yes.
4       Q    And your interest, is it related at all to
5   your professional activities or more just interest
6   in investing and the economy in general?
7       A    Both.
8       Q    Has anything that's been published or that
9   you have read that Doctor Stiglitz has written been
10  utilized by you in any of your courses?
11      A.   No
12      Q    Has -- are you aware of anything that he's
13  written that in any way relates to domestic or
14  matrimonial law?
15      A.   No.
16      Q    Was this before or after he became a Nobel
17  Prize winner, if you recall? That was, would have
18  been in October of '01 that it was announced and
19  prize monies were distributed the following --
20      A    After.
21      Q.   -- early the following year. After that

1   point?
2       A    Yes.
3       Q    So you were aware he was a Nobel Prize
4   winner then?
5       A.   I don't recollect clearly. I knew he was
6   an important economist
7       Q    Were you aware of his tenure in D.C. as in
8   the Clinton administration or the World Bank?
9       A    I probably was aware. I'm not sure -- I
10  could have, you know, easily pulled that together if
11  I hadn't been reminded of it. But I am something of
12  a news junkie, so I was aware of people in major
13  roles in the administration.
14      Q    I will go ahead and throw it out there
15  Did you think he was a celebrity?
16      A    Absolutely not.
17      Q    Okay. Why not?
18      A.   I'm interpreting your question to mean a
19  celebrity within the meaning of New York law. And
20  celebrity —
21      Q.   That was a fair interpretation.

9 (Pages 33 to 36)

### Page 37

1     A   I would have answered no even if you had
2 meant it in a broader context. He's certainly not
3 going to be on the front page of, you know, Us
4 Magazine. But in the context of New York law, the
5 scope of celebrity has been confined to
6 entertainers.
7     Q   No one other than entertainers?
8     A   No one other than entertainers.
9     Q   And you're talking about reported
10 opinions; is that correct?
11     A   Yes.
12     Q   Because, in fact, you don't know what's
13 gone on in the matrimonial courts where the files
14 are sealed; do you?
15     A   No.
16     Q   So, in fact, someone other than an
17 entertainer could have been determined to have been
18 a celebrity under New York law that would not have
19 necessarily been a reported opinion?
20     MR. SIMPSON: Object to the form
21     Q.   Isn't that true?

### Page 38

1     THE WITNESS: Are you instructing me?
2     MR. SIMPSON: No. No. You can answer
3 I'm just object to the form of the question
4     A   It -- all things are possible. However,
5 as far as the doctrine is concerned, the only thing
6 that is relevant is reported opinions. And I would
7 say beyond reported opinions, we sometimes have
8 small clips in the New York Law Journal which might
9 not cover a sealed matrimonial opinion, but
10 certainly go beyond formally published opinions
11     And since this has been a subject of great
12 interest to the New York bar, I would be -- and all
13 of the published discussions of the doctrine cite
14 the very small number of cases, there are also
15 reported cases declining to extend celebrity status
16 beyond the very narrow framework in which it has
17 been found So I'm relying on those reported cases
18 as well.
19     Q   Now, you will agree with me, I would
20 think, that a court could make a determination of
21 enhanced earning capacity for a spouse without

### Page 39

1 finding celebrity status; is that correct?
2     A   Absolutely.
3     Q   So is it fair to say that celebrity status
4 is one way that you could find an enhanced earning
5 capacity?
6     A   Yes. Let me just say I would not put it
7 that way, but one could
8     Q   I will bite How would you put it?
9     A   The celebrity status cases have a couple
10 of components And one is that in all the
11 instances, three reported cases, one in New Jersey,
12 in all the instances the spouse has contributed
13 directly through services to — the noncelebrity
14 spouse has contributed directly to the career of the
15 so-called celebrity spouse I would distinguish
16 that from other enhanced earnings cases
17     Q   And based on the facts that you've been
18 given -- and let me just clarify that. I have
19 Exhibit 3 here that I believe to be a statement of
20 facts that you were working from, and I would like
21 to show that to you.

### Page 40

1     Please identify what I've given to you as
2 Exhibit 3 which also has the identification number
3 of 1349 on the bottom right-hand corner
4     A   Yes. This appears to be the statement of
5 facts that Ms. Bank's attorneys gave me and asked me
6 to work with
7     Q   And as I understand the materials that
8 I've been provided, if my interpretation is correct,
9 you have not reviewed depositions or pleadings or
10 other sources of facts other than Exhibit 3; is that
11 correct?
12     A   Not entirely
13     Q   Tell me what other sources of fact that
14 you're relying on in any way to form your -- any
15 opinions that you hold in this case beyond
16 Exhibit 3?
17     A   On the first page of my opinion letter, I
18 detail some expert opinions that were shared with
19 me
20     Q   Thank you Those were the economic
21 reports done in the underlying case?

*Deposition of Catherine Ross, Esq*
*Taken on November 14, 2007*

Page 41

1    A.  Yes.
2    Q   In addition to that statement of facts --
3    A   Yes, sir.
4    Q   -- does that summarize the sum total of
5  your fact investigation before you did your
6  research?
7    A   Yes.
8    Q   Okay  And all those were provided to you
9  by Ms Bank's counsel?
10   A   Yes.
11   Q   And you had all those before you began
12  your inquest?
13   A.  At some point very early on.
14       MR. SIMPSON: Object
15   A   Yes
16   Q   Have you at any time asked the attorneys
17  for Ms Bank or any -- inquired of any other source
18  of additional factual information in order to
19  supplement what we've identified as your universe of
20  facts?
21   A.  Yes. As my letter indicates, after I had

Page 42

1  already drafted my opinion letter, I asked them
2  whether I could see the settlement agreement, and
3  they shared it with me.
4    Q   And that's a settlement agreement that was
5  done in 2004 in New York?
6    A   Yes.
7    Q   Now, have we identified your total source
8  of facts upon which you base your opinions?
9    A   Yes.
10   Q   Let me go back to Exhibit 9  I apologize
11  for hopping around, that's your invoice, but I'm
12  trying to piece this together  So you kept small
13  pieces of paper, little yellow Post-it notes, that
14  you then at some point gathered up and totaled up
15  and came up with the 26 hours and 45 minutes?
16   A   Yes
17   Q   Did you keep it like in 10-minute,
18  15-minute intervals, or what's your increment?
19   A   10 minutes.
20   Q   10 minutes  Okay  Which makes it a
21  little tough to come out with 45 minutes, but in any

Page 43

1  case, and how --
2    A.  Excuse me.
3       MR. SIMPSON: Objection
4    A   That is not correct  Because if I worked
5  45 minutes, I didn't round it up to 50
6    Q   Okay
7    A   And on a project like this, I tend to work
8  in fairly concentrated periods.
9    Q   So you did it in blocks of time?
10   A   Yes
11   Q   How much before February the 9th were you
12  retained? Was it two or three weeks or --
13       MR. SIMPSON: Objection
14   Q   You indicated that you thought you had
15  been called in January, but I was just trying to
16  get --
17   A   Yes
18   Q   -- when in January?
19   A   I told you I thought roughly the third
20  week of January.
21   Q   So it was only a relatively couple of

Page 44

1  weeks time then?
2    A   It was a --
3       MR. SIMPSON: Object to the form  Asked
4    and answered
5    A   Yes
6    Q   This 26 hours was done within a couple of
7  week -- two-week time period?
8       MR. SIMPSON: Objection
9    A   Yes.
10   Q   Okay  And how did you derive your hourly
11  rate?
12   A   Based on the last -- two things  Based on
13  the last time I had served as an expert witness,
14  based on what I had been paid for consultations not
15  as an expert witness but for other purposes  And
16  the -- what I am accustomed to being paid when I do
17  work that is requested by other people that is not
18  the work that I would normally pick up and choose to
19  do as a professor.
20   Q   And I take it as a professor at your
21  university, there are no restrictions on your

11 (Pages 41 to 44)

*Deposition of Catherine Ross, Esq*
*Taken on November 14, 2007*

Page 45

1  outside work?
2  A    The formal requirement is no more than 20
3  percent of your time over the course of the academic
4  year  In other words, roughly one day a week
5  Q    Okay
6  A    But you can work during a two-week period,
7  more than two days
8  Q    A concentrated amount
9  A    Yes
10  Q    I understand  Now, I see your address is
11  in New York  Is that your residence?
12  A    Yes
13  Q    And what, you commute down here to teach?
14  A    Yes
15  Q    During the year, this past year, let's say
16  the 2007 year, have you approached that 20 percent
17  of outside activities?
18  A    Nowhere near
19  Q    So you keep it at a significantly lower
20  level than the maximum you're allowed to do?
21  A    Yes.

Page 46

1  Q    Okay  Let's go back to Exhibit 5, those
2  notes we were looking at a few moments ago  It's
3  the one with your handwritten notes there  Some of
4  your writing is readable to me  Some is not  Why
5  don't you just read through what Exhibit 5 says?
6  A    I appreciate your tact  Okay
7  Q    And what I would like you to do is read
8  what it says --
9  A    What it actually says and then explain
10  it?
11  Q    Not the shorthand
12  A    Absolutely
13  Q    Just what that shorthand means
14  A    Okay  Up in the upper right-hand it says
15  two hours  It says, Rick, need more facts, re
16  timing of work leading to prize
17        On the right it says args, I believe, but
18  I am not certain, it says fight against something
19  marital P property
20  Q    Do you know what that reference is?
21  A    Yes  That would be I think when Rick and

Page 47

1  I spoke, he was telling me that Stiglitz was arguing
2  that the prize was not marital property based on the
3  timing
4        Then under that, nature of settlement
5  Q    Is that a question that you were asking?
6  A    Yes  What were the terms of the
7  settlement
8  Q    And then the next, the two bullet points 1
9  and 2 there with arrows?
10  A    Yeah  This was a -- I believe at a very
11  early point in my thinking, and I was thinking how
12  do I structure my findings  What's the best way to
13  compare the two jurisdictions
14        In other words, point-by-point on each
15  item of law, or the approach that I ultimately used
16  which is, one, to show a D.C. court could have
17  awarded -- arrived at, arrived at similar result by
18  different route  Two, to show that -- reading it in
19  the actual words, to show outside scope of unique
20  New York jurisprudence
21  Q    What do those two items mean first in

Page 48

1  terms of were they your thoughts or something that
2  Rick said to you?
3  A    They were my thoughts
4  Q    And what does particularly that second
5  item mean?
6  A    Well, I was certainly before having
7  researched it completely familiar with the notion of
8  celebrity status in New York  And my initial view
9  was that this -- that Stiglitz would not fall within
10  that  And that, therefore, I would need to explain
11  why he didn't
12  Q    How about enhanced earnings, were you
13  focusing on that at all?
14  A    Not at that point
15  Q    Okay  Were you aware that enhanced
16  earning capacity was an issue in his case in New
17  York?
18        MR. SIMPSON: At the time of his --
19  Q    At the time of this
20  A    I am not certain when I focused on it  I
21  believe that in our early conversation, Rick had

12 (Pages 45 to 48)

*Deposition of Catherine Ross, Esq*
*Taken on November 14, 2007*

Page 49

1  asked me something about, you know, was I familiar
2  with the celebrity goodwill notion, and I was. And
3  I'm not sure whether we got beyond that in the
4  conversation  This was very early
5  Q    And then the next notations there ending
6  in the items MY, and then the circled amount or
7  numbers, what is that about?
8  A    Okay  When we then spoke on the phone,
9  these were my notes of what I wanted to just -- I
10  had these two questions, and then I also just wrote
11  down my current thinking. I'm not sure whether I
12  actually shared that with him or not in our
13  conversation
14      I pulled this piece of paper in front of
15  me when we were on the phone  And I believe I asked
16  or he volunteered that there would be competing --
17  no, there were competing experts in New York  So,
18  this was I guess before I saw the expert reports
19  And he said, one or two, you know, on each side
20  Something like that
21  Q    And what's the circled indication down

Page 50

1  below the things  the information we already
2  discussed about the 9 or 10-page length?
3  A    It's says formal opinion letter  Formal
4  OP letter later.
5  Q    Over on the left-hand side there is a
6  No 5 appears to be 515K  What do those relate to?
7  A    That I was asking $500 an hour  And that
8  I wanted a minimum number of hours that would amount
9  to $15,000.
10  Q    And as of that bill, Exhibit 9  you showed
11  me or we discussed earlier, you hadn't quite gotten
12  there but you felt with the additional work you
13  will. so that will be --
14  A    Actually, no.  They agreed to 500 an hour
15  but not to 15,000 guaranteed
16  Q    Okay  And you were willing to go forward
17  anyway?
18  A    Yes
19  Q    Okay  And your hourly rate for your time
20  in deposition is the same as your hourly rate for
21  doing the other work?

Page 51

1  A    Yes
2  Q    And I take it that same rate will apply if
3  you testify at trial?
4  A    I would assume so.
5  Q    Let's continue through the notes if we can
6  just to accomplish that task  Can you tell me in
7  sequence, if you can just look through these, are
8  these in some chronological order one way or the
9  other, or are they just random in the order that I
10  have them here? I put them in the same order they
11  were numbered and given to me
12  A    If you will give me a minute to review
13  them
14  Q    I will give you a minute to look at them,
15  sure
16      (Discussion off the record )
17      MR  WHITWORTH:  We can take a break
18      MR  SIMPSON:  Okay
19      (Whereupon a brief break was taken, after
20  which the following was heard:
21  Q    Before we took a break, I was asking you

Page 52

1  to look through your notes and tell me if, first, if
2  they were in some sort of time sequence
3  A    These notes appear to be in the correct
4  sequence.
5  Q    Meaning the one on the top is the
6  earliest?
7  A    No.  Meaning the one that we already
8  discussed actually is out of order
9  Q    Thank you
10  A    But the next three sheets are in order
11  Q    In which order?  In other words, is it --
12      MR  SIMPSON:  Which is the oldest, you
13  mean?
14  Q    The 961, 962, and 963
15  A    961 and 962 come first  The 960 comes
16  after 962  And then 963 would be the last set of
17  the notes
18  Q    Okay  Let's go through then first with
19  961, and tell me what the occasion was for these
20  notes and what they indicate
21  A    This was my first conversation with Rick.

*13 (Pages 49 to 52)*

*Deposition of Catherine Ross, Esq*
*Taken on November 14, 2007*

Page 53

1  Q  Okay
2  A.  My notes
3  Q  That's in that third week of January time
4  period?
5  A.  Yes.
6  Q  And this is when he's just telling you the
7  overview and the parties, that sort of thing?
8  A  Uh-huh  Yes.
9  Q  Tell me what they specifically say and
10  stating the complete statement for any abbreviations
11  you may have used
12  A.  Okay  Right at the top it says he's a
13  friend of Fred's, that would be my dean
14  Q  Rick is?
15  A.  Huh?
16  Q  You mean Rick is?
17  A  That Rick is a friend of Fred's
18  Q  Say hi to Fred for me
19  A  Exactly  So that's where I formed the
20  impression that perhaps Fred had mentioned me
21  On the top here, New York.  He wanted to

Page 54

1  know was I admitted to New York, I guess
2  202-662-203 something.  Is that perhaps Rick's
3  number?
4  And he told me that he's in a firm that --
5  a civil litigation firm that does general
6  litigation, mostly professional liability,
7  especially lawyers  Coverage litigation.  And that
8  he was working with Meredith Werner on this matter
9  And after he had briefed me, I think on
10  the top here, I wrote, we should talk on Thursday
11  afternoon.  I should call him on Thursday  He would
12  be in his -- he would be in and reachable  And --
13  Q  After the legal malpractice case in D C,
14  needs expert, the W stands for with?
15  A  Witness.
16  Q  Witness  Thank you  What's the rest of
17  that?
18  A.  For the general case  Initially, when he
19  told me -- again, this is my recollection  When he
20  told me that it was a legal malpractice case,
21  involving issues such as standards of care, I said

Page 55

1  that I would not be the right expert for that
2  question
3  Q  And why was that?
4  A  I guess I was interrupting him, because I
5  don't work in the area of professional
6  responsibility  And he said, no  So he was saying
7  we need an expert witness for the general case.  And
8  he said, no, no.  That wasn't what I had in mind
9  There is somebody else we use, whatever, for that
10  And he said, this is a pure legal
11  question  So then he gave me the facts that lay
12  behind the pure legal question  He wanted to ask me
13  about family law in the two jurisdictions.
14  Q  So your expertise was focused purely on a
15  legal question of analysis of law?
16  A  Yes.
17  Q  And then he told you his client was Rita
18  Bank, lawyer in D C, matrimonial law; is that what
19  that says?
20  A  Yes
21  Q  The client, meaning Rita's client, was

Page 56

1  Joseph Stiglitz is suing her and it was versus Jane
2  Hannaway was the --
3  A  With reference to the case Stiglitz V. --
4  Q  The underlying case name?
5  A  Yes
6  Q  What's that, Bank represented Stiglitz?
7  A  Yes.
8  Q  What's the next line there?
9  A  He left in June in D C or something and
10  then he moved to New York  Joe moved to New York.
11  Q  Lived in D C  Is that what it says?
12  A  No  I believe it --
13  Q  June in D C
14  A  June in D C
15  MR. SIMPSON:  Jane in D C ?
16  THE WITNESS:  Oh, Jane in D C  Thank
17  you
18  MR. WHITWORTH:  Thank you, Rick
19  A  We may need to get one of my former
20  secretaries in here actually  Okay  Jane in D C
21  Joe moved to New York.  Negotiations over the --

14 (Pages 53 to 56)

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 57

1  regarding divorce in D.C.
2    Q   Please continue
3    A   Hannaway sued Joe in New York  Litigated
4  in New York and settled  Joe sued Rita for
5  malpractice  One, she should have filed in D.C.
6  before he was sued in New York  He says he
7  instructed her
8        Hannaway deposition supports our client,
9  Rick's client  Issues re what was nonmarital  He
10  had girlfriend  Standard of care  Question,
11  differences between New York and D.C. law  Stiglitz
12  contends New York recognizes celebrity status so
13  unfavorable to him  We, Rita's attorneys, argue --
14  the last line is cut off.
15    Q   We need to see the original so we know
16  what the last line is, because it's cut off on the
17  copies we got
18    A   On the left, settled without court
19  opinion  Standard of care in D.C., expert, are
20  arguments regarding equitable distribution, ED,
21  equitable distributions  Ultimate result in range

Page 58

1  reasonable in D.C. if to trial
2    Q   Are these notes on the left things that
3  Rick was telling you?
4    A   I don't remember  I know the one, I know
5  I would have asked him is there a reported opinion,
6  and he said, no, they settled  Not even reported
7  Is there -- did the court issue any opinions that I
8  could see, and he said no  But the other, I'm not
9  sure.
10      MR. WHITWORTH: Counsel, do we have the
11  original available that we could -- she could
12  read what the rest of it looks like?
13      MR. SIMPSON: I don't believe we have it
14  here, but we'll follow up during the next
15  break
16      MR. WHITWORTH: Thank you
17      MR. SIMPSON: So we know where we are
18    Q   Okay  Is there anything else that
19  occurred contemporaneous with these notes that your
20  memory is refreshed from having reviewed them that
21  you haven't stated on the record?

Page 59

1    A   No
2    Q   And I understand from your earlier
3  statement that 962 is a continuation of the notes
4  from 961?
5    A   I believe so  I'm not positive, but I
6  believe so  Yeah  Because I question, first
7  question at the bottom of the proceeding page, now
8  question simple facts to assume  Adultery alleged.
9  Again, simple facts  Legal opinion comparing --
10  compares New York and D.C.
11    Q   Is this what he's telling you he needs?
12    A   Yes.
13    Q   The Q stands for question?
14    A   Yes.
15    Q   Are you asking him to give you a statement
16  of facts?
17    A   No  I'm putting -- he's saying here's
18  what we're looking for somebody to answer these
19  questions  So I'm putting the question what is  He
20  will give me simple facts that I can take for
21  granted.  I don't need to go out and collect the

Page 60

1  facts.  Adultery is alleged.  Simple facts  Legal
2  opinion, compare New York and D.C.
3        While D.C. does not have established case
4  law, some factors can't say division or decision --
5  I'm not entirely sure -- was totally different
6    Q   Again, is this your statement or Rick's or
7  part of a question?
8    A   Part of a question
9    Q   That you made to him?
10    A   I don't know.
11    Q   I mean, off the top of your head, did you
12  understand the issue, or did you need to look into
13  the case law?
14    A   I understood the issue.
15    Q   Could you have given him a written report
16  without spending the 23 hours going into the case
17  law or --
18    A   Not --
19      MR. SIMPSON: Object to the form
20    A   Not as I understand my obligations  No
21    Q.  So you knew the basic concepts, but you

15 (Pages 57 to 60)

*Corbin & Hook Reporting and Videoconferencing*
410-268-6006  1-866-337-6778

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 61

1 needed to review the cases and flesh out the
2 details?
3    A.    That's correct  And one could always be
4 surprised by a recent decision
5    Q    Okay
6    A.    It would be — I would never give an
7 opinion without researching my assumptions  And
8 when I was in practice, I would never have answered
9 even a relatively simple question from a client
10 without checking that my understanding of the law
11 was accurate and up-to-date
12    Q    Okay  And you believe that's an
13 obligation any attorney has representing a client?
14    A    Yes, I do
15    Q    What's the next statement on there?
16    A    Dispel notion New York exceptional  And
17 that was part of the question, it wasn't an
18 instruction  He wanted to know could we dispel the
19 notion
20    Q    So he was asking you this question?
21    A.    Yes.

Page 62

1    Q    What does narrow Q refer to?
2    A    He was emphasizing to me that he didn't,
3 he was not retaining me to look at all of the legal
4 issues in the case  But that there were very narrow
5 group of matrimonial law questions where he was
6 asking me to compare the two jurisdictions
7    Q    And that is summarized in your letter as
8 well; is it not?
9    A    Yes
10    Q    The opinion letter, I'll refer to it, it's
11 dated February 9th?
12    A    Yes
13    Q    Please continue on with what the rest of
14 your notes on 962 referred to
15    A    Oh, that Rick and his colleagues would
16 need to disclose who their experts were somewhere
17 between January 31 and early February  So we really
18 needed to determine quickly whether I was doing
19 this, which was I think why we said we would talk
20 again in a few days  It's in Federal Court  Bank
21 lives in Maryland, and they moved the case to

Page 63

1    Federal Court
2    Q    Did they tell you why?
3    A    No  It wasn't pertinent to what I'd be
4 doing
5    Q    That's fine
6    A    Expert — oh, they were going to do these
7 expert disclosures, then they were going to go to
8 mediation  Something in writing initial opinion
9 somewhere between the 31st and the 7th  And if
10 needed, a more detailed — more —
11    Q    Does that say prior to deposition perhaps?
12    A    Yes  No, no  I was trying to see if it
13 detailed it  I'm not sure what it really says  D,
14 to something, something more, prior to dep
15         On the left, admitted in New York  That's
16 my note  I'm just speaking to him, yes, I'm
17 admitted in New York, and I'm writing notes  I do
18 that when I'm on the phone  It keeps me awake  And
19 that my knowledge of D C law is as an academic and
20 not as a practitioner
21    Q    Page 963, the last of these four pages of

Page 64

1 Exhibit 5 to this deposition, as I recall, you said
2 the sequence is this was the latest --
3    A    Yes
4    Q    -- of the four pages —
5    A    Yes
6    Q    -- after the 960 that we looked at first?
7    A.    Correct
8    Q    Can you tell me the occasion that these
9 notes were taken?
10    A    This is a very early preliminary outline
11 of what I want to put in the letter, how I'm going
12 to structure the letter
13    Q    Then we have a draft of Thursday, February
14 the 8th that I've been provided, and I'm not saying
15 that's the only draft  But — and we know the final
16 letter was dated February 9th  Can you put that in
17 timeframe for me when you did 963?
18    A    Well, let's see  I spent after we had
19 this agreement, I wanted — I looked at the expert
20 opinions.  I did some reviewing of the cases I knew
21 were essential.  Began to shepherdize them to make

16 (Pages 61 to 64)

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 65

1  sure of changes and so forth before I really -- I'm
2  not sure if I did this before I actually started to
3  look at the cases again or whether I did this based
4  on my knowledge of the general outlines of the case
5  law. I'm just really not sure.
6      But I believe I did this as I was starting
7  to read the expert -- the expert evaluations on the
8  property from --
9      Q  The economic experts analyzing Joe
10  Stiglitz's good will.
11     A  I was starting to get a sense of what the,
12  the conflicts and claims were about the good will
13  and the enhanced earning capacity. I think that's
14  when I did this. So --
15     Q  Did you retain any notes from looking at
16  the cases?
17     A  No. I gave you all of the notes. What I
18  do is sometimes I write notes in margins. And I
19  gave Ms. Bank's attorneys everything I had that had
20  handwritten notes on it to produce.
21     Q  So the cases that we got that might have a

Page 66

1  note or underline on them, those are the totality --
2     A  Those are my notes.
3     Q  -- of the notes that you made on those
4  cases?
5     A  That's correct.
6     Q  Did you highlight things in yellow?
7     A  I gave them everything that I had marked
8  up.
9     Q  Well, the reason I ask, if you highlight
10  things in yellow, because they don't come across in
11  photocopying, that's why I'm trying to find that
12  out.
13     A  I may have. I more commonly underline
14  with a pen.
15     Q  Okay. Because I highlight things all the
16  time. When you copy them --
17     A  I think I was working with a pen most of
18  the time. I can't say that I didn't highlight
19  anything.
20     Q  Thank you.
21     A  So I was just sort of -- because both in

Page 67

1  terms of thinking about how I was going to organize
2  it so that I would know what research I needed to
3  do. So as I think about it, I'm pretty sure this is
4  before I did research, because I was trying to
5  organize what research I needed to -- break it into
6  pieces that I could start to work on and start to
7  reduce some things to writing in my computer.
8      So, you know, first, what was the
9  question? What are my qualifications? A
10  conclusionary statement.
11     Q  What's that mean when you say an
12  exclusionary (sic) statement?
13     A  Well, one, two, three. Qualifications.
14  Three, conclusions.
15     Q  Oh, conclusory statement. Thank you.
16     A  I don't know if you want me to read this
17  to you or not?
18     Q  Yes, go ahead. In case I can't understand
19  something.
20     A  If reach decision in court, each court's
21  -- each court's -- each court -- I'm sorry, no, I

Page 68

1  crossed out each. Courts in each jurisdiction had
2  discretion to reach similar results by different
3  reasoning.
4     Q  And you have a statement in your report to
5  that effect?
6     A  Yes. I didn't find anything that made me
7  decide that I was wrong in that conclusion.
8      Four, Nobel Prize, one case on point is
9  Ketterle.
10     Q  And that was a 2004 case; is that correct?
11     A  Yes. And I said in my opinion, if it had
12  been published in time to bear on this. In other
13  words, they settled, but if they had gone to trial,
14  presumably that would have been later, the court
15  might have been aware of Ketterle, it might not
16  have, depending on the timing.
17     Q  Were you ever made aware that there are
18  issues in this case about whether they should have
19  gone to court earlier?
20     A  Yes.
21     Q  So you discounted that entirely?

17 (Pages 65 to 68)

*Deposition of Catherine Ross, Esq*
*Taken on November 14, 2007*

Page 69

1    MR. SIMPSON: Object to form
2    A.  No. That wasn't the question that I was
3    asked
4    Q   I got you
5    A.  The only question I was asked was what is
6    the difference in law in the two jurisdictions
7    What difference would it have made to the outcome if
8    they had proceeded in D.C. as opposed to New York
9    I was not asked about the timing
10   Q   Okay  But you will concede because you
11   mentioned it in your report that, for example, the
12   D.C. law section you cited in your report was
13   October of 2004, changed in the previous section, in
14   the previous iteration of that?
15   A   I remember it changed in the Fall. I
16   don't remember exactly which year offhand.
17   Q   We will go over that later
18   A   Yeah. So yes, there certainly might be a
19   question which that, too, would have applied
20   Okay. Distinguish work during M, marriage
21   Q.  Where are you reading now?

Page 70

1    A   I'm reading right to the right of the word
2    Ketterle. I'm sorry  Which is K-E-T-I-E-R-L-E.
3    And I was aware of that case before my first
4    conversation with Rick. Distinguish during M,
5    marriage, arg life course.
6    Q   What's that mean?
7    A   It's my shorthand for expectations of
8    future earnings based on enhancement of reputation
9    and professional good will and accomplishments
10   during the marriage
11   Q   Thank you  Immediately to the left of
12   that item are some notes, looks like may be a
13   question mark or something there
14   A   Uh-huh
15   Q   Would you clarify what those notes refer
16   to?
17   A   CF, the Nobel, to stock options
18   Intangible  Accumulated things  Patents
19   Copyrights
20   Q   You were just writing down some examples
21   of things that would be intangibles?

Page 71

1    A.  Yes, and that increased your earning
2    capacity  And also that represent things that where
3    you are rewarded in a form that may be difficult to
4    value today for work that you performed during the
5    marriage and where it is clear that the payoff down
6    the road is marital property.
7    Q   Did you ever focus on the issue that Joe
8    Stiglitz claimed that the work that led to the Nobel
9    Prize was all premarital work?
10   A   I did.
11   Q   And how did that factor if at all into
12   your opinion?
13   A   Well, I said in my opinion that ultimately
14   that would have been an issue at trial, in which
15   they would have had to present evidence going both
16   ways  My own view is that it is not very credible.
17   Q   Why?
18   A   First of all, he had several coauthors on
19   the article that actually won the Nobel Prize  They
20   did not win the Nobel Prize.  Secondly, while it is
21   true that the Nobel Prize recognizes specific pieces

Page 72

1    of work, it tends to go to people for — who have a
2    broader reputation and they choose a piece of work
3    as being the most distinguished work
4         And it's my view, although I'm not an
5    expert in how the Nobel Prize is awarded, but
6    certainly if I were representing him at trial on
7    this question and arguing that the Nobel Prize
8    wasn't celebrity, for example, I would say — no
9    actually, let me retract that  I misspoke
10        But the argument would be if he had
11   written that article with his colleagues and decided
12   to go take up pottery in Vermont, I would be shocked
13   if he ultimately won the Nobel Prize.
14        So his continued prodigious productivity,
15   his visibility, I would venture to bet, not being an
16   expert, and including all the work he did during the
17   marriage, contributed to the visibility that
18   reminded the Nobel Prize awarders to look at him and
19   to ultimately award the work for that, the award for
20   that earlier piece of work which he alone got and
21   not his coauthors.

18 (Pages 69 to 72)

*Deposition of Catherine Ross, Esq*
*Taken on November 14, 2007*

Page 73

1   Q    You're aware that there was a period of
2   time that passed between when he did the work that
3   was cited and his marriage to Jane Hannaway; is that
4   correct?
5   A    Yes.
6   Q    And did you as part of your analysis
7   consider what activities he did during that time
8   period versus what he did post marriage to Jane
9   Hannaway?
10  A    No, I didn't. In part because that really
11  wasn't the question I was asked.
12  Q    That's fine.
13  A    And I would like to tell you some of the
14  other reasons.
15  Q    Go ahead.
16  A    Because my reading of the expert reports
17  again convinced me that this was a matter for
18  trial. There were differences as to what the facts
19  were. I don't think it's a question we can answer
20  based on what we know without a hearing.
21      I would also just add that the length of

Page 74

1   the marriage suggests that an awful lot of work was
2   accomplished during the marriage as does his
3   curriculum vitae.
4   Q    Okay. Please continue with the remainder
5   of your notes on 963.
6   A    Five. New York celebrity status. Elkus
7   case E-L-K-U-S.
8   Q    Which, of course, is in your opinion, and
9   we're familiar with it.
10  A    Yes. Might not reach. Limited to
11  achieved during marriage.
12  Q    I need you to explain what you mean by
13  those notes might not reach.
14  A    I didn't -- I was saying I didn't think he
15  would come within the confines of the celebrity
16  status doctrine.
17  Q    Okay.
18  A    Then I moved but without saying so in my
19  notes to this second group of cases that I think
20  you've -- or some of your questions suggest you've
21  collapsed into celebrity status, which are also, if

Page 75

1   not unique, certainly at a high-water mark in New
2   York. And these are the enhanced earnings linked to
3   professional licenses. And then I put CEOs, law Ps,
4   et cetera.
5   Q    What does that mean?
6   A    There are cases involving claims against
7   such people, they do not fit into that doctrine,
8   those are professional license cases
9   Q    P, what is Ps referring to?
10  A    Law Ps, partners.
11  Q    Partners. Thank you.
12  A    People, big high earners where spouses
13  have tried to piggyback on these what I regard as
14  professional license cases, and say that New York's
15  special doctrine extends beyond doctors and so
16  forth, for their schooling and residency, that's
17  what those cases are about, and to other
18  achievements. And the courts have said no, that the
19  doctrine doesn't go that far. So the CEO, Law Ps,
20  et cetera
21      Here if his experts prevailed, the

Page 76

1   question would be status prior to marriage. And --
2   Q    And tell me what that means, just so I'm
3   clear what you're saying.
4   A    Whether his professional status prior to
5   the marriage was as high and his earning capacity
6   was as high as it was some 32 years later when the
7   marriage ended. And I would say that for a person
8   of his current status to say I haven't really
9   achieved much in the last 30 years would be fairly
10  surprising to me.
11  Q    Okay.
12  A    In terms of how people's careers develop.
13  Q    All right.
14  A    Now, this is refreshing my memory about
15  when I made these notes, and why even within the
16  general pathetic nature of my handwriting they are
17  even more illegible. I had taken a number of the
18  expert reports with me on the Acela and -- where I
19  had several quiet hours to read them. And as I was
20  reading about these issues concerning the
21  development of his career from both sides, I made

*Corbin & Hook Reporting and Videoconferencing*
*410-268-6006   1-866-337-6778*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 77

1  these notes on the train.
2  Q  I take it that's how you go and come from
3  your residence to your job?
4  A  Frequently  But that's a nice, you know,
5  three, four hours of uninterrupted time, which could
6  even result in a 45-minute component  So then --
7  pardon my sarcasm  But in D C , different question,
8  looks to future earnings, accumulation of future
9  assets.
10  Q  And what do you mean by that?
11  A  In the District of Columbia one of the
12  factors in equitable distribution is the capacity of
13  each party to accumulate assets in the future.
14  Q  And on a continuum of spouses, Jane
15  Hannaway was particularly well-positioned to have
16  future accumulation; isn't that true?
17  MR  SIMPSON: Object to the form
18  A  Yes  But that isn't the question  The
19  question is the respective capacity of the two
20  spouses going, now going their separate ways
21  Q.  So you're saying Joe's was greater because

Page 78

1  of the Nobel Prize --
2  A  Exactly
3  Q  -- and his other status?
4  A  Exactly
5  MR  SIMPSON: Object to the form
6  A  And that is something that the court
7  could take into account in crafting an equitable
8  division
9  Q  And then what's your -- what, No 6, Point
10  No 6?
11  A  D.C. law equitable  Confer other jurs.
12  And then I had distinguish and, you know, I'm not
13  sure if this says MD or if I started to write MA,
14  which would bring me back to Ketterle, which is an
15  equitable -- if it was MA for Mass, Ketterle is also
16  an equitable jurisdiction, but it is a peculiar one
17  Q  Tell me what the CF other jurisdictions
18  means  Compare?
19  A  Oh, yes, compare other jurisdictions  And
20  the reason that I would put that is that when there
21  is an issue of unsettled law in D.C., they look to

Page 79

1  other equitable jurisdiction states  And they quote
2  quite liberally, they cite to other equitable
3  jurisdictions when they consider new questions
4  Q  It is true, is it not, that D C  does look
5  to Maryland particularly?
6  A  Yes
7  Q  Isn't that what you were indicating by
8  distinguish Maryland?
9  A  I don't remember
10  Q  Well, but D C 's law in terms of equitable
11  jurisdiction is more akin to Maryland's than, say,
12  Virginia; isn't it?
13  A  Yes
14  Q  Of the immediate geographically close by
15  jurisdiction?
16  A  So I might have been saying I should look
17  at Maryland, or I might have been saying talk about
18  Massachusetts, and if necessary, explain the
19  difference between equitable distribution in D C
20  and in Massachusetts  And I really don't remember.
21  Q  I don't recall - and you can correct me if

Page 80

1  I didn't remember everything - you mentioning a
2  comparison with Maryland in your report?
3  A  I don't believe I did, and I know I did
4  look at some Maryland cases  I don't recall finding
5  anything that I thought I needed to deal with one
6  way or the other  And in the cases I was looking
7  at, the D C  court, there was one where they relied
8  very heavily on a Pennsylvania case, which is also
9  an equitable jurisdiction  And it just didn't
10  happen within the cases that I was looking at for
11  this, in preparation of the opinion letter that any
12  of the Maryland cases popped up as being
13  particularly important
14  Q  Now, how do you do your research?  What
15  tools do you use?
16  MR  SIMPSON: Did she use in this case, do
17  you mean?
18  MR  WHITWORTH: Yes  The research in this
19  case  Of course
20  A  Well, I go into West Law or Lexis, one or
21  the other.

20 (Pages 77 to 80)

*Corbin & Hook Reporting and Videoconferencing*
*410-268-6006  1-866-337-6778*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

| Page 81 | Page 83 |
|---|---|
| 1    Q    That's what I'm trying to find out  Do | 1    I printed and did not cite  I did not provide you |
| 2   you subscribe to both services -- | 2   with cases I cited if I did not write on them |
| 3    A   Yes | 3    Q    Okay  In other words, you have cited the |
| 4    Q   -- through the university? | 4   case, but there were no comments that you made in |
| 5    A   Yes | 5   the margins or something like that? |
| 6    Q   Do you know, did you use both in this | 6    A   Yes |
| 7   particular endeavor? | 7    Q    Is there anything else you did in the |
| 8    A   I don't recall | 8   course of your investigation or research that you |
| 9    Q    And I take it your research was done | 9   haven't stated on this record? |
| 10  totally on-line? | 10   A    Well, I read some annotations, some of |
| 11   A   No | 11  which I cited |
| 12   Q   Didn't go to the books or you did? | 12   Q    What annotations did you read that you |
| 13   A   I always go to the books | 13  didn't cite? |
| 14   Q   Tell me what you did in this case | 14   A    I gave them to you if I read them and |
| 15       MR SIMPSON: For legal research | 15  didn't cite them |
| 16   Q    Your legal research  What searches did | 16   Q    They are within the materials that you |
| 17  you make? | 17  provided -- |
| 18   A    I probably looked at some things in | 18   A    Yes |
| 19  Oldham, which I have in hard copy | 19   Q    -- to counsel?  Okay |
| 20   Q    Spell that and reference it | 20   A    Well, if I printed them  I may have |
| 21   A.   O-L-D-H-A-M.  In fact, I cite Oldham. | 21  pulled something up and said this isn't on point, or |

| Page 82 | Page 84 |
|---|---|
| 1   Thomas Oldham  He has a constantly updated summary | 1   I know all of this already |
| 2   of matrimonial law economic distribution issues | 2    Q    Anything else that you did? |
| 3   State by state  Which also has very good footnotes | 3    A    Not to my recollection |
| 4   to leading cases for every concept | 4    Q    Okay  Did you speak with anyone, a |
| 5       I looked at the American Law Institute | 5   colleague, another professor, a research student |
| 6   notes, the comments  Also, to lead me to something | 6   that you exchanged views and exchanged information |
| 7   that I might not have picked up on-line  I started | 7   about your project in this case? |
| 8   of course with cases that I knew, Ketterle and | 8    A    No |
| 9   Elkus, and shepherdized them | 9    Q    When you were drafting, were there any |
| 10   Q    Did you keep your shepherdization notes? | 10  communications that you had with counsel for Rita |
| 11   A    No, I don't  You know, if I do it | 11  Bank or anyone else about the material that was |
| 12  on-line -- | 12  being put into your opinion letter? |
| 13   Q    You don't print those out? | 13   A    No |
| 14   A    -- you're jumping  Yeah, if I printed | 14   Q    The first, I believe, the first draft that |
| 15  them, I gave them to you | 15  I have, and I will show it to you, I have marked as |
| 16   Q    Okay | 16  Exhibit 4, it's February 8 of '07  It's been |
| 17   A    I sometimes print them, but I don't | 17  numbered 939 through 957  Do you know if there was |
| 18  always | 18  a prior draft to this one? |
| 19   Q    Now, were there cases that you looked at | 19   A    There are two issues  One is I didn't |
| 20  beyond the ones you printed that we were provided? | 20  start a new draft every day when I returned to work |
| 21   A.   I provided you with all of the cases that | 21  on this.  So I don't believe there is a prior draft. |

*Corbin & Hook Reporting and Videoconferencing*
*410-268-6006   1-866-337-6778*

Deposition of Catherine Ross, Esq
Taken on November 14, 2007

Page 85

1    Q    In terms of one being printed out?
2    A    Exactly.
3    Q    So this was a work in progress on your
4    screen, on your computer  And obviously, it's quite
5    lengthy, so it took you a while to do it
6    A    Exactly  This was a work in progress,
7    continuing work.  I produced everything that I had
8    printed and everything that I had in my computer. I
9    didn't have anything earlier than this.
10   Q    Can you give me, if not a breakdown, an
11   estimate of how much of that 26 hours and 45 minutes
12   you spent doing the digging, doing the exhuming the
13   law in the cases, annotations and shepherdization
14   versus the writing?
15   A    I would say maybe it's kind of hard to
16   separate out, because I was working on the letter in
17   pieces  So that I would be going from fresh
18   research into the letter to write a paragraph based
19   on what I had just been researching  And then I'm
20   not sure that I could break it down exactly that
21   way.

Page 86

1    Q    Give me a ballpark
2         MR. SIMPSON: Object to the form  If you
3    can give a fair estimate, do that  That's my
4    objection
5         MR. WHITWORTH: A fair estimate is another
6    way of saying it  Certainly
7         MR. SIMPSON: If you're able
8    Q    And I apologize, I inadvertently stapled
9    two drafts together with this exhibit  I didn't
10   intend to do it that way  I thought there were
11   two  And the first one is underneath the second
12   We'll just leave them together as an exhibit
13   That's fine
14        But it's February 5th, so I want to
15   clarify that on the record  That was my oversight
16   I thought I had two.
17        But in any case, we have a February 5th
18   and February 8th version, and so let's start at the
19   bottom of the February 5th one, and it starts at
20   Page 949 --
21   A    I --

Page 87

1    Q    Let me finish, please  It runs through
2    957  Now you may respond?
3    A    The second issue I wanted to mention in
4    terms of the dates is that I -- occasionally this
5    date line might change itself automatically, even if
6    I wasn't doing any work but just opening a draft
7    And so, I'm not entirely sure that the dates
8    accurately reflect the last day that I worked on the
9    particular version, but I'm assuming they did
10   Q    I think I understand what you're saying.
11   But in any case, it's fair to say that the
12   February 5th version preceded the February 8th
13   version?
14   A    I hope so
15   Q    Let's -- focusing at, beginning at
16   Page 949, you have something written in the upper
17   right-hand quadrant there
18   A    Yeah, enter the changes at the office.
19   Q    This is something you had on a laptop, and
20   you were traveling back and forth with?
21   A    I was working in my home office over the

Page 88

1    weekend
2    Q    And at the office, you mean when you got
3    back down here to school?
4    A    Yes  At George Washington University.
5    Q    And so, you printed this out and took it
6    with you on the train or wherever  And you --
7    A    Or even just, you know, sat in the living
8    room with it  I don't know.
9    Q    You don't remember specifically?
10   A    Where I did the mark-up, no.
11   Q    And your notations, are they stylistic
12   changes mostly?
13        MR. SIMPSON: Object to the form
14   Q    Were there any substantive changes you
15   were making at this point?
16   A    Well, I will have to look.  On the first
17   page, 949, I had omitted one of the expert reports
18   Q    When you were listing what you had looked
19   at?
20   A    Yes  At the last full paragraph on 950
21   I wanted to add that Hannaway moved to follow

22 (Pages 85 to 88)

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

**Page 89**

1  Stiglitz when he pursued his career in government
2  Q    Let me ask you what the note above that
3  says  It's a little unclear to me
4  A    We do not have the benefit of a court
5  opinion.
6  Q    Thank you
7  A    At the bottom of 951, these are
8  substantive adjustments.  The, in Elkus, Mr. Elkus
9  was Von Stade.  I'm sorry  V-O-N, new word,
10  S-T-A-D-E.  Voice coach both before and during the
11  marriage
12       And the next line, professional licenses,
13  I thought it was important to put out professional
14  training and licenses, because these often include
15  the period of time -- these cases often include the
16  period of time when someone is getting a degree that
17  enables them to work in a professional capacity.
18       And to spouses, I wanted to add under
19  certain conditions, which I think is a substantial
20  modification.
21       Some of these are stylistic.  Some of them

**Page 90**

1  I need to fill in a cite
2  Q    Let me just stop you there and ask you a
3  couple of general questions  When you were doing
4  these changes, had you provided a draft to counsel
5  for Rita Bank?
6  A    No
7  Q    You were -- the final version was what
8  they saw, the one that's February 9th, or did they
9  see a prior version?
10  A    I sent them a penultimate version  I made
11  one change based on a subsequent conversation with
12  them
13  Q    Okay
14  A    I sent it as a draft
15  Q    Okay  We'll get to that  Thank you  All
16  right  I don't have any more questions on the
17  February 5th version
18  A    You don't want me to continue?
19  Q    No  I have flipped through those  I'm
20  satisfied with how they came out on the next
21  version.

**Page 91**

1       Let me have you look at the first version
2  there on Exhibit 4, which is the February 8th
3  version that starts at 939 and goes through 948
4       Was this the draft that you gave to
5  counsel, or was this still a prior draft of what you
6  gave to counsel for Rita Bank?
7  A    This is still a prior draft.
8  Q    Okay  And again, did anyone give you any
9  input for any of the changes that were made here
10  here, or were they all of your own doing?
11  A    They are all my own.
12  Q    And obviously based on a comparison
13  between this and the final one, you really didn't
14  make a whole lot of changes between February 8th and
15  February 9th?
16  A    No, I'm something of perfectionist, and I
17  keep fiddling, you know, trying to improve
18  Q    I know
19  A    The substance was all there
20  Q    I had an ex-law professor as a partner for
21  a number of years.  I suffered through many drafts

**Page 92**

1  and redrafts of everything I wrote
2  A    Oh, actually -- okay  Now, I'm looking at
3  Page 947 -- yeah, Page 947, I suddenly put in I had
4  not dealt with the change in the law in the
5  District
6  Q    In the District of Columbia?
7  A    Exactly.
8  Q    And that's where your note is on the
9  left-hand border in the third paragraph down?
10  A    Yes, sir.
11  Q    We'll get to that in your final opinion
12       MR. WHITWORTH:  Do you want to take a
13  little break, then we'll go on to the final
14  opinion?
15       MR SIMPSON:  Okay
16  Q    Let me just clarify that before we go off
17  the record, now we have the February 9th version,
18  and I don't have any mark-up on that  How did the
19  version go to counsel for Ms Bank, and how did it
20  get changed?  Because I don't see another mark-up
21  version in the materials I was provided.  You may

*23 (Pages 89 to 92)*

*Deposition of Catherine Ross, Esq*
*Taken on November 14, 2007*

**Page 93**

1  not have actually marked one up, you may have just
2  changed it on your computer and then printed it
3      But what I'm looking for is what change
4  was made between this February 8th version that we
5  have and the February 9th version that's been
6  published to --
7      A   I can tell you --
8      Q   -- in the case
9      MR. SIMPSON: You're asking other than
10  what's marked on the February 8th draft?
11      MR. WHITWORTH:  Yes  As I understood what
12  she said, she sent you all a copy I guess
13  electronically or whatever, and it had after
14  input from counsel for Rita Bank, it had some
15  change  I'm trying to identify what that
16  change was
17      A   I actually made it on the Thursday,
18  February 8th version that we've been looking at
19      Q   Okay  Tell me what it is and where it
20  is
21      A.   I will tell you exactly where it is.  And

**Page 94**

1  I guess I wrote it -- all the other comments are
2  mine  And I cleaned those up, and I e-mailed it at
3  some point  If you look under the summary of
4  conclusions, I know that this is the area
5      Q   The final paragraph?  No?
6      A   No.  Summary of conclusions right at the
7  top of 940
8      Q   Pardon me  Thank you
9      A   I had sent Rick a cleaned up version of
10  this letter with all of the other correction that I
11  had said I needed to fill in and dealing with the
12  change in law  And Rick simply suggested that I
13  take out my somewhat -- I don't want to characterize
14  it, but my unnecessary comments where I said
15  Stiglitz as much -- didn't disadvantage Stiglitz as
16  much as I understand he alleges nor would it have
17  advantaged him as much as he apparently believes
18      And I thought that was quite a valid
19  comment which did not change the substance of my
20  views at all
21      Q.   That was suggested by Rick?

**Page 95**

1      A.   Yes
2      Q   Okay  And then --
3      A.   With great diffidence
4      Q   I'm sorry?
5      A.   With great diffidence  He didn't want me
6  to feel that he had in any way sculpted or affected
7  my letter
8      Q   And now that we've concluded this
9  Exhibit 4, I find that I do have a February 7th
10  draft of -- a February 2nd draft which I have marked
11  as Exhibit 7, so we'll address that before we get to
12  the final draft
13      MR. SIMPSON:  Do you want to take a
14  five-minute break?
15      MR. WHITWORTH:  Yes, thank you
16      (Whereupon a brief recess was taken, after
17  which the following was heard:
18      Q   Okay  Let's go to what I have marked as
19  No  7 that I found underneath the No  4 that we just
20  discussed that had two versions of your opinion
21  letter.

**Page 96**

1      A.   This is now the earliest of the ones --
2      Q   Now, we've found an earlier one
3      And I'm not really going to ask you any
4  questions about this other than to just confirm that
5  this was the earliest of the printed iterations of
6  your opinion?
7      A   I can't confirm that without looking at
8  all the documents that were produced
9      Q   Okay  Well, I'm telling you that I've now
10  unearthed three from the documents that were given
11  to me
12      A   I'm happy to accept that  I just can't
13  tell you that I know for a fact that this is the
14  earliest one I produced.
15      Q   But all the ones you printed out, you gave
16  to counsel to give to me?
17      A   Yes
18      Q   Just looking at it, if you can just review
19  it quickly to confirm that this is the earliest one
20  that you recall having printed
21      A.   It certainly appears to be the earliest of

24 (Pages 93 to 96)

Deposition of Catherine Ross, Esq
Taken on November 14, 2007

Page 97

1  the ones that I have looked at today
2  Q   Thank you  Now, let's get to the final
3  version  Actually, although I've given you all that
4  fanfare, I want to go back and just make sure that I
5  have got everything  Let's go back and take a look
6  at that exhibit that I had marked  It's the very
7  first one  You've got it right there  I believe,
8  double-check the number on that for me?
9       MR SIMPSON: Exhibit 6
10 Q   Is it 6?
11 A   Yes
12 Q   Thank you  Exhibit 6  And we've gotten
13 through your CV  We've looked at that  We didn't
14 go into great detail on it  I et me just ask you on
15 that, if I can have you go back and take a quick
16 look at your CV, it's Exhibit --
17 A   Yes
18 Q   -- I  Is that pretty up-to-date?  Is
19 there anything that's of any significance that's not
20 included on that version?  I understand that it was
21 probably produced February of this year or earlier.

Page 98

1  A   Nothing that would be significant to what
2  we're doing here.
3  Q   All right  Now, Item 20 on Exhibit 6, if
4  I can go back to that point with you, we ask for all
5  notes, diagrams, photographs or other documents
6  prepared or reviewed in connection with your
7  assignment
8       Have you provided to counsel for Ms Bank
9  all such documents?
10 A   Yes  With the following caveat  As I
11 said earlier, it was their view that I did not need
12 to produce copies of cases that I cited or materials
13 that I cited in my opinion letter unless I had
14 marked or annotated them in some way  So I did not
15 produce clean copies of materials that I cited.
16 Q   That's fair enough  Those cases are
17 identified and can be pulled up by anybody with a
18 reporting service  I will accept that
19       And I think you've clarified that you
20 didn't exchange oral -- didn't have oral discussions
21 with other people that help formulate your opinion

Page 99

1  other than what you've told me about your
2  conversations with Rick Simpson
3  A   That's correct.
4  Q   And you didn't exchange any written
5  materials with anyone else including counsel for
6  Ms Bank beyond what you've provided to them to
7  disclose to us; is that correct?
8  A   That's correct
9  Q   Have you provided -- Item 22, I'm looking
10 at now, each publication or paper that was written
11 or worked on by you that refers or relates to the
12 opinions and the subjects upon which you're expected
13 to testify?
14 A   I believe so
15 Q   Are there any other documents that you
16 intend to rely on in support of your testimony at
17 trial that are beyond the documents that you
18 provided to counsel to exchange as part of our
19 document request?
20 A   Not at this time
21 Q   We would ask that we be seasonably

Page 100

1  informed and provide a copy should that response
2  change between now and trial
3       MR SIMPSON: We will comply with the
4  rules
5       MR WHITWORTH: Thank you
6  Q   And just -- well, actually, we didn't have
7  this one marked so I won't bother
8       Okay  Now, we'll go to what I marked as
9  No 8 which is your February 9th report  I guess
10 we'll call that the final report, or do you have
11 another name for it?
12 A   The final opinion letter  Yes
13 Q   Now, I apologize that this is actually a
14 copy that we made from our own file that was
15 provided to us  I don't know why it has a
16 February 8th date up in the upper left-hand corner,
17 but that's the way it came to us
18       MR SIMPSON: It also has some
19 highlighting and handwriting on it
20       MR WHITWORTH: Well, I must confess that
21 I actually got my co-counsel Linda Hamilton's

25 (Pages 97 to 100)

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

## Page 101

1  copy, because I marked mine up even worse  So
2  I will put on the record that I believe the
3  question marks on the side of a couple of those
4  paragraphs were done by my co-counsel Linda
5  Hamilton, and I didn't clean it up further when
6  I made a copy of it yesterday.
7      And as Mr Simpson pointed out, you can
8  see some dark smudges where apparently there
9  had been some highlighting done  And again, I
10 think it's -- this version is readable, but I
11 will put on the record that that's not the way
12 it came to us  Those were added after we
13 received it
14 Q   I'm going to work from my own highlighted
15 copy, we've already discussed the fact that
16 that Ketterle case, is that the way you pronounce
17 it? K-E-I-I-E-R-L-E?
18 A   I believe it's Ketterle
19 Q   Ketterle  Thank you  I'm putting an R in
20 it where it doesn't belong  Ketterle case was a
21 Massachusetts appellate 2004 opinion?

## Page 102

1  A   Yes
2  Q   Did you -- and that case quoted a 2000
3  case in Massachusetts which --
4  A   Excuse me  What page are you on?
5  Q   I'm looking at Page 3
6  A   Thank you
7  Q   Your second paragraph there
8  A   Yep
9  Q   And you indicated that that case quoted
10 the Williams versus Massa, M-A-S-S-A, a 2000 case
11 A   Yes
12 Q   But it's true, is it not, if someone had
13 done a search of the case law across the many
14 jurisdictions in this country looking for a Nobel
15 Prize distribution case prior to 2004, you wouldn't
16 have found one using that approach; is that fair to
17 say?
18 A   You wouldn't have found a case at all
19 Q   Thank you  Now, the next item I want to
20 discuss is on Page 4 where you discuss the Elkus
21 case, am I pronouncing that the way it's pronounced?

## Page 103

1  A   Yes
2  Q   E-L-K-U-S  A 1991 New York opinion, and
3  that case was preceded by the Golub, G-O-L-U-B, a
4  1988 case?
5  A   Yes
6  Q   And then you say at the last sentence of
7  that paragraph: No New York court has found an
8  increase in celebrity status meriting division in
9  more than 15 years since Elkus was decided  What do
10 you base that statement on?
11 A   My search of all of the reported opinions
12 and all of the published discussions of this line of
13 cases
14 Q   But as we discussed earlier, that really
15 is an overly broad statement since it doesn't -- you
16 cannot search the sealed trial court or nisi prius
17 decisions in New York; is that correct?
18     MR. SIMPSON: Object to the form of the
19 question
20 A   I'm not sure what your question is
21 Q   Well, you say no New York court, you can't

## Page 104

1  really say that with certainty; isn't that true?
2  A   I suppose if one were going to be really a
3  stickler, one could say no reported opinion  But it
4  would be my position that as far as the development
5  of a doctrine, the unreported opinions are less than
6  irrelevant  They are a nullity  They don't exist
7  They can't be used  They have not extended the
8  doctrine or commented on the doctrine  We don't
9  know what happened, and we don't know the
10 reasoning  They are as if they never existed.
11 Q   No New York court has overturned those two
12 opinions; is that correct?
13 A   That's correct
14 Q   And, therefore, every litigant who has
15 exposure or is claimed by their spouse to have
16 exposure as -- to the celebrity status doctrine, has
17 to take those cases and that law into account when
18 they're analyzing their litigation prospects; is
19 that correct?
20 A   Yes
21 Q   And similarly in Joseph Stiglitz's case,

*26 (Pages 101 to 104)*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 105

1  that was an issue because it was raised by counsel
2  for his wife; isn't that correct?
3  A   If counsel for his wife told him it was an
4  issue, then I guess he thought it was an issue
5  Q   Oh, isn't that why they did the economic
6  reports on his good will and so forth?
7        MR SIMPSON:  Object to form
8  A   I don't know why they did the economic
9  reports
10  Q   Okay  And, and also enhanced earnings
11  comes into play to have that good will analyzed as
12  well; isn't that correct?
13  A   As I believe I explained earlier, I'm not
14  sure that enhanced earnings is limited to celebrity
15  status or is the same doctrine.
16  Q   You're not sure?
17  A   I would argue that it's not.  Although, I
18  know that many people would lump them together, and
19  we've been discussing that.
20  Q   Let's just assume for the moment that you
21  don't lump them together  Joe Stiglitz had exposure

Page 106

1  for an enhanced earning capacity finding on behalf
2  of his wife; did he not?
3  A   In both the District of Columbia and New
4  York, yes
5  Q   Well, I'm focusing on New York at the
6  moment, because that's the -- the cases that we're
7  talking about were New York
8  A   But we are talking about celebrity status
9  cases in New York
10  Q   Okay  All right  Now, it's true, is it
11  not, that the District of Columbia does not follow
12  the same line of cases as the enhanced earning
13  capacity cases of New York?
14  A   I cannot give a simple yes or no answer to
15  that question
16  Q   Well, give me you best shot  Give me
17  your less than --
18        MR SIMPSON:  You're asking for her view
19  of the relationship if any?
20  Q   Give me your explanation of why you can't
21  say yes or no to that.

Page 107

1  A   Because the District of Columbia is free
2  to look at any other equitable jurisdiction state to
3  answer a question that it is trying to answer, and
4  New York is an equitable distribution state
5  Q   Is there any case law in D C that you're
6  familiar with that specifically relies on enhanced
7  earning capacity doctrine?
8  A   Not offhand.
9  Q   And of course, you did a research to
10  identify whether or not there was case law related
11  to that in D C ?
12  A   Well, let me go to a different section of
13  my opinion letter
14  Q   Could you just answer that question?
15  A   Yes
16  Q   Now, do you want to explain further?
17  A   Yes.  What I found in D C --
18  Q   And reference what you're looking at for
19  me, so I can be on the same --
20  A   I'm looking at Page 9
21  Q   Thank you.

Page 108

1  A   Literally on the same page
2  Q   What are you referencing?
3  A   I'm looking at the discussion of
4  professional good will, which in the District of
5  Columbia is marital property subject to
6  distribution, and which is frequently seen as
7  something very much akin to future earning capacity
8  Q   And that's based on which cases?
9  A   McDiarmid, M-C, capital D, I-A-R-M-I-D, in
10  1994, District of Columbia case
11  Q   Any other cases that support that?
12  A   Well, McDiarmid cites a long line of cases
13  from a variety of equitable distribution
14  jurisdictions  And I wasn't able to find a court --
15  a case directly on point in the District  I will
16  say that McDiarmid remains good law in the District
17  Q   Are you aware of any difference in the
18  approach that the New York courts take in their
19  enhanced earning capacity cases and the District of
20  Columbia takes in its equitable distribution line of
21  cases regarding that issue?

27 (Pages 105 to 108)

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 109

1    A.   Well, that's not comparing apples and
2    oranges  Equitable distribution is the overall
3    regime of property distribution in both the District
4    and New York
5        Q.   Now, let's talk about that change of law
6    in the District of Columbia  I think you cited --
7    and I'll have to get it in front of me
8            Section 16-910, where is that in your
9    report?  Do you remember?
10   A.   Page 7
11       Q.   Thank you  Now, the section that you
12   cited and that you had a document in with your
13   materials, and I may not have copied it, but it said
14   it was the October of 2004 edition of that section
15   Do you recall that?
16   A.   Yes.
17       Q.   Excuse me  I misspoke  2002 edition  In
18   fact, it's noted right here in your letter  It's
19   October 19, 2002
20   A.   Right
21       Q.   What was the difference between 16-910 in

Page 110

1    its preOctober of 2002 as compared to 16-910 after
2    October 19th of 2002?
3    A.   As I've said in my letter, the differences
4    are trivial
5        Q.   Is what?  I beg your pardon?
6    A.   The differences are trivial
7        Q.   Well, I know that's what you said, but I'm
8    asking you what the differences were
9    A.   Well, both provide for equitable
10   distributions, and both instruct the court to
11   consider all relevant factors including but not
12   limited to the duration of the marriage, the age,
13   health, occupation, amount and sources of income,
14   vocational skills, employability, assets, debts and
15   needs of each of the parties  Provisions for the
16   custody of minor children  Whether the distribution
17   is in lieu of or in addition to maintenance  The
18   opportunity for future acquisition of assets and
19   income
20           Then there are some additional factors
21   which go into greater detail than the 2001 edition,

Page 111

1    but that would not change the issues under dispute
2    here because all of them were also factors that the
3    court could take into consideration under the 2001
4    code
5        Q.   Well, there was a new section added in
6    October of 2002  Item 8  Each party's contribution
7    to the education of the other party which enhanced
8    the other party's earning capacity --
9    A.   Right  In this --
10       Q.   -- or ability?  Excuse me
11   A.   In this instance both of the parties, as I
12   understand it, had completed their degrees when they
13   married  The only really important thing as I'm
14   looking at it now would be Item 12 in the 2004 law,
15   the circumstances which contributed to the
16   estrangement of the parties
17       Q.   Which wasn't in the prior code section?
18   A.   Which was not in the prior code section
19       Q.   Well, the effects of taxation on the value
20   of the assets subject to distribution was added as
21   well; was it not?

Page 112

1    A.   Yes, but that's something all family court
2    judges take into account  That's a very routine
3    consideration
4        Q.   And also new was Section 9, each party's
5    increase or decrease in income as a result of the
6    marriage or the duties of homemaking and child care?
7    A.   Yes  And that was handled in the older
8    statute  I didn't cite the language  I don't know
9    if you have a copy of the statute here, but the 2001
10   instructed the court to consider each party's
11   contributions to assets and to the family unit,
12   which is a different way of getting at the same
13   point
14           And Item 10, specifically in the 2004,
15   adds dissipation, but that is also a standard
16   consideration
17       Q.   And the taxability of the assets was added
18   in the new section?
19   A.   Yes  And that is a standard
20   consideration
21       Q.   With that law changing in October of 2002,

*28 (Pages 109 to 112)*

*Deposition of Catherine Ross, Esq*
*Taken on November 14, 2007*

**Page 113**

1  what cases would that apply to in terms of cases
2  that are in litigation at that time?
3  A  In process?
4  Q  Already filed
5  A  I actually did not research that  And so,
6  I don't know if it became effective for all
7  decisions not yet entered or whether there was a
8  grandfathering
9  Q  By grandfathering, explain what you mean
10  on the record
11  A  I mean, that if you had already filed your
12  Complaint, that the court would apply prior law  I
13  don't know the answer to that
14  Q  Okay
15  A  I didn't look at that question in part
16  because I thought that Stiglitz would only be worse
17  off under the new statute  But if that had kicked
18  in, that would have disadvantaged him
19  Q  Explain in what way you mean that
20  A  I think that the instruction that the
21  court may consider the circumstances that

**Page 114**

1  contributed to the estrangement of the parties would
2  allow the trial court to consider his alleged
3  adultery in crafting an equitable distribution
4  Q  Now, do you know of any basis in D C law
5  for the court to consider a distinction between
6  assets accrued while the marriage -- while the
7  parties are still living together as married couple
8  before the ultimate divorce hearing as opposed to
9  assets accrued during the period of separation?
10  A  No  In fact, the statute is quite clear
11  that the court is to divide assets as of the date of
12  the divorce decree
13  Q  The date of the decree which can't occur
14  until the hearing is concluded; is that correct?
15  A  That's correct  And to value them on that
16  date
17  Q  How does --
18  A  Not all jurisdictions are so clear, and
19  many actually leave that to the discretion of the
20  judge
21  Q  As to evaluation date?

**Page 115**

1  A  Yes
2  Q  How does a judge value them as of that
3  date when a hearing may have occurred and it takes
4  some time to get a decree put together?
5  A  Well, I would imagine one could ask for
6  post motion submissions
7  Q  But you don't know practically?
8  A  I don't know practically  I don't
9  practice in the District
10  Q  Are you aware of a reason why Rita Bank
11  would have had Joe Stiglitz start putting money in a
12  separate account in the Spring of 2002, April
13  specifically?
14  MR  SIMPSON: Object to the form  Beyond
15  the scope
16  A  No  I don't know what was on Rita Bank's
17  mind
18  Q  Are you aware that there is a practice of
19  some of the judges in the District of Columbia of
20  taking into account assets accrued in the period of
21  separation differently than those that accrued while

**Page 116**

1  the marriage was still intact?
2  MR  SIMPSON: Object to the form
3  A  No  But it is not inconsistent with my
4  emphasis on the discretion accorded to trial judges
5  in the District
6  Q  They would have broad enough discretion to
7  do that if they chose to do so you're saying?
8  A  They might
9  Q  Are you aware of what the practice is
10  among the matrimonial law judges in the District of
11  Columbia?
12  A  No  I was asked to comment on the law and
13  not the practice by the judges
14  MR  WHITWORTH: Let's take another short
15  break  I think I may be close to concluding
16  I just want to look through my notes for a
17  minute
18  MR  SIMPSON: Five minutes
19  (Whereupon a brief recess was taken, after
20  which the following was heard:
21  MR  WHITWORTH: Back on the record  You

*29 (Pages 113 to 116)*

*Deposition of Catherine Ross, Esq*
*Taken on November 14, 2007*

**Page 117**

1  will be pleased to hear I don't have any
2  further questions
3      MR SIMPSON: Thank you  We have no
4  questions.
5      THE REPORTER: Read and sign?
6      MR SIMPSON: Yes  Please
7      (Whereupon at 12:51 the deposition
8  concluded )
9
10
11
12
13
14
15
16
17
18
19
20
21

**Page 118**

1          DISTRICT OF COLUMBIA
2
3      I, Susan Farrell Smith, Notary Public of
4  the District of Columbia, do hereby certify that
5  CATHERINE J ROSS, ESQ personally appeared before
6  me at the time and place herein set out, and, after
7  having been duly sworn by me, was examined by
8  counsel
9      I further certify that the examination was
10 recorded stenographically by me and that this
11 transcript is a true record of the proceedings
12     I further certify that I am not of counsel
13 to any of the parties, nor an employee of counsel,
14 nor related to any of the parties, nor in any way
15 interested in the outcome of this action
16     As witness my hand and notarial seal this
17 19th day of November, 2007
18 _____
19          Susan Farrell Smith
20          Notary Public
21   (My Commission expires February 29, 2012)

**Page 119**

1      ACKNOWLEDGEMENT OF DEPONENT
2
3  I, CATHERINE J ROSS, ESQ , acknowledge that I have
4  read and examined the foregoing testimony, and the
5  same is a true, correct and complete transcription
6  of the testimony given by me  and any corrections
7  appear on the attached errata sheet signed by me
8
9
10
11 _____        _____
12  (Signature)              (Date)
13
14
15
16
17
18
19
20
21

30 (Pages 117 to 119)

*Corbin & Hook Reporting and Videoconferencing*
*410-268-6006  1-866-337-6778*

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 120

| A | | | | |
|---|---|---|---|---|
| **abbreviations** | 119:1 | 9:20 10:2 | anybody 17:16 | **arising** 10:3 |
| 53:10 | **acquisition** | 14:17 34:5 | 22:10 98:17 | **Armand** 12:16 |
| **ability** 111:10 | 110:18 | 46:2 | **anyway** 50:17 | 12:20 13:12 |
| **able** 86:7 108:14 | **action** 118:15 | **agree** 38:19 | **apologize** 42:10 | **arrived** 47:17,17 |
| **Absolutely** | **active** 6:12 | **agreed** 33:4 | 86:8 100:13 | **arrows** 47:9 |
| 36:16 39:2 | **activities** 15:4 | 50:14 | **apparently** | **article** 34:6,17 |
| 46:12 | 31:2 32:5 35:5 | **agreement** | 94:17 101:8 | 71:19 72:11 |
| **academic** 45:3 | 45:17 73:7 | 32:19 42:2,4 | **appear** 17:21 | **articles** 34:13 |
| 63:19 | **activity** 14:16 | 64:19 | 27:8 28:20 | **asked** 9:16 12:5 |
| **accept** 96:12 | **actual** 47:19 | **ahead** 26:7 | 52:3 119:7 | 24:3 25:12 |
| 98:18 | **add** 73:21 88:21 | 36:14 67:18 | **APPEARAN...** | 40:5 41:16 |
| **accomplish** 51:6 | 89:18 | 73:15 | 2:1 | 42:1 44:3 49:1 |
| **accomplished** | **added** 101:12 | **akin** 79:11 | **appeared** 118:5 | 49:15 58:5 |
| 74:2 | 111:5,20 | 108:7 | **appears** 29:4 | 69:3,5,9 73:11 |
| **accomplishme...** | 112:17 | **alleged** 59:8 | 40:4 50:6 | 116:12 |
| 70:9 | **addition** 41:2 | 60:1 114:2 | 96:21 | **asking** 47:5 50:7 |
| **accorded** 116:4 | 110:17 | **alleges** 94:16 | **appellate** 101:21 | 51:21 59:15 |
| **account** 78:7 | **additional** 41:18 | **allow** 114:2 | **apples** 109:1 | 61:20 62:6 |
| 104:17 112:2 | 50:12 110:20 | **allowed** 45:20 | **applied** 69:19 | 93:9 106:18 |
| 115:12,20 | **address** 12:16 | **American** 13:19 | **apply** 11:8 51:2 | 110:8 |
| **accounts** 6:8,8 | 27:9 28:14 | 14:10,11 82:5 | 113:1,12 | **assets** 77:9,13 |
| **accrued** 114:6,9 | 45:10 95:11 | **amount** 45:8 | **appreciate** 9:1 | 110:14,18 |
| 115:20,21 | **adds** 112:15 | 49:6 50:8 | 46:6 | 111:20 112:11 |
| **accumulate** | **adjustments** | 110:13 | **appreciation** | 112:17 114:6,9 |
| 77:13 | 89:8 | **analysis** 55:15 | 10:15 | 114:11 115:20 |
| **Accumulated** | **administration** | 73:6 | **approach** 47:15 | **assignment** 98:7 |
| 70:18 | 36:8,13 | **analyzed** 105:11 | 102:16 108:18 | **associate** 7:2,7 |
| **accumulation** | **admitted** 54:1 | **analyzing** 65:9 | **approached** | 18:19 19:2,4,8 |
| 77:8,16 | 63:15,17 | 104:18 | 45:16 | 22:6 |
| **accurate** 61:11 | **adultery** 59:8 | **annotated** 98:14 | **April** 115:12 | **associated** 18:9 |
| **accurately** 87:8 | 60:1 114:3 | **annotations** | **area** 15:3 24:11 | **Association** |
| **accustomed** | **advanced** 16:10 | 83:10,12 85:13 | 55:5 94:4 | 13:19 14:10,11 |
| 44:16 | 16:12,13 | **announced** | **areas** 16:16 | **associations** |
| **Acela** 76:18 | **advantaged** | 35:18 | **arg** 70:5 | 13:17 17:9 |
| **achieved** 74:11 | 94:17 | **answer** 14:7 | **args** 46:17 | **assume** 51:4 |
| 76:9 | **advertised** | 38:2 59:18 | **argue** 23:11 | 59:8 105:20 |
| **achievements** | 11:21 | 73:19 106:14 | 57:13 105:17 | **assuming** 8:19 |
| 75:18 | **advisement** 22:4 | 107:3,3,14 | **arguing** 47:1 | 87:9 |
| **acknowledge** | **affirmed** 4:3 | 113:13 | 72:7 | **assumptions** |
| 119:3 | **afternoon** 54:11 | **answered** 37:1 | **argument** 72:10 | 61:7 |
| **ACKNOWLE.** | **age** 110:12 | 44:4 61:8 | **arguments** | **attached** 3:16 |
| | **ago** 5:20 6:20 | **answers** 21:15 | 57:20 | 13:10 119:7 |

*Deposition of Catherine Ross, Esq*
*Taken on November 14, 2007*

attended 13:21
17:5
attention 30:15
attorney 10:6
23:2 61:13
attorneys 9:2,4
9:8,10 11:19
12:5,12 28:11
40:5 41:16
57:13 65:19
author 15:9
automatically
87:5
available 22:1
58:11
awake 63:18
award 72:19,19
awarded 47:17
72:5
awarders 72:18
aware 35:12
36:3,7,9,12
48:15 68:15,17
70:3 73:1
108:17 115:10
115:18 116:9
awful 74:1
A M 1:13

**B**
back 10:8 12:9
31:17 42:10
46:1 78:14
87:20 88:3
97:4,5,15 98:4
116:21
background
24:19
ballpark 86:1
bank 1:7 4:12
6:7 9:4 36:8
41:17 55:18

56:6 62:20
84:11 90:5
91:6 92:19
93:14 98:8
99:6 115:10
**Bank's** 28:11
40:5 41:9
65:19 115:16
bar 13:19 14:10
14:11 17:3,6,9
17:13 18:17
22:9 38:12
base 42:8
103:10
based 39:17
44:12,12,14
47:2 65:3 70:8
73:20 85:18
90:11 91:12
108:8
basic 60:21
basis 6:2,5 114:4
bear 15:21
68:12
beg 110:5
began 41:11
64:21
beginning 10:12
26:16 87:15
behalf 2:9,18
106:1
believe 12:5
25:2 32:5,16
32:21 33:12
39:19 46:17
47:10 48:21
49:15 56:12
58:13 59:5,6
61:12 65:6
80:3 84:14,21
97:7 99:14
101:2,18

105:13
believed 7:9
believes 94:17
**Bell** 2:14 12:10
belong 13:16,18
101:20
benefit 4:16
89:4
best 14:7 47:12
106:16
bet 72:15
better 29:15
beyond 38:7,10
38:16 40:15
49:3 75:15
82:20 99:6,17
115:14
big 75:12
bill 32:10 50:10
billing 31:2
bio 3:7 25:4
bit 14:17 26:8
bite 39:8
block 6:7
blocks 43:9
blog 34:9
bono 6:2,5 17:16
17:18 24:13
book 15:10
books 81:12,13
border 92:9
**Boston** 22:7
bother 100:7
bottom 29:1
40:3 59:7
86:19 89:7
break 19:5
51:17,19,21
58:15 67:5
85:20 92:13
95:14 116:15
breakdown

85:10
brief 3:7 25:3
51:19 95:16
116:19
briefed 54:9
bring 78:14
broad 15:5
103:15 116:6
broader 24:1
37:2 72:2
brought 7:20
24:15
bulk 7:11
bullet 26:18
47:8
business 10:15

**C**
CA 1:6
call 23:20 29:5
32:20 33:11
54:11 100:10
called 4:2 15:18
23:18 27:5
43:15
capacity 8:4,10
10:18 20:12
21:11 38:21
39:5 48:16
65:13 71:2
76:5 77:12,19
89:17 106:1,13
107:7 108:7,19
111:8
capital 108:9
care 24:15 54:21
57:10,19 112:6
career 39:14
76:21 89:1
careers 76:12
case 4:14 8:9 9:5
10:5,13 11:2

12:4,13 15:10
20:19 22:17,21
23:1,1,3 25:5
31:2 32:4,15
40:15,21 43:1
48:16 54:13,18
54:20 55:7
56:3,4 60:3,13
60:16 62:4,21
65:4 67:18
68:8,10,18
70:3 74:7 80:8
80:16,19 81:14
83:4 84:7
86:17 87:11
93:8 101:16,20
102:2,3,9,10
102:13,15,18
102:21 103:3,4
104:21 107:5
107:10 108:10
108:15
cases 7:8,10
21:2 22:14,16
28:9 38:14,15
38:17 39:9,11
39:16 61:1
64:20 65:3,16
65:21 66:4
74:19 75:6,8
75:14,17 80:4
80:6,10,12
82:4,8,19,21
83:2 85:13
89:15 98:12,16
103:13 104:17
106:6,9,12,13
108:8,11,12,19
108:21 113:1,1
**CATHERINE**
1:11 3:2 4:1
118:5 119:3

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

caught 20:2
caveat 98:10
celebrity 8:7
  20:13 21:11
  36:15,19,20
  37:5,18 38:15
  39:1,3,9,15
  48:8 49:2
  57:12 72:8
  74:6,15,21
  103:8 104:16
  105:14 106:8
censure 25:17
CEO 75:19
CEOs 75:3
certain 30:1
  46:18 48:20
  89:19
certainly 20:19
  37:2 38:10
  48:6 69:18
  72:6 75:1 86:6
  96:21
certainty 104:1
certify 118:4,9
  118:12
cetera 22:13
  75:4,20
CF 70:17 78:17
chance 9:3
change 12:15
  87:5 90:11
  92:4 93:3,15
  93:16 94:12,19
  100:2 109:5
  111:1
changed 13:8
  69:13,15 92:20
  93:2
changes 16:1
  65:1 87:18
  88:12,14 90:4

91:9,14
changing 112:21
chapter 15:10
chapters 15:9
characterize
  94:13
checked 6:11
checking 61:10
checkoff 28:17
child 15:1,18
  112:6
children 15:8
  16:1,3,5,6
  110:16
children's 18:11
choose 44:18
  72:2
chose 116:7
chronological
  51:8
circled 49:6,21
circumstances
  111:15 113:21
cite 21:2 38:13
  79:2 81:21
  83:1,13,15
  90:1 112:8
cited 69:12 73:3
  83:2,3,11
  98:12,13,15
  109:6,12
cites 108:12
City 22:19 23:4
civil 24:15 54:5
claim 4:12 7:20
  7:21
claimed 71:8
  104:15
claims 65:12
  75:6
clarified 98:19
clarify 24:4 26:4

29:16 39:18
  70:15 86:15
  92:16
class 21:5
classroom 16:11
  CLE 14:8
clean 98:15
  101:5
cleaned 94:2,9
clear 10:1 17:12
  71:5 76:3
  114:10,18
clearly 11:9 36:5
client 6:5 8:2
  55:17,21,21
  57:8,9 61:9,13
clients 5:21 7:1
  8:3,6 24:6
clinic 24:10
Clinton 36:8
clips 38:8
close 79:14
  116:15
coach 89:10
coauthor 15:11
coauthors 71:18
  72:21
code 111:4,17
  111:18
collapsed 74:21
colleague 84:5
colleagues 62:15
  72:11
collect 59:21
College 22:7
Colorado 10:4
Columbia 1:2
  6:18 10:20
  11:11 12:6
  17:3,6,17
  21:12 34:4
  77:11 92:6

106:3,11 107:1
  108:5,10,20
  109:6 115:19
  116:11 118:1,4
combined 12:17
come 16:8 21:14
  42:21 52:15
  66:10 74:15
  77:2
comes 52:15
  105:11
commencing
  1:12
comment 94:19
  116:12
commented
  104:8
comments 82:6
  83:4 94:1,14
Commission
  118:21
commitment
  33:7
commonly
  66:13
communicatio...
  84:10
commute 45:13
compare 47:13
  60:2 62:6
  78:18,19
compared 110:1
compares 59:10
comparing
  21:12 59:9
  109:1
comparison
  21:9 80:2
  91:12
competing
  49:16,17
Complaint

113:12
complete 10:11
  27:2 53:10
  119:5
completed
  111:12
completely 48:7
complicated
  30:8
Complies 27:12
comply 23:5
  100:3
component 77:6
components
  39:10
comprehensive
  21:4
computer 28:5
  31:17 67:7
  85:4,8 93:2
concede 69:10
concentrated
  43:8 45:8
concept 82:4
concepts 20:11
  60:21
concerned 38:5
concerning
  10:14 15:1,8
  76:20
concluded 95:8
  114:14 117:8
concluding
  116:5
conclusion 68:7
conclusionary
  67:10
conclusions
  67:14 94:4,6
conclusory
  67:15
conditions 89:19

Deposition of Catherine Ross, Esq.
Taken on November 14, 2007

conducted 16:9
Confer 78:11
confess 100:20
confined 37:5
confines 74:15
confirm 96:4,7
  96:19
conflicts 65:12
congregate
  22:18
connected 13:4
Connecticut 5:9
  6:14 24:15
connection
  20:15 29:5
  98:6
consider 73:7
  79:3 110:11
  112:10 113:21
  114:2,5
consideration
  111:3 112:3,16
  112:20
constantly 82:1
constitutional
  15:21 16:7
consultant
  18:10
consultations
  44:14
contacted 12:4
contemporane...
  32:5 58:19
contends 57:12
contested 10:3
context 34:1
  37:2,4
contiguous 19:6
continuation
  59:3
continue 23:7
  51:5 57:2

62:13 74:4
90:18
continued 72:14
continuing 14:6
  85:7
continuous 20:4
continuum
  77:14
contributed
  39:12,14 72:17
  111:15 114:1
contribution
  111:6
contributions
  112:11
conversation
  29:11,21 48:21
  49:4,13 52:21
  70:4 90:11
conversations
  99:2
convicted 25:14
convinced 73:17
Cooter 12:20
  13:12
copied 109:13
copies 57:17
  98:12,15
copy 22:2 27:14
  66:16 81:19
  93:12 100:1,14
  101:1,6,15
  112:9
Copyrights
  70:19
Corbin 1:19
corner 29:2 40:3
  100:16
corporate 7:11
  23:9
correct 4:15
  12:8 18:3 22:7

23:14 37:10
39:1 40:8,11
43:4 52:3 61:3
64:7 66:5
68:10 73:4
79:21 99:3,7,8
103:17 104:12
104:13,19
105:2,12
114:14,15
119:5
correction 94:10
corrections
  119:6
counsel 4:2
  26:12 27:21
  29:9 41:9
  58:10 83:19
  84:10 90:4
  91:5,6 92:19
  93:14 96:16
  98:8 99:5,18
  105:1,3 118:8
  118:12,13
country 6:6
  102:14
couple 39:9
  43:21 44:6
  90:3 101:3
  114:7
course 4:16
  15:17 18:8
  27:6,7 34:6
  45:3 70:5 74:8
  80:19 82:8
  83:8 107:9
courses 15:15
  16:10,12,13
  35:10
court 1:1 7:17
  10:20,20 11:3
  22:14 23:13

38:20 47:16
57:18 58:7
62:20 63:1
67:20,21 68:14
68:19 78:6
80:7 89:4
103:7,16,21
104:11 108:14
110:10 111:3
112:1,10
113:12,21
114:2,5,11
courts 15:1
  37:13 68:1
  75:18 108:18
court's 67:20,21
cover 38:9
coverage 24:14
  54:7
covered 20:18
  25:20 26:19
co-counsel
  100:21 101:4
crafting 78:7
  114:3
credible 71:16
crime 25:14
Crofton 2:7
crossed 68:1
current 49:11
  76:8
curriculum 3:6
  4:17 16:13
  74:3
custody 15:2
  110:16
cut 57:14,16
CV 8:13 19:12
  20:1 97:13,16

dark 101:8
date 29:13,17
  87:5 100:16
  114:11,13,16
  114:21 115:3
  119:12
dated 62:11
  64:16
dates 27:9 31:9
  87:4,7
David 2:2 4:11
day 45:4 84:20
  87:8 118:17
days 33:5 45:7
  62:20
DC 1:20
DE 1:20
deal 80:5
dealing 94:11
dealt 10:9 92:4
dean 33:12
  53:13
dearth 31:1
debts 110:14
decide 68:7
decided 72:11
  103:9
decision 60:4
  61:4 67:20
decisions 103:17
  113:7
declared 4:3
declining 38:15
decrease 112:5
decree 114:12
  114:13 115:4
Defendant 1:8
  2:18 26:12
  27:21
defended 4:21
Defense 2:5 29:9
degree 89:16

**D**

D 63:13 108:9

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

degrees 111:12
dep 63:14
dependent 9:2
depending 30:7
  68:16
deponent 8:20
  25:12 119:1
deposed 5:1
deposit 5:7
deposition 1:11
  3:5 5:19 8:18
  50:20 57:8
  63:11 64:1
  117:7
depositions 4:20
  4:21 5:1,18
  40:9
derive 44:10
description 3:7
  25:4
descriptions
  25:7
detail 25:8
  30:20 40:18
  97:14 110:21
detailed 21:7
  31:15 63:10,13
details 61:2
determination
  38:20
determine 62:18
determined
  37:17
develop 76:12
development
  76:21 104:4
diagrams 98:5
diary 30:3 31:15
dictated 28:3
difference 69:6
  69:7 79:19
  108:17 109:21

differences
  57:11 73:18
  110:3,6,8
different 25:7,8
  47:18 60:5
  68:2 77:7
  107:12 112:12
differently
  115:21
difficult 71:3
diffidence 95:3
  95:5
digging 85:12
directly 39:13
  39:14 108:15
disadvantage
  94:15
disadvantaged
  113:18
disagreement
  11:10
disbarment
  25:17
disclose 62:16
  99:7
disclosed 12:9
disclosure 12:12
disclosures 63:7
discounted
  68:21
discretion 68:2
  114:19 116:4,6
discuss 102:20
  102:20
discussed 29:20
  30:6 50:2,11
  52:8 95:20
  101:15 103:14
discussing
  105:19
discussion 51:16
  108:3

discussions
  38:13 98:20
  103:12
dispel 61:16,18
dispensed 8:17
dispute 111:1
dissipation
  112:15
distinction
  114:5
distinguish
  39:15 69:20
  70:4 78:12
  79:8
distinguished
  72:3
distributed
  35:19
distribution
  57:20 77:12
  79:19 82:2
  102:15 107:4
  108:6,13,20
  109:2,3 110:16
  111:20 114:3
distributions
  57:21 110:10
district 1:1,2
  6:18 10:20,20
  11:11 12:6
  17:3,5,17,20
  18:1 21:12
  77:11 92:5,6
  106:3,11 107:1
  108:4,10,15,16
  108:19 109:3,6
  115:9,19 116:5
  116:10 118:1,4
divide 114:11
division 60:4
  78:8 103:8
divorce 10:3

  15:5 57:1
  114:8,12
Dixon 2:14
  12:10
Doctor 35:9
doctors 75:15
doctrine 38:5,13
  74:16 75:7,15
  75:19 104:5,8
  104:8,16
  105:15 107:7
document 25:1
  29:1 99:19
  109:12
documents 3:11
  26:9 27:1 96:8
  96:10 98:5,9
  99:15,17
doing 5:17 28:9
  30:6 32:8
  50:21 62:18
  63:4 85:12,12
  87:6 90:3
  91:10 98:2
domestic 23:12
  23:19 34:21
  35:13
double-check
  97:8
doubt 30:16
dozen 16:21,21
  17:1
draft 3:9,12
  64:13,15 84:14
  84:18,20,21
  87:6 90:4,14
  91:4,5,7 93:10
  95:10,10,12
drafted 42:1
drafting 84:9
drafts 27:8,18
  27:20 28:2

86:9 91:21
dues 13:20
duly 118:7
duration 110:12
duties 112:6
dwhitworth@ .. .
  2:3
D.C 1:14 2:16
  6:15 10:3 11:7
  11:9 17:13
  36:7 47:16
  54:13 55:18
  56:9,11,13,14
  56:15,16,20
  57:1,5,11,19
  58:1 59:10
  60:2,3 63:19
  69:8,12 77:7
  78:11,21 79:4
  79:10,19 80:7
  107:5,11,17
  114:4

**E**

E 1:4
earlier 4:10
  50:11 59:2
  68:19 72:20
  85:9 96:2
  97:21 98:11
  103:14 105:13
earliest 52:6
  96:1,5,14,19
  96:21
early 30:4 35:21
  41:13 47:11
  48:21 49:4
  62:17 64:10
earners 75:12
earning 8:4
  10:18 20:12
  38:21 39:4

48:16 65:13
71:1 76:5
106:1,12 107:7
108:7,19 111:8
earnings 20:12
21:11 39:16
48:12 70:8
75:2 77:8
105:10,14
easily 36:10
economic 34:6
35:2 40:20
65:9 82:2
105:5,8
economist 34:3
34:12 36:6
economists
34:14
economy 35:6
ED 57:20
edition 109:14
109:17 110:21
education 111:7
educational
15:4
effect 68:5
effective 113:6
effects 111:19
either 8:11
14:21 20:11
22:10 25:3
32:15
electronically
93:13
Elkus 74:6 82:9
89:8,8 102:20
103:9
emphasis 116:4
emphasizing
62:2
employability
110:14

employee
118:13
enables 89:17
endeavor 81:7
ended 76:7
engagement
32:14,15
enhanced 8:4
10:18 20:12,12
21:11 38:21
39:4,16 48:12
48:15 65:13
75:2 105:10,14
106:1,12 107:6
108:19 111:7
enhancement
70:8
entailed 33:8
enter 32:9 87:18
entered 28:5
31:16 113:7
entertainer
37:17
entertainers
37:6,7,8
entirely 40:12
60:5 68:21
87:7
equitable 57:20
57:21 77:12
78:7,11,15,16
79:1,2,10,19
80:9 107:2,4
108:13,20
109:2 110:9
114:3
errata 119:7
escapes 34:12
especially 54:7
ESQ 1:11 3:2
4:1 118:5
119:3

ESQUIRE 2:2
2:10,12
essential 64:21
established 60:3
estimate 85:11
86:3,5
estrangement
111:16 114:1
evaluation
114:21
evaluations 65:7
evidence 15:19
71:15
evidences 31:8
exactly 7:15
53:19 69:16
78:2,4 85:2,6
85:20 92:7
93:21
examination 3:1
4:2,6 118:9
examined 4:5
118:7 119:4
example 69:11
72:8
examples 70:20
exceptional
61:16
exchange 98:20
99:4,18
exchanged 84:6
84:6
exclusionary
67:12
Excuse 21:14
43:2 102:4
109:17 111:10
exhibit 3:4,5
8:14 19:12
24:17 26:9
27:11 28:16,16

29:3 31:4,8
39:19 40:2,10
40:16 42:10
46:1,5 50:10
64:1 84:16
86:9,12 91:2
95:9,11 97:6,9
97:12,16 98:3
Exhibits 3:16
exhuming 85:12
exist 104:6
existed 104:10
expectations
70:7
expected 27:5
99:12
experience 4:19
5:17 6:3,21
9:12
expert 4:13 9:17
9:21 12:1 13:9
24:12 25:12
27:5 40:18
44:13,15 49:18
54:14 55:1,7
57:19 63:6,7
64:19 65:7,7
72:5,16 73:16
76:18 88:17
expertise 55:14
experts 26:13,17
49:17 62:16
65:9 75:21
expires 118:21
explain 46:9
48:10 74:12
79:18 107:16
113:9,19
explained
105:13
explanation
106:20

exposure 104:15
104:16 105:21
extend 38:15
extended 104:7
extends 75:15
extent 20:20
ex-law 91:20
E-L-K-U-S 74:7
103:2
e-mail 11:20
12:17 13:5,8
34:10
e-mailed 94:2
e-mails 12:8,9
13:4

**F**

fact 37:12,16
40:13 41:5
81:21 96:13
101:15 109:18
114:10
factor 71:11
factors 60:4
77:12 110:11
110:20 111:2
facts 3:8 10:21
39:17,20 40:5
40:10 41:2,20
42:8 46:15
55:11 59:8,9
59:16,20 60:1
60:1 73:18
factual 41:18
faculty 34:4
failure 23:4
fair 36:21 39:3
86:3,5 87:11
98:16 102:16
fairly 43:8 76:9
fall 18:8 48:9
69:15

Deposition of Catherine Ross, Esq
Taken on November 14, 2007

familiar 8:19
  34:1 48:7 49:1
  74:9 107:6
families 15:21
  16:3,5
family 12:6
  13:18 14:9
  15:1,17,18
  16:13,18 18:8
  23:21 24:1
  55:13 112:1,11
fanfare 97:4
far 11:2 38:5
  75:19 104:4
Farrell 1:14,21
  2:20 118:3,19
favorable 11:13
February 27:19
  30:5 43:11
  62:11,17 64:13
  64:16 84:16
  86:14,17,18,19
  87:12,12 90:8
  90:17 91:2,14
  91:15 92:17
  93:4,5,10,18
  95:9,10 97:21
  100:9,16
  118:21
Federal 62:20
  63:1
fee 33:9
feel 16:20 95:6
felt 50:12
fiddling 91:17
fight 46:18
figured 30:14
file 17:21 28:13
  100:14
filed 7:16 57:5
  113:4,11
files 10:9 37:13

fill 90:1 94:11
final 27:7 64:15
  90:7 91:13
  92:11,13 94:5
  95:12 97:2
  100:10,12
find 31:17 33:7
  34:7 39:4
  66:11 68:6
  81:1 95:9
  108:14
finding 39:1
  80:4 106:1
findings 47:12
fine 63:5 73:12
  86:13
finish 19:19
  20:8 28:17
  87:1
firm 7:3,9 11:15
  11:17 13:1
  22:12,13 23:9
  31:15 54:4,5
first 3:11 4:20
  12:18 27:4
  29:2,21 30:20
  32:21 40:17
  47:21 52:1,15
  52:18,21 59:6
  64:6 67:8 70:3
  71:18 84:14,14
  86:11 88:16
  91:1 97:7
fit 75:7
five 10:2 15:16
  15:20 31:18
  74:6 116:18
five-minute
  95:14
flesh 61:1
flipped 90:19
focus 15:3,5

71:7
focused 13:11
  48:20 55:14
focusing 15:7
  48:13 87:15
  106:5
follow 58:14
  88:21 106:11
following 35:19
  35:21 51:20
  95:17 98:10
  116:20
follows 4:5
footnotes 82:3
foregoing 119:4
form 27:8 37:20
  38:3 40:14
  44:3 60:19
  69:1 71:3
  77:17 78:5
  86:2 88:13
  103:18 105:7
  115:14 116:2
formal 45:2 50:3
  50:3
formally 38:10
formed 53:19
former 56:19
formulate 98:21
forth 8:21 12:9
  65:1 75:16
  87:20 105:6
forward 8:19
  50:16
forwarded 13:6
  34:6
found 38:17
  95:19 96:2
  102:16,18
  103:7 107:17
four 63:21 64:4
  68:8 77:5

framework
  38:16
Fred 33:15,16
  53:18,20
Fred's 53:13,17
free 107:1
frequently 77:4
  108:6
fresh 85:17
friend 53:13,17
front 22:20 37:3
  49:14 109:7
full 18:9 88:20
functions 17:6
further 101:5
  107:16 117:2
  118:9,12
future 70:8 77:8
  77:8,13,16
  108:7 110:18

_____ G _____
G 2:2
gap 19:16
Garrison 7:3
gather 18:20
gathered 42:14
general 6:21
  33:2 35:6 54:5
  54:18 55:7
  65:4 76:16
  90:3
geographically
  79:14
George 88:4
getting 89:16
  112:12
girlfriend 57:10
give 16:20 21:1
  51:12,14 59:15
  59:20 61:6
  85:10 86:1,3

91:8 96:16
  106:14,16,16
  106:20
given 10:21 17:2
  39:18 40:1
  51:11 60:15
  96:10 97:3
  119:6
gleaned 28:19
go 10:8 26:18
  31:17 32:9
  36:14 38:10
  42:10 46:1
  50:16 52:18
  59:21 63:7
  67:18 69:17
  72:1,12 73:15
  75:19 77:2
  80:20 81:12,13
  92:13,16,19
  95:18 97:4,5
  97:14,15 98:4
  100:8 107:12
  110:21
goes 21:18 91:3
going 8:19 25:12
  26:7 32:9 37:3
  60:16 63:6,7
  64:11 67:1
  71:15 77:20,20
  85:17 96:3
  101:14 104:2
golf 5:13
Golub 103:3
good 4:8,9 5:12
  30:13 65:10,12
  70:9 82:3
  105:6,11 108:4
  108:16
goodwill 49:2
gotten 31:1
  50:11 97:12

*Deposition of Catherine Ross, Esq*
*Taken on November 14, 2007*

government
  89:1
grandfathering
  113:8,9
granted 59:21
great 38:11 95:3
  95:5 97:14
greater 77:21
  110:21
group 17:3
  18:11 62:5
  74:19
groups 17:10
guaranteed
  50:15
guess 49:18 54:1
  55:4 93:12
  94:1 100:9
  105:4
G-O-L-U-B
  103:3

**H**

Hamilton 101:5
Hamilton's
  100:21
hand 28:6,7
  118:16
handle 7:10,12
handled 112:7
handling 7:8
handwriting
  76:16 100:19
handwritten
  3:10 28:12
  46:3 65:20
handy 28:17
hand-typed 28:3
Hannaway 56:2
  57:3,8 73:3,9
  77:15 88:21
happen 80:10

happened 33:11
  104:9
happy 96:12
hard 81:19
  85:15
Harvard 34:6
Haven 5:9
hazards 22:17
head 60:11
health 110:13
hear 117:1
heard 11:18
  12:18 33:19
  51:20 95:17
  116:20
hearing 73:20
  114:8,14 115:3
heavily 80:8
held 11:21
help 98:21
hi 53:18
hiatus 20:6
high 75:12 76:5
  76:6
highlight 66:6,9
  66:15,18
highlighted
  101:14
highlighting
  100:19 101:9
Highway 2:5
high-water 75:1
hold 40:15
Holterman
  20:19 21:20
home 87:21
homeless 22:18
homemaking
  112:6
Hook 1:19
hope 87:14
hopping 42:11

hospitals 23:7,8
hour 50:7,14
hourly 44:10
  50:19,20
hours 31:21
  42:15 44:6
  46:15 50:8
  60:16 76:19
  77:5 85:11
Huh 53:15
husband 6:6
  10:6 34:4
husband's 10:15
H-O-L-T-E-R
  21:3

**I**

identification
  40:2
identified 41:19
  42:7 98:17
identify 40:1
  93:15 107:10
illegible 76:17
imagine 115:5
immediate
  79:14
immediately
  11:4 70:11
important 36:6
  80:13 89:13
  111:13
impression
  53:20
improve 91:17
inadvertently
  86:8
include 89:14,15
included 97:20
including 72:16
  99:5 110:11
inclusive 14:5

income 110:13
  110:19 112:5
inconsistent
  116:3
increase 103:8
  112:5
increased 71:1
increment 42:18
independent
  16:15
INDEX 3:1,4
indicate 52:20
indicated 43:14
  102:9
indicates 41:21
indicating 79:7
indication 49:21
individual 16:10
individuals 7:19
informal 31:20
information
  41:18 50:1
  84:6
informed 100:1
initial 48:8 63:8
initially 30:5
  54:18
injunction 22:19
input 91:9 93:14
inquest 41:12
inquired 41:17
instance 111:11
instances 39:11
  39:12
Institute 82:5
instruct 110:10
instructed 57:7
  112:10
instructing 38:1
instruction
  61:18 113:20
intact 116:1

Intangible 70:18
intangibles
  70:21
intellectual
  10:17
intend 86:10
  99:16
intended 24:3
  25:9
interdisciplin...
  18:11
interest 34:15
  35:4,5 38:12
interested
  118:15
interesting
  19:15 34:8
interpretation
  36:21 40:8
interpreting
  36:18
interrupt 27:10
interrupting
  14:3 55:4
intervals 42:18
introduced 4:10
investigation
  41:5 83:8
investing 35:6
investment 6:8
invoice 3:14
  31:3 42:11
involved 5:2 8:4
  9:20 11:7
  12:19 13:5
  23:4
involvement
  10:12
involving 8:7,11
  22:17 24:14
  54:21 75:6
irrelevant 104:6

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

issue 11:7 33:2
  35:2 48:16
  58:7 60:12,14
  71:7,14 78:21
  87:3 105:1,4,4
  108:21
issues 8:3,6,11
  10:17 15:8,21
  18:12 21:10
  54:21 57:9
  62:4 68:18
  76:20 82:2
  84:19 111:1
item 27:4,16
  47:15 48:5
  70:12 98:3
  99:9 102:19
  111:6,14
  112:14
items 26:11
  47:21 49:6
iteration 69:14
iterations 96:5
I-A-R-M-I-D
  108:9

___ J ___
J 1:11 3:2 4:1
  118:5 119:3
Jane 56:1,15,16
  56:20 73:3,8
  77:14
January 30:1
  33:1 43:15,18
  43:20 53:3
  62:17
Jersey 39:11
job 77:3
Joe 56:10,21
  57:3,4 65:9
  71:7 105:21
  115:11

Joe's 77:21
Joseph 1:4 4:12
  33:19 56:1
  104:21
Journal 34:16
  38:8
JR 2:2
judge 5:13
  114:20 115:2
judges 112:2
  115:19 116:4
  116:10,13
July 19:9
jump 26:7
jumping 82:14
June 19:9 20:3
  56:9,13,14
junkie 36:12
jurisdiction 6:9
  68:1 78:16
  79:1,11,15
  80:9 107:2
jurisdictions
  47:13 55:13
  62:6 69:6
  78:17,19 79:3
  102:14 108:14
  114:18
jurisdiction's
  11:8
jurisprudence
  47:20
jurs 78:11

___ K ___
K 1:13 2:15
keep 28:16 30:2
  31:20 42:17
  45:19 82:10
  91:17
keeps 63:18
kept 31:15

42:12
Ketterle 68:9,15
  70:2 78:14,15
  82:8 101:16,18
  101:19,20
kicked 113:17
kind 22:16 33:7
  85:15
knew 34:3 36:5
  60:21 64:20
  82:8
know 4:11,19
  9:21 10:8,11
  12:3,9 13:12
  14:14 20:18,21
  21:4 25:14,16
  25:19 30:11
  32:1 33:16,18
  36:10 37:3,12
  46:20 49:1,19
  54:1 57:15
  58:4,4,17
  60:10 61:18
  64:15 67:2,8
  67:16 73:20
  77:4 78:12
  80:3 81:6
  82:11 84:1,17
  88:7,8 91:17
  91:18 94:4
  96:13 100:15
  104:9,9 105:8
  105:18 110:7
  112:8 113:6,13
  114:4 115:7,8
  115:16
knowledge 11:3
  63:19 65:4
knows 33:12
Kuter's 12:16
K-E-T-T-E-R....
  70:2 101:17

___ L ___
landlord 5:6
  9:14
language 112:8
laptop 87:19
large 31:15
largely 23:10
latest 64:2
law 6:17 7:2,11
  10:3 11:7,8,10
  11:11,15 12:6
  13:18 14:9
  15:6,17 16:14
  18:2,7,8 21:12
  21:13 22:7
  23:18,21 24:1
  24:7,11,13
  25:21 33:12
  34:21 35:14
  36:19 37:4,18
  38:8 47:15
  55:13,15,18
  57:11 60:4,13
  60:17 61:10
  62:5 63:19
  65:5 69:6,12
  75:3,10,19
  78:11,21 79:10
  80:20 82:2,5
  85:13 92:4
  94:12 102:13
  104:17 107:5
  107:10 108:16
  109:5 111:14
  112:21 113:12
  114:4 116:10
  116:12
Lawrence 33:15
  33:16
laws 23:5
lawsuit 5:3
lawyer 5:13

8:10 13:16
  55:18
lawyers 54:7
law-related
  16:19
lay 55:11
lead 23:2 82:6
leading 34:3
  46:16 82:4
leave 86:12
  114:19
lecture 20:20
lectures 21:5
led 71:8
left 6:6 56:9
  57:18 58:2
  63:15 70:11
left-hand 50:5
  92:9 100:16
legal 6:3 18:10
  54:13,20 55:10
  55:12,15 59:9
  60:1 62:3
  81:15,16
length 50:2
  73:21
lengths 25:7
lengthy 85:5
letter 10:19 11:5
  11:6,12 30:4,6
  30:10,20 32:12
  32:14 40:17
  41:21 42:1
  50:3,4 62:7,10
  64:11,12,16
  80:11 84:12
  85:16,18 94:10
  95:7,21 98:13
  100:12 107:13
  109:18 110:3
let's 8:13 28:14
  45:15 46:1

Deposition of Catherine Ross, Esq
Taken on November 14, 2007

51:5 52:18
64:18 86:18
87:15 95:18
97:2,5 105:20
109:5 116:14
level 30:19
45:20
levels 25:8
Lexis 80:20
liability 54:6
liberally 79:2
Liberties 24:16
license 6:12,13
6:14,15 18:1
75:8,14
licensed 17:20
licenses 75:3
89:12,14
lieu 110:17
life 6:6 70:5
limited 74:10
105:14 110:12
Linda 100:21
101:4
line 21:6 56:8
57:14,16 87:5
89:12 103:12
106:12 108:12
108:20
linked 75:2
list 26:11 28:17
34:10
listing 88:18
Literally 108:1
litigant 104:14
litigants 21:10
Litigated 57:3
litigation 7:2,7
7:13 8:1 26:2,5
26:5 54:5,6,7
104:18 113:2
litigators 7:10

little 26:8 32:10
32:11 42:13,21
89:3 92:13
Lived 56:11
lives 62:21
living 88:7
114:7
LLP 2:14
long 9:20 10:1
108:12
longer 30:14
look 8:13 24:18
51:7,14 52:1
60:12 62:3
65:3 72:18
78:21 79:4,16
80:4 88:16
91:1 94:3 97:5
97:16 107:2
113:15 116:16
looked 64:6,19
81:18 82:5,19
88:18 97:1,13
looking 19:12
46:2 59:18
65:15 80:6,10
92:2 93:3,18
96:7,18 99:9
102:5,14
107:18,20
108:3 111:14
looks 29:13
58:12 70:12
77:8
lot 74:1 91:14
lower 45:19
lump 105:18,21
_____ M _____
M 1:7 69:20
70:4
MA 78:13,15

Magazine 37:4
mailing 34:10
maintained 6:12
17:8
maintenance
110:17
major 36:12
making 88:15
malpractice
26:2 54:13,20
57:5
manual 21:17
21:18 22:1
margins 65:18
83:5
marital 15:9,10
46:19 47:2
71:6 108:5
mark 70:13 75:1
marked 8:14
26:10 28:15
31:5 66:7
84:15 93:1,10
95:10,18 97:6
98:14 100:7,8
101:1
marks 101:3
mark-up 88:10
92:18,20
marriage 69:20
70:5,10 71:5
72:17 73:3,8
74:1,2,11 76:1
76:5,7 89:11
110:12 112:6
114:6 116:1
married 111:13
114:7
Maryland 23:19
62:21 79:5,8
79:17 80:2,4
80:12

Maryland's
79:11
Mass 78:15
Massa 102:10
Massachusetts
22:10 79:18,20
101:21 102:3
material 31:1
84:11
materials 4:18
14:12 24:20
28:20 40:7
83:16 92:21
98:12,15 99:5
109:13
matrimonial
7:12 13:16
15:6 17:6,9
23:15,16 24:2
24:11 34:21
35:14 37:13
38:9 55:18
62:5 82:2
116:10
matrimonial-r...
7:8
matter 9:14 11:9
17:16,18 23:12
23:15,16 24:13
31:21 54:8
73:17
matters 7:12
23:9
maximum 45:20
McDiarmid
108:9,12,16
MD 1:20 2:6,7
78:13
mean 30:10,11
36:18 47:21
48:5 52:13
53:16 60:11

67:11 70:6
74:12 75:5
77:10 80:17
88:2 113:9,11
113:19
meaning 29:7
36:19 52:5,7
55:21
means 46:13
76:2 78:18
meant 37:2
mechanics 8:18
mediation 63:8
medical 24:14
24:14
meetings 13:21
member 17:12
18:16 22:9
memory 58:20
76:14
men 22:18
mention 87:3
mentioned
53:20 69:11
mentioning 80:1
Meredith 2:10
25:3 54:8
meriting 103:8
met 11:19 13:14
middle 23:1
mind 55:8
115:17
mine 94:2 101:1
minimum 50:8
minor 110:16
minute 8:14
51:12,14
116:17
minutes 31:18
42:15,19,20,21
43:5 85:11
116:18

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

missed 32:13
misspoke 72:9
  109:17
misstatement
  9:9
mistake 20:1
modification
  89:20
moment 28:14
  105:20 106:6
moments 27:9
  46:2
money 115:11
monies 35:19
morning 4:8,9
motion 17:21
  23:10 115:6
motions 23:11
  23:13
moved 56:10,10
  56:21 62:21
  74:18 88:21
mwerner@rd...
  2:11
M-A-S-S-A
  102:10
M-C 108:9

___ N ___
name 33:17 34:2
  34:12 56:4
  100:11
narrow 38:16
  62:1,4
nature 13:7
  16:11 47:4
  76:16
near 45:18
necessarily
  37:19
necessary 79:18
need 25:13,16

25:19 32:1,2
46:15 48:10
55:7 56:19
57:15 59:21
60:12 62:16
74:12 90:1
98:11
needed 17:21
  30:4,21 33:8
  61:1 62:18
  63:10 67:2,5
  80:5 94:11
needs 54:14
  59:11 110:15
negotiated 7:14
negotiating 8:2
Negotiations
  56:21
never 5:1 11:18
  11:19 13:14
  17:15 18:16
  23:10,12 61:6
  61:8 104:10
new 5:9 6:10,12
  6:13 7:3 17:10
  17:18,19 20:13
  21:12 22:19,20
  23:4 36:19
  37:4,18 38:8
  38:12 39:11
  42:5 45:11
  47:20 48:8,16
  49:17 53:21
  54:1 56:10,10
  56:21 57:3,4,6
  57:11,12 59:10
  60:2 61:16
  63:15,17 69:8
  74:6 75:1,14
  79:3 84:20
  89:9 103:2,7
  103:17,21

104:11 106:3,5
106:7,9,13
107:4 108:18
109:4 111:5
112:4,18
113:17
news 36:12
nice 77:4
nine-page 30:12
nisi 103:16
Nobel 35:16
  36:3 68:8
  70:17 71:8,19
  71:20,21 72:5
  72:7,13,18
  78:1 102:14
noncelebrity
  39:13
nonmarital 57:9
Nope 13:15
normal 8:18
normally 44:18
notarial 118:16
Notary 1:14
  118:3,20
notations 49:5
  88:11
note 63:16 66:1
  89:2 92:8
noted 109:18
notes 3:10 20:11
  20:20 21:5
  28:8,12,14,21
  29:4,10 30:13
  31:3,20 32:4,7
  32:8 42:13
  46:2,3 49:9
  51:5 52:1,3,17
  52:20 53:2
  58:2,19 59:3
  62:14 63:17
  64:9 65:15,17

65:18,20 66:2
66:3 70:12,15
74:5,13,19
76:15 77:1
82:6,10 98:5
116:16
notice 13:8
notion 48:7 49:2
  61:16,19
November 1:12
  118:17
No.VA 1:20
Ns 21:3
nullity 104:6
number 31:21
  38:14 40:2
  50:8 54:3
  76:17 91:21
  97:8
numbered 51:11
  84:17
numbering 26:9
numbers 49:7
N.W 1:13 2:15

___ O ___
object 37:20
  38:3 41:14
  44:3 60:19
  69:1 77:17
  78:5 86:2
  88:13 103:16
  105:7 115:14
  116:2
objection 43:3
  43:13 44:8
  86:4
obligation 61:13
obligations
  60:20
obviously 9:9
  21:21 85:4

91:12
occasion 5:5
  9:19 52:19
  64:8
occasionally
  87:4
occupation
  110:13
occur 5:8 114:13
occurred 19:9
  58:19 115:3
occurrence 9:19
October 35:18
  69:13 109:14
  109:19 110:2
  111:6 112:21
offense 25:13
offhand 69:16
  107:8
office 12:16 13:7
  87:18,21 88:2
oh 56:16 62:15
  63:6 67:15
  78:19 92:2
  105:5
okay 9:12 12:19
  13:1,3,12
  14:19 15:12
  17:2,15 21:21
  22:5 24:17
  27:13 28:8
  33:14 36:17
  41:8 42:20
  43:6 44:10
  45:5 46:1,6,14
  48:15 49:8
  50:16,19 51:18
  52:18 53:1,12
  56:20 58:18
  61:5,12 66:15
  69:10,20 74:4
  74:17 76:11

Deposition of Catherine Ross, Esq
Taken on November 14, 2007

Page 131

82:16 83:3,19
84:4 90:13,15
91:8 92:2,15
93:19 95:2,18
96:9 100:8
105:10 106:10
113:14
older 112:7
oldest 52:12
Oldham 81:19
81:21 82:1
omitted 88:17
Once 5:4
ones 82:20 96:1
96:15 97:1
on-line 81:10
82:7,12
OP 50:4
opening 87:6
opinion 10:19
11:5,6 30:6
37:19 38:9
40:17 42:1
50:3 57:19
58:5 59:9 60:2
61:7 62:10
63:8 68:11
71:12,13 74:8
80:11 84:12
89:5 92:11,14
95:20 96:6
98:13,21
100:12 101:21
103:2 104:3
107:13
opinions 37:10
38:6,7,10
40:15,18 42:8
58:7 64:20
99:12 103:11
104:5,12
opportunity

110:18
opposed 7:20
30:18 69:8
114:8
opposite 7:21
options 70:17
oral 4:2 32:19
98:20,20
Orally 33:3,4
oranges 109:2
order 26:8 41:18
51:8,9,10 52:8
52:10,11
organize 67:1,5
origin 24:21
original 3:16
57:15 58:11
originally 29:19
outcome 69:7
118:15
outcomes 21:10
outline 64:10
outlines 20:11
33:2 65:4
outside 45:1,17
47:19
overall 109:2
overly 103:15
oversight 86:15
overturned
104:11
overview 53:7
O-L-D-H-A-M
81:21

_____ P _____

P 46:19 75:9
page 13:5 22:20
26:15 27:16
29:2 37:3
40:17 59:7
63:21 86:20

87:16 88:17
92:3,3 102:4,5
102:20 107:20
108:1 109:10
pages 30:12,18
63:21 64:4
paid 44:14,16
paper 42:13
49:14 99:10
paragraph
85:18 88:20
92:9 94:5
102:7 103:7
paragraphs
24:19 101:4
pardon 77:7
94:8 110:5
part 12:12 26:2
60:7,8 61:17
73:6,10 99:18
113:15
participated
24:9
particular 81:7
87:9
particularly
48:4 77:15
79:5 80:13
parties 53:7
110:15 111:11
111:16 114:1,7
118:13,14
partner 91:20
partners 75:10
75:11
party 5:2 7:21
32:15 77:13
111:7
party's 111:6,8
112:4,10
passed 73:2
Patents 70:18

pathetic 76:16
Paul 7:3 22:13
payoff 71:5
peculiar 78:16
pen 66:14,17
penalties 4:4
Pennsylvania
18:3,14,17
80:8
penultimate
90:10
people 23:6
34:15 36:12
44:17 72:1
75:7,12 98:21
105:18
people's 76:12
percent 45:3,16
perfectionist
91:16
performed 71:4
period 18:6
27:19 44:7
45:6 53:4 73:1
73:8 89:15,16
114:9 115:20
periods 43:8
perjury 4:4
person 27:5
76:7
personal 26:5
personally
118:5
pertinent 63:3
phone 11:19
29:5 33:3,4
49:8,15 63:18
photocopying
66:11
photographs
98:5
pick 44:18

picked 82:7
piece 42:12
49:14 72:2,20
pieces 42:13
67:6 71:21
85:17
piggyback 75:13
place 118:6
Plaintiff 1:5 2:9
4:3 26:6
play 16:8 105:11
played 5:13
pleadings 40:9
please 14:4,7
20:8 28:21
40:1 57:2
62:13 74:4
87:1 117:6
pleased 117:1
point 26:18 36:1
41:13 42:14
47:11 48:14
68:8 78:9
83:21 88:15
94:3 98:4
108:15 112:13
pointed 101:7
points 47:8
point-by-point
47:14
popped 80:12
portion 22:2
position 18:10
104:4
positive 59:5
possible 38:4
post 73:8 115:6
Post-it 42:13
pottery 72:12
practically
115:7,8
practice 7:11

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

| | | | | |
|---|---|---|---|---|
| 18:1,13 23:11 | previous 69:13 | production 3:11 | 99:6,9,18 | 55:11,12,15 |
| 25:21 30:2 | 69:14 | productivity | 100:15 | 57:10 59:6,7,8 |
| 31:14 61:8 | previously 4:20 | 72:14 | **Provisions** | 59:13,19 60:7 |
| 115:9,18 116:9 | 9:14,17 | professional | 110:15 | 60:8 61:9,17 |
| 116:13 | print 82:13,17 | 17:9 35:5 54:6 | Ps 75:3,9,10,19 | 61:20 67:9 |
| practiced 6:17 | printed 82:14 | 55:5 70:9 75:3 | psychiatric 23:7 | 69:2,5,19 |
| practitioner | 82:20 83:1,20 | 75:8,14 76:4 | 23:7 | 70:13 72:7 |
| 63:20 | 85:1,8 88:5 | 89:12,13,17 | public 1:14 23:7 | 73:11,19 76:1 |
| preamble 8:18 | 93:2 96:5,15 | 108:4 | 25:16 118:3,20 | 77:7,18,19 |
| preceded 87:12 | 96:20 | professor 18:2,4 | publication | 101:3 103:19 |
| 103:3 | prior 6:20 26:4 | 18:20 19:2,4,8 | 99:10 | 103:20 106:15 |
| predominantly | 63:11,14 76:1 | 19:14 22:7 | publications | 107:3,14 |
| 7:8 | 76:4 84:18,21 | 44:19,20 84:5 | 15:13,14 | 113:15 |
| pregnant 23:3 | 90:9 91:5,7 | 91:20 | published 35:8 | questions 25:11 |
| preliminary | 102:15 111:17 | progress 11:2 | 38:10,13 68:12 | 49:10 59:19 |
| 30:6,10 64:10 | 111:18 113:12 | 85:3,6 | 93:6 103:12 | 62:5 74:20 |
| premarital 71:9 | prisoners 24:9 | project 43:7 | pulled 36:10 | 79:3 90:3,16 |
| **PREMARKED** | prius 103:16 | 84:7 | 49:14 83:21 | 96:4 117:2,4 |
| 3:5 | prize 35:17,19 | projected 21:9 | 98:17 | quick 97:15 |
| preOctober | 36:3 46:16 | pronounce | pure 55:10,12 | quickly 62:18 |
| 110:1 | 47:2 68:8 71:9 | 101:16 | purely 35:2 | 96:19 |
| preparation | 71:19,20,21 | pronounced | 55:14 | quiet 76:19 |
| 23:2 29:5 | 72:5,7,13,18 | 102:21 | purposes 44:15 | quite 16:14,18 |
| 80:11 | 78:1 102:15 | pronouncing | pursued 89:1 | 23:11 50:11 |
| prepare 9:4 28:4 | pro 6:2,5 17:16 | 102:21 | put 34:9,12 39:6 | 79:2 85:4 |
| prepared 4:18 | 17:18 24:13 | property 15:9 | 39:8 51:10 | 94:18 114:10 |
| 14:13 20:10 | probably 14:17 | 15:10 46:19 | 64:11,16 75:3 | quote 79:1 |
| 24:12 25:5 | 15:7 20:2 36:9 | 47:2 65:8 71:6 | 78:20 84:12 | quoted 102:2,9 |
| 98:6 | 81:18 97:21 | 108:5 109:3 | 89:13 92:3 | |
| present 19:13 | problem 21:20 | prospects | 101:2,11 115:4 | **R** |
| 31:19 71:15 | proceeded 69:8 | 104:18 | putting 59:17,19 | R 101:19 |
| presentation | proceeding 59:7 | provide 26:12 | 101:19 115:11 | raised 105:1 |
| 20:10 | proceedings | 26:17 27:19 | P.A 2:4 | random 51:9 |
| presentations | 118:11 | 83:1 100:1 | | range 16:18 |
| 14:13 16:11 | process 113:3 | 110:9 | **Q** | 57:21 |
| 17:2 21:8 | prodigious | provided 23:6 | quadrant 87:17 | rate 44:11 50:19 |
| presented 14:20 | 72:14 | 24:20 26:21 | qualifications | 50:20 51:2 |
| presumably | produce 65:20 | 27:18,20 28:20 | 67:9,13 | reach 67:20 68:2 |
| 68:14 | 98:12,15 | 40:8 41:8 | question 10:14 | 74:10,13 |
| pretty 67:3 | produced 28:11 | 64:14 82:20,21 | 14:4,7 20:9 | reachable 54:12 |
| 97:18 | 85:7 96:8,14 | 83:17 90:4 | 24:3 36:18 | read 34:15 35:9 |
| prevailed 75:21 | 97:21 | 92:21 98:8 | 38:3 47:5 55:2 | 46:5,7 58:12 |

Deposition of Catherine Ross, Esq
Taken on November 14, 2007

| | | | | |
|---|---|---|---|---|
| 65:7 67:16 | 7:18 10:1 | relations 23:19 | 105:6,9 | respective 77:19 |
| 76:19 83:10,12 | 54:19 84:3 | relationship | represent 4:11 | respond 22:4 |
| 83:14 117:5 | recommended | 10:17 12:20 | 22:10 71:2 | 87:2 |
| 119:4 | 33:16 | 106:19 | representation | response 25:2 |
| readable 46:4 | record 51:16 | relatively 43:21 | 6:3,21 24:6 | 100:1 |
| 101:10 | 58:21 83:9 | 61:9 | representative | responsibility |
| readily 22:1 | 86:15 92:17 | released 23:6 | 8:10 | 55:6 |
| reading 47:18 | 101:2,11 | relevant 38:6 | represented | rest 54:16 58:12 |
| 69:21 70:1 | 113:10 116:21 | 110:11 | 5:21 6:5 7:20 | 62:13 |
| 73:16 76:20 | 118:11 | relied 80:7 | 17:15 56:6 | restrictions |
| realize 14:6 | recorded 118:10 | relies 107:6 | representing | 44:21 |
| really 7:21 | redacted 25:6 | rely 99:16 | 9:11 61:13 | result 47:17 |
| 21:14 30:19 | redrafts 92:1 | relying 38:17 | 72:6 | 57:21 77:6 |
| 62:17 63:13 | reduce 32:2 67:7 | 40:14 | reprimand | 112:5 |
| 65:1,5 73:10 | refer 9:7 31:4 | remainder 74:4 | 25:17 | results 68:2 |
| 76:8 79:20 | 62:1,10 70:15 | remains 108:16 | reproductive | retain 32:8 |
| 91:13 96:3 | reference 46:20 | remember 13:20 | 24:14 | 65:15 |
| 103:14 104:1,2 | 56:3 81:20 | 58:4 69:15,16 | reputation 70:8 | retainage 32:13 |
| 111:13 | 107:18 | 79:9,20 80:1 | 72:2 | retained 4:13 |
| reason 66:9 | referenced | 88:9 109:9 | request 3:11 | 9:10 10:5 |
| 78:20 115:10 | 15:12 | reminded 36:11 | 22:3 25:3 | 11:16 29:20,20 |
| reasonable 58:1 | referencing | 72:18 | 99:19 | 32:18 43:12 |
| reasoning 68:3 | 108:2 | report 3:13 27:7 | requested 26:12 | retaining 62:3 |
| 104:10 | referred 11:18 | 34:11 60:15 | 26:16 32:6 | retract 72:9 |
| reasons 73:14 | 62:14 | 68:4 69:11,12 | 44:17 | return 5:6 |
| recall 6:11 11:15 | referring 75:9 | 80:2 100:9,10 | required 31:16 | returned 84:20 |
| 14:19 20:16 | refers 99:11 | 109:9 | requirement | review 9:3 51:12 |
| 29:19 30:9 | reflect 87:8 | reported 1:21 | 45:2 | 61:1 96:18 |
| 34:17 35:17 | refreshed 58:20 | 2:20 22:20 | research 16:15 | reviewed 40:9 |
| 64:1 79:21 | refreshing 76:14 | 37:9,19 38:6,7 | 16:17 28:10 | 58:20 98:6 |
| 80:4 81:8 | regard 75:13 | 38:15,17 39:11 | 34:13,14 41:6 | reviewing 4:17 |
| 96:20 109:15 | regarded 15:7 | 58:5,6 103:11 | 67:2,4,5 80:14 | 28:9 64:20 |
| received 11:11 | regarding 21:10 | 104:3 | 80:18 81:9,15 | rewarded 71:3 |
| 11:13 19:7 | 23:5 26:13 | REPORTER | 81:16 83:8 | RICHARD 2:12 |
| 22:18 101:13 | 57:1,20 108:21 | 14:3 19:19 | 84:5 85:18 | Rick 25:3 29:6,7 |
| receiving 11:5 | regime 109:3 | 20:8 117:5 | 107:9 113:5 | 29:8 32:21 |
| recess 95:16 | relate 50:6 | reporting 1:19 | researched 48:7 | 46:15,21 48:2 |
| 116:19 | related 20:11 | 98:18 | researching | 48:21 52:21 |
| recognizes | 25:20 35:4 | reports 13:10 | 61:7 85:19 | 53:14,16,17 |
| 57:12 71:21 | 107:10 118:14 | 27:4 40:21 | residence 45:11 | 56:18 58:3 |
| recollect 36:5 | relates 35:13 | 49:18 73:16 | 77:3 | 62:15 70:4 |
| recollection | 99:11 | 76:18 88:17 | residency 75:16 | 94:9,12,21 |

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

99:2
Rick's 54:2 57:9
  60:6
Rifkind 7:3
right 5:15 17:19
  46:17 53:12
  55:1 70:1,1
  76:13 90:16
  94:6 97:7 98:3
  106:10 109:18
  109:20 111:9
rights 8:20 16:8
  24:10
right-hand 29:2
  40:3 46:14
  87:17
Rita 1:7 4:12 9:4
  55:17 57:4
  84:10 90:5
  91:6 93:14
  115:10,16
Rita's 55:21
  57:13
RJL 1:6
road 71:6
roles 36:13
room 16:12 88:8
Ross 1:11 2:14
  3:2,5 4:1 12:10
  118:5 119:3
roughly 33:1
  43:19 45:4
round 43:5
route 47:18
routine 112:2
rsimpson@rd ..
  2:13
Rt 2:6
rules 100:4
runs 87:1

————— S —————

s 79:10
sarcasm 77:7
sat 88:7
satisfied 90:20
savings 6:7
saw 12:7 13:4
  49:18 90:8
saying 16:4
  19:13 55:6
  59:17 64:14
  74:14,18 76:3
  77:21 79:16,17
  86:6 87:10
  116:7
says 46:5,8,9,14
  46:15,17,18
  50:3 53:12
  55:19 56:11
  57:6 63:13
  78:13 89:3
school 18:7
  23:18 33:13
  88:3
schooling 75:16
scope 10:12 32:6
  37:5 47:19
  115:15
screen 85:4
sculpted 95:6
seal 118:16
sealed 37:14
  38:9 103:16
search 102:13
  103:11,16
searches 81:16
seasonably
  99:21
second 24:17
  27:11 48:4
  74:19 86:11
  87:3 102:7
Secondly 71:20

secretaries
  56:20
secretary 28:7
section 13:19
  14:9 69:12,13
  107:12 109:8
  109:11,14
  111:5,17,18
  112:4,18
security 5:6
see 26:15 27:11
  29:12 32:12
  42:2 45:10
  57:15 58:8
  63:12 64:18
  90:9 92:20
  101:8
seeing 4:17
seeking 11:14
seen 26:10 108:6
seminar 15:20
seminars 14:1
  16:9
send 13:20
senior 18:10
sense 65:11
sent 34:18 90:10
  90:14 93:12
  94:9
sentence 103:6
separate 77:20
  85:16 115:12
separation
  114:9 115:21
sequence 13:3
  51:7 52:2,4
  64:2
serve 9:16
served 9:21
  44:13
service 98:18
services 23:5

39:13 81:2
Serving 1:20
sessions 14:8
set 52:16 118:6
settled 11:4 57:4
  57:18 58:6
  68:13
settlement 11:13
  42:2,4 47:4,7
settlements 7:14
Seven 7:6
share 32:3
shared 40:18
  42:3 49:12
sheaf 26:21
sheet 119:7
sheets 52:10
shelters 22:18
shepherdization
  82:10 85:13
shepherdize
  64:21
shepherdized
  82:9
shocked 72:12
short 30:10
  116:14
shorthand 46:11
  46:13 70:7
shot 106:16
show 39:21
  47:16,18,19
  84:15
showed 11:12
  50:10
sic 67:12
side 11:12 49:19
  50:5 101:3
sides 76:21
sign 117:5
Signature
  119:12

signed 119:7
significance
  97:19
significant 98:1
  68:2
significantly
  45:19
similar 47:17
  68:2
similarly 104:21
simple 59:8,9,20
  60:1 61:9
  106:14
simply 94:12
Simpson 2:12
  22:3 27:10,13
  27:15,17 29:7
  29:8 37:20
  38:2 41:14
  43:3,13 44:3,8
  48:18 51:18
  52:12 56:15
  58:13,17 60:19
  69:1 77:17
  78:5 80:16
  81:15 86:2,7
  88:13 92:15
  93:9 95:13
  97:9 99:2
  100:3,18 101:7
  103:18 105:7
  106:18 115:14
  116:2,18 117:3
  117:6
sir 41:3 92:10
six 14:17 34:11
sixth 26:15
skills 110:14
small 11:17 38:8
  38:14 42:12
Smith 1:14,21
  2:20 118:3,19
smudges 101:8

5

Deposition of Catherine Ross, Esq
Taken on November 14, 2007

Page 135

| | | | | |
|---|---|---|---|---|
| somebody 10:9 | 89:18 | 118:10 | 88:14 89:8 | 103:20 105:14 |
| 55:9 59:18 | Spring 115:12 | stickies 32:10,11 | suddenly 92:3 | 105:16 |
| somewhat 94:13 | Stade 89:9 | stickler 104:3 | sued 25:20 57:3 | surprised 61:4 |
| son 34:5,18 | standard 57:10 | Stiglitz 1:4 4:12 | 57:4,6 | surprising 76:10 |
| sorry 14:2 19:11 | 57:19 112:15 | 33:19 34:7,11 | suffered 91:21 | Susan 1:14,21 |
| 67:21 70:2 | 112:19 | 35:9 47:1 48:9 | sufficient 30:21 | 2:20 118:3,19 |
| 89:9 95:4 | standards 54:21 | 56:1,3,6 57:11 | suggest 74:20 | suspension |
| sort 31:11 34:10 | stands 54:14 | 71:8 89:1 | suggested 94:12 | 25:17 |
| 52:2 53:7 | 59:13 | 94:15,15 | 94:21 | sworn 118:7 |
| 66:21 | stapled 86:8 | 105:21 113:16 | suggests 74:1 | system 11:3 |
| source 41:17 | start 14:4 67:6,6 | 115:11 | suing 56:1 | S-T-A-D-E |
| 42:7 | 84:20 86:18 | Stiglitz's 65:10 | suit 7:17 | 89:10 |
| sources 31:10 | 115:11 | 104:21 | sum 41:4 | |
| 40:10,13 | started 65:2 | stock 70:17 | summaries | T |
| 110:13 | 78:13 82:7 | stop 90:2 | 34:13 | tact 46:6 |
| so-called 39:15 | starting 65:6,11 | Street 1:13 2:15 | summarize 41:4 | take 8:13 22:3 |
| span 30:15 | starts 86:19 91:3 | 34:16 | summarized | 25:13 44:20 |
| speak 84:4 | state 15:18 | structure 47:12 | 62:7 | 51:2,17 59:20 |
| speaking 63:16 | 18:13 20:13 | 64:12 | summary 25:9 | 72:12 77:2 |
| special 75:15 | 82:3,3 107:2,4 | student 24:7,13 | 30:11,12 31:3 | 78:7 81:9 |
| specific 27:8 | stated 58:21 | 84:5 | 82:1 94:3,6 | 92:12 94:13 |
| 71:21 | 83:9 | students 16:14 | supervised | 95:13 97:5,15 |
| specifically | statement 3:8 | 16:17 | 16:14 | 104:17 108:18 |
| 10:18 16:16 | 39:19 40:4 | studies 15:4 | supervision | 111:3 112:2 |
| 53:9 88:9 | 41:2 53:10 | study 16:11 | 16:15 | 116:14 |
| 107:6 112:14 | 59:3,15 60:6 | stylistic 88:11 | supplement | taken 1:12 4:21 |
| 115:13 | 61:15 67:10,12 | 89:21 | 21:15 41:19 | 51:19 64:9 |
| spectrum 15:5 | 67:15 68:4 | subject 38:11 | supplemented | 76:17 95:16 |
| Spell 81:20 | 103:10,15 | 108:5 111:20 | 30:7 | 116:19 |
| spelling 21:1 | states 1:1 79:1 | subjects 99:12 | support 99:16 | takes 108:20 |
| spending 60:16 | stating 53:10 | submissions | 108:11 | 115:3 |
| spent 64:18 | status 8:7 20:13 | 115:6 | supports 57:8 | talk 8:21 33:4,8 |
| 85:12 | 21:11 38:15 | subscribe 81:2 | suppose 104:2 | 54:10 62:19 |
| spoke 32:21 | 39:1,3,9 48:8 | subsequent | sure 21:3,4,16 | 79:17 109:5 |
| 47:1 49:8 | 57:12 74:6,16 | 90:11 | 21:19 26:19,20 | talked 30:5 |
| spoken 14:2,8 | 74:21 76:1,4,8 | subspecialty | 27:1 28:15 | talking 16:20,21 |
| sponsored 14:8 | 78:3 103:8 | 15:6 | 36:9 49:3,11 | 30:9 37:9 |
| spouse 8:2 38:21 | 104:16 105:15 | substance 91:19 | 51:15 58:9 | 106:7,8 |
| 39:12,14,15 | 106:8 | 94:19 | 60:5 63:13 | task 51:6 |
| 104:15 | statute 112:8,9 | substantial | 65:1,2,5 67:3 | taught 15:16,18 |
| spouses 8:3 | 113:17 114:10 | 89:19 | 78:13 85:20 | 15:19 18:8 |
| 75:12 77:14,20 | stenographica... | substantive | 87:7 97:4 | taxability |

Corbin & Hook Reporting and Videoconferencing
410-268-6006  1-866-337-6778

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

Page 136

| | | | | |
|---|---|---|---|---|
| 112:17 | 21:21 | 43:14,19 80:5 | **topics** 16:19 | 93:15 107:3 |
| **taxation** 111:19 | **thank** 19:21 | 86:10,16 89:13 | 20:18 | **turn** 26:14 |
| **teach** 15:15,17 | 27:13,17 28:8 | 94:18 105:4 | **total** 32:9 41:4 | **turned** 30:8,21 |
| 15:17,20 20:19 | 29:18 40:20 | 113:16 | 42:7 | **two** 8:20 21:3,6 |
| 45:13 | 52:9 54:16 | **thoughts** 48:1,3 | **totaled** 42:14 | 43:12 44:12 |
| **teacher's** 21:17 | 56:16,18 58:16 | **three** 39:11 | **totality** 66:1 | 45:7 46:15 |
| 21:18 22:1 | 66:20 67:15 | 43:12 52:10 | **totally** 9:2 60:5 | 47:8,13,18,21 |
| **teaches** 12:6 | 70:11 75:11 | 67:13,14 77:5 | 81:10 | 49:10,19 55:13 |
| **teaching** 18:7 | 89:6 90:15 | 96:10 | **tough** 42:21 | 62:6 67:13 |
| 20:15 21:9 | 94:8 95:15 | **throw** 36:14 | **train** 77:1 88:6 | 69:6 77:19 |
| **tell** 4:4 28:21 | 97:2,12 100:5 | **Thursday** 54:10 | **training** 89:14 | 84:19 86:9,11 |
| 32:17 33:10 | 101:19 102:6 | 54:11 64:13 | **transcript** 3:16 | 86:16 95:20 |
| 40:13 51:6 | 102:19 107:21 | 93:17 | 118:11 | 104:11 |
| 52:1,19 53:9 | 109:11 117:3 | **time** 5:19 9:13 | **transcription** | **two-page** 30:11 |
| 63:2 64:8 | **thing** 31:11 38:5 | 10:16 12:1 | 119:5 | **two-week** 44:7 |
| 73:13 76:2 | 53:7 111:13 | 14:15 18:5 | **transmitted** | 45:6 |
| 78:17 81:14 | **things** 9:1 26:16 | 19:3,20 27:19 | 13:9 | **typically** 25:12 |
| 93:7,19,21 | 26:19 34:15 | 31:10,18 33:7 | **traveling** 87:20 | |
| 96:13 | 38:4 44:12 | 41:16 43:9 | **trial** 23:1,10 | **U** |
| **telling** 47:1 53:6 | 50:1 58:2 66:6 | 44:1,7,13 45:3 | 51:3 58:1 | **Uh-huh** 8:16 |
| 58:3 59:11 | 66:10,15 67:7 | 48:18,19 50:19 | 68:13 71:14 | 12:14 27:3 |
| 96:9 | 70:18,21 71:2 | 52:2 53:3 | 72:6 73:18 | 31:6 53:8 |
| **tenant** 9:14 | 81:18 | 66:16,18 68:12 | 99:17 100:2 | 70:14 |
| **tend** 15:4 43:7 | **think** 25:20 | 73:2,7 77:5 | 103:16 114:2 | **ultimate** 57:21 |
| **tends** 72:1 | 29:21 33:5 | 89:15,16 99:20 | 116:4 | 114:8 |
| **tenure** 19:7 36:7 | 36:15 38:20 | 113:2 115:4 | **tried** 10:3 22:17 | **ultimately** 47:15 |
| **tenured** 19:2,8 | 46:21 54:9 | 118:6 | 22:21 75:13 | 71:13 72:13,19 |
| **term** 18:8 | 62:19 65:13 | **timeframe** 64:17 | **trivial** 110:4,6 | **unable** 23:3 |
| **terms** 11:13 | 66:17 67:3 | **Times** 22:20 | **TRO** 6:7 | **unclear** 89:3 |
| 16:1 26:8 31:9 | 73:19 74:14,19 | **timing** 46:16 | **true** 37:21 71:21 | **underline** 66:1 |
| 47:6 48:1 67:1 | 87:10 89:19 | 47:3 68:16 | 77:16 79:4 | 66:13 |
| 76:12 79:10 | 98:19 101:10 | 69:9 | 102:12 104:1 | **underlying** |
| 85:1 87:4 | 109:6 113:20 | **today** 71:4 97:1 | 106:10 118:11 | 40:21 56:4 |
| 113:1 | 116:15 | **told** 43:19 54:4 | 119:5 | **underneath** |
| **testified** 4:5 | **thinking** 47:11 | 54:19,20 55:17 | **Trunnell** 2:4 | 86:11 95:19 |
| 9:13 | 47:11 49:11 | 99:1 105:3 | **truth** 4:4 | **understand** 4:13 |
| **testify** 51:3 | 67:1 | **tools** 80:15 | **try** 8:21 22:14 | 26:7 40:7 |
| 99:13 | **third** 29:21 33:1 | **top** 26:14 52:5 | **trying** 14:5 | 45:10 59:2 |
| **testifying** 9:13 | 43:19 53:3 | 53:12,21 54:10 | 30:19 42:12 | 60:12,20 67:18 |
| **testimony** 24:12 | 92:9 | 60:11 94:7 | 43:15 63:12 | 87:10 94:16 |
| 99:16 119:4,6 | **Thomas** 82:1 | **topic** 14:19 16:2 | 66:11 67:4 | 97:20 111:12 |
| **textbook** 21:18 | **thought** 34:7 | 21:5 | 81:1 91:17 | **understanding** |

*Deposition of Catherine Ross, Esq.*
*Taken on November 14, 2007*

| | | | | |
|---|---|---|---|---|
| 61:10 | 108:13 | 90:18 92:12 | went 7:13 23:10 | 54:15,16 55:7 |
| understood | venture 72:15 | 94:13 95:5,13 | 23:18 31:10 | 56:16 118:16 |
| 60:14 93:11 | Vermont 72:12 | 97:4 102:19 | weren't 7:21 8:1 | won 5:11,14 |
| unearthed 96:10 | version 86:18 | 107:16 116:16 | Werner 2:10 | 71:19 72:13 |
| unfavorable | 87:9,12,13 | wanted 10:19 | 54:8 | word 70:1 89:9 |
| 57:13 | 90:7,9,10,17 | 24:21 30:20 | West 15:14 | words 45:4 |
| unified 15:1 | 90:21 91:1,3 | 33:5,6,7 49:9 | 80:20 | 47:14,19 52:11 |
| uninterrupted | 92:17,19,21 | 50:8 53:21 | we'll 22:3 27:9 | 68:13 83:3 |
| 77:5 | 93:4,5,18 94:9 | 55:12 61:18 | 28:17 58:14 | work 31:8,19 |
| Union 24:16 | 97:3,20 101:10 | 64:19 87:3 | 86:12 90:15 | 40:6 43:7 |
| unique 47:19 | versions 95:20 | 88:21 89:18 | 92:11,13 95:11 | 44:17,18 45:1 |
| 75:1 | versus 56:1 73:8 | Washington | 100:8,10 | 45:6 46:16 |
| unit 112:11 | 85:14 102:10 | 1:13 2:16 88:4 | we're 16:20 | 50:12,21 55:5 |
| UNITED 1:1 | Videoconfere... | wasn't 10:9 55:8 | 59:18 74:9 | 67:6 69:20 |
| universe 41:19 | 1:19 | 61:17 63:3 | 98:2 106:6 | 71:4,8,9 72:1,2 |
| university 18:3 | view 48:8 71:16 | 69:2 72:8 | we've 12:9 | 72:3,16,19,20 |
| 18:9 34:4 | 72:4 98:11 | 73:11 87:6 | 27:18 32:6 | 73:2 74:1 |
| 44:21 81:4 | 106:18 | 108:14 111:17 | 41:19 93:18 | 84:20 85:3,6,7 |
| 88:4 | views 84:6 94:20 | way 8:17 16:7 | 95:8 96:2 | 87:6 89:17 |
| unnecessary | Virginia 79:12 | 20:16 31:8 | 97:12,13 | 101:14 |
| 94:14 | visibility 72:15 | 35:13 39:4,7 | 101:15 105:19 | worked 8:9 |
| unreported | 72:17 | 40:14 47:12 | Wharton 7:3 | 16:16 23:1 |
| 104:5 | visiting 18:4 | 51:8 80:6 | Whitworth 2:2 | 31:9,10,21 |
| unsettled 78:21 | 22:6 | 85:21 86:6,10 | 2:4 3:3 4:7,11 | 43:4 87:8 |
| updated 82:1 | vitae 3:6 4:17 | 95:6 98:14 | 22:5 27:14,16 | 99:11 |
| upper 46:14 | 74:3 | 100:17 101:11 | 51:17 56:18 | working 18:11 |
| 87:16 100:16 | vocational | 101:16 102:21 | 58:10,16 80:18 | 39:20 54:8 |
| up-to-date | 110:14 | 112:12 113:19 | 86:5 92:12 | 66:17 85:16 |
| 61:11 97:18 | Voice 89:10 | 118:14 | 93:11 95:15 | 87:21 |
| use 26:18 28:7 | volunteered | ways 10:16 | 100:5,20 | World 36:8 |
| 55:9 80:15,16 | 49:16 | 71:16 77:20 | 116:14,21 | worse 101:1 |
| 81:6 | Von 89:9 | Wednesday | wide 7:10 | 113:16 |
| usually 15:20 | vs 1:6 | 1:12 | wife 105:2,3 | wouldn't 13:11 |
| utilized 35:10 | V-O-N 89:9 | week 30:1 33:1 | 106:2 | 17:21 21:14 |
| | | 43:20 44:7 | Williams 102:10 | 102:15,18 |
| **V** | **W** | 45:4 53:3 | willing 50:16 | write 65:18 |
| V 56:3 | W 54:14 | weekend 88:1 | win 71:20 | 78:13 83:2 |
| valid 94:18 | Wall 34:16 | weeks 34:11 | winner 35:17 | 85:18 |
| value 71:4 | want 4:18 14:4 | 43:12 44:1 | 36:4 | writing 32:2 |
| 111:19 114:15 | 21:1 26:18 | Weiss 7:3 22:13 | witness 4:2 | 46:4 63:8,17 |
| 115:2 | 27:1 64:11 | well-positioned | 19:21 27:6 | 67:7 70:20 |
| variety 7:10 | 67:16 86:14 | 77:15 | 38:1 44:13,15 | 85:14 |

*Deposition of Catherine Ross, Esq*
*Taken on November 14, 2007*

| | | | | |
|---|---|---|---|---|
| 27:4,7 34:7 35:9,13 60:15 72:11 87:16 99:4,10 **wrong** 12:8 68:7 **wrote** 25:2 49:10 54:10 92:1 94:1 | 59:10 60:2 61:16 63:15,17 69:8 74:6 75:2 103:2,7,17,21 104:11 106:4,5 106:7,9,13 107:4 108:18 109:4 **York's** 75:14 | **1991** 103:2 **1994** 108:10 **2** **2** 3:7 47:9 **2nd** 95:10 2/2/07 3:12 2/8/07 3:9 2/9 29:13 2/9/07 3:13 20 45:2,16 98:3 | **3** 3:8 39:19 40:2 40:10,16 102:5 30 76:9 **301 261.0035** 2:8 **31** 62:17 **31st** 63:9 **32** 76:6 | 87:12 91:2,14 93:4,10,18 100:16 87 22:12 **9** 9 3:14 30:18 31:4,8 42:10 50:2,10 107:20 112:4 |
| **Y** **Yale** 24:5 **yeah** 19:17 47:10 59:6 69:18 82:14 87:18 92:3 | **$** $15,000 50:9 $500 50:7 **0** 01 35:18 05-1826 1:6 07 84:16 | 2000 19:10 20:3 102:2,10 20006 2:16 2001 1:13 110:21 111:3 112:9 2001/2002 18:5 2002 109:17,19 | **4** 4 3:3,9 84:16 91:2 95:9,19 102:20 45 42:15,21 43:5 85:11 **45-minute** 77:6 450 2:6 | **9th** 43:11 62:11 64:16 90:8 91:15 92:17 93:5 100:9 939 84:17 91:3 94 22:13 940 94:7 |
| **year** 16:1,1 18:9 19:18 35:21 45:4,15,15,16 69:16 97:21 **years** 5:20 6:1,4 6:20 7:5,6 10:2 13:18 14:17 15:16,20 16:18 20:2,19 34:5 76:6,9 91:21 103:9 | **1** 1 3:6 8:14 19:12 47:8 97:18 10 5:20 6:1,4,20 30:12,17 42:19 42:20 112:14 10-minute 42:17 10-page 29:15 50:2 | 110:1,2 111:6 112:21 115:12 2004 42:5 68:10 69:13 101:21 102:15 109:14 111:14 112:14 2005 19:13 2007 1:12 45:16 118:17 | **5** 5 3:10 28:16 29:3 46:1,5 50:6 64:1 **5th** 86:14,17,19 87:12 90:17 50 43:5 500 50:14 515K 50:6 | 947 92:3,3 948 91:3 949 86:20 87:16 88:17 950 88:20 951 89:7 957 84:17 87:2 96 19:5 960 29:1 52:15 64:6 |
| **yellow** 42:13 66:6,10 **Yep** 102:8 **yesterday** 101:6 **York** 6:10,12,13 7:4 17:10,18 17:19 20:13 21:13 22:19,20 23:4 36:19 37:4,18 38:8 38:12 42:5 45:11 47:20 48:8,17 49:17 53:21 54:1 56:10,10,21 57:3,4,6,11,12 | 10:09 1:13 12 111:14 12:51 117:7 1349 40:3 14 1:12 15 103:9 15,000 50:15 15-minute 42:18 16-910 109:8,21 110:1 18 26:16 27:16 19 109:19 19th 110:2 118:17 1988 103:4 | 2011 2:15 2012 118:21 202-662-203 54:2 202 662 2000 2:17 2101 2:5 21114 2:7 22 99:9 23 60:16 26 42:15 44:6 85:11 29 118:21 **3** | **6** 6 3:11 26:9 27:16 78:9,10 97:9,10,12 98:3 **7** 7 3:12 95:11,19 109:10 7th 63:9 95:9 **8** 8 3:13 84:16 100:9 111:6 8th 64:14 86:18 | 961 52:14,15,19 59:4 962 52:14,15,16 59:3 62:14 963 52:14,16 63:21 64:17 74:5 99 19:5,9 |